# Exhibit 3

1

1

2 UNITED STATES DISTRICT COURT

3 SOUTHERN DISTRICT OF NEW YORK

4 No. 10 Civ. 9308(JSR)

5 -------------------------------------------x

6 BURTON T. FRIED,

7                         Plaintiff,

8           - against -

9 LVI SERVICES, INC., LVI PARENT CORP., CODE

10 HENNESSY SIMMONS, LLC d/b/a CHS PRIVATE

11 EQUITY V LP; APOLLO INVESTMENT CORP.,

12 SCOTT E. STATE, in his official and

13 individual capacities; BRIAN SIMMONS, in

14 his official and individual capacities;

15 RAJAY BAGARIA, in his official and

16 individual capacities; GERALD J. GIRARDI,

17 in his official and individual capacities,

18                         Defendants.

19 -------------------------------------------x

20                         May 23, 2011

                            11:06  a.m.

21

22

23

24

25

**2**

1
2
3
4    VIDEOTAPE DEPOSITION of RAJAY
5  BAGARIA, taken by the Plaintiff, pursuant
6  to Notice, held at the offices of Thompson
7  Wigdor & Gilly, LLP, 85 Fifth Avenue, New
8  York, New York, before Debbie Zaromatidis,
9  a Shorthand Reporter and Notary Public of
10  the State of New York.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**4**

1
2    S T I P U L A T I O N S
3
4    IT IS HEREBY STIPULATED AND
5  AGREED by and between the Attorneys for
6  the respective parties hereto that filing
7  and sealing be and the same are hereby
8  waived.
9    IT IS FURTHER STIPULATED AND
10  AGREED that all objections except as to
11  the form of the question, shall be
12  reserved to the time of the trial.
13    IT IS FURTHER STIPULATED AND
14  AGREED that the within examination may be
15  signed and sworn to before any notary
16  public with the same force and effect as
17  though signed and sworn to before this
18  Court.
19
20
21
22
23
24
25

**3**

1
2    A P P E A R A N C E S :
3
4    THOMPSON WIGDOR & GILLY, LLP
5    Attorneys for Plaintiff
6      85 Fifth Avenue
7      New York, New York 10003
8  BY:  SHAFFIN A. DATOO, ESQ.
9      MATTHEW GORMAN, ESQ.
10
11  SIDLEY AUSTIN, LLP
12    Attorneys for Defendants
13      787 Seventh Avenue
14      New York, New York 10019
15  BY:  JOANNE SELTZER, ESQ.
16
17
18  ALSO PRESENT:
19    BURTON FRIED
20    J.D. MARTINEZ, Videographer
21
22
23
24
25

**5**

1
2    THE VIDEOGRAPHER:  We are on   11:06:13
3  the record.  My name is JD Martinez of   11:06:13
4  Veritext New York.  The date today is May   11:06:17
5  23, 2011.  The time on the video monitor   11:06:20
6  is 11:06 a.m.  This deposition being held   11:06:24
7  in the office of Thompson Widgor & Gilly   11:06:27
8  LLP, located at 85, Fifth Avenue, New   11:06:31
9  York, New York.  The caption of this case   11:06:34
10  is Burton T. Fried versus LVI Services,   11:06:36
11  Inc., et al., filed in the United States   11:06:41
12  District Court, Southern District of New   11:06:43
13  York.  The name of the witness is Rajay   11:06:46
14  Bagaria.   11:06:48
15    At this time the attorneys will   11:06:50
16  identify themselves and the parties they   11:06:50
17  represent after which our court reporter,   11:06:53
18  Debbie, will swear in the witness, and we   11:06:55
19  can proceed.   11:06:57
20    MS. SELTZER:  Joanne Seltzer   11:07:00
21  with Sidley Austin, LLP representing   11:07:02
22  defendants.   11:07:03
23    MR. DATOO:  Shaffin Datoo with   11:07:05
24  Thompson Widgor & Gilly representing the   11:07:08
25  plaintiff Burt Fried.   11:07:08

2 (Pages 2 to 5)

**14**

BAGARIA

1
2      Q.   What are your job duties at      11:13:33
3    Apollo?                                 11:13:36
4      A.   My focus is on investment       11:13:36
5    underwriting.                           11:13:39
6      Q.   For any particular type of       11:13:40
7    companies or investments?              11:13:44
8      A.   All types.                       11:13:45
9      Q.   Okay.  Now, are you familiar    11:13:46
10   with a company called LVI Parent Corp.?  11:13:49
11     A.   Yes.                             11:13:51
12     Q.   How so?                          11:13:52
13     A.   It is the parent of LVI          11:13:53
14   Services.                               11:13:56
15     Q.   Okay.  What does LVI Parent do?  11:13:56
16     A.   If it is -- if my                11:13:59
17   understanding -- I am -- my             11:14:04
18   understanding -- the corporate structure  11:14:07
19   is -- I am not entirely clear as to what  11:14:08
20   the holding company's different names are,  11:14:14
21   but if Parent is directly above Services  11:14:17
22   its sole purpose would be to own the    11:14:20
23   equity of Services.                     11:14:23
24     Q.   Okay.  And who owns LVI Parent?  11:14:24
25     A.   If parent is the ultimate        11:14:27

**15**

BAGARIA

1
2    holding company, then it is owned by    11:14:31
3    Apollo, Code Hennessy, Falcon, and      11:14:34
4    potentially some others.                11:14:40
5      Q.   Is there a majority owner?       11:14:41
6      A.   Majority being defined as over   11:14:44
7    50 percent?                             11:14:46
8      Q.   Yes.                             11:14:47
9      A.   No.                              11:14:48
10     Q.   Is there any owner that owns     11:14:48
11   more stock than others?                 11:14:52
12     A.   Yes.                             11:14:53
13     Q.   And which owner would that be?   11:14:53
14     A.   Apollo has slightly more shares  11:14:56
15   than Code Hennessy.                     11:14:58
16     Q.   Was that true in 2010?           11:15:00
17     A.   At the conclusion of the         11:15:03
18   restructuring, yes.                     11:15:06
19     Q.   Okay.  And what percentage does  11:15:06
20   Apollo own of LVI Parent?               11:15:11
21     A.   Approximately 34.                11:15:13
22     Q.   When did Apollo finalize its     11:15:15
23   investment in LVI Parent?               11:15:20
24          MS. SELTZER:  I object to the    11:15:23
25   form.  You can answer.                  11:15:25

**16**

BAGARIA

1
2      A.   In I believe it was October     11:15:26
3    2010.                                   11:15:31
4      Q.   Is that when the transaction    11:15:31
5    closed?                                 11:15:33
6      A.   Yes.  We finalized our          11:15:33
7    investment when the transaction closed.  11:15:36
8      Q.   Okay.  And that was in October  11:15:37
9    2010?                                   11:15:40
10     A.   I believe so.  I can't recall   11:15:40
11   the exact date.                         11:15:42
12     Q.   Okay.  And why did Apollo invest  11:15:43
13   in LVI Parent?                          11:15:46
14     A.   To obtain a recovery on our     11:15:47
15   existing investment.                    11:15:51
16     Q.   What do you mean by that?       11:15:51
17     A.   Apollo had an investment in LVI  11:15:55
18   that it made in 2005.  Due to the       11:15:59
19   underperformance of the company, that   11:16:03
20   investment no longer had value, so Apollo  11:16:06
21   invested new money in order to obtain   11:16:09
22   ownership, so that it might obtain a     11:16:12
23   recovery at some point in the future.   11:16:15
24     Q.   Does LVI have a board of        11:16:17
25   directors, LVI Parent have a board of   11:16:21

**17**

BAGARIA

1
2    directors?                              11:16:23
3      A.   LVI has a board of directors.  I  11:16:24
4    can't recall the specific entity,       11:16:26
5    whichever the board sits at.            11:16:28
6      Q.   So when you mean LVI, do you    11:16:33
7    mean Parent, do you mean Services, do you  11:16:35
8    mean another LVI entity?                11:16:37
9      A.   When I mean LVI I refer to the  11:16:39
10   operating company of LVI that generates  11:16:41
11   all the income.  There is a holding     11:16:43
12   company that has -- that is where the   11:16:45
13   equity and the board sits, and I don't  11:16:47
14   recall the specific name of that entity.  11:16:49
15     Q.   Do you sit on the board of LVI?  11:16:51
16     A.   I sit on the board of directors  11:16:55
17   of the company, and again I am not clear  11:16:58
18   as to whether that is LVI Holdings or   11:17:02
19   Services or Parent, but at whatever entity  11:17:04
20   the board of directors is comprised at  11:17:07
21   that is where I have a board seat.      11:17:10
22     Q.   So you sit on the board of      11:17:11
23   directors, but you don't know for what  11:17:13
24   company you sit on?                     11:17:14
25          MS. SELTZER:  Objection.        11:17:15

5  (Pages 14 to 17)

VERITEXT REPORTING COMPANY

212-267-6868                                    516-608-2400

### Page 22

```
1                BAGARIA
2     Q.   You can answer.            11:21:01
3     A.   That is how our charter is  11:21:02
4 established.                         11:21:04
5     Q.   What is LVI Acquisition Corp.?  11:21:05
6     A.   It was an entity I believe  11:21:16
7 formed to consummate the acquisition, and  11:21:19
8 I am not clear whether that related to  11:21:26
9 this transaction in 2010 or the 2005  11:21:28
10 buyout.                             11:21:34
11    Q.   Do you know the relationship  11:21:34
12 between LVI Acquisition and LVI Parent?  11:21:36
13    A.   I don't.                    11:21:39
14    Q.   Does LVI Parent have any    11:21:40
15 employees?                          11:21:44
16    A.   I do not believe so.        11:21:45
17    Q.   And does LVI Parent have any  11:21:51
18 officers?                           11:21:53
19    A.   I don't know the answer to that  11:21:54
20 question.                           11:21:57
21    Q.   Well, you said Jeffrey Smith is  11:21:57
22 an officer of LVI Parent, correct?  11:21:59
23         MS. SELTZER:   Objection.   11:22:02
24    A.   I said that Jeffrey Smith is an  11:22:02
25 officer of the board, and I was unclear as  11:22:04
```

### Page 23

```
1                BAGARIA
2 to what level the board he sat at.  11:22:07
3     Q.   What do you mean that Jeffrey  11:22:09
4 Smith is an officer of the board?   11:22:12
5     A.   His title is secretary to my  11:22:14
6 knowledge.                          11:22:20
7     Q.   Is -- but he is not on the board  11:22:20
8 of directors, correct?              11:22:24
9     A.   He is not a board member.    11:22:25
10    Q.   Okay.  And is he an officer of  11:22:26
11 LVI Parent?                         11:22:29
12         MS. SELTZER:   Objection. Asked  11:22:31
13 and answered.                       11:22:33
14    A.   I don't know the answer to that  11:22:33
15 question.                           11:22:35
16    Q.   Okay.  Does LVI Parent own any  11:22:35
17 assets?                             11:22:37
18    A.   I can't -- I don't know.    11:22:38
19    Q.   Does it own -- you said it is a  11:22:46
20 holding company, correct?           11:22:48
21    A.   If it is a holding company that  11:22:49
22 sits directly above Services, then it  11:22:51
23 would own a hundred percent of the equity,  11:22:54
24 as I mentioned.                     11:22:56
25    Q.   Does LVI Parent have its own  11:22:56
```

### Page 24

```
1                BAGARIA
2 bank account?                       11:22:59
3     A.   I don't know the answer.    11:22:59
4     Q.   Does LVI Parent have any    11:23:00
5 offices?                            11:23:02
6     A.   I don't know.              11:23:02
7     Q.   You don't know if it has an  11:23:08
8 office?                             11:23:10
9         MS. SELTZER:   Asked and     11:23:11
10 answered.                          11:23:12
11    A.   That is what I said.        11:23:12
12    Q.   Do you know where LVI Parent is  11:23:13
13 headquartered?                      11:23:17
14    A.   I don't know.              11:23:17
15    Q.   Does LVI Parent have any    11:23:18
16 subsidiaries?                       11:23:21
17    A.   I would think LVI Services at  11:23:22
18 some point in the chain would be a sub.  11:23:32
19    Q.   Any other subs?             11:23:33
20    A.   Not -- I don't know the answer  11:23:34
21 to that question.                   11:23:36
22    Q.   Is LVI Services a wholly-owned  11:23:36
23 subsidiary of LVI Parent?           11:23:39
24    A.   I don't know.              11:23:41
25    Q.   Do you know what the         11:23:42
```

### Page 25

```
1                BAGARIA
2 relationship is between LVI Acquisition  11:23:46
3 and LVI Services?                    11:23:49
4     A.   I don't know.              11:23:50
5     Q.   What does LVI Services do?  11:23:51
6     A.   It is engaged in the remediation  11:23:54
7 of asbestos and mold and also in    11:24:01
8 structural demolition.              11:24:06
9     Q.   And do you have any background  11:24:07
10 in that area?                       11:24:09
11         MS. SELTZER:   Objection to the  11:24:12
12 form.                               11:24:13
13    A.   Can you be more specific?    11:24:13
14    Q.   Do you know anything about the  11:24:15
15 business that LVI Services engages in?  11:24:16
16    A.   I invested in the company.  So  11:24:19
17 from that standpoint, yes.           11:24:21
18    Q.   From a financial standpoint?  11:24:23
19    A.   Well, a financial investment  11:24:25
20 which entails 34 percent ownership   11:24:28
21 connotes some knowledge of the underlying  11:24:31
22 business.                           11:24:37
23    Q.   Okay.  Have you ever worked in  11:24:37
24 that business?                      11:24:38
25    A.   As an employee of a services  11:24:39
```

7 (Pages 22 to 25)

**46**

BAGARIA

1
2 document is forwarded to anyone outside of  11:44:38
3 Apollo?                                      11:44:41
4     A.  Outside of our attorneys, not to  11:44:42
5 my knowledge.                                11:44:46
6     Q.  Okay.  Now, did there come a         11:44:46
7 time when Scott State was hired as           11:44:50
8 president and CEO of LVI Services?           11:44:53
9     A.  Yes, he was hired as CEO.        11:44:55
10    Q.  And do you know when that was?    11:44:58
11    A.  I believe it was in October or    11:45:00
12 around October.                              11:45:04
13    Q.  Of what year?                      11:45:05
14    A.  2010.                                 11:45:06
15    Q.  And who made the decision to      11:45:08
16 hire Mr. State?                              11:45:11
17    A.  The board of directors.           11:45:11
18    Q.  And were you involved in the      11:45:18
19 decision to hire him?                        11:45:19
20    A.  I had no authority to make the    11:45:24
21 decision.  However, I was offered the        11:45:26
22 opportunity to meet with Scott.             11:45:28
23    Q.  And did you take that             11:45:29
24 opportunity?                                 11:45:31
25    A.  Yes.                                11:45:31

**47**

BAGARIA

1
2     Q.  And what did you think?           11:45:32
3         MS. SELTZER:  Objection to the    11:45:34
4 form.                                        11:45:35
5     A.  I thought --                        11:45:35
6     Q.  What did you think of Mr. State?  11:45:37
7     A.  I thought he was a very well      11:45:39
8 qualified candidate.                         11:45:41
9     Q.  Okay.  And did the board vote on  11:45:43
10 hiring Mr. State?                            11:45:47
11    A.  I was not part of that board.  I  11:45:48
12 had no knowledge of it.                      11:45:50
13    Q.  Do you know when Mr. State's      11:45:51
14 first day of work was?                       11:45:53
15        MS. SELTZER:  Objection.          11:45:55
16    A.  I can't recall.                    11:45:56
17    Q.  Now, after Mr. State was hired,   11:45:57
18 did Mr. Fried's job title change?           11:45:59
19    A.  I believe Burt gave up the        11:46:02
20 interim CEO title and kept his title as     11:46:09
21 chairman.                                    11:46:12
22    Q.  Okay.  And what were his job      11:46:13
23 duties as chairman?                         11:46:15
24    A.  There was no specific document    11:46:19
25 that outlined his job duties as chairman    11:46:25

**48**

BAGARIA

1
2 to my knowledge.                             11:46:27
3     Q.  All right.  Do you know what his  11:46:29
4 job duties were as chairman?                11:46:32
5     A.  What they were?                    11:46:33
6     Q.  Yes.                                 11:46:35
7     A.  I do not.                            11:46:36
8     Q.  Did there come a time when you    11:46:37
9 learned what his job duties were as          11:46:43
10 chairman?                                    11:46:46
11    A.  I learned anecdotally from Burt   11:46:46
12 about some of the things he claimed to      11:46:54
13 have done with the previous CEO, but I      11:46:56
14 have not come across any document produced  11:47:02
15 by the board which outlined those           11:47:06
16 responsibilities that Burt should hold as   11:47:08
17 chairman.                                    11:47:12
18    Q.  When did you have this            11:47:12
19 conversation -- was it a conversation with  11:47:14
20 Mr. Fried that you had where he told you    11:47:16
21 about his duties under Mr. McNamara?        11:47:19
22    A.  Yes.                                 11:47:21
23    Q.  And when was that conversation?   11:47:22
24    A.  They were in late October I       11:47:23
25 believe.                                     11:47:26

**49**

BAGARIA

1
2     Q.  And how many conversations were  11:47:27
3 there?                                       11:47:31
4     A.  At least one, maybe two.          11:47:31
5     Q.  Do you recall what you said in    11:47:37
6 the first conversation?                      11:47:40
7     A.  Well, this was in the context of  11:47:41
8 what his role as chairman should be going   11:47:46
9 forward, which obviously was a matter of    11:47:48
10 debate, and I do recall expressing my       11:47:54
11 point of view on what his role should be    11:47:59
12 under the new ownership.                     11:48:02
13    Q.  And what was your point of view?  11:48:04
14    A.  That he would have a more         11:48:05
15 diminished role as chairman if what he      11:48:09
16 claimed to have done under Bob McNamara's   11:48:12
17 leadership as chairman was in fact true.    11:48:16
18    Q.  Why?                                11:48:19
19        MS. SELTZER:  Objection.          11:48:20
20    A.  Because the new CEO did not need  11:48:21
21 Burt to act in that capacity.               11:48:26
22    Q.  Is that because Burt was 70       11:48:28
23 years old?                                   11:48:34
24        MS. SELTZER:  Objection.          11:48:35
25    A.  No, it was not.                    11:48:35

13 (Pages 46 to 49)

**50**

BAGARIA
```
2    Q.   Now, while Mr. Fried was        11:48:37
3  chairman under Scott State, do you have  11:48:40
4  any reason to believe that his work      11:48:45
5  performance was less than excellent?     11:48:47
6        MS. SELTZER:  I object to the     11:48:50
7  form.                                     11:48:52
8    A.   His work performance in what     11:48:52
9  capacity?                                 11:48:54
10   Q.   Whatever the job duties he was    11:48:55
11 performing at LVI under Scott State.      11:48:58
12   A.   Under his employment agreement?   11:49:01
13   Q.   No, the job duties he was         11:49:02
14 performing while Scott State was CEO.     11:49:04
15   A.   But are you referring to his job  11:49:06
16 duties as the chairman or as an employee? 11:49:08
17   Q.   His job -- well,                  11:49:10
18 chairman -- what do you mean by -- when   11:49:16
19 you say his job duties as chairman?       11:49:19
20   A.   Burt had a consulting            11:49:19
21 arrangement in which he was receiving     11:49:21
22 compensation.                             11:49:23
23   Q.   When did he enter into this      11:49:24
24 arrangement?                              11:49:28
25   A.   I don't know.                     11:49:29
```

**51**

BAGARIA
```
2    Q.   So when Scott State was CEO, was 11:49:29
3  Burt under this consulting arrangement?   11:49:34
4    A.   I believe Burt was still         11:49:37
5  on -- on the payroll.                     11:49:39
6    Q.   As an employee or as a           11:49:42
7  consultant?                               11:49:44
8    A.   I am not sure which one.         11:49:45
9    Q.   Was Mr. Fried ever an employee   11:49:47
10 of LVI Services under Scott State?        11:49:56
11   A.   I can't recall whether he was an 11:49:59
12 employee or a consultant, but he was      11:50:04
13 receiving some remuneration from the      11:50:07
14 company.                                  11:50:11
15   Q.   In whatever capacity Mr. Fried   11:50:11
16 was in, do you have any reason to believe 11:50:19
17 that his job performance was less than    11:50:22
18 excellent?                                11:50:24
19       MS. SELTZER:  Objection to        11:50:25
20 form.                                     11:50:26
21   A.   Yes, I do.                        11:50:26
22   Q.   Why?                              11:50:28
23   A.   As I stated previously, the      11:50:29
24 business materially underperformed his    11:50:33
25 expectations, and as a result I questioned 11:50:36
```

**52**

BAGARIA
```
2  his ability to lead in a -- in a capacity 11:50:41
3  that had significant responsibility.      11:50:49
4    Q.   At that time, Scott State was    11:50:51
5  the new CEO, correct?                     11:50:54
6    A.   He had joined I believe in       11:50:55
7  October, yes.                             11:50:58
8    Q.   And the job duties that Mr.      11:50:58
9  Fried was performing either as an employee 11:51:02
10 or as a consultant of LVI services, was he 11:51:04
11 performing those duties in a satisfactory  11:51:08
12 manner?                                   11:51:11
13       MS. SELTZER:  Objection. Can      11:51:12
14 you -- which period? After Mr. State came 11:51:13
15 on as --                                  11:51:16
16       MR. DATOO:  Yes.                   11:51:17
17   A.   So the period between Mr. State  11:51:18
18 joining and Burt resigning is a very      11:51:20
19 narrow period of time, and I can't really 11:51:27
20 comment on his performance within that    11:51:31
21 small window.                             11:51:34
22   Q.   Now, prior to hiring Mr. State,  11:51:35
23 did you ever think about firing Mr. Fried? 11:51:41
24   A.   I was unaware that Burt had a    11:51:44
25 consulting or employment arrangement with 11:51:54
```

**53**

BAGARIA
```
2  the company and was receiving the amount  11:51:56
3  of compensation that he was getting. When 11:51:58
4  that came to my attention, it was very    11:52:01
5  clear to me that that needed to either    11:52:04
6  discontinue or be set at a level that was 11:52:08
7  materially lower than what we had been    11:52:11
8  paying Burt.                              11:52:14
9        As it relates to his role as      11:52:16
10 chairman, we fully envisioned him         11:52:19
11 maintaining a role on the board of        11:52:21
12 directors but in a capacity that the board 11:52:23
13 agreed and the CEO could work with.       11:52:28
14   Q.   Okay. My question was prior to   11:52:34
15 Mr. State's hire did you ever think about  11:52:36
16 firing Mr. Fried?                         11:52:39
17   A.   Prior to Mr. State joining the   11:52:40
18 company, we felt no need to terminate Burt 11:52:45
19 Fried in his capacity as interim CEO      11:52:50
20 because the restructuring was coming close 11:52:52
21 to a resolution, and we would -- at that   11:52:55
22 point in time we would find a permanent   11:52:58
23 CEO.                                      11:53:00
24   Q.   Now, you said we twice. Who do   11:53:01
25 you mean by "we"?                         11:53:04
```

14 (Pages 50 to 53)

VERITEXT REPORTING COMPANY

212-267-6868                                   516-608-2400

**54**

BAGARIA

1
2   A. When I said we, I meant the   11:53:05
3 board.   11:53:06
4   Q. Everyone on the board?   11:53:07
5   A. I don't know if all members of   11:53:08
6 the board shared this view.   11:53:10
7   Q. Who shared that view?   11:53:11
8   A. Certainly Jerry Girardi from   11:53:13
9 Apollo.   11:53:15
10   Q. Is that the only person that   11:53:16
11 shared the view?   11:53:17
12   MS. SELTZER: Objection. To   11:53:19
13 your knowledge.   11:53:20
14   Q. That view.   11:53:21
15   A. To my knowledge.   11:53:21
16   Q. Now, after Mr. State was hired,   11:53:22
17 did there come a time when Mr. State began   11:53:27
18 taking away Mr. Fried's job duties and   11:53:29
19 giving them to other employees?   11:53:32
20   MS. SELTZER: Objection to the   11:53:33
21 form.   11:53:34
22   A. I don't have direct knowledge of   11:53:35
23 it.   11:53:39
24   Q. Do you have indirect knowledge   11:53:40
25 of it?   11:53:45

**55**

BAGARIA

1
2   A. I heard from Burt about things   11:53:46
3 Scott was doing to take away   11:53:53
4 responsibilities, and I heard from Scott,   11:53:55
5 you know, a different side of the story.   11:54:00
6   Q. And what did you hear from Mr.   11:54:03
7 Fried?   11:54:05
8   A. That Scott was taking actions to   11:54:05
9 marginalize Burt within the organization.   11:54:11
10   Q. And did he list any specific   11:54:14
11 examples?   11:54:16
12   A. I can't recall the details.   11:54:17
13   Q. And what did you say in   11:54:20
14 response?   11:54:21
15   A. I told Burt that he needed to   11:54:21
16 defer to Scott and Scott's decisions on   11:54:30
17 what role Burt would have in the ongoing   11:54:35
18 operations of the business.   11:54:39
19   Q. And what did Mr. Fried say in   11:54:40
20 response to that?   11:54:42
21   A. Mr. Fried wanted to discuss that   11:54:43
22 more extensively.   11:54:46
23   Q. So he didn't refuse to defer to   11:54:47
24 Mr. State, did he?   11:54:52
25   MS. SELTZER: I object to the   11:54:55

**56**

BAGARIA

1
2 form.   11:54:56
3   A. I can't recall.   11:54:56
4   Q. And what did you hear from Mr.   11:54:57
5 State?   11:54:59
6   A. Mr. State had a vision for how   11:54:59
7 to fix the business and grow it, and that   11:55:05
8 entailed making certain changes and he   11:55:09
9 needed more autonomy to execute his plan   11:55:13
10 and less involvement from Burt in order to   11:55:21
11 do that, and Apollo was supportive of that   11:55:23
12 decision.   11:55:26
13   Q. Now, did you attend a meeting on   11:55:26
14 October 19 between Mr. State and Mr.   11:55:29
15 Fried?   11:55:31
16   A. I can't recall.   11:55:32
17   Q. Okay. Do you know if they met   11:55:34
18 on or about that day?   11:55:36
19   A. I don't know.   11:55:38
20   Q. Did you hear if Mr. State made   11:55:39
21 any comments about Mr. Fried's age?   11:55:47
22   MS. SELTZER: I object to the   11:55:52
23 form.   11:55:53
24   Q. At a meeting?   11:55:53
25   A. Can you repeat the question?   11:55:54

**57**

BAGARIA

1
2   Q. Sure.   11:55:55
3   Do you know if Mr. State or did   11:55:56
4 you --   11:55:58
5   MR. DATOO: Sorry. Strike that.   11:55:58
6   Q. Did you hear if Mr. State made   11:56:00
7 any comments about Mr. Fried's age at a   11:56:02
8 meeting the two of them were at?   11:56:04
9   MS. SELTZER: Same objection.   11:56:07
10   A. I know that Burt and Scott had a   11:56:12
11 meeting where the relationship and Burt's   11:56:14
12 involvement in the business was discussed   11:56:18
13 and that there was a comment made around   11:56:20
14 Burt's age. I heard that from both Scott   11:56:24
15 and Burt prior to the Burt -- the board   11:56:28
16 meeting in November 4 where we discussed   11:56:33
17 the issue more broadly.   11:56:36
18   Q. And what was the comment that   11:56:38
19 was made about Mr. Fried's age?   11:56:41
20   A. The comment was along the lines   11:56:44
21 of Burt you're 70 or 71 years old. How   11:56:47
22 long do you plan to continue doing this?   11:56:53
23   Q. Do you know if Mr. State made   11:56:55
24 any comments about planning for the future   11:57:01
25 at that meeting?   11:57:04

15 (Pages 54 to 57)

90

BAGARIA

1
2     Q.   Now, after -- who argued first    12:44:04
3  in this board meeting, Mr. Fried or Mr.    12:44:09
4  State?                    12:44:13
5     A.   I believe Scott State spoke    12:44:14
6  first.                    12:44:21
7     Q.   Okay.  And then did he speak or   12:44:22
8  did he argue?                12:44:25
9     MS. SELTZER:  Objection.    12:44:26
10     A.   Again, I don't know the    12:44:27
11  difference.  If you want to explain it,    12:44:28
12  I'll be happy to address it.    12:44:30
13     Q.   I am just trying to use -- I am   12:44:31
14  just trying to use -- to understand your    12:44:34
15  meaning of the words.    12:44:38
16     A.   Okay.    12:44:38
17     Q.   And did Mr. Fried state I guess   12:44:39
18  anything second after Mr. State?    12:44:42
19     MR. DATOO:  That was a horrible   12:44:45
20  question.  Strike that.    12:44:46
21     Q.   Did Mr. Fried then present his   12:44:47
22  point of view after Mr. State?    12:44:49
23     A.   Yes.    12:44:51
24     Q.   And then while Mr. Fried was    12:44:51
25  presenting his point of view, did he    12:44:53

91

BAGARIA

1
2  mention that Mr. State made a comment    12:44:58
3  about his age?    12:45:05
4     A.   Yes.    12:45:05
5     Q.   And did you notice any reaction   12:45:06
6  by the other board members?    12:45:08
7     A.   The reaction to    12:45:14
8  Scott's -- Burt's speech was more of    12:45:20
9  surprise because I believe that most felt   12:45:22
10  that the statement was taken out of    12:45:29
11  context, and some of the threats that    12:45:29
12  followed by Burt was -- was entirely new   12:45:33
13  to all of us, and -- and that is why we    12:45:38
14  had a surprise reaction.    12:45:43
15     Q.   What threats did Mr. Fried make?  12:45:45
16     A.   Burt threatened to take up an   12:45:48
17  age based discrimination case.  He also    12:45:54
18  threatened to disrupt our relationship    12:45:57
19  with the company's sureties, which is a    12:45:59
20  lifeline to the business, so actions that   12:46:03
21  would potentially cause real harm to the   12:46:06
22  company outside of his issues with the    12:46:09
23  comment that Scott had made.    12:46:13
24     Q.   And how did he threaten to break  12:46:15
25  up the relationship with the sureties?    12:46:21

92

BAGARIA

1
2     A.   Burt claimed that he had    12:46:24
3  substantial influence over the    12:46:26
4  relationship and the decision for Arch to   12:46:27
5  extend surety financing to the company,    12:46:31
6  and that him announcing his uninvolvement   12:46:39
7  with LVI would disrupt and cause    12:46:42
8  significant harm to the company.    12:46:44
9     Q.   Now, did Mr. Fried --    12:46:46
10     MR. DATOO:  Strike that.    12:46:52
11     Q.   After Mr. Fried presented his   12:46:53
12  point of view, what happened next?    12:46:56
13     A.   We asked Burt and Scott to step   12:46:58
14  outside, and the board had a discussion    12:47:03
15  around what had transpired.    12:47:05
16     Q.   And how long was that    12:47:07
17  discussion?    12:47:08
18     A.   I can't recall exactly but    12:47:08
19  approximately fifteen minutes.    12:47:12
20     Q.   And what was discussed outside   12:47:14
21  the presence of Mr. Fried and Mr. State?   12:47:17
22     A.   We discussed how to resolve the   12:47:21
23  situation.    12:47:25
24     Q.   And what resolution was reached?  12:47:26
25  Was a resolution reached?    12:47:33

93

BAGARIA

1
2     A.   A course of action was    12:47:36
3  determined, and that was to have John    12:47:38
4  Schnabel from Falcon engage Burt in    12:47:41
5  discussions around an arrangement that    12:47:45
6  could work for all sides.    12:47:50
7     Q.   Was a vote taken at this board   12:47:52
8  meeting as to Mr. Fried's employment?    12:47:56
9     A.   Not that I can recall.    12:47:58
10     Q.   And what did -- what did you say  12:48:00
11  at this meeting, this meeting just among   12:48:05
12  the board members?    12:48:08
13     A.   To be clear, we had not made a   12:48:09
14  decision at that board meeting to    12:48:11
15  terminate Burt.  We simply wanted to find  12:48:13
16  an arrangement that could work for all    12:48:20
17  sides.  We wanted to find an opportunity   12:48:22
18  for Burt to stay involved with the company 12:48:24
19  as chairman.  What I specifically said was  12:48:26
20  my views surrounding Burt's list and the   12:48:30
21  autonomy that I felt we should provide a   12:48:34
22  new CEO to the company, which I've stated   12:48:37
23  previously, but I will be happy to say it   12:48:40
24  again.    12:48:42
25     Q.   And what did Mr. Girardi say at   12:48:42

24 (Pages 90 to 93)

94

```
1              BAGARIA
2   this meeting?                    12:48:45
3      A.  I can't recall exactly what he  12:48:45
4   said.                           12:48:48
5      Q.  What did Mr. Schnabel say at  12:48:48
6   this meeting?                   12:48:51
7      A.  I can't recall exactly what John  12:48:51
8   said.                           12:48:54
9      Q.  What did Mr. Simmons say at this  12:48:54
10  meeting?                        12:48:56
11     A.  Again, I can't recall exactly  12:48:56
12  what you said.                  12:48:58
13     Q.  What did Mr. Buck say at this  12:48:59
14  meeting?                        12:49:02
15     A.  No recollection.           12:49:02
16     Q.  How about Mr. Fiorucci?     12:49:04
17     A.  The same.                  12:49:06
18     Q.  Was there ever a vote taken to  12:49:07
19  terminate Mr. Fried?            12:49:16
20         MS. SELTZER:  I object to the  12:49:18
21  form.                           12:49:19
22     A.  We -- there was consensus   12:49:20
23  amongst the board.  Everyone had an  12:49:23
24  opportunity to voice their concern, but  12:49:27
25  everyone was in agreement to my  12:49:31
```

95

```
1   understanding.                  12:49:33
2      Q.  During that meeting?       12:49:34
3      A.  No.  Again, we did not make a  12:49:35
4   decision to terminate Burt at that  12:49:37
5   meeting.                        12:49:39
6      Q.  All right.  When did the   12:49:41
7   board -- did the board come to a consensus  12:49:43
8   to terminate Mr. Fried at that meeting if  12:49:45
9   Mr. Schnabel's conversation with Mr. Fried  12:49:49
10  didn't go well?                 12:49:52
11         MS. SELTZER:  Objection.  Asked  12:49:53
12  and answered.                   12:49:54
13     A.  Again, we did not make a    12:49:55
14  decision to terminate.          12:49:57
15     Q.  Did there come a time when the  12:49:59
16  board made a decision to terminate?  12:50:00
17     A.  Yes.                       12:50:02
18     Q.  When?                      12:50:03
19     A.  When we determined that we could  12:50:03
20  not reach a suitable arrangement with  12:50:07
21  Burt.                           12:50:09
22     Q.  What was the date?         12:50:10
23     A.  I don't recall.            12:50:11
24     Q.  And did the board hold a    12:50:12
```

96

```
1              BAGARIA
2   meeting?                        12:50:14
3      A.  I can't recall.            12:50:16
4      Q.  And how did the board come to  12:50:21
5   this consensus?                 12:50:23
6      A.  The board had -- was involved  12:50:24
7   with the decision making around resolving  12:50:29
8   the tensions between Burt and Scott.  We  12:50:33
9   attempted to find a resolution, which was  12:50:36
10  a path all board members were supportive  12:50:40
11  of, and when we determined we couldn't it  12:50:42
12  was clear and conversations were held as  12:50:47
13  to what -- what needed to happen around  12:50:51
14  Burt's employment, but the decision for,  12:50:55
15  you know, termination related more towards  12:51:00
16  Burt -- Burt's consulting or employment  12:51:03
17  arrangement.  The decision for his  12:51:05
18  chairmanship was not something that the  12:51:09
19  board terminated.  That was done by Burt.  12:51:11
20     Q.  But as an employee or as a   12:51:15
21  contractor --                   12:51:19
22     A.  Yes.                       12:51:20
23     Q.  -- he was terminated from LVI  12:51:20
24  Services, correct?              12:51:23
25     A.  Yes.                       12:51:24
```

97

```
1              BAGARIA
2      Q.  And was the vote -- was there a  12:51:25
3   vote taken to terminate Mr. Fried?  12:51:28
4      A.  I can't recall if there was a  12:51:31
5   specific vote whether that decision was  12:51:35
6   unanimous or majority, but there were a  12:51:37
7   large number of board members who were  12:51:41
8   supportive and voiced their support over  12:51:44
9   taking that course of action, so it was  12:51:47
10  a -- it was a company approved  12:51:51
11  termination.                    12:51:54
12     Q.  Was -- how did the board come to  12:51:55
13  this consensus?  Was it through  12:52:01
14  conversations, through e-mail exchanges?  12:52:03
15     A.  Yes, all of the above.      12:52:05
16     Q.  And you testified that you don't  12:52:10
17  know if it was a unanimous vote?  12:52:12
18     A.  I can't recall whether our   12:52:15
19  charter stipulates that that would need  12:52:17
20  unanimous approval or majority, but I do  12:52:19
21  know that it was in compliance with our  12:52:23
22  corporate organization documents.  12:52:26
23     Q.  But there was no meeting held?  12:52:29
24         MS. SELTZER:  Objection.  Asked  12:52:33
25  and answered.                   12:52:34
```

25 (Pages 94 to 97)

VERITEXT REPORTING COMPANY

212-267-6868                                    516-608-2400

**118**

```
1              BAGARIA
2    in front you marked Plaintiff's 11,        01:14:27
3    Exhibit 11.                                01:14:30
4         Please take a look at it and let      01:14:31
5    me know if you have ever seen it before.   01:14:33
6    A.   I don't recall looking at this.       01:14:39
7         (Plaintiff's Exhibit 12 marked        01:15:12
8    for identification.)                       01:15:15
9         (Document handed to witness.)         01:15:16
10   Q.   Mr. Bagaria, you have in front        01:15:17
11   of a document marked Plaintiff's Exhibit   01:15:18
12   12.                                        01:15:21
13        Could you take a look at that         01:15:21
14   document and let me know if you have ever  01:15:22
15   seen it before?                            01:15:24
16   A.   I can't recall reviewing this.        01:15:27
17   Q.   Okay.  Now, you mentioned             01:15:29
18   earlier that Mr. Fried resigned; is that   01:15:33
19   correct?                                   01:15:39
20   A.   I believe Burt resigned as            01:15:39
21   chairman of the board.  Correct.           01:15:44
22   Q.   But he was terminated --              01:15:47
23   A.   As an employee.                       01:15:50
24   Q.   Of LVI Services?                      01:15:51
25   A.   Again, I don't recall which           01:15:52
```

**119**

```
1              BAGARIA
2    entity he was employed by.                 01:15:54
3    Q.   Okay.  Now, after the decision        01:15:55
4    to terminate Mr. Fried was made, did LVI   01:16:00
5    Services offer to retain him as a          01:16:04
6    consultant?                                01:16:06
7    A.   We had discussions around             01:16:07
8    creating a consulting opportunity for Burt 01:16:16
9    as an attempt to create a workable         01:16:19
10   solution, which I understand Burt          01:16:24
11   rejected.                                  01:16:28
12   Q.   Okay.  And did you ever see --        01:16:28
13   do you know if that offer to retain Mr.    01:16:30
14   Fried as a consultant was reduced to       01:16:36
15   writing?                                   01:16:38
16   A.   I can see that it has been.           01:16:38
17   Q.   Okay.  Did you know before I          01:16:40
18   showed you the document?                   01:16:41
19   A.   I -- I recall being told that it      01:16:42
20   had been offered to him.                   01:16:45
21   Q.   And do you recall what the terms      01:16:48
22   were?                                      01:16:50
23   A.   I don't recall the specifics,         01:16:51
24   although I did have conversations with     01:16:55
25   Code Hennessy on the level of              01:16:59
```

**120**

```
1              BAGARIA
2    compensation.                              01:17:01
3    Q.   Okay.  And do you recall what         01:17:05
4    the level of compensation was?             01:17:06
5    A.   I don't recall the specifics.         01:17:07
6    Q.   Do you recall if any                  01:17:09
7    compensation was guaranteed to Mr. Fried?  01:17:10
8         MS. SELTZER:  I object to the         01:17:13
9    form.                                      01:17:14
10   A.   I recall there was two                01:17:15
11   components.  One was a set salary for      01:17:17
12   maintaining the board seat, and then to    01:17:21
13   the extent he worked hours there would be  01:17:25
14   some -- some bill rate established.        01:17:28
15   Q.   And what kind of functions did        01:17:30
16   you envision Mr. Fried performing as a     01:17:36
17   consultant?                                01:17:38
18   A.   Really in whatever capacity the       01:17:39
19   CEO needed it.                             01:17:44
20   Q.   So if Mr. State didn't need him       01:17:46
21   in any capacity he would be performing no  01:17:49
22   functions?                                 01:17:51
23        MS. SELTZER:  Objection.              01:17:52
24   A.   As a consultant, correct.             01:17:53
25   Q.   And do you recall if Mr. Fried        01:17:55
```

**121**

```
1              BAGARIA
2    had to waive his right to sue for age      01:17:58
3    discrimination if he became a consultant?  01:18:02
4    A.   I don't know the details around       01:18:04
5    that.                                      01:18:07
6    Q.   Do you know anything about that?      01:18:07
7    A.   No.                                   01:18:08
8    Q.   Do you know who drafted the           01:18:09
9    consulting agreement?                      01:18:20
10   A.   I don't.                              01:18:21
11   Q.   Do you know who came up with the      01:18:25
12   idea of having Mr. Fried work as a         01:18:27
13   consultant?                                01:18:29
14        MS. SELTZER:  Objection.              01:18:29
15   A.   I can't recall.                       01:18:31
16   Q.   Do you know who would have            01:18:31
17   reviewed the consulting agreement before   01:18:32
18   it was presented to Mr. Fried?            01:18:34
19   A.   Most likely Sidley.                   01:18:36
20   Q.   Okay.  Now, does LVI Services         01:18:37
21   currently have a satellite office in       01:18:48
22   Westport, Connecticut?                     01:18:50
23   A.   I believe that office has been        01:18:52
24   closed.                                    01:18:54
25   Q.   Now, did Mr. Fried work out of        01:18:54
```

**31  (Pages 118 to 121)**

**122**

```
                BAGARIA
1
2    that office?                    01:19:01
3       A.  I believe so.            01:19:01
4       Q.  Do you know how often?   01:19:05
5       A.  I don't.                 01:19:06
6       Q.  Did Mr. Fried ever work out of  01:19:08
7    the New York office?            01:19:10
8       A.  I don't remember.        01:19:11
9       Q.  Do you know what types of  01:19:12
10   projects Mr. Fried was working on while he  01:19:16
11   was chairman?                   01:19:17
12      A.  I don't.                 01:19:18
13      Q.  Are you familiar with Sheri  01:19:20
14   Dembin?                         01:19:27
15      A.  No.                      01:19:27
16      Q.  You don't know who that is?  01:19:28
17      A.  I don't.                 01:19:29
18      Q.  Are you familiar with Mr.  01:19:31
19   Fried's daughter?               01:19:32
20      A.  I know he has -- he had a  01:19:33
21   daughter that worked for the company.  01:19:35
22      Q.  Do you know what her name is?  01:19:37
23      A.  I can't recall. It might have  01:19:38
24   been Sheri.                     01:19:40
25      Q.  Okay. And do you know what  01:19:41
```

**123**

```
                BAGARIA
1
2    office she worked in?           01:19:43
3       A.  Yes, the Westport office.  01:19:44
4       Q.  Okay. And do you know what her  01:19:46
5    job title was?                  01:19:48
6       A.  I don't.                 01:19:49
7       Q.  Do you know what her job duties  01:19:50
8    were?                           01:19:51
9       A.  No.                      01:19:52
10      Q.  Do you know how long she was  01:19:53
11   employed by LVI Services?       01:19:56
12      A.  I don't.                 01:19:57
13      Q.  Do you know who she reported to?  01:19:59
14      A.  I don't.                 01:20:00
15      Q.  Do you have any personal  01:20:10
16   knowledge about the quality of her work  01:20:11
17   performance?                    01:20:13
18      A.  No.                      01:20:14
19      Q.  Do you know if Mr. Fried's  01:20:14
20   daughter was terminated from LVI Services?  01:20:18
21      A.  My understanding is she was  01:20:21
22   terminated along with all of the other  01:20:24
23   employees in that office.       01:20:26
24      Q.  And what is your understanding  01:20:27
25   based upon?                     01:20:28
```

**124**

```
                BAGARIA
1
2       A.  My communication --      01:20:29
3          MS. SELTZER:  Objection. If  01:20:31
4    his understanding comes through any  01:20:32
5    conversations with counsel, he is not to  01:20:34
6    testify about that.             01:20:36
7       Q.  Other than any conversations you  01:20:38
8    may or may not have had with counsel --  01:20:39
9       A.  Yes. My conversations were with  01:20:42
10   Scott State.                    01:20:46
11      Q.  And what did he tell you?  01:20:47
12      A.  That he was closing the Westport  01:20:48
13   office.                         01:20:50
14      Q.  And did he tell you that Mr.  01:20:51
15   Fried's daughter was being terminated?  01:20:52
16      A.  Yes.                     01:20:54
17      Q.  And who made the decision to  01:20:55
18   terminate -- I mean close the office?  01:20:57
19      A.  This was Scott's decision.  01:20:59
20      Q.  Did the board have to approve  01:21:00
21   it?                             01:21:02
22      A.  I don't believe so.      01:21:03
23      Q.  Did you vote to close the  01:21:04
24   office?                         01:21:07
25      A.  I don't recall.          01:21:07
```

**125**

```
                BAGARIA
1
2       Q.  And do you recall when the  01:21:08
3    decision to close the office was made?  01:21:11
4       A.  I can't recall the specific  01:21:13
5    date.                           01:21:15
6       Q.  And was everyone from that  01:21:16
7    office terminated?              01:21:17
8       A.  My understanding was a  01:21:19
9    substantial portion of these -- the staff  01:21:23
10   was terminated. I can't -- I don't know  01:21:28
11   exactly whether every single employee was  01:21:32
12   included.                       01:21:36
13      Q.  And do you recall when the  01:21:36
14   selection of employees that were being  01:21:37
15   terminated was made?            01:21:42
16      A.  No.                      01:21:43
17      Q.  Do you know when the Westport  01:21:49
18   office closed?                  01:21:58
19      A.  I don't know the exact date.  01:21:59
20      Q.  Do you know an approximate date?  01:22:01
21      A.  Earlier this year.       01:22:04
22      Q.  Now, do you know if Mr. Fried's  01:22:06
23   daughter was offered the opportunity to  01:22:12
24   work in the Milford office?     01:22:13
25      A.  I don't know.            01:22:16
```

**32  (Pages 122 to 125)**

**135**

```
          BAGARIA
1
2    A.  Not to my knowledge.        01:40:37
3    Q.  Do you know who is paying your  01:40:38
4  attorney's fees?                 01:40:40
5    A.  Well, to be clear, we have had  01:40:41
6  two sets of attorneys, and so Apollo may  01:40:45
7  have been responsible for some of the  01:40:49
8  fees.  I am not -- I am not clear on the  01:40:50
9  details.                         01:40:52
10   Q.  Are you paying any fees      01:40:53
11 personally?                      01:40:54
12   A.  No, I am not.                01:40:55
13   Q.  Do you know if any of your   01:40:56
14 attorneys have been paid on an hourly  01:40:58
15 basis?                           01:41:00
16   A.  I don't know the details.    01:41:01
17      (Continued on next page.)    01:41:01
18
19
20
21
22
23
24
25
```

**136**

```
          BAGARIA
1
2    MR. DATOO:  Okay.  I have no    01:41:03
3  further questions for the witness.  01:41:04
4    MS. SELTZER:  Thank you.        01:41:06
5    THE VIDEOGRAPHER:  We're going  01:41:07
6  off the record.  1:41 p.m., end of today's  01:41:08
7  questioning.                     01:41:12
8      (Time noted: 1:41 p.m.)       01:41:13
9
10
11
12
13
14
15          RAJAY BAGARIA
16
17 Subscribed and sworn to before me
18 this    day of       , 2011
19
20              .
21
22
23
24
25
```

**137**

```
          BAGARIA
1
2  C E R T I F I C A T I O N
3
4
5
6    I, DEBBIE ZAROMATIDIS, a Shorthand
7  Reporter and a Notary Public, do hereby
8  certify that the foregoing witness, RAJAY
9  BAGARIA, was duly sworn on the date
10 indicated, and that the foregoing is a
11 true and accurate transcription of my
12 stenographic notes.
13    I further certify that I am not
14 employed by nor related to any party to
15 this action.
16
17
18
19
20
21
22
23      DEBBIE ZAROMATIDIS
24
25
```

**138**

```
          BAGARIA
1
2  E X H I B I T S
3
4  PLAINTIFF'S
5  EXHIBIT      DESCRIPTION       PAGE
6  1      Memo                 43
7  2      List of responsibilities  59
8  3      E-mail               66
9  4      E-mail               71
10 5      E-mail               77
11 6      E-mail               99
12 7      E-mail               101
13 8      Letter               104
14 9      Handwritten notes      107
15 10     E-mail               112
16 11     Document             117
17 12     Document             118
18
19
20
21
22
23
24
25
```

34  (Pages 135 to 138)

# Exhibit 4

1

1

2  UNITED STATES DISTRICT COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  No. 10 Civ. 9308(JSR)

5  ------------------------------------------x

6  BURTON T. FRIED,

7                          Plaintiff,

8          - against -

9  LVI SERVICES, INC., LVI PARENT CORP., CODE

10  HENNESSY SIMMONS, LLC d/b/a CHS PRIVATE

11  EQUITY V LP; APOLLO INVESTMENT CORP.,

12  SCOTT E. STATE, in his official and

13  individual capacities; BRIAN SIMMONS, in

14  his official and individual capacities;

15  RAJAY BAGARIA, in his official and

16  individual capacities; GERALD J. GIRARDI,

17  in his official and individual capacities,

18                          Defendants.

19  ------------------------------------------x

20                          June 1, 2011
                            9:38 a.m.

21

22

23

24

25

## Page 2

1
2
3
4          VIDEOTAPE DEPOSITION of PAUL
5  CUTRONE, taken by the Plaintiff, pursuant
6  to Notice, held at the offices of Thompson
7  Wigdor & Gilly, LLP, 85 Fifth Avenue, New
8  York, New York, before Debbie Zaromatidis,
9  a Shorthand Reporter and Notary Public of
10 the State of New York.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 4

1
2              S T I P U L A T I O N S
3
4          IT IS HEREBY STIPULATED AND
5  AGREED by and between the Attorneys for
6  the respective parties hereto that filing
7  and sealing be and the same are hereby
8  waived.
9          IT IS FURTHER STIPULATED AND
10 AGREED that all objections except as to
11 the form of the question, shall be
12 reserved to the time of the trial.
13         IT IS FURTHER STIPULATED AND
14 AGREED that the within examination may be
15 signed and sworn to before any notary
16 public with the same force and effect as
17 though signed and sworn to before this
18 Court.
19
20
21
22
23
24
25

## Page 3

1
2  A P P E A R A N C E S :
3
4  THOMPSON WIGDOR & GILLY, LLP
5  Attorneys for Plaintiff
6      85 Fifth Avenue
7      New York, New York 10003
8  BY:  SHAFFIN A. DATOO, ESQ.
9
10
11 SIDLEY AUSTIN, LLP
12 Attorneys for Defendants
13      787 Seventh Avenue
14      New York, New York 10019
15 BY:  JOANNE SELTZER, ESQ.
16
17
18 ALSO PRESENT:
19      BURTON FRIED
20      J.D. MARTINEZ, Videographer
21
22
23
24
25

## Page 5

1
2          THE VIDEOGRAPHER:  My name is      09:37:53
3  J.D. Martinez of Veritext New York.  The    09:37:54
4  date today is June 1, 2011.  The time is     09:37:57
5  approximately 9:38 a.m.  This deposition    09:38:01
6  is being held in the officeS of Thompson    09:38:03
7  Wigdor & Gilly, LLP, located at 85 Fifth    09:38:05
8  Avenue, New York, New York.  The caption     09:38:11
9  of the case is Burton T. Fried versus LVI    09:38:13
10 Services, Inc. et al. filed in the United    09:38:16
11 States District Court, Southern District    09:38:20
12 of New York.  The name of the witness is     09:38:21
13 Paul Cutrone.                                09:38:23
14         At the time -- at this time the      09:38:25
15 attorneys will identify themselves and the  09:38:27
16 parties they represent, after which our      09:38:29
17 court reporter Debbie Zaromatdis, will       09:38:31
18 swear in the witness, and we can proceed.    09:38:33
19         MS. SELTZER:  Joanne Seltzer,        09:38:35
20 Sidley Austin, LLP representing all          09:38:37
21 defendants.                                  09:38:39
22         MR. DATOO:  Shaffin Datoo,           09:38:40
23 Thompson Wigdor & gilly representing the     09:38:43
24 plaintiff, Burton Fried.
25

VERITEXT REPORTING COMPANY

212-267-6868                    516-608-2400

**6**

1
2  PAUL  CUTRONE,
3  having first been duly sworn by a Notary
4  Public of the State of New York, was
5  examined and testified as follows:
6  EXAMINATION BY MR. DATOO:          09:38:53
7      Q.  Good morning, Mr. Cutrone.      09:38:53
8      A.  Good morning. As you know, my   09:38:55
9  name is Shaffin Datoo, and I represent Mr.  09:38:56
10  Fried in this matter. I am going to ask    09:39:00
11  you some questions today. I hope you can   09:39:01
12  answer all of them unless you are directed  09:39:08
13  not to answer by your attorney.           09:39:08
14      I am just going to start off          09:39:08
15  with some preliminary questions. Is your   09:39:09
16  ability to tell the truth in any way       09:39:11
17  impaired today?                           09:39:12
18      A.  No.                             09:39:13
19      Q.  Do you understand that the       09:39:14
20  answers you are about to give are under    09:39:16
21  oath, and that you are subject to          09:39:17
22  penalties of perjury if you give an        09:39:20
23  untruthful answer?                        09:39:23
24      A.  Yes.                            09:39:24
25      Q.  I am going to assume that if you  09:39:24

**7**

1  CUTRONE
2  answer a question that you understood it.  09:39:26
3  If you don't understand a question, let me  09:39:27
4  know, and I will ask it a different way.    09:39:29
5      Please give verbal answers to my      09:39:31
6  questions. Don't nod your head or shake    09:39:34
7  it; otherwise, the court reporter won't be  09:39:36
8  able to take it down.                      09:39:39
9      A.  Uh-huh.                          09:39:40
10      Q.  And please don't answer my       09:39:40
11  question before I am finished asking it;   09:39:43
12  otherwise, the court reporter won't be     09:39:46
13  able to take both of us talking at the     09:39:48
14  same time.                               09:39:50
15      If you need a break, just let me     09:39:51
16  know. The only condition I have is that   09:39:53
17  you answer the last question asked.       09:39:55
18      Do you understand?                   09:39:59
19      A.  Yes.                            09:40:00
20      MS. SELTZER: Could I add one        09:40:01
21  thing?                                   09:40:02
22      MR. DATOO: Sure.                    09:40:04
23      MS. SELTZER: Paul, play to the      09:40:05
24  camera.                                  09:40:06
25      THE WITNESS: Okay.                  09:40:08

**8**

1  CUTRONE
2      MS. SELTZER: I am saying just       09:40:09
3  turn, so they could get a good shot of     09:40:10
4  you.                                     09:40:13
5      THE WITNESS: This is my good        09:40:13
6  side.                                    09:40:15
7      MS. SELTZER: I know. I know         09:40:15
8  Shaffin is very attractive, but you have   09:40:16
9  to -- go ahead.                          09:40:18
10      Q.  Mr. Cutrone, in connection with  09:40:19
11  this lawsuit, did you provide your        09:40:21
12  attorney with all responsive documents?   09:40:23
13      A.  Yes.                            09:40:24
14      Q.  Where did you look to find any   09:40:25
15  documents?                               09:40:27
16      A.  Whatever documents I would have  09:40:29
17  been asked for, I would have had in my     09:40:31
18  office.                                  09:40:33
19      Q.  Does that include on your        09:40:33
20  computer?                                09:40:36
21      A.  Yes.                            09:40:37
22      Q.  Do you have a personal e-mail    09:40:37
23  account?                                 09:40:39
24      A.  At work?                        09:40:40
25      Q.  Just a personal e-mail account.  09:40:42

**9**

1  CUTRONE
2      A.  Yes.                            09:40:45
3      Q.  Did you check your personal      09:40:45
4  e-mail account for any responsive         09:40:48
5  documents?                               09:40:49
6      A.  I did not.                      09:40:50
7      Q.  Okay. Would there be any work-   09:40:50
8  related documents stored in your personal  09:40:52
9  e-mail?                                  09:40:54
10      A.  No.                            09:40:55
11      Q.  Okay. Do you keep any work-      09:40:55
12  related documents at home?               09:40:57
13      A.  No.                            09:40:59
14      Q.  Okay. Have you ever been sued   09:41:01
15  before?                                  09:41:05
16      A.  Me personally?                  09:41:05
17      Q.  Yes.                           09:41:08
18      A.  No.                            09:41:08
19      Q.  Have you ever -- has anyone ever  09:41:09
20  accused you of discrimination?            09:41:12
21      A.  No.                            09:41:14
22      Q.  Have you ever given any sworn    09:41:15
23  testimony before?                        09:41:16
24      A.  Yes.                           09:41:17
25      Q.  How many times?                 09:41:19

3  (Pages 6 to 9)

**VERITEXT REPORTING COMPANY**

212-267-6868                                       516-608-2400

**14**

CUTRONE

1
2    A.   Yes.                                09:44:48
3    Q.   Who?                                09:44:48
4    A.   The president and CEO, Scott        09:44:49
5    State.                                   09:44:51
6    Q.   And is he president and CEO of      09:44:51
7    LVI Services, Inc.?                      09:44:54
8    A.   Yes.                                09:44:56
9    Q.   Okay. Since you've been            09:44:56
10   employed by LVI Services, have you      09:45:10
11   received any anti-discrimination training? 09:45:12
12   A.   No.                                 09:45:14
13   Q.   Have you -- do you know if LVI     09:45:18
14   Services, Inc. has a handbook?          09:45:24
15   A.   Yes.                                09:45:25
16   Q.   And do you know if that handbook  09:45:26
17   contains an equal employment opportunity 09:45:30
18   policy?                                  09:45:32
19   A.   I haven't looked at that in a      09:45:33
20   while. So offhand I don't know, but I   09:45:35
21   believe it does.                         09:45:38
22   Q.   Okay. Do you know if it           09:45:39
23   contains an anti-discrimination policy?  09:45:41
24   A.   It may.                            09:45:43
25   Q.   And do you know if it contains    09:45:44

**16**

CUTRONE

1
2    but if we -- whatever policies we have   09:46:33
3    relative to things you mentioned would be 09:46:36
4    in one or both of those documents if they 09:46:38
5    are.                                     09:46:41
6    Q.   And was Mr. Fried employed by      09:46:41
7    LVI Services, Inc.?                      09:46:43
8    A.   Yes.                                09:46:44
9    Q.   Do you know for how long?          09:46:46
10   A.   Offhand, no. I mean the entire    09:46:48
11   time that I was -- when I was hired in   09:46:57
12   February of '89 Mr. Fried I believe was  09:46:59
13   employed by LVI Services, Inc. at the time 09:47:03
14   although he might have been employed by  09:47:07
15   the then former parent. So I really don't 09:47:07
16   know, but he was with the company all    09:47:10
17   those years that I was with the company  09:47:12
18   when I was with the company.             09:47:19
19   Q.   Okay. Do you know what Mr.         09:47:20
20   Fried's last job title was?              09:47:22
21        MS. SELTZER:  Objection. At        09:47:24
22   the time of termination?                 09:47:25
23        MR. DATOO:  Yes, his last job      09:47:27
24   title.                                   09:47:29
25        MS. SELTZER:  Okay.                09:47:29

**15**

CUTRONE

1
2    an anti-retaliation policy?              09:45:45
3    A.   I don't know. It may.              09:45:47
4    Q.   Do you know if any of these        09:45:49
5    policies that I just mentioned exist     09:45:50
6    outside the handbook?                    09:45:52
7        MS. SELTZER:  I object to the       09:45:54
8    form.                                    09:45:56
9    Q.   Let me rephrase it.               09:45:56
10       Do you know if any of these         09:45:58
11   policies that I just mentioned exist?    09:45:59
12       MS. SELTZER:  Same objection.       09:46:06
13   Are you talking about --                 09:46:08
14       MR. DATOO:  Apart from the          09:46:10
15   handbook.                                09:46:11
16       MS. SELTZER:  So like online        09:46:12
17   or --                                    09:46:13
18       MR. DATOO:  Yes.                    09:46:14
19   Q.   Are there -- do you know if        09:46:14
20   these policies -- does LVI Services, Inc. 09:46:16
21   have these policies?                     09:46:18
22   A.   I'll say this: We have a code      09:46:20
23   of ethics policy, and we have an employee 09:46:23
24   handbook. I can't tell you chapter and   09:46:27
25   verse what is in each of those documents, 09:46:31

**17**

CUTRONE

1
2    A.   I don't know.                       09:47:30
3    Q.   Okay. And do you know who -- if    09:47:31
4    he last worked for LVI Services, Inc.?   09:47:35
5    A.   I'll say that his pay check came    09:47:39
6    from LVI Services, Inc. Yes. He was an  09:47:43
7    employee of LVI Services, Inc.           09:47:46
8    Q.   Okay. And what is LVI Parent?      09:47:47
9    A.   LVI Parent Corp. is a holding      09:47:55
10   company.                                 09:48:01
11   Q.   Does it engage in any business?    09:48:03
12   A.   No, not the business that -- no    09:48:05
13   business at all actually. It is just a   09:48:10
14   holding company.                         09:48:12
15   Q.   And who owns LVI Parent?           09:48:13
16   A.   Currently?                          09:48:15
17   Q.   Yes.                                09:48:17
18   A.   LVI Parent is owned by -- there    09:48:18
19   are several investors, several           09:48:24
20   stockholders. You want me to name them? 09:48:26
21   Q.   Yes, if you can.                    09:48:28
22   A.   And I -- I don't know if they      09:48:29
23   have a specific name, you know. There    09:48:32
24   might be a different fund name, but Code  09:48:33
25   Hennessy Simmons, CHS if you will, Apollo, 09:48:37

5 (Pages 14 to 17)

**VERITEXT REPORTING COMPANY**

212-267-6868                                516-608-2400

**18**

```
1              CUTRONE
2    and I think it is Apollo Investments, and    09:48:40
3    Falcon investments are the three primary      09:48:43
4    shareholders.  Together they own 95 to 97    09:48:48
5    percent of the company.          09:48:54
6        Q.   Do you know when LVI Parent was     09:48:58
7    formed?                 09:49:00
8        A.   2002 I believe.          09:49:01
9        Q.   Does LVI Parent have a board of     09:49:04
10   directors?               09:49:09
11       A.   Yes.              09:49:09
12       Q.   And how many people are           09:49:10
13   currently on the board?          09:49:11
14       A.   I believe there are currently      09:49:12
15   eight members on the board.        09:49:14
16       Q.   Can you give me their names?       09:49:15
17       A.   From Code Hennessy you have        09:49:17
18   Brian Simmons and Rob Hogan.  From Apollo     09:49:21
19   you have Rajay Bagaria and Gerald Girardi.    09:49:28
20   From Falcon you have John Schnabel.  You      09:49:37
21   have two outside directors Robert Buck,       09:49:41
22   Bob Buck, and Richard Fiorucci, and Scott     09:49:44
23   State.  So two, four, five, six -- eight.     09:49:48
24       Q.   Okay.  And were all of these       09:49:53
25   people on the board in the first half of      09:49:54
```

**19**

```
1              CUTRONE
2    November of 2010?             09:49:59
3        A.   Yes.              09:50:01
4        Q.   Okay.  Was anyone else on the      09:50:03
5    board in the first half of November of       09:50:06
6    2010?                  09:50:09
7        A.   In the first half.  I don't        09:50:10
8    know.  I don't think so.          09:50:12
9        Q.   Okay.  When Mr. Fried was          09:50:13
10   employed by LVI Services, was he on the       09:50:15
11   board of directors of LVI Parent?        09:50:18
12       A.   Yes.              09:50:20
13       Q.   And do you know if Mr. Fried and    09:50:26
14   Scott State served on the board of LVI        09:50:30
15   Parent at the same time?          09:50:33
16       A.   I don't know.          09:50:33
17       Q.   Okay.  Now, did you attend any     09:50:36
18   board meetings of LVI Parent?        09:50:39
19       A.   Yes.              09:50:42
20       Q.   Did you regularly attend board     09:50:44
21   meetings of LVI Parent?          09:50:46
22       A.   To the extent there were because   09:50:49
23   prior to October of '10 the ultimate        09:50:52
24   parent was a different corporation, which     09:50:58
25   was LVI Acquisition.  So LVI Acquisition      09:51:01
```

**20**

```
1              CUTRONE
2    had quarterly board meetings, which I        09:51:05
3    attended.               09:51:08
4        Q.   Okay.  And in what capacity did    09:51:09
5    you attend?               09:51:11
6        A.   As CFO.             09:51:12
7        Q.   Okay.  Okay.  What is LVI          09:51:13
8    Acquisition Corp.?            09:51:19
9        A.   Like LVI Parent, it was a          09:51:19
10   holding company as well.          09:51:21
11       Q.   Okay.  What is the relationship    09:51:22
12   between LVI Acquisition and LVI Parent?       09:51:26
13       A.   Currently, LVI Invest -- first     09:51:28
14   of all LVI Acquisition changed its name to    09:51:33
15   LVI Invest and is now a minority owner of     09:51:38
16   LVI Parent.               09:51:41
17       Q.   Do you know what percentage LVI    09:51:42
18   Invest owns of LVI Parent?         09:51:45
19       A.   Roughly 2 or 3 percent.        09:51:46
20       Q.   Okay.  And -- and who owns LVI     09:51:48
21   Invest?                09:51:53
22       A.   LVI Invest is owned by --         09:51:53
23   primarily by Code Hennessy Simmons and        09:51:56
24   others.  They own roughly 85 percent of      09:51:59
25   LVI Invest.               09:52:02
```

**21**

```
1              CUTRONE
2        Q.   Sorry.  What was the --         09:52:04
3        A.   They own roughly 85 percent of     09:52:05
4    LVI Invest.               09:52:08
5        Q.   No.  The name of the second --     09:52:09
6        A.   Others.             09:52:10
7        Q.   Others.  Okay?          09:52:12
8        A.   Primarily individuals.         09:52:13
9        Q.   Okay.  Does LVI Parent have any    09:52:14
10   employees?               09:52:17
11       A.   No.               09:52:17
12       Q.   Does LVI Parent have any          09:52:17
13   officers?               09:52:21
14       A.   Yes.              09:52:22
15       Q.   How many?            09:52:24
16       A.   I don't know offhand.         09:52:25
17       Q.   Do you know their -- their        09:52:29
18   positions?               09:52:32
19       A.   I know I am vice president of      09:52:33
20   LVI Parent.  Sitting here today, I         09:52:36
21   just -- I don't want to guess at the other    09:52:41
22   officers.               09:52:44
23       Q.   Okay.  And you're also a vice     09:52:44
24   president of LVI Services?         09:52:47
25       A.   Yes, sir.           09:52:48
```

6 (Pages 18 to 21)

**22**

CUTRONE

1
2   Q.   Okay.  Do you know anyone else   09:52:49
3   who is an officer of LVI Parent other than   09:52:51
4   yourself?   09:52:54
5   A.   Scott State, Joseph Annarumma,   09:52:55
6   and I am -- I would be guessing after   09:53:06
7   that.  I'm not sure.   09:53:09
8   Q.   Okay.  And do you know what   09:53:10
9   Scott State's job title is as an officer   09:53:12
10  of LVI Parent?   09:53:14
11  A.   President I believe.   09:53:15
12  Q.   And he is also the president of   09:53:19
13  LVI Services?   09:53:23
14  A.   Correct.   09:53:24
15  Q.   And do you know what Mr.   09:53:25
16  Annarumma's job title is as an officer of   09:53:26
17  LVI Parent?   09:53:29
18  A.   Vice president and treasurer and   09:53:30
19  secretary.   09:53:33
20  Q.   And does he hold the same titles   09:53:33
21  with LVI Services, Inc.?   09:53:39
22  A.   Yes.   09:53:41
23  Q.   Is Jeffrey Smith an officer of   09:53:42
24  LVI Parent?   09:53:46
25  A.   No.   09:53:47

**23**

CUTRONE

1
2   Q.   Who is Jeffrey Smith?   09:53:56
3   A.   Jeffrey Smith is an attorney for   09:53:58
4   Sidley Austin, and Sidley Austin is the   09:53:59
5   company's general counsel -- outside   09:54:01
6   counsel.  Excuse me.   09:54:03
7   Q.   Does Mr. Smith serve as   09:54:04
8   secretary to LVI Parent?   09:54:05
9   A.   He attends board meetings and   09:54:07
10  acts as secretary, so he takes the   09:54:10
11  minutes.   09:54:12
12  Q.   Why doesn't Mr. -- do you know   09:54:12
13  why Mr. Annarumma doesn't take the minutes   09:54:17
14  as secretary?   09:54:20
15  A.   It's just not been our practice.   09:54:21
16  Q.   Okay.  How long has Mr. Smith   09:54:24
17  been taking minutes at LVI Parent board   09:54:27
18  meetings?   09:54:29
19  A.   The last several years.  It   09:54:30
20  could be as far back as 2005 but certainly   09:54:33
21  over the last couple of years.   09:54:36
22  Q.   Okay.  And does LVI Parent own   09:54:38
23  any assets?   09:54:40
24  A.   Its only asset is its   09:54:41
25  investments in LVI Services, Inc.   09:54:46

**24**

CUTRONE

1
2   Q.   Does LVI Parent have its own   09:54:48
3   bank account?   09:54:51
4   A.   I am not sure.   09:54:51
5   Q.   Does LVI Parent have any   09:54:54
6   offices?   09:54:57
7   A.   None outside of 80 Broad Street.   09:54:57
8   In other words, 80 Broad is our -- the   09:55:04
9   office of LVI Services, Inc.  That is also   09:55:06
10  the mailing address for LVI Parent Corp.   09:55:09
11  as well.   09:55:11
12  Q.   And is that where LVI Parent is   09:55:12
13  headquartered?   09:55:14
14  A.   Again, that is -- yes, that is   09:55:15
15  the corporate office if you will.   09:55:17
16  Q.   Okay.  Now, other than LVI   09:55:18
17  Services, Inc., does LVI Parent have any   09:55:22
18  subsidiaries?   09:55:24
19  A.   Not directly.   09:55:25
20  Q.   Okay.  How about indirectly?   09:55:27
21  A.   Well, LVI Services, Inc. has   09:55:29
22  several wholly-owned subsidiaries.   09:55:33
23  Q.   And is LVI Services a wholly-   09:55:35
24  owned subsidiary of LVI Parent?   09:55:38
25  A.   Yes.   09:55:40

**25**

CUTRONE

1
2   Q.   Now, what is the relationship,   09:55:40
3   if any, between LVI Acquisition and LVI   09:55:44
4   Services?   09:55:48
5   A.   Currently none other than LVI   09:55:49
6   Invest is indirectly a minority owner of   09:55:56
7   LVI Services, Inc. through its   09:55:59
8   investment -- their ownership interest in   09:56:02
9   LVI Parent.   09:56:04
10  Q.   Okay.  Now does LVI Services   09:56:05
11  have a board of directors?   09:56:08
12  A.   Yes.   09:56:09
13  Q.   And how many people are   09:56:11
14  currently on that board?   09:56:13
15  A.   I believe Services, Inc. is just   09:56:14
16  Scott and I.   09:56:22
17  Q.   And was Mr. Fried on the board   09:56:23
18  at any time of LVI Services?   09:56:24
19  A.   Yes.   09:56:28
20  Q.   And did there come a time when   09:56:28
21  he was no longer on the board?   09:56:36
22  A.   Yes.   09:56:37
23  Q.   And when was this?   09:56:38
24  A.   I don't recall.   09:56:39
25  Q.   Do you know why he was -- was he   09:56:40

7 (Pages 22 to 25)

VERITEXT REPORTING COMPANY

```
                                    30
1              CUTRONE
2   decisions or resolutions should be made by  10:00:38
3   the board of directors of LVI Parent?        10:00:40
4       A.   It depends on the situation and     10:00:43
5   circumstances I guess. I'm not sure I         10:00:46
6   understand the question.                      10:00:50
7       Q.   Well, how do you know if a          10:00:51
8   resolution should be made by the board of    10:00:53
9   directors of LVI Services or whether it      10:00:56
10  should be made by the board of LVI Parent?   10:00:58
11      A.   Offhand I don't know.               10:01:01
12      Q.   So has there ever been a time       10:01:03
13  where the board of LVI Services decided      10:01:07
14  that LVI -- the board of LVI Parent should   10:01:10
15  make a resolution?                           10:01:13
16      A.   Again, there was no formal          10:01:15
17  meetings of LVI Services, Inc.'s board.      10:01:17
18  It -- there was a board consisting of two,   10:01:20
19  and it would always -- I say always          10:01:24
20  because I do not recall ever having a        10:01:29
21  formal meeting where there was minutes of    10:01:31
22  the board of LVI Services, Inc. The only     10:01:32
23  time the board took action was to execute    10:01:35
24  resolutions in lieu of a meeting.            10:01:39
25      Q.   Okay. So it wasn't -- was           10:01:41
```

```
                                    31
1              CUTRONE
2   it -- when you discussed with the other      10:01:45
3   board members of LVI Services whether to     10:01:56
4   sign a resolution or make a resolution,      10:01:59
5   did there ever come a time where the board   10:02:02
6   decided that perhaps the parent -- the       10:02:06
7   board of directors of the parent should      10:02:08
8   make the resolution?                         10:02:10
9       A.   A, I don't recall there ever        10:02:12
10  being any discussions of the board of LVI    10:02:14
11  Services formally or informally. Although    10:02:18
12  I mentioned before we might get together     10:02:20
13  by conversation or what have you, but it     10:02:22
14  might be something as simple as, oh, we      10:02:24
15  need to sign a resolution to elect so and    10:02:27
16  so as officer of the company. Okay. Send     10:02:29
17  me the resolution, and I'll sign it. That    10:02:31
18  is the conversation, but I don't recall      10:02:33
19  there ever being a time where there was a    10:02:35
20  discussion where well who should sign that   10:02:37
21  resolution, should it be Services, should    10:02:39
22  it be Parent, no.                            10:02:42
23      Q.   Okay. Now, does LVI Services        10:02:43
24  have any offices?                            10:02:49
25      A.   Offices or officers?                10:02:50
```

```
                                    32
1              CUTRONE
2       Q.   Offices.                  10:02:52
3       A.   Yes.                       10:02:53
4       Q.   How many approximately?             10:02:54
5       A.   We have 80 Broad Street for one.    10:02:56
6   We have an office in Westport that is        10:03:05
7   effectively LVI Services, Inc./LVI           10:03:07
8   Parent, LVI Acquisition just like 80 Broad   10:03:11
9   Street, and we have an office in Orange,     10:03:14
10  Texas, which houses our national director    10:03:16
11  of health and safety. It is considered a     10:03:20
12  corporate office, if you will, and those     10:03:22
13  employees work for LVI Services, Inc. We     10:03:24
14  have an office in Colorado where our CEO     10:03:26
15  and COO call their primary place of          10:03:32
16  business. I don't know exactly where in      10:03:36
17  Colorado offhand, and I believe that         10:03:39
18  constitutes all the offices of the           10:03:45
19  company.                                     10:03:48
20      Q.   So about five?                      10:03:48
21      A.   Four.                       10:03:49
22      Q.   Four offices.                       10:03:49
23           And where is LVI Services           10:03:52
24  headquartered?                               10:03:55
25      A.   It is always been 80 Broad          10:03:56
```

```
                                    33
1              CUTRONE
2   Street.                                      10:04:01
3       Q.   And is that where you maintain      10:04:01
4   an office?                                   10:04:03
5       A.   Yes.                       10:04:03
6       Q.   Do you work at any other offices    10:04:04
7   regularly?                                   10:04:05
8       A.   No.                        10:04:06
9       Q.   Just the one at 80 Broad Street?    10:04:07
10      A.   Yes.                        10:04:11
11      Q.   And does LVI Services have any      10:04:11
12  employees?                                   10:04:14
13      A.   Yes.                        10:04:14
14      Q.   Approximately how many?             10:04:15
15      A.   Thirty.                     10:04:16
16      Q.   And does LVI Services have any      10:04:19
17  officers?                                    10:04:23
18      A.   Yes.                        10:04:24
19      Q.   About how many?             10:04:25
20      A.   Six to ten.                 10:04:27
21      Q.   Now, prior to 2006, do you         10:04:30
22  recall what Mr. Fried's job title as LVI     10:04:45
23  Services was?                                10:04:48
24      MS. SELTZER:  Prior to January           10:04:50
25  of '06? When do you want?                    10:04:52
```

9 (Pages 30 to 33)

**VERITEXT REPORTING COMPANY**

212-267-6868                                    516-608-2400

**34**

1              CUTRONE
2      MR. DATOO:  Yes, prior to 2006.  10:04:54
3  So --                      10:04:56
4      A.   Burt was always president and   10:04:57
5  CEO.                      10:04:59
6      Q.   Okay.  And do you know how long   10:04:59
7  he was president and CEO?            10:05:03
8      A.   Probably as long as I was vice   10:05:05
9  president and CFO.            10:05:08
10      Q.   Okay.  Do you know what his job   10:05:09
11  duties were as CEO?            10:05:12
12      MS. SELTZER:  Objection.  At   10:05:15
13  any particular point in time?         10:05:16
14      MR. DATOO:  This is all prior   10:05:18
15  to 2006.                   10:05:19
16      A.   As president and CEO, you know,   10:05:22
17  Burt was the leader of the business, the   10:05:25
18  strategic leader, and handled the overall   10:05:29
19  direction of the company.            10:05:37
20      Q.   And during the time he was CEO   10:05:38
21  prior to 2006, how was LVI Services doing   10:05:42
22  financially?               10:05:47
23      A.   Prior to -- the whole 20      10:05:48
24  years --                   10:05:53
25      Q.   Yes, prior to January 1, 2006   10:05:54

**35**

1              CUTRONE
2  during the entire time that he was CEO   10:05:57
3  that you know of.            10:06:00
4      MS. SELTZER:  So over a 20-year   10:06:01
5  period?                   10:06:02
6      MR. DATOO:  Yes.         10:06:03
7      Q.   Generally speaking how was LVI   10:06:04
8  Services doing financially?         10:06:06
9      A.   We had our good years, and we   10:06:07
10  had our bad years.            10:06:09
11      Q.   Okay.  How about in '04, 2004,   10:06:10
12  how was LVI Services doing financially?   10:06:12
13      A.   '04 was a very good year.  We   10:06:15
14  had four hurricanes in Florida, which   10:06:18
15  contributed a significant amount of   10:06:21
16  revenue to the bottom line of the company,   10:06:23
17  stress and aggravation to go with it.   10:06:26
18      Q.   And how about in 2005?      10:06:28
19      A.   Similar.            10:06:30
20      Q.   Okay.  Now, did there -- do you   10:06:31
21  have personal knowledge of how Mr. Fried's   10:06:35
22  work performance was as CEO prior to 2006?  10:06:37
23      MS. SELTZER:  Over the entire   10:06:44
24  twenty-year period?            10:06:45
25      MR. DATOO:  Yes, in general.   10:06:47

**36**

1              CUTRONE
2      A.   How his work performance was?   10:06:47
3  Well, we were a successful contracting   10:06:49
4  organization that continued to grow in its   10:06:53
5  space and become the dominant leader in   10:06:58
6  the industry.  So I would say that is   10:07:01
7  fairly good marks --            10:07:02
8      Q.   Okay.               10:07:04
9      A.   -- for a CEO.         10:07:04
10      Q.   Did you work closely with Mr.   10:07:06
11  Fried when he was CEO prior to 2006?   10:07:08
12      A.   Sure.               10:07:11
13      Q.   Now, did there come a time in   10:07:11
14  2005 or 2006 when LVI Services began to   10:07:17
15  look for a new CEO?            10:07:22
16      A.   Yes.               10:07:24
17      Q.   Do you know why that is?  Why   10:07:25
18  that was?  Sorry.            10:07:32
19      A.   Yes, I have heard -- you know,   10:07:33
20  Burt expressed back at the time that he   10:07:35
21  wanted to find his successor, somebody to   10:07:38
22  lead the company through its next 20   10:07:42
23  years.  So it was -- it was primarily, you   10:07:44
24  know, Burt's desire to make sure he had a   10:07:50
25  good succession plan.            10:07:52

**37**

1              CUTRONE
2      Q.   Do you know why he wanted a   10:07:55
3  successor?               10:07:56
4      A.   Meaning?            10:07:57
5      Q.   Do you know why he was looking   10:07:58
6  for someone to succeed him?         10:07:59
7      A.   Because he couldn't do it   10:08:01
8  forever.  Right?  You know, he was -- it   10:08:03
9  is the old proverbial what if I get hit by   10:08:06
10  a bus, and at some point I am going to   10:08:10
11  retire, you know, and doing something   10:08:13
12  else.  He was deciding, you know, I am   10:08:15
13  doing this for a period of time, and   10:08:17
14  logically the company needs a successor to   10:08:19
15  bring it to the next X of amount of years.   10:08:22
16      Q.   Do you know if he was looking to   10:08:27
17  retire from LVI Services at that point?   10:08:28
18      A.   I know he was looking for his   10:08:30
19  replacement, and I think you would always   10:08:32
20  expect -- I don't know whether he expected   10:08:35
21  to stay on as chairman or not, what his   10:08:38
22  personal goals and aspirations were.  I   10:08:41
23  just know that he was looking for a   10:08:44
24  replacement to take on the day-to-day   10:08:46
25  responsibilities that he was then   10:08:47

10 (Pages 34 to 37)

**VERITEXT REPORTING COMPANY**

212-267-6868                              516-608-2400

**38**

```
1              CUTRONE
2    responsible for.                    10:08:48
3         Q.   Did you ever have a conversation  10:08:49
4    with him about what his role was going to  10:08:50
5    be once his successor was named?      10:08:53
6         A.   Not specifically.         10:08:54
7         Q.   Okay.  Did he ever tell you he  10:08:56
8    wanted to retire prior to 2006?       10:08:58
9         A.   You know, not that I recall any  10:09:02
10   specific conversations.             10:09:04
11        Q.   Do you know when            10:09:05
12   approximately --                    10:09:16
13            MR. DATOO:  Strike that.    10:09:17
14        Q.   Do you know who Robert McNamara  10:09:18
15   is?                                 10:09:20
16        A.   Yes.                       10:09:20
17        Q.   Who is he?                 10:09:20
18        A.   The former president and CEO of  10:09:21
19   LVI Services, Inc.                  10:09:25
20        Q.   And was he -- was Mr. McNamara  10:09:27
21   the one who was hired to succeed Mr. Fried  10:09:33
22   as CEO of LVI Services?             10:09:35
23        A.   At the time, yes.          10:09:38
24        Q.   Okay.  And while Mr. McNamara  10:09:39
25   was the CEO of LVI Services, what was Mr.  10:09:42
```

**39**

```
1              CUTRONE
2    Fried's job title?                  10:09:46
3         A.   He was chairman.           10:09:47
4         Q.   Chairman of LVI Services?  10:09:48
5         A.   Chairman of the ultimate parent  10:09:51
6    corp.  I don't know that there was a  10:09:56
7    formal distinction as chairman of LVI  10:09:58
8    Service, Inc. and its subsidiaries.  We  10:10:01
9    were directors of LVI Services.  Actually  10:10:05
10   at that time, when Bob came on, Bob then  10:10:07
11   became director with me of the         10:10:10
12   subsidiaries.  So Burt was on the board of  10:10:15
13   the ultimate parent.  I don't recall if he  10:10:19
14   was on the board of the intermediary  10:10:21
15   parent.  It might have been Bob and I the  10:10:24
16   rest of the way down like it used to be  10:10:27
17   Burt and I the rest of the way down.  So  10:10:30
18   it was very much an order of things, if  10:10:33
19   you will.                           10:10:36
20        Q.   When you say "ultimate parent,"  10:10:36
21   what company are you referring to?  10:10:38
22        A.   In '05, in November of '05, LVI  10:10:40
23   Acquisition now known as LVI Invest  10:10:43
24   acquired an ownership of LVI Parent Corp.  10:10:47
25   So -- I am sorry?  What was the question?  10:11:00
```

**40**

```
1              CUTRONE
2         Q.   When you refer to ultimate  10:11:03
3    parent --                          10:11:05
4         A.   Right.                     10:11:06
5         Q.   -- what company are you  10:11:07
6    referring to?                      10:11:08
7         A.   So LVI Acquisition became the  10:11:08
8    ultimate parent in November of '05 when it  10:11:10
9    acquired LVI Parent.                10:11:13
10        Q.   And when you refer to the  10:11:14
11   intermediate --                    10:11:17
12        A.   You have -- the company has done  10:11:19
13   four leveraged buyouts.  Each time a new  10:11:22
14   investment was going to come in to acquire  10:11:28
15   the company, the business, it would form a  10:11:31
16   Newco, invest its equity into that Newco  10:11:35
17   and then Newco would acquire Old Co.  So  10:11:39
18   '97, 2002 -- well, '93, '97, 2002, 2005,  10:11:44
19   there was always a Newco formed above the  10:11:54
20   Old Co. at the time.                10:11:57
21        Q.   Okay.                       10:11:57
22        A.   So LVI Services, Inc. was the  10:11:58
23   company that first existed, the public  10:12:00
24   parent in '93, and there was a Newco, and  10:12:02
25   there was another Newco in '02, a Newco  10:12:06
```

**41**

```
1              CUTRONE
2    in '05, and then we collapsed -- we merged  10:12:09
3    out of existence a couple of those  10:12:12
4    intermediary Newcos.  So because we  10:12:16
5    basically just had four Old Cos., we  10:12:18
6    basically merged them, and what you had  10:12:22
7    was LVI Acquisition, LVI Parent, LVI  10:12:24
8    Services, Inc. in late '05.         10:12:27
9         Q.   Okay.  And while Mr. McNamara  10:12:29
10   was the CEO of LVI Services, was Mr. Fried  10:12:34
11   an employee of LVI Services, Inc. as well?  10:12:37
12        A.   Yes.                       10:12:40
13        Q.   Okay.  And do you know what his  10:12:41
14   job title was as an employee of LVI  10:12:42
15   Services, Inc.?                     10:12:45
16        A.   His role was chairman.     10:12:45
17        Q.   Chairman.  So he had the title  10:12:47
18   chairman with LVI services, Inc. and with  10:12:50
19   either of the ultimate parent or the  10:12:53
20   intermediate parent?               10:12:57
21        A.   Again, what I had said is the  10:12:58
22   ultimate parent Burt was chairman of.  I  10:13:02
23   don't know if there was a formal  10:13:05
24   distinction of chairman of any of the  10:13:07
25   board members of any parent below the  10:13:09
```

11 (Pages 38 to 41)

**42**

```
                 CUTRONE
 1
 2   ultimate parent.                10:13:12
 3       Q.   But he held the title of        10:13:13
 4   chairman as an employee with LVI Services  10:13:14
 5   while Mr. McNamara was CEO?        10:13:17
 6       A.   So there by that distinction, it  10:13:19
 7   would clearly be as two-member boards Burt  10:13:21
 8   and I, and Burt was the chairman. Let's    10:13:24
 9   say it that way. So I just don't know if    10:13:26
10   there was a formal distinction as a board   10:13:28
11   member, even though his position as        10:13:31
12   employee of Services was chairman. That     10:13:32
13   is what we referred to him as, was         10:13:34
14   chairman.                        10:13:36
15       Q.   And while Mr. McNamara was CEO,   10:13:36
16   what were Mr. Fried's job duties?          10:13:39
17       A.   Primarily, you know, as I        10:13:43
18   understand it, Burt still          10:13:47
19   maintained -- was in-house general         10:13:51
20   counsel. So from -- primarily, you know,   10:13:52
21   legal matters would run through Burt, and  10:13:56
22   primarily it was strategic in nature. His  10:14:05
23   position was more strategic. If we had     10:14:07
24   any mergers or acquisition we were looking 10:14:12
25   at, you know, he was chairman, and Bob     10:14:15
```

**43**

```
                 CUTRONE
 1
 2   McNamara was president and CEO ran the     10:14:17
 3   day-to-day operations. I reported to Bob,  10:14:21
 4   and Burt handled the legal and overall     10:14:22
 5   strategic role for the company and then    10:14:25
 6   certainly had other responsibilities that  10:14:27
 7   he and Bob agreed would be his             10:14:29
 8   responsibilities I guess.           10:14:32
 9       Q.   Do you know what those were?      10:14:33
10       A.   Burt had involvement with our     10:14:34
11   bonding line. So, you know, contract       10:14:39
12   reviews and requests for bonds would       10:14:44
13   come -- again would come through But. He   10:14:47
14   would sign off on what bond requests we    10:14:50
15   were making. So legal and contractual      10:14:52
16   matters were primarily in Burt's           10:14:54
17   wheelhouse. He also had -- again,          10:14:56
18   when -- when we looked at different        10:15:01
19   companies for acquisitions like we         10:15:04
20   acquired a business in '07; we acquired a  10:15:06
21   business in '09, he would play an active   10:15:08
22   role in that, you know, evaluating         10:15:11
23   whether the company was for us and then in 10:15:13
24   participating and negotiating the deal.    10:15:15
25       There was other items that ran        10:15:19
```

**44**

```
                 CUTRONE
 1
 2   through the corporate office in Westport.  10:15:23
 3   There was business development efforts     10:15:25
 4   that went on out of that office, and I     10:15:26
 5   don't know if he had a personal            10:15:29
 6   relationship, working relationship with    10:15:32
 7   the woman that handled that, but clearly   10:15:34
 8   he had an involvement when it came to      10:15:37
 9   overseeing, you know, what -- marketing    10:15:39
10   materials, things of that nature. He -- I  10:15:41
11   believe he had involvement in that respect 10:15:44
12   because it was out of his office. Travel   10:15:47
13   and -- travel went through the Westport    10:15:49
14   office. So people who were going to        10:15:53
15   travel for the company would -- would make 10:15:56
16   their reservations through our reserve     10:15:58
17   systems. And those would go through        10:16:01
18   either Burt or -- or Shari for approval    10:16:02
19   and processing. Those are some of the      10:16:05
20   primary items --                 10:16:10
21       Q.   Okay.                    10:16:11
22       A.   -- that I recall.          10:16:12
23       Q.   Those all that you know of?      10:16:13
24       A.   That I recall.             10:16:14
25       Q.   Okay. Now, while -- going back   10:16:15
```

**45**

```
                 CUTRONE
 1
 2   a bit prior to 2006.             10:16:23
 3       A.   Okay.                    10:16:29
 4       Q.   When Mr. Fried was           10:16:29
 5   CE -- president and CEO of LVI Services,   10:16:32
 6   where did he maintain an office?           10:16:35
 7       A.   Early on we were together either  10:16:37
 8   at 80 Broad Street or prior to that it was 10:16:42
 9   470 Park Avenue South, and prior to that   10:16:47
10   was 345 Hudson Street.            10:16:50
11       Q.   All in New York City?          10:16:52
12       A.   Yes.                     10:16:54
13       Q.   And then did there come a time   10:16:54
14   when an office in Westport opened?         10:16:56
15       A.   Yes.                     10:16:58
16       Q.   And what -- do you recall when   10:16:59
17   that was?                       10:17:00
18       A.   Sometime prior. We could check   10:17:01
19   the lease. I don't recall how far back we  10:17:09
20   opened the office, but clearly it was      10:17:13
21   before '05, and it was sometime after Blue 10:17:14
22   Point's investment in '02. So somewhere    10:17:21
23   between 2002, 2005 we opened up Westport.  10:17:23
24       Q.   And when that Westport office    10:17:28
25   opened up and while Mr. Fried was CEO, did 10:17:30
```

12 (Pages 42 to 45)

**46**

CUTRONE

1
2    he spend any time in the Westport office?   10:17:32
3        A.   Yes.                    10:17:34
4        Q.   Do you know approximately -- and   10:17:35
5    did he also spend any time in the New York   10:17:36
6    office during that same time period?   10:17:38
7        A.   Early on, the first year or two,   10:17:41
8    he would split time.  He would spend a   10:17:43
9    couple of days in New York and a couple of   10:17:45
10   days in Westport.  Usually two in New York   10:17:47
11   and three in Westport.  It was   10:17:49
12   about -- but it was whatever he decided.   10:17:51
13   It wasn't strict.  But generally he was in   10:17:53
14   the office a couple of days a week in the   10:17:55
15   New York office, and then at some point I   10:17:57
16   want to say it clearly went -- then Burt   10:18:01
17   was exclusively in Westport.   10:18:05
18       Q.   Did he ever come to the New York   10:18:08
19   office when Mr. McNamara was CEO?   10:18:09
20       A.   Yes.  If there was a meeting or   10:18:13
21   whatever the case may be, but it wasn't a   10:18:14
22   set diet.  It was on an as-needed basis.   10:18:18
23   He would come down with Bob to -- to meet   10:18:22
24   with Bob for things.   10:18:26
25       Q.   When you say he came down with   10:18:27

**47**

CUTRONE

1
2    Bob --                    10:18:30
3        A.   To meet with Bob.   10:18:30
4        Q.   Can you tell me how many times a   10:18:31
5    week Mr. Fried would work out of the New   10:18:33
6    York office while Mr. McNamara was CEO?   10:18:35
7        A.   I wouldn't say -- it is   10:18:37
8    sometimes per week.  It would -- he never   10:18:39
9    really worked out of the 80 Broad Street   10:18:40
10   office.  He would come down for meetings.   10:18:43
11   So how many times I don't know.  It would   10:18:44
12   depend on whether there was a -- it would   10:18:46
13   just depend on the nature of the meeting.   10:18:48
14   If it required Burt's presence physically,   10:18:50
15   he would be at 80 Broad Street, and then   10:18:52
16   he might stay there for a couple of hours   10:18:55
17   and go back to Westport.  So generally   10:18:57
18   never -- he didn't maintain an office at   10:18:59
19   30 Broad Street.  He would be there for   10:19:01
20   meetings, and when he needed to work he   10:19:03
21   would work out of a guest office, so his   10:19:06
22   primary location was Westport.   10:19:08
23       Q.   Okay.  So can you give me an   10:19:10
24   approximate number of how many times a   10:19:11
25   month he worked out of -- Mr. Fried worked   10:19:13

**48**

CUTRONE

1
2    out of the New York office?   10:19:16
3        A.   Really -- I really can't.  I   10:19:16
4    would say almost never that he worked out   10:19:18
5    of the New York office.   10:19:20
6        Q.   Can you tell me approximately   10:19:24
7    how many times per month Mr. Fried had a   10:19:28
8    meeting at the New York office?   10:19:29
9        A.   I don't know.  You know -- you   10:19:30
10   know, a couple of times a year maybe.   10:19:31
11   Maybe more but not frequent.   10:19:34
12       Q.   Okay.  And while Mr. McNamara   10:19:35
13   was CEO, did Mr. Fried ever come to New   10:19:38
14   York to meet with clients or have any   10:19:41
15   client meetings?   10:19:43
16       A.   He may have.  I don't know.  I   10:19:43
17   didn't keep his calendar, so I just don't know.   10:19:54
18       Q.   Now, while Mr. McNamara was CEO,   10:19:57
19   how was LVI Services doing financially   10:20:01
20   during that period of time?   10:20:03
21       A.   We had our good years, and we   10:20:05
22   had our bad years.   10:20:07
23       Q.   Okay.  How about in 2008?   10:20:08
24       A.   2008 was a fairly good year in   10:20:13
25   both revenue and operating income.   10:20:20

**49**

CUTRONE

1
2        Q.   And how about in 2009?   10:20:22
3        A.   Much softer volume.  You know,   10:20:24
4    the economic downturn took its toll.   10:20:30
5    The -- we kind of stayed afloat in '08   10:20:34
6    because we had a couple of big contracts   10:20:37
7    and backlog that helped us maintain a   10:20:39
8    level of business through 2007, 2008, but   10:20:42
9    we weren't able to replenish that business   10:20:46
10   sufficient enough to maintain that level   10:20:50
11   of business.  So in '09 and then in 2010   10:20:51
12   the volumes were significantly less than   10:20:55
13   what they were in 2007, 2008.   10:20:58
14       Q.   In your opinion, would '09 be   10:21:00
15   considered a bad year?   10:21:03
16       A.   You know, I wouldn't say a bad   10:21:04
17   year because the one thing I'll say that   10:21:07
18   -- what the company was able to do is   10:21:09
19   maintain fairly strong gross margins on   10:21:17
20   the work that it did perform, and it was   10:21:17
21   able to manage its overhead, spend   10:21:17
22   reasonably well to maintain an operating   10:21:20
23   profit, but to the extent that it was   10:21:23
24   still saddled with the same debit load   10:21:27
25   that you had for a company, you know, that   10:21:32

13  (Pages 46 to 49)

**VERITEXT REPORTING COMPANY**

212-267-6868                            516-608-2400

**62**

CUTRONE

1
2      MS. SELTZER:  I object to the    10:43:23
3  form.  You can answer.              10:43:24
4      A.   Again, I don't evaluate the    10:43:25
5  chairman's performance.  It is not for me    10:43:27
6  to evaluate.                        10:43:32
7      Q.   Okay.  Now, did there come a    10:43:33
8  time when Mr. Fried became the interim CEO    10:43:38
9  of LVI Services?                    10:43:41
10     A.   Yes.                       10:43:43
11     Q.   Do you know when that was?    10:43:44
12     A.   Shortly after Mr. Freed's    10:43:45
13  requests McNamara left.            10:43:48
14     Q.   And do you know when that was?    10:43:49
15     A.   He resigned, advised us of his    10:43:51
16  resignation, you know, a couple of days or    10:43:55
17  a day after we executed the change order    10:43:57
18  for 130 Liberty Street, so early March is    10:44:00
19  when he resigned.  I want to say he stayed    10:44:03
20  on for the better part of March, and then    10:44:05
21  at that point Burt came on as interim    10:44:09
22  chairman -- interim -- interim president    10:44:12
23  and CEO.                           10:44:15
24     Q.   Do you know why Burt came on as    10:44:17
25  interim president and CEO?          10:44:19

**63**

CUTRONE

1
2      A.   That was the decision of the    10:44:21
3  board.                             10:44:22
4      Q.   Do you know if Burt was asked to    10:44:25
5  be president and interim CEO?       10:44:34
6      A.   What I recall is that shortly    10:44:35
7  after McNamara resigned, the board    10:44:37
8  retained a consultant or had a consultant    10:44:40
9  come in to meet with the team to meet with    10:44:42
10  myself and others I believe to assess, you    10:44:47
11  know, what does the company need now that    10:44:51
12  its CEO has abruptly left.  It didn't take    10:44:53
13  long to convince that consultant that the    10:44:57
14  business didn't need any outside help,    10:45:00
15  that, you know, Burt was -- and Burt and    10:45:04
16  the team were more than capable of    10:45:07
17  handling its affairs while a search went    10:45:09
18  on for a replacement, and that is what we    10:45:12
19  did, and I supported that.          10:45:14
20     Q.   Okay.  Do you -- in your    10:45:15
21  opinion, was Burt a good choice?    10:45:17
22     A.   Absolutely.               10:45:20
23     Q.   Why?                      10:45:20
24     A.   Why not?  I mean it was the role    10:45:21
25  he held for some fifteen plus years prior    10:45:23

**64**

CUTRONE

1
2  to Bob coming aboard.  You know, he -- it    10:45:27
3  is in his blood.  It is like, you know,    10:45:31
4  falling off a bike.  So for Burt to -- and    10:45:34
5  he was always active during the time that    10:45:37
6  Bob was there.  So for Burt to step back    10:45:39
7  in and perform the role of president and    10:45:41
8  CEO, contract reviews, bid reviews,    10:45:43
9  engaging with me on financial affairs,    10:45:48
10  whatever the case may, you know, it was an    10:45:50
11  old hat for him.  Why not?  I think there    10:45:53
12  was no better choice on an interim basis    10:45:55
13  than Burt if he was willing to do it.    10:45:59
14     Q.   Okay.  And do you know if Mr.    10:46:01
15  Fried continued to perform his prior job    10:46:05
16  duties as chairman while he was president    10:46:07
17  -- interim president and CEO?       10:46:09
18     A.   Yes.  I don't -- I don't believe    10:46:11
19  anybody stepped in to -- as active    10:46:15
20  chairman or acting chairman while Burt was    10:46:18
21  acting president and CEO.  The team    10:46:20
22  rallied around him, and we got the job    10:46:25
23  done.  We did what we had to do.    10:46:28
24     Q.   And in your opinion how was Mr.    10:46:30
25  Fried's work performance as interim    10:46:32

**65**

CUTRONE

1
2  president and CEO?                  10:46:34
3      A.   Well, again I -- in my area,    10:46:35
4  you know, it was fine.  There is    10:46:37
5  no -- just like before, just like then,    10:46:40
6  you know, I would engage him on things    10:46:43
7  that he needed to be engaged on but    10:46:46
8  otherwise went about doing the role that I    10:46:49
9  have been doing for the last 20 years and    10:46:51
10  didn't need to bother him with a lot    10:46:54
11  actually.  You know, let's just go    10:46:56
12  forward, keep doing what we are doing,    10:46:58
13  take care of -- take care of your end of    10:47:00
14  the business and, you know, go out and    10:47:04
15  find a replacement.                 10:47:06
16     Q.   And why were you trying to find    10:47:07
17  a -- why wasn't Mr. Fried chosen as the    10:47:09
18  permanent CEO and president, if you know?    10:47:15
19     MS. SELTZER:  I object to the    10:47:19
20  form.  Can you phrase it again?    10:47:20
21     MR. DATOO:  Sure.              10:47:21
22     Q.   Was Mr. Fried considered to be    10:47:21
23  the permanent president and CEO of LVI    10:47:23
24  Services?                          10:47:26
25     A.   When the search went on for the    10:47:26

17 (Pages 62 to 65)

**66**

| | | |
|---|---|---|
| 1 | CUTRONE | |
| 2 | replacement for Bob you mean? | 10:47:28 |
| 3 | Q. Yes. | 10:47:30 |
| 4 | A. I don't know. I don't -- I | 10:47:31 |
| 5 | don't think Burt -- well, I know Burt | 10:47:32 |
| 6 | didn't want it. Burt didn't want to be a | 10:47:36 |
| 7 | permanent replacement. Burt wanted to | 10:47:39 |
| 8 | find another president and CEO. | 10:47:41 |
| 9 | Q. Do you know if that is because | 10:47:43 |
| 10 | he wanted to keep his chairman role? | 10:47:44 |
| 11 | MS. SELTZER: Objection. | 10:47:47 |
| 12 | A. You'll have to ask Burt. | 10:47:48 |
| 13 | Q. Okay. Now, while Mr. Fried was | 10:47:50 |
| 14 | the interim president and CEO, did he work | 10:47:52 |
| 15 | out of the New York office? | 10:47:55 |
| 16 | A. No. | 10:47:56 |
| 17 | Q. Was he still based in -- | 10:47:57 |
| 18 | A. Westport. | 10:48:00 |
| 19 | Q. The Westport office? | 10:48:01 |
| 20 | A. Yes. | 10:48:02 |
| 21 | Q. Did he travel to New York more | 10:48:03 |
| 22 | often to work out of the New York office | 10:48:04 |
| 23 | while he was president -- interim | 10:48:06 |
| 24 | president and CEO? | 10:48:09 |
| 25 | A. No, not that I recall. There | 10:48:10 |

**67**

| | | |
|---|---|---|
| 1 | CUTRONE | |
| 2 | was no real need. Not really. He could | 10:48:12 |
| 3 | do everything by phone and e-mail. So | 10:48:15 |
| 4 | there was no need for him to be physically | 10:48:17 |
| 5 | at 80 Broad Street. | 10:48:19 |
| 6 | Q. Do you know if he was in New | 10:48:20 |
| 7 | York meeting with clients while he was | 10:48:22 |
| 8 | president and interim CEO? | 10:48:24 |
| 9 | A. I don't know. | 10:48:26 |
| 10 | Q. Okay. Now, while Mr. Fried was | 10:48:26 |
| 11 | interim president and CEO, was LVI | 10:48:35 |
| 12 | services going through a restructuring? | 10:48:38 |
| 13 | A. Yes. | 10:48:40 |
| 14 | Q. Okay. Why is that? | 10:48:41 |
| 15 | A. In late 2009, probably mid 2009, | 10:48:43 |
| 16 | the company's financial performance -- | 10:48:57 |
| 17 | based on the company's financial | 10:48:59 |
| 18 | performance it was evident that its | 10:49:01 |
| 19 | business size and resulting profit was not | 10:49:04 |
| 20 | going to be sufficient to maintain the | 10:49:09 |
| 21 | covenant levels required under the | 10:49:11 |
| 22 | existing debt agreements. So, as I said | 10:49:14 |
| 23 | earlier, while we were still quote, | 10:49:17 |
| 24 | unquote successful in that we were still | 10:49:19 |
| 25 | maintaining our presence in the industry, | 10:49:21 |

**68**

| | | |
|---|---|---|
| 1 | CUTRONE | |
| 2 | the management team was intact; the gross | 10:49:23 |
| 3 | margins are intact; SGA, you know, | 10:49:26 |
| 4 | somewhat rationalized given the lower | 10:49:29 |
| 5 | volume, we just weren't -- simply weren't | 10:49:33 |
| 6 | making enough money to support the debt | 10:49:35 |
| 7 | load, and, therefore, it was evident we | 10:49:37 |
| 8 | were going to be in default of our | 10:49:40 |
| 9 | covenants. | 10:49:42 |
| 10 | So the board understood that, | 10:49:42 |
| 11 | and the lender group was approached. We | 10:49:44 |
| 12 | retained a firm to assist in the | 10:49:49 |
| 13 | restructuring of its debt instruments and | 10:49:55 |
| 14 | equity investments, and that took | 10:49:59 |
| 15 | basically a year because we started | 10:50:03 |
| 16 | somewhere around September of '09 and | 10:50:05 |
| 17 | completed October 8th, the final close, of | 10:50:07 |
| 18 | '10. | 10:50:11 |
| 19 | Q. And what was Mr. Fried's role in | 10:50:11 |
| 20 | the restructuring? | 10:50:13 |
| 21 | A. Like myself, you know, we -- we | 10:50:14 |
| 22 | were there to, A, run the company and keep | 10:50:22 |
| 23 | the wheels moving, B, provide information | 10:50:26 |
| 24 | necessary to assist really the -- it was | 10:50:30 |
| 25 | more the ownership group that was leading | 10:50:35 |

**69**

| | | |
|---|---|---|
| 1 | CUTRONE | |
| 2 | the efforts around the restructuring, you | 10:50:41 |
| 3 | know, Code Hennessy as, Apollo as | 10:50:46 |
| 4 | subordinate lender at that time and | 10:50:52 |
| 5 | partial owner, minority owner, and the | 10:50:54 |
| 6 | lender group. It was Code and Apollo | 10:50:57 |
| 7 | really strategically working with each | 10:51:02 |
| 8 | other and the lender group, but certainly | 10:51:05 |
| 9 | Bob when he was there and then Burt were | 10:51:12 |
| 10 | involved and understanding and helping the | 10:51:15 |
| 11 | team, you know -- you know, navigate kind | 10:51:19 |
| 12 | of the process. | 10:51:24 |
| 13 | We had the consultants in from | 10:51:25 |
| 14 | the bank gathering all kinds of | 10:51:29 |
| 15 | information on forecasting and what have | 10:51:31 |
| 16 | you. We had the investor group from the | 10:51:33 |
| 17 | company that was hired by the company -- | 10:51:35 |
| 18 | really Code Hennessy picked them and | 10:51:37 |
| 19 | then -- engaged them to be the company | 10:51:40 |
| 20 | through the company. It was really kind | 10:51:42 |
| 21 | of Code/Apollo driving the bus as far | 10:51:44 |
| 22 | where we would go with this. | 10:51:47 |
| 23 | Now, that is my impression. | 10:51:49 |
| 24 | Quite frankly Burt and Bob certainly had | 10:51:51 |
| 25 | input, involvement and I did and others, | 10:51:53 |

18 (Pages 66 to 69)

98

```
 1            CUTRONE
 2    handling whatever he was handling. I      11:21:32
 3    anticipated a transition period to Scott,  11:21:34
 4    and I didn't know what Scott, Burt and the 11:21:37
 5    board had agreed would be Burt's           11:21:40
 6    responsibilities going forward, and it was 11:21:42
 7    not necessarily relevant to me.            11:21:44
 8        Q.   Do you know if Mr. Fried had any  11:21:47
 9    direct reports while Mr. State was CEO?    11:21:53
10        A.   I don't know.          11:21:55
11        Q.   Do you know if he delegated work  11:22:03
12    to anybody?                  11:22:06
13            MS. SELTZER:  Objection.    11:22:08
14        Q.   I am sorry. Do you know if Mr.    11:22:09
15    Fried delegated work to anybody while Mr.  11:22:11
16    State was CEO?               11:22:13
17            MS. SELTZER:  I object to the 11:22:15
18    form, but you can answer.          11:22:16
19        A.   I don't know.          11:22:17
20        Q.   Now, after Mr. State started     11:22:18
21    working at LVI Services, do you have any   11:22:30
22    personal knowledge of Mr. Fried's work     11:22:34
23    performance?                 11:22:37
24        A.   No.                11:22:37
25            MR. DATOO:  46.        11:23:13
```

99

```
 1            CUTRONE
 2        (Plaintiff's Exhibit 46 marked   11:23:16
 3    for identification.)           11:23:16
 4        (Document handed to witness.)    11:23:18
 5        Q.   Mr. Cutrone, you have in front   11:23:18
 6    of a document that has been marked         11:23:20
 7    Plaintiff's Exhibit 46.          11:23:22
 8        Can you take a look at the       11:23:24
 9    document and let me know if you've seen it 11:23:24
10    before?                  11:23:26
11        A.   Yes. Okay.           11:23:27
12            MS. SELTZER:  This is 46.    11:24:04
13        Q.   46. Do you see on the first     11:24:06
14    page an e-mail written by John Leonard to  11:24:07
15    yourself with a copy to Mr. Fried and Mr.  11:24:12
16    Leonard dated September 21, 210?           11:24:15
17        A.   Uh-huh.             11:24:18
18        Q.   Do you agree with Mr. Leonard's  11:24:19
19    comments in which he wrote: "You are       11:24:27
20    infamous in the little 13 billion dollar   11:24:28
21    market"?                 11:24:32
22        A.   Well, I responded by saying very 11:24:36
23    well said and completely true, so that is  11:24:37
24    a good indication that I agreed. Although  11:24:39
25    I think he used the term infamous, but he  11:24:42
```

100

```
 1            CUTRONE
 2    means famous. Infamous has actually a      11:24:45
 3    negative connotation which -- if I know     11:24:48
 4    the English language, which I have been    11:24:52
 5    accused of not knowing.          11:24:54
 6        Q.   Well, would you -- well, did you  11:24:55
 7    agree with the term infamous or would you  11:24:57
 8    agree with the term famous?        11:24:59
 9        A.   I would -- famous. Infamous --   11:25:01
10    somebody is infamous for a bad reason. If  11:25:03
11    you are known in this industry, you're     11:25:07
12    well known in a good way, not in a bad     11:25:10
13    way.                    11:25:13
14        Q.   Okay. Did you believe that Mr.   11:25:13
15    Fried would be a supportive chairman?      11:25:19
16        A.   Yeah. Yes.           11:25:21
17        Q.   Okay. Is that because he was     11:25:27
18    supportive of Mr. McNamara?        11:25:31
19            MS. SELTZER:  Objection.    11:25:33
20        A.   Just my evaluation of Burt like, 11:25:34
21    you know, he was -- he wanted what was     11:25:39
22    best for the company. So if he was         11:25:43
23    involved with the company, you know, he    11:25:46
24    would always be having -- in my mind have  11:25:48
25    the objective of doing something that is   11:25:52
```

101

```
 1            CUTRONE
 2    good for the company.            11:25:53
 3        Q.   Now, after Mr. State started     11:25:54
 4    working at LVI Services, did there come a  11:25:59
 5    time when Mr. State began transitioning    11:26:02
 6    Mr. Fried's job duties to other employees? 11:26:04
 7        A.   Yes, obviously. Yes.      11:26:06
 8        Q.   And how do you know that?    11:26:14
 9        A.   By what was occurring. There     11:26:16
10    was the appointment of Greg DiCarlo as     11:26:29
11    general counsel. There was nothing more    11:26:31
12    formal than that. You know my role was     11:26:35
13    still my role. I reported to him, and --   11:26:38
14    but at some point I was aware that there   11:26:41
15    was a set of responsibilities that Burt    11:26:44
16    had outlined and then Scott looked to      11:26:46
17    delegate to others in the organization as  11:26:50
18    opposed to them being performed by the     11:26:52
19    chairman.                11:26:55
20        Q.   Okay. And do you know what      11:26:55
21    duties Mr. State wanted to delegate to     11:26:57
22    others?                  11:27:00
23        A.   Of what -- of that list?    11:27:00
24        Q.   Yes --               11:27:04
25        A.   That I referred to?       11:27:04
```

VERITEXT REPORTING COMPANY

212-267-6868                              516-608-2400

126

CUTRONE

1  
2 tell you what happened and, you know,    11:54:26
3 let's just let it play out, but let's    11:54:28
4 focus on what we have to do.    11:54:30
5    Q.   Now, did you ever have a    11:54:31
6 conversation with Mr. State about Mr.    11:54:45
7 Fried's job duties or his role at LVI    11:54:47
8 other than what you just testified to?    11:54:49
9    A.   Not that I recall.    11:54:51
10    Q.   Did you ever have a conversation    11:54:54
11 with anybody about Mr. Fried's job duties    11:54:55
12 or his role at LVI other than what you    11:54:58
13 just testified to?    11:55:00
14    MS. SELTZER: I object to the    11:55:03
15 form. The meeting in LVI, outside LVI?    11:55:03
16    MR. DATOO: Anybody.    11:55:06
17    MS. SELTZER: His wife, his --    11:55:07
18    MR. DATOO: Anybody.    11:55:09
19    A.   Well, certain things I share    11:55:10
20 with my wife. Now, kind of the ongoing    11:55:12
21 things, really the only other person that    11:55:16
22 I have in any way been conversant at all    11:55:18
23 with would be John, John Leonard, and to a    11:55:21
24 lesser extent Kamal and Joseph. You know,    11:55:24
25 the three of us worked -- the four of us    11:55:27

127

CUTRONE

1  
2 have been working together for 20 years.    11:55:30
3 It has come up in conversation what is    11:55:32
4 going on shoulder to shoulder huddled up    11:55:36
5 with each other, and, you know, we are a    11:55:36
6 little befuddled by it too, but we try not    11:55:39
7 to let it be a distraction.    11:55:43
8    Q.   So what did you discuss with Mr.    11:55:45
9 Leonard about Mr. Fried's job duties or    11:55:46
10 his role at LVI?    11:55:48
11    A.   I -- I didn't really. My point    11:55:52
12 is usually we talk about the fact that we    11:55:54
13 have this ongoing battle, but I didn't    11:55:57
14 talk about the job duties per se. I think    11:55:59
15 he was probably aware like I was aware    11:56:02
16 that there was a list, and there was a    11:56:04
17 list of duties, and Scott wanted to assign    11:56:06
18 them out, and Burt didn't want to, and    11:56:08
19 that started their friction, and he    11:56:09
20 wondered about how much longer are we    11:56:11
21 going to do this. That is the extent of    11:56:14
22 it. After that it was just more of, you    11:56:15
23 know, when are you being deposed, that    11:56:18
24 kind of thing, not -- there has not really    11:56:20
25 been a lot of dialogue about it because    11:56:22

128

CUTRONE

1  
2 there is nothing for us to do. It is of    11:56:25
3 no relevance to us other than the company    11:56:29
4 has to defend a very significant lawsuit,    11:56:31
5 and we have got jobs to do. So we just go    11:56:34
6 back to work.    11:56:36
7    Q.   And does the same thing apply    11:56:36
8 for conversations with Mr. Annarumma or    11:56:38
9 Mr. Sookram?    11:56:41
10    A.   Yes.    11:56:42
11    Q.   Did you ever take any notes of    11:56:42
12 your conversations with these three    11:56:43
13 individuals?    11:56:45
14    A.   No.    11:56:45
15    Q.   Did you take any notes regarding    11:56:45
16 a conversation you had about Mr. Fried    11:56:47
17 during your Denver meeting?    11:56:49
18    A.   No.    11:56:51
19    Q.   Did you ever have a conversation    11:56:51
20 with Mr. State about whether there was    11:57:01
21 uncertainty concerning employees -- who    11:57:04
22 employees should be reporting to between    11:57:06
23 Mr. State and Mr. Fried?    11:57:08
24    A.   Say -- rephrase -- say that    11:57:10
25 again, please.    11:57:13

129

CUTRONE

1  
2    Q.   Did you ever have a conversation    11:57:14
3 with Mr. State about any uncertainty with    11:57:15
4 LVI employees as to who they should be    11:57:19
5 reporting to between state and Mr. Fried?    11:57:22
6    MS. SELTZER: I object to the    11:57:27
7 form, but you can answer.    11:57:28
8    A.   I would say no because I am not    11:57:29
9 aware that there was any uncertainty of    11:57:30
10 what is Scott wanted. Obviously there    11:57:33
11 must be have been uncertainty between him    11:57:37
12 and Burt, but I am not aware of    11:57:39
13 any -- there was never any discussion with    11:57:41
14 me about that uncertainty.    11:57:42
15    Q.   Do you know if there was any    11:57:44
16 uncertainty amongst the employees as to    11:57:45
17 who they should be reporting to for    11:57:48
18 certain things?    11:57:50
19    A.   No. Like post -- like when    11:57:51
20 Scott came aboard?    11:57:53
21    Q.   Yes.    11:57:54
22    A.   No, I think Scott made it pretty    11:57:55
23 clear very candidly, very directly, very    11:57:56
24 logically, and we subscribed to it and    11:57:59
25 went forward day one.    11:58:02

33 (Pages 126 to 129)

**138**

```
                  CUTRONE
1
2    didn't have an opinion or anything on it    12:13:34
3    because we didn't -- we didn't know         12:13:37
4    anything about it.  We just found out       12:13:39
5    secondhand that this is the road it has     12:13:41
6    taken.                          12:13:43
7    Q.    Okay.  Did you ever --     12:13:44
8    A.    Let me just put this on silent.   12:14:35
9    Q.    Did you ever see a letter from   12:14:37
10   Mr. Fried's attorneys?         12:14:41
11   A.    A letter -- yes.          12:14:44
12   Q.    Do you recall when you first saw  12:14:46
13   that letter?                   12:14:47
14   A.    No.                      12:14:48
15   Q.    How did you come to see the    12:14:52
16   letter?                        12:14:53
17   A.    It was e-mailed to me by Scott,  12:14:53
18   and the original ultimately was with me.  12:15:01
19   I have -- I have the original letter   12:15:08
20   because it was addressed to Scott at 80  12:15:10
21   Broad Street.                  12:15:13
22   Q.    How did you -- I'm sorry.      12:15:16
23   A.    I just wanted to say it was    12:15:17
24   delivered to 80 Broad Street.    12:15:19
25   Q.    So how did you come to be in   12:15:21
```

**139**

```
                  CUTRONE
1
2    possession of that letter?        12:15:22
3    A.    At some point I asked Scott if    12:15:23
4    he wanted me to open it or send it to him,  12:15:26
5    and he asked me -- you know, I don't    12:15:29
6    recall.  He might have probably said open  12:15:32
7    it because I wouldn't have opened it if he  12:15:33
8    didn't agree to it, but I think I already  12:15:36
9    knew it was coming because I think, you   12:15:38
10   know, going back to the conversation I    12:15:40
11   think at some point Scott said to me, you  12:15:43
12   know, I think he is going to file suit or  12:15:46
13   something, you know, that -- so I didn't   12:15:52
14   think the letter was necessarily an   12:15:52
15   ultimate surprise because it obviously   12:15:56
16   wasn't moving forward productively the   12:15:59
17   other way.  I don't know what was going on  12:16:03
18   between the conversation -- in         12:16:05
19   conversations between Burt and the board  12:16:06
20   and Scott.  But it -- you know, at some   12:16:08
21   point I got the letter.         12:16:11
22   Q.    Okay.                    12:16:12
23         MR. DATOO:  Can we take a short  12:16:14
24   break?                         12:16:16
25         MS. SELTZER:  Got to find the   12:16:17
```

**140**

```
                  CUTRONE
1
2    letter?                          12:16:18
3         THE VIDEOGRAPHER:  We're going   12:16:19
4    off the record, 12:16 p.m.       12:16:20
5         (Recess taken.)            12:16:22
6         THE VIDEOGRAPHER:  We're       12:23:28
7    returning to the record, 12:23 p.m.   12:23:28
8    Q.    Mr. Cutrone, you have in front  12:23:31
9    of you a document that has been previously  12:23:32
10   marked as Plaintiff's Exhibit 8.  It is a  12:23:34
11   document Bates stamped B Simmons 44   12:23:37
12   through B Simmons 49.           12:23:45
13         Can you please take a look at   12:23:54
14   this document and let me know if you have  12:23:55
15   seen it before?                12:23:58
16   A.    Yes, I have.             12:23:59
17   Q.    Is this the letter from Mr.    12:24:00
18   Fried -- Fried's attorneys that you    12:24:06
19   mentioned earlier?             12:24:10
20         MS. SELTZER:  Do you mean the   12:24:14
21   attachment?                    12:24:15
22   A.    Yes, the attachment.  Not the   12:24:15
23   cover.                         12:24:17
24   A.    Yes, this is the letter I     12:24:17
25   recall.  Yes.                  12:24:19
```

**141**

```
                  CUTRONE
1
2    Q.    Okay.  Now, if you look at    12:24:19
3    the -- did you read -- did you receive   12:24:29
4    this letter on November 15, 2010?    12:24:32
5    A.    I don't know.  I think it was   12:24:35
6    received at the office because it    12:24:40
7    was -- it says via hand delivery addressed  12:24:44
8    to Scott State.  And so if that is true,  12:24:46
9    it probably hit our office on November 15.  12:24:49
10   Q.    Okay.  Do you --           12:24:52
11   A.    I --                     12:24:54
12   Q.    Go ahead.                12:24:55
13   A.    I sent the e-mail to Scott on   12:24:56
14   the 16th.                      12:24:58
15   Q.    And do you recall when this    12:25:03
16   letter was delivered to you?     12:25:04
17   A.    No.                      12:25:05
18   Q.    Okay.                    12:25:05
19         MS. SELTZER:  I object to the   12:25:06
20   form.  He didn't testify it was delivered  12:25:07
21   to him specifically.           12:25:10
22         MR. DATOO:  I'm sorry?       12:25:11
23         MS. SELTZER:  I said he didn't  12:25:12
24   testify it was delivered to him.    12:25:13
25   Q.    Well, at some point -- at some  12:25:15
```

36  (Pages 138 to 141)

**VERITEXT REPORTING COMPANY**

212-267-6868                                        516-608-2400

**146**

```
1              CUTRONE
2   board meeting, did you have any        12:28:31
3   discussions -- other than what -- sorry.  12:28:32
4   Let me back up.                        12:28:36
5       Other than what you have          12:28:37
6   testified to after the November 4 board  12:28:38
7   meeting, did you have any discussions with  12:28:41
8   anyone about Mr. Fried's job duties or his  12:28:42
9   role at LVI?                           12:28:45
10      MS. SELTZER:  Objection.  Asked    12:28:47
11  and answered.  You can answer again.   12:28:48
12      A.  No.                            12:28:50
13      Q.  Okay.  Do you know why Mr. Fried  12:28:51
14  was terminated?                        12:28:56
15      A.  Specifically, no.              12:28:57
16      Q.  How about generally?           12:29:01
17      A.  My understanding is that       12:29:02
18  the -- they could not come to terms on the  12:29:08
19  offer of compensation and responsibilities  12:29:12
20  going forward.  There was an offer.  He  12:29:15
21  didn't accept, and therefore his       12:29:19
22  termination -- his employment ceases.  12:29:23
23      Q.  And how did you come to learn  12:29:25
24  that?                                  12:29:26
25      A.  I couldn't recall.  It was     12:29:26
```

**147**

```
1              CUTRONE
2   either through conversation with Scott  12:29:27
3   or -- it probably would have been talking  12:29:30
4   with Scott.                            12:29:32
5       Q.  Do you recall when that        12:29:33
6   conversation took place?               12:29:33
7       A.  No.                            12:29:34
8       Q.  Was it before or after Mr. Fried  12:29:35
9   was terminated?                        12:29:36
10      A.  I don't know.  Assuming there  12:29:37
11  was a conversation, I am just saying who  12:29:40
12  else would I have heard from.  Either  12:29:42
13  Scott or Kamal are the only two people I  12:29:44
14  would have -- that would shared that fact  12:29:47
15  with me.  It might have -- you know, I  12:29:49
16  recall an e-mail from Burt about a     12:29:54
17  severance package -- a severance package  12:29:59
18  or a termination package, and I want to  12:30:03
19  say he wrote to me -- I don't think that  12:30:06
20  was the first time I heard.  It could have  12:30:08
21  been.  It could have been from Burt    12:30:10
22  himself.                               12:30:12
23      Q.  Do you recall when that was?   12:30:12
24      A.  Offhand, no.                   12:30:13
25      Q.  Do you recall what the substance  12:30:14
```

**148**

```
1              CUTRONE
2   of the e-mail was?                     12:30:16
3       A.  Something about I understand I  12:30:17
4   am going to get a package, and I think I  12:30:19
5   referred him to Kamal because I wouldn't  12:30:21
6   normally deliver that.                 12:30:23
7       Q.  Do you know if that was before  12:30:24
8   or after Mr. Fried was terminated?     12:30:26
9       A.  I don't know.                  12:30:28
10      Q.  Okay.                          12:30:29
11      A.  But there is an e-mail to that  12:30:30
12  effect, so --                          12:30:32
13      Q.  Okay.  Are you familiar with   12:30:33
14  Shari Dembin?                          12:30:35
15      A.  Yes.                           12:30:36
16      Q.  How so?                        12:30:36
17      A.  She -- I've known Shari since  12:30:37
18  she was sixteen years old.             12:30:43
19      Q.  And was she employed by LVI    12:30:45
20  Services?                              12:30:51
21      A.  Yes.                           12:30:51
22      Q.  Do you know how long?          12:30:51
23      A.  At least ten years, probably  12:30:52
24  fifteen.                               12:30:56
25      Q.  And which office did she work  12:30:57
```

**149**

```
1              CUTRONE
2   in?                                    12:31:00
3       A.  Originally she worked out of the  12:31:00
4   corporate office at 80 Broad Street and/or  12:31:03
5   470 Park when it was there, where ever the  12:31:08
6   corporate office was.                  12:31:12
7       Q.  And how about later on?        12:31:13
8       A.  At some point she relocated to  12:31:14
9   the Westport office.                   12:31:17
10      Q.  And did you know if she is     12:31:18
11  related to Mr. Fried?                  12:31:20
12      A.  It is his daughter.            12:31:21
13      Q.  And when did you find that out?  12:31:22
14      A.  Probably the day I met her.    12:31:25
15      Q.  And do you know what           12:31:28
16  Ms. Dembin's job title was?            12:31:32
17      A.  In -- I believe it was insurance  12:31:34
18  and bonding administrator.             12:31:36
19      Q.  And do you know what her job   12:31:38
20  duties were?                           12:31:40
21      A.  Generally but she didn't report  12:31:40
22  to me.                                 12:31:46
23      Q.  Can you tell me what her job   12:31:46
24  duties were generally?                 12:31:48
25      A.  She administered insurance and  12:31:49
```

38 (Pages 146 to 149)

VERITEXT REPORTING COMPANY

212-267-6868                              516-608-2400

```
                                                    150
```

1  CUTRONE
2  bonding. So all the company's insurance    12:31:50
3  certs, you know, when we -- when we start    12:31:53
4  a project we have to provide our client an    12:31:57
5  insurance certificate to evidence our    12:32:01
6  insurance. So she was the point person.    12:32:02
7  So all of the requests for insurance certs    12:32:06
8  came through to her, and she was the    12:32:09
9  clearinghouse with our -- to issue those    12:32:10
10  certs. We could issue a lot of them    12:32:13
11  in-house, and sometimes we had to go to    12:32:15
12  the broker for a special cert. So she was    12:32:18
13  -- everything routed through her in that    12:32:21
14  respect. She issued certs.    12:32:24
15  Q.   What do you mean by certs?    12:32:26
16  A.   Insurance certificates.    12:32:28
17  Certificates of insurance evidencing the    12:32:30
18  company's insurance on behalf of the owner    12:32:31
19  on a project. So every project you have    12:32:33
20  to give them a certificate of insurance,    12:32:35
21  so they could see what our -- A, they are    12:32:37
22  named as the certificate holder and    12:32:40
23  we -- it provides notice as to the limits    12:32:43
24  that the company has, policy limits.    12:32:44
25  Q.   Do you know how much money she    12:32:46

```
                                                    151
```

1  CUTRONE
2  made?    12:32:48
3  A.   Yes. I -- offhand I think it    12:32:48
4  was 85,000 a year.    12:32:52
5  Q.   Okay.    12:32:54
6  A.   In that range.    12:32:56
7  Q.   Do you know if she was    12:32:56
8  responsible for reviewing and processing    12:32:59
9  insurance requests from LVI's other    12:33:01
10  offices?    12:33:05
11  A.   That is what I just described.    12:33:05
12  Q.   Okay. And was she responsible    12:33:07
13  for reviewing -- do you know if she was    12:33:09
14  responsible for reviewing bid and bond    12:33:12
15  requests before the requests were sent to    12:33:14
16  a surety?    12:33:16
17  A.   Yes. Again, she had a similar    12:33:18
18  function in my understanding that all bid    12:33:20
19  bond requests and all bond requests also    12:33:23
20  came through Shari. She received them and    12:33:25
21  any information necessary for the company    12:33:28
22  to -- to actually then order the bid bonds    12:33:31
23  or payment performance bonds from the    12:33:35
24  surety. So, yes, she was the -- the    12:33:38
25  person that routed them through.    12:33:41

```
                                                    152
```

1  CUTRONE
2  Q.   And do you know how long she had    12:33:43
3  this role for?    12:33:44
4  A.   Several years.    12:33:45
5  Q.   What do you mean by several?    12:33:47
6  A.   Probably at least five.    12:33:49
7  Q.   Okay. And do you know what her    12:33:52
8  job title was prior or her role was prior?    12:33:56
9  A.   She started off primarily as    12:34:01
10  Burt's administrative assistant, and then    12:34:05
11  she took on different roles and    12:34:09
12  responsibilities over the course of the    12:34:10
13  years, insurance bonding, administration.    12:34:12
14  She also was involved with the travel    12:34:17
15  program and the promotions, if we -- if a    12:34:21
16  branch office was going to order T-shirts    12:34:27
17  or hats. So she was -- things like that,    12:34:29
18  so she was -- she would organize and    12:34:31
19  receive and place orders for that on    12:34:33
20  behalf of the branches. So LA would say I    12:34:36
21  need this, that, the other thing, and she    12:34:39
22  would secure them. So she was like the    12:34:41
23  one purchase agent, if you will, for the    12:34:43
24  company for promotional items, and she    12:34:45
25  also assisted quite adeptly in organizing    12:34:48

```
                                                    153
```

1  CUTRONE
2  any company functions. So the holiday    12:34:53
3  party at Rosini's, management meetings off    12:34:56
4  site, she would be coordinating with    12:34:59
5  Burt's direction on, you know, sites,    12:35:03
6  location and making arrangements for the    12:35:06
7  rooms and et cetera, et cetera for -- for    12:35:08
8  a management meeting of, you know,    12:35:10
9  sometimes 20, sometimes 60 people at -- at    12:35:12
10  an event or at a resort setting or    12:35:15
11  whatever, you know.    12:35:17
12  Q.   And did she continue to perform    12:35:18
13  those job duties when she was I guess    12:35:20
14  responsible for insurance and bonding?    12:35:25
15  A.   Yeah. There were much fewer and    12:35:26
16  far in between in the last five years, but    12:35:31
17  to the extent we had them, you know, she    12:35:34
18  would. Yes.    12:35:36
19  Q.   And would you consider when she    12:35:36
20  became responsible for insurance and    12:35:39
21  bonding a promotion?    12:35:42
22  MS. SELTZER: I object to form,    12:35:45
23  but you can answer if you know.    12:35:46
24  A.   You know, not formally. I mean    12:35:48
25  she was given salary increases over time    12:35:50

VERITEXT REPORTING COMPANY

212-267-6868                                        516-608-2400

**154**

```
 1            CUTRONE
 2  and -- but I wouldn't say it was        12:35:53
 3  promotion.  You know, administrative -- it   12:35:57
 4  is an administrative position either way.    12:35:59
 5  So administrating bonding insurance or       12:36:01
 6  administrating for an executive.  So --      12:36:04
 7       Q.   Do you know who gave her          12:36:09
 8  assigned her those responsibilities?        12:36:13
 9       A.   With regards to bonding and       12:36:14
10  insurance, let me step back.  Five plus      12:36:17
11  years ago, Joseph Annarumma took over as     12:36:22
12  primary manager over insurance bonding on    12:36:25
13  the administration of insurance and          12:36:29
14  bonding.  Joseph was procuring and           12:36:32
15  negotiating -- procuring quotes for          12:36:36
16  insurance for annual renewals and things     12:36:38
17  of that nature and Shari administered the    12:36:40
18  certificate program, you know, issuance of   12:36:42
19  certificates.  Bonding administration was    12:36:47
20  really kind of always with Burt, you know,   12:36:50
21  that -- all bid bonds, the review of that,   12:36:52
22  it is all about contractual review because   12:36:55
23  you are going to give the bonding company    12:36:57
24  -- you want to make sure it's got good       12:36:58
25  scope and terms and conditions that were     12:37:02
```

**155**

```
 1            CUTRONE
 2  acceptable, and Burt would review those      12:37:04
 3  provisions prior to ordering it.  So Shari   12:37:07
 4  wouldn't -- Shari might tab the page here    12:37:09
 5  is the different provisions, but Burt was    12:37:12
 6  I believe -- because Burt was the one that   12:37:13
 7  would review that specifically and say,      12:37:16
 8  yes, go ahead and send it.                   12:37:17
 9       So Shari administered the              12:37:19
10  bonding program through -- you know, with    12:37:21
11  Burt because she received in the bid         12:37:23
12  bonds, logged them, tabbed them, gave them   12:37:28
13  to Burt.  He would clear them.  She would    12:37:30
14  send them to the bonding company to get      12:37:33
15  bid bonds.  She would get the bid bonds,     12:37:35
16  log them in, and get them to the branch,     12:37:42
17  and she would administer that function       12:37:42
18  under Burt's direction on the bonding        12:37:42
19  side.  On the insurance side also under      12:37:43
20  Joseph's direction but she had it down.      12:37:46
21  She didn't -- it was a very                  12:37:47
22  straightforward process, but if there was    12:37:49
23  a unique insurance requirement, then she     12:37:50
24  would go to Joseph if something was unique   12:37:52
25  or different because Joseph knew our         12:37:56
```

**156**

```
 1            CUTRONE
 2  policies.  Joseph managed our policies for   12:37:58
 3  workers comp, general liability, et          12:38:00
 4  cetera.  So he was the manager on the        12:38:02
 5  insurance side, and Burt was the manager     12:38:04
 6  on bonding side, and she administered the    12:38:06
 7  function necessary for both those            12:38:09
 8  managers.  That is how I understood it.      12:38:11
 9       Q.   Do you know who assigned her      12:38:12
10  those job duties?                            12:38:14
11       A.   I think Burt and Joseph --        12:38:15
12       Q.   Okay.                             12:38:21
13       A.   -- you know, going back now five  12:38:22
14  plus years ago.                             12:38:24
15       Q.   Right.  And do you know what her  12:38:25
16  work performance was like?                   12:38:26
17       A.   Not directly but, you know, she   12:38:28
18  didn't report to me.                         12:38:33
19       Q.   Okay.  How about indirectly?  Do  12:38:34
20  you know what her work performance was       12:38:37
21  like?                                       12:38:39
22       A.   It was fine.                      12:38:39
23       Q.   Okay.  Now, did you consider her  12:38:41
24  job duties as noncritical administrative     12:38:45
25  duties?                                     12:38:49
```

**157**

```
 1            CUTRONE
 2       MS. SELTZER:  I object to the          12:38:50
 3  form.                                       12:38:51
 4       A.   Did I consider them noncritical.  12:38:51
 5  What do you mean by critical?  I considered  12:38:55
 6  them administrative.                         12:38:58
 7       Q.   Do you -- could her job duties    12:39:00
 8  have been performed by a secretary?         12:39:06
 9       A.   Her job duties could be           12:39:08
10  performed by any capable person paying       12:39:14
11  attention.                                  12:39:16
12       Q.   Why do you -- why was she         12:39:17
13  being -- how much do secretaries get paid?  12:39:19
14       A.   First we don't have any           12:39:22
15  secretaries.  We have administrative         12:39:25
16  assistants, and there is no defined          12:39:30
17  structure or salary.  We pay for             12:39:31
18  performance based upon what the manager's    12:39:33
19  opinion is as to role and responsibility,    12:39:37
20  and we compensate people accordingly.        12:39:40
21       Q.   What is your highest -- your      12:39:42
22  current highest paid administrative          12:39:45
23  assistant?                                  12:39:47
24       A.   In the corporate office?          12:39:48
25       Q.   Yes.                              12:39:51
```

40 (Pages 154 to 157)

**158**

CUTRONE

1
2     A.   60.                    12:39:52
3     Q.   Now, did there come a time when   12:39:55
4  Ms. Dembin was terminated?            12:40:04
5     A.   Yes.        12:40:06
6     Q.   And do you recall when that was?   12:40:06
7     A.   Yes, early January.        12:40:08
8     Q.   Do you know why?            12:40:10
9     A.   Primarily because we were        12:40:11
10  closing the Westport office. Actually   12:40:13
11  specifically because we were closing the   12:40:18
12  Westport office.            12:40:20
13     Q.   And was the closure of that     12:40:21
14  office a part of a bigger layoff?   12:40:23
15     A.   Yes.        12:40:26
16     Q.   And how many people were laid   12:40:27
17  off in total?            12:40:30
18     A.   There was a reduction in force   12:40:31
19  of about at least a dozen people or about   12:40:33
20  a dozen people.            12:40:39
21     Q.   And who made the decision to lay   12:40:42
22  off?            12:40:47
23          MS. SELTZER:   Objection.   12:40:49
24     Q.   To lay off the 12 people.   12:40:50
25          MS. SELTZER:   I object to the   12:40:54

**159**

CUTRONE

1
2  form simply because it may not have been   12:40:55
3  one person. Do you want for each person   12:40:57
4  to --            12:40:59
5          MR. DATOO:   That is why I said   12:41:00
6  who.            12:41:01
7          MS. SELTZER:   Okay.   12:41:01
8     A.   Well, there was meetings amongst   12:41:02
9  several senior managers, Scott, myself,   12:41:06
10  John Leonard, the regional managers, Mark   12:41:09
11  Canessa, regional managers being Aiello,   12:41:14
12  Pearson, Anderson. I believe Greg DiCarlo   12:41:18
13  might have been in those            12:41:22
14  discussions -- that discussion as well.   12:41:24
15          MS. SELTZER:   Before I let him   12:41:26
16  answer if there were any discussions with   12:41:27
17  Greg DiCarlo that had any kind of legal   12:41:29
18  component, you are not to testify about   12:41:32
19  those, okay.            12:41:34
20     A.   No, it was -- it was about the   12:41:35
21  reduction in force.            12:41:37
22          MS. SELTZER:   Okay.   12:41:38
23     A.   About, you know, Scott assessing   12:41:39
24  the business, assessing the talent that   12:41:42
25  the business has, the effectiveness of   12:41:46

**160**

CUTRONE

1
2  that -- of that talent, talent meaning the   12:41:48
3  personnel, and evaluating where it was   12:41:50
4  being effective and delivering a return,   12:41:53
5  and so he evaluated many aspects of the   12:41:58
6  business to -- collectively as a team.   12:42:01
7  People were asked for their opinions.   12:42:04
8  People gave their opinions, and at the end   12:42:06
9  of the day I would say without any   12:42:09
10  reservation that all the managers that   12:42:11
11  participated on those calls were   12:42:13
12  supporters of the reduction in force to   12:42:16
13  the individual, and then we acted on it.   12:42:19
14     Q.   Including you?            12:42:23
15     A.   Yes.            12:42:25
16     Q.   And who made the final decision   12:42:25
17  as to who was going to be laid off?   12:42:30
18          MS. SELTZER:   Objection.   12:42:34
19     A.   I mean --            12:42:36
20          MS. SELTZER:   I object to the   12:42:36
21  form.            12:42:39
22          MR. DATOO:   What is -- what is   12:42:39
23  wrong with the form?            12:42:39
24          MS. SELTZER:   Well, I mean   12:42:40
25  first of all what do you mean by final   12:42:41

**161**

CUTRONE

1
2  decision? Secondly, you are assuming that   12:42:43
3  there was one individual that made the   12:42:45
4  final decision.            12:42:47
5          MR. DATOO:   I said who. I said   12:42:48
6  -- I never said it could be one, two,   12:42:50
7  three people. Who made the final   12:42:52
8  decision.            12:42:54
9          MS. SELTZER:   You may answer.   12:42:55
10     A.   The way I see it is we agreed as   12:42:56
11  a group.            12:42:58
12     Q.   Now, you testified that there   12:42:59
13  was a series of meetings among senior   12:43:04
14  managers regarding the layoff, correct?   12:43:06
15     A.   Uh-huh.            12:43:09
16     Q.   Do you recall when the meetings   12:43:10
17  first began?            12:43:10
18     A.   No.            12:43:11
19     Q.   Do you know how long after Mr.   12:43:16
20  State started working at LVI?   12:43:21
21     A.   Offhand, no. I think it was,   12:43:24
22  you know, first -- first it was part of   12:43:30
23  the budgeting process -- you know, the   12:43:33
24  planning process for '11 was when   12:43:35
25  the -- the conversations first started   12:43:39

41 (Pages 158 to 161)

**VERITEXT REPORTING COMPANY**

162

CUTRONE

1
2 about personnel and -- and roles and          12:43:40
3 responsibilities and effectiveness or lack     12:43:45
4 of effectiveness. So it was all part of        12:43:48
5 that iterative process over those first        12:43:51
6 couple of months.                              12:43:54
7     Q.  And that process started in the        12:43:55
8 first couple of months?                        12:43:57
9     A.  Yes.                        12:43:58
10    Q.  And do you know if it was in            12:43:59
11 October, November?                             12:44:03
12    A.  Like I said, Scott started, you         12:44:06
13 know, effective October 1. September 24,       12:44:08
14 we could take. And, you know, it wasn't        12:44:11
15 the first order of business to go into.        12:44:14
16 Okay. Let's go do layoffs. It was             12:44:16
17 understanding the business, talking about     12:44:18
18 who does what, roles or responsibilities,     12:44:20
19 who is this guy, who is that guy,             12:44:22
20 effectiveness. You know, he was              12:44:24
21 counseling with his team as to what          12:44:26
22 constitutes the talents. So that is what     12:44:29
23 I said is iterative process. It started       12:44:32
24 dialogue, dialogue, dialogue planning        12:44:36
25 process, meet in Denver. I think it was      12:44:37

163

CUTRONE

1
2 not until after I would say -- when it        12:44:40
3 comes to substantive talks about reduction    12:44:47
4 in force, I believe that was more in          12:44:49
5 earnest in December.                          12:44:53
6     Q.  In when?                    12:44:55
7     A.  In December. I don't think we         12:44:56
8 got really into it -- maybe in November.      12:44:57
9 Maybe in November.                            12:45:00
10    Q.  What part of November?                 12:45:01
11    A.  I don't recall. We would              12:45:03
12 have -- we would have had dialogue about     12:45:04
13 it in our Denver meeting, so I think -- I    12:45:06
14 really think it started up in November and   12:45:12
15 then, you know, into December. That is my    12:45:14
16 recollection of the time frame.              12:45:17
17    Q.  And that Denver meeting happened      12:45:18
18 after the November 4 board meeting?          12:45:19
19    A.  I believe so.                 12:45:21
20    Q.  Well, Mr. State told you what         12:45:22
21 happened at the board meeting in Denver,     12:45:24
22 correct?                            12:45:25
23    A.  Yes.                         12:45:26
24    Q.  So obviously it happened            12:45:27
25 afterwards, correct?                         12:45:29

164

CUTRONE

1
2     A.  Correct.                     12:45:30
3     Q.  Okay. Now, prior to having the       12:45:31
4 substantive talks, were there preliminary    12:45:41
5 talks?                              12:45:43
6         MS. SELTZER:  Objection. About       12:45:44
7 the layoffs.                        12:45:45
8     Q.  About the layoffs?             12:45:47
9     A.  There -- there were no           12:45:49
10 preliminary talks about layoffs. There      12:45:51
11 was discussions about people's              12:45:54
12 effectiveness, talents, capabilities, who   12:45:58
13 was responsible for what. It was about      12:46:00
14 the lay of the land. There was no talk      12:46:04
15 about layoffs early on. I think that came   12:46:05
16 more of as we went through the planning     12:46:08
17 process, and we saw, you know, business     12:46:11
18 backlog and contributions for next year     12:46:13
19 and who is going to bring in the work and   12:46:15
20 everything. I think that really started     12:46:17
21 to spur the okay, well, this guy is         12:46:20
22 effective. Who does he report to. Who       12:46:24
23 pays for him, that kind of thing.           12:46:27
24     So it was very interesting and          12:46:28
25 very -- it was a quality process quite      12:46:30

165

CUTRONE

1
2 frankly that I think really got the         12:46:33
3 management team to think through            12:46:35
4 capabilities, put longevity aside. Let's    12:46:38
5 talk about capabilities and              12:46:43
6 responsibilities, and out of that came     12:46:45
7 ultimately the group decision on reduction 12:46:46
8 in force.                           12:46:50
9     Q.  At what point did you start         12:46:51
10 discussing names?                        12:46:53
11    A.  I don't recall.               12:46:54
12    Q.  Was it -- was that part of the       12:46:55
13 substantive talks you referred to?         12:46:57
14    A.  Yes.                          12:46:59
15    Q.  Okay. And that was towards the       12:47:00
16 end of November, early December?            12:47:03
17    A.  I don't know, but it was in that    12:47:05
18 time frame. It was November, December.     12:47:06
19 We did the layoffs on January 7 I want to  12:47:09
20 say. So we concluded on our decision, my   12:47:11
21 recollection is we basically concluded      12:47:15
22 prior to the holidays and then clearly     12:47:17
23 decided to wait until after the holidays   12:47:18
24 to make the announcement. So it -- you     12:47:20
25 know, it could have started in Denver and  12:47:23

42 (Pages 162 to 165)

VERITEXT REPORTING COMPANY

212-267-6868                                516-608-2400

**166**

CUTRONE

1
2  ended, you know, sometime in, you know, in   12:47:25
3  Denver like mid-November and ended   12:47:29
4  sometime in December, and I would say that   12:47:31
5  is about -- the 30-day window in my memory   12:47:33
6  for when that would have taken place.   12:47:39
7  Q.  Why was Ms. Dembin included in   12:47:41
8  the layoff?   12:47:43
9  A.  Because we were closing the   12:47:44
10  Westport office.   12:47:46
11  Q.  Could she have worked out of   12:47:47
12  another office?   12:47:48
13  A.  Not effectively.  It would have   12:47:49
14  been --   12:47:52
15  Q.  Why?   12:47:52
16  A.  It was simply -- her functions   12:47:53
17  could be reassigned quite easily to   12:47:56
18  personnel at 80 Broad Street.  There was   12:47:58
19  no need to have two corporate offices.   12:48:00
20  Joseph worked out of New York.  His staff   12:48:03
21  was more than capable to perform the   12:48:05
22  administrative functions on the insurance   12:48:08
23  side.  The general counsel, his paralegal   12:48:11
24  could handle the administrative functions   12:48:13
25  on the bonding side.  So there was no need   12:48:16

**168**

CUTRONE

1
2  A.  Good question.  I don't know.   12:48:59
3  Well, it would have been Gregg.   12:49:03
4  Q.  And where was Greg?  Where was   12:49:07
5  Mr. DeCarlo?  What office did he work out   12:49:10
6  of?   12:49:12
7  A.  He is out of Westport.   12:49:12
8  Q.  And where is he working now?   12:49:13
9  A.  Still out of the Westport office   12:49:15
10  until that lease expires.   12:49:16
11  Q.  And then where is he going to go   12:49:18
12  to?   12:49:21
13  A.  I don't know.   12:49:21
14  Q.  Where do you think he would go   12:49:22
15  to?   12:49:23
16  MS. SELTZER:  I object to the   12:49:24
17  form.   12:49:25
18  Q.  Which office do you think he   12:49:25
19  would work out of?   12:49:26
20  A.  I don't know.  We might rent him   12:49:28
21  a suite out of there.  We might have   12:49:30
22  relocate to the Milford office.   12:49:32
23  Q.  So this -- to this date is the   12:49:34
24  Westport office open?   12:49:36
25  A.  Yes.   12:49:37

**167**

CUTRONE

1
2  to retain her.   12:48:18
3  Q.  Did you hire anyone else to   12:48:19
4  assume any of her job duties?   12:48:21
5  A.  No.   12:48:23
6  Q.  Could Ms. Dembin have performed   12:48:23
7  her job duties out of the Milford,   12:48:27
8  Connecticut office?   12:48:29
9  A.  No, because she would have been   12:48:30
10  unsupervised.  She would have been there   12:48:32
11  by herself.   12:48:35
12  Q.  Where -- which office did   12:48:35
13  Mr. Annarumma work out of?   12:48:37
14  A.  80 Broad Street.   12:48:39
15  Q.  Didn't -- wasn't -- didn't Ms.   12:48:40
16  Dembin report to Mr. Annarumma while she   12:48:42
17  was in the Westport office?   12:48:45
18  A.  Partially, you know, on the   12:48:46
19  insurance side, yes.   12:48:48
20  Q.  And then how about the bonding   12:48:49
21  side?   12:48:51
22  A.  She reported to Burt.   12:48:51
23  Q.  Well, when -- after Mr. Fried   12:48:53
24  was terminated, who did she report to on   12:48:55
25  the bonding side?   12:48:58

**169**

CUTRONE

1
2  Q.  So if Ms. Dembin -- could   12:49:38
3  Ms. Dembin have continued to work out of   12:49:41
4  the Westport office to this day?   12:49:44
5  A.  Physically if the office is   12:49:45
6  there, yes.   12:49:46
7  Q.  And if --   12:49:47
8  MR. DATOO:  Strike that.   12:49:51
9  Q.  Now, were there any lists that   12:49:52
10  circulated that had names of employees to   12:49:59
11  be laid off?   12:50:01
12  A.  I don't think so.   12:50:02
13  Q.  Were there -- was there a target   12:50:06
14  number of people to be laid off?   12:50:17
15  A.  No.   12:50:19
16  Q.  Was every employee within LVI   12:50:20
17  evaluated for layoff -- for inclusion in   12:50:26
18  the layoff?   12:50:29
19  A.  In effect, yes.   12:50:30
20  Q.  What do you mean by in effect?   12:50:32
21  A.  Well, we constantly evaluate our   12:50:34
22  people.  So the group I am talking about   12:50:37
23  is corporate.  All right.  So corporate   12:50:38
24  being the Westport office, there is 80   12:50:41
25  Broad Street, and there is Orange, Texas.   12:50:43

43 (Pages 166 to 169)

VERITEXT REPORTING COMPANY

212-267-6868                    516-608-2400

**170**

CUTRONE

1
2    There is the Westport office, and there        12:50:45
3    was a change in focus as to how we are        12:50:47
4    going to approach business development,        12:50:49
5    and there was a reassignment of               12:50:51
6    responsibilities and a -- and a reduction     12:50:55
7    in force.                                     12:50:57
8         So we said okay.  Let's go               12:50:57
9    through whatever we need and not need we      12:50:59
10   will let go.  The woman that worked at 80     12:51:02
11   Broad Street underneath Joseph that          12:51:05
12   handled insurance claims, and we             12:51:07
13   reassigned that responsibility to Gary       12:51:09
14   Thibodeaux in Orange, Texas.  We let go of   12:51:11
15   Shari and reassigned her responsibilities    12:51:14
16   to both Greg and Joseph because they were    12:51:15
17   going to take back those                     12:51:17
18   responsibilities -- take those              12:51:18
19   responsibilities.  The marketing team in     12:51:19
20   the Westport office was let go because       12:51:22
21   that was being shifted underneath Canessa.   12:51:24
22   So it was a very logical, unemotional        12:51:26
23   approach towards reduction in force, and     12:51:30
24   the fact that it happens to be Burt's        12:51:34
25   daughter is irrelevant.                      12:51:37

**171**

CUTRONE

1
2    Q.   I am sorry?                             12:51:38
3    A.   The fact that it happens to be          12:51:39
4    Burt's daughter is irrelevant.               12:51:41
5    Q.   To you?                                 12:51:42
6    A.   Yeah.                                    12:51:42
7    Q.   Okay.  Were there any employees         12:51:43
8    that worked in the Westport office           12:51:46
9    retained?                                     12:51:49
10   A.   Other than general counsel and          12:51:50
11   his staff, no.                                12:51:54
12   Q.   And who comprises the general           12:51:55
13   counsel's staff?                              12:52:00
14   A.   Greg DiCarlo, Tom Cullen, and           12:52:01
15   Jeannie Naggy.                                12:52:04
16   Q.   Are they both attorneys?               12:52:05
17   A.   Greg is an -- Tom is an                 12:52:07
18   attorney, and Genie is a paralegal.          12:52:09
19   Q.   So Ms. Dembin wasn't laid off          12:52:12
20   because the Westport office closed, wasn't   12:52:18
21   she?                                          12:52:20
22   A.   Well, it is part and parcel.  It        12:52:20
23   was, you know, we are going to close the     12:52:23
24   Westport office, move it out -- reassign     12:52:24
25   responsibilities.  So the physical           12:52:27

**172**

CUTRONE

1
2    location had less to do with it than the     12:52:28
3    reassigning of responsibilities, but         12:52:31
4    without Burt there there was no reason to    12:52:33
5    have a Westport office.                       12:52:34
6    Q.   Now, well, what about Mr.               12:52:36
7    DiCarlo and his staff?                        12:52:39
8    A.   Well, he can -- he can function         12:52:40
9    from anywhere.  We just -- we have a         12:52:44
10   lease, so he is staying in the Westport      12:52:46
11   office for the time being.                    12:52:48
12   Q.   Now, you testified that you            12:52:50
13   were -- were you constantly evaluating       12:52:51
14   your staff?                                   12:52:53
15   A.   Uh-huh.                                  12:52:54
16   Q.   Why is that that Ms. Dembin was         12:52:54
17   not terminated prior to the layoff?          12:52:57
18   MS. SELTZER:  I object to the                12:53:03
19   form of the question.  He never testified   12:53:04
20   that he was her report.                       12:53:05
21   MR. DATOO:  Sorry.                           12:53:10
22   MS. SELTZER:  He didn't                      12:53:11
23   supervise Ms. Dembin, if that is what you   12:53:12
24   are alluding to.  You just asked him why    12:53:14
25   he didn't terminate Ms. Dembin.             12:53:16

**173**

CUTRONE

1
2    MR. DATOO:  No, why wasn't she              12:53:18
3    terminated.                                   12:53:19
4    MS. SELTZER:  If you know the                12:53:20
5    answer.                                       12:53:21
6    A.   I don't know.                           12:53:21
7    Q.   You don't know.  So you just           12:53:22
8    said you were evaluating --                   12:53:24
9    A.   As a company.                           12:53:25
10   Q.   -- as a company.                        12:53:26
11   A.   So managers are always assigned        12:53:27
12   the responsibility of evaluating their       12:53:29
13   talents, and when I mentioned earlier when  12:53:31
14   the economic downturn hit in '08 and        12:53:34
15   business came down in '09 and '10 we made   12:53:37
16   reductions in force then of all personnel   12:53:40
17   in all companies.  It is what we have       12:53:43
18   done in our history.  When you grow you     12:53:45
19   build talent, and when you are contracting  12:53:49
20   you have to let go of talent, and          12:53:52
21   sometimes it is good people.                 12:53:56
22   Q.   Do you know why Ms. Dembin             12:53:57
23   wasn't laid off in the prior layoff?        12:53:59
24   A.   No, I don't know.                       12:54:00
25   Q.   Well, who --                            12:54:02

**44 (Pages 170 to 173)**

**174**

CUTRONE

1          CUTRONE
2    A.  When you say the prior layoff  12:54:04
3  meaning as part of the overall process the  12:54:06
4  company goes through them, we lay people  12:54:08
5  off all the time.      12:54:10
6    Q.  Were you involved in any  12:54:11
7  decisions to lay off prior to the January  12:54:12
8  lay off, January 2011 layoff?  12:54:15
9    A.  In previous corporate layoffs,  12:54:17
10  sure, I was consulted.    12:54:19
11    Q.  And was everyone evaluated for  12:54:21
12  layoff or continued employment?  12:54:24
13    MS. SELTZER:  I object to the  12:54:27
14  form. You mean for each separate one?  12:54:29
15    MR. DATOO:  Yes.    12:54:33
16    A.  I -- I don't know if I  12:54:34
17  understand your question.  The -- the  12:54:36
18  company always looks at -- we don't just  12:54:37
19  decide one day okay today is Tuesday. We  12:54:43
20  are going to do evaluation of personnel  12:54:45
21  and decide whether we need layoffs or not.  12:54:47
22  Every manager is tasked with the  12:54:49
23  responsibility to evaluate his talent and  12:54:52
24  retain them or not retain them. That is  12:54:54
25  just SOP. So all I am saying is no  12:54:57

**175**

CUTRONE

1          CUTRONE
2  different than historically if there is a  12:54:59
3  need for retrenching of the business and  12:55:01
4  reduction of force we go through that  12:55:02
5  process. Sometimes it is closing an  12:55:04
6  office. We closed Pittsburgh. We closed  12:55:06
7  Seattle. We closed Orlando. You know, we  12:55:08
8  will -- we will close offices and lay off  12:55:11
9  the whole staff.      12:55:13
10    Q.  When was your last  12:55:14
11  layoff -- other other -- prior to the  12:55:16
12  January 2011 layoff, when was your last  12:55:18
13  layoff?      12:55:21
14    A.  When a layoff -- where it was  12:55:21
15  more kind of company wide reevaluation, I  12:55:23
16  want to say we have done several since,  12:55:33
17  you know, '05 because in '05 we had  12:55:39
18  trouble with the banks. In '06, '7, '8,  12:55:44
19  '9, there was plenty of times where we  12:55:47
20  went through a process of this one goes,  12:55:48
21  this one stays, if you will.  12:55:51
22    Q.  And did the decision making  12:55:53
23  procedure in terms of who to lay off vary  12:55:55
24  in any of these other layoffs as compared  12:55:58
25  to the January 2011 layoff?  12:56:01

**176**

CUTRONE

1          CUTRONE
2    A.  Did the procedure change?  12:56:04
3    Q.  Well, you testified earlier that  12:56:09
4  there was a group decision to determine  12:56:11
5  who to lay off, correct?  12:56:14
6    A.  In this particular case, there  12:56:16
7  were several managers brought in to the  12:56:20
8  discussion, and I think that was smart of  12:56:24
9  Scott because he is new. So he says let's  12:56:25
10  talk about our people. Let's talk about  12:56:28
11  talent, and he was soliciting  12:56:29
12  input from -- from the management to see  12:56:33
13  let's evaluate. Tell me about this one,  12:56:34
14  that one in going through the -- the  12:56:36
15  process.      12:56:38
16    So there was very much of a  12:56:39
17  group decision for good reason. Prior to  12:56:41
18  that, you know, much of the management  12:56:45
19  team was together for a long time. It  12:56:48
20  probably took on the same process. You  12:56:49
21  know, when we would talk about layoffs Bob  12:56:52
22  and I would talk about okay let's do  12:56:55
23  corporate. I mean I have had  12:56:57
24  conversations with him back in -- okay. I  12:57:00
25  am trying to think when that was. '6, '7  12:57:01

**177**

CUTRONE

1          CUTRONE
2  when we first ran into trouble with the  12:57:03
3  banks, we started talking about layoffs.  12:57:05
4  So it would still be a group decision  12:57:07
5  whether it is several managers or whether  12:57:10
6  it is one or two managers, two managers,  12:57:12
7  three managers. It just depends. It  12:57:14
8  depends on the situation.  12:57:16
9    Q.  So what I am -- what I am trying  12:57:17
10  to get at is you were involved in these  12:57:19
11  prior layoff decisions, correct?  12:57:22
12    A.  On occasion, yes.  12:57:24
13    Q.  Okay. And on the occasions that  12:57:26
14  you were involved with these layoff  12:57:28
15  decisions, did Shari's name ever come up?  12:57:30
16    A.  Not that I recall.  12:57:34
17    Q.  Do you know why not?  12:57:38
18    A.  No.    12:57:40
19    Q.  Was Mr. Annarumma involved in  12:57:41
20  these decisions?    12:57:44
21    A.  Probably not.  12:57:45
22    Q.  Why not?    12:57:47
23    A.  He managed a very small group of  12:57:50
24  people, so the decisions usually are  12:57:55
25  within -- when -- for the corporate office  12:58:01

45 (Pages 174 to 177)

VERITEXT REPORTING COMPANY

212-267-6868              516-608-2400

**182**

CUTRONE

```
1          CUTRONE
2    operating level. The 12 people I referred   01:07:53
3    to were at the corporate level, and that    01:07:55
4    would include regional managers. So there   01:07:57
5    was no prescribed number. It was an         01:08:02
6    evaluation that was concluded on.           01:08:06
7       Q.   Was there a certain target          01:08:08
8    savings that LVI was hoping to achieve?     01:08:10
9       A.   No.                                 01:08:13
10      Q.   Did Mr. State ever suggest that     01:08:14
11   he wanted to save a million dollars by      01:08:19
12   closing the Westport office?                01:08:21
13      A.   Not that I recall, no.              01:08:23
14      Q.   Okay.                               01:08:26
15           (Continued on next page.)           01:08:26
16
17
18
19
20
21
22
23
24
25
```

**183**

```
1          CUTRONE
2       MR. DATOO:   Thank you very            01:08:30
3    much.                                     01:08:31
4       THE VIDEOGRAPHER:   We're going        01:08:32
5    off the record, 1:08 p.m. End of today's  01:08:33
6    questioning.                              01:08:37
7           (Time noted: 1:08 p.m.)            01:08:39
8
9
10
11
12
13
14          PAUL CUTRONE
15
16   Subscribed and sworn to before me
17   this     day of       , 2011
18
19
20
21
22
23
24
25
```

**184**

```
1
2          C E R T I F I C A T I O N
3
4
5
6       I, DEBBIE ZAROMATIDIS, a Shorthand
7    Reporter and a Notary Public, do hereby
8    certify that the foregoing witness, PAUL
9    CUTRONE, was duly sworn on the date
10   indicated, and that the foregoing is a
11   true and accurate transcription of my
12   stenographic notes.
13       I further certify that I am not
14   employed by nor related to any party to
15   this action.
16
17
18
19
20
21
22
23           DEBBIE ZAROMATIDIS
24
25
```

**185**

```
1
2          E X H I B I T S
3
4    PLAINTIFF'S
5    EXHIBIT     DESCRIPTION          PAGE
6    44          E-mail          84
7    45          E-mail          95
8    46          E-mail          99
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

47 (Pages 182 to 185)

VERITEXT REPORTING COMPANY

212-267-6868                    516-608-2400