# Exhibit 5

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

No. 10 Civ. 9308(JSR)

----------------------------------------x

BURTON T. FRIED,

                     Plaintiff,

       - against -

LVI SERVICES, INC., LVI PARENT CORP., CODE

HENNESSY SIMMONS, LLC d/b/a CHS PRIVATE

EQUITY V LP; APOLLO INVESTMENT CORP.,

SCOTT E. STATE, in his official and

individual capacities; BRIAN SIMMONS, in

his official and individual capacities;

RAJAY BAGARIA, in his official and

individual capacities; GERALD J. GIRARDI,

in his official and individual capacities,

                   Defendants.

----------------------------------------x

                     May 23, 2011
                     2:39 p.m.

c9dfbb84-ebd6-4083-b8a8-7b260e306ed0

Page 2

```
 1
 2
 3
 4          VIDEOTAPE DEPOSITION of GERALD
 5   GIRARDI, taken by the Plaintiff, pursuant
 6   to Notice, held at the offices of Thompson
 7   Wigdor & Gilly, LLP, 85 Fifth Avenue, New
 8   York, New York, before Debbie Zaromatidis,
 9   a Shorthand Reporter and Notary Public of
10   the State of New York.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1
 2        S T I P U L A T I O N S
 3
 4        IT IS HEREBY STIPULATED AND
 5   AGREED by and between the Attorneys for
 6   the respective parties hereto that filing
 7   and sealing be and the same are hereby
 8   waived.
 9        IT IS FURTHER STIPULATED AND
10   AGREED that all objections except as to
11   the form of the question, shall be
12   reserved to the time of the trial.
13        IT IS FURTHER STIPULATED AND
14   AGREED that the within examination may be
15   signed and sworn to before any notary
16   public with the same force and effect as
17   though signed and sworn to before this
18   Court.
19
20
21
22
23
24
25
```

Page 3

```
 1
 2   A P P E A R A N C E S :
 3
 4   THOMPSON WIGDOR & GILLY, LLP
 5   Attorneys for Plaintiff
 6        85 Fifth Avenue
 7        New York, New York 10003
 8   BY:  SHAFFIN A. DATOO, ESQ.
 9        MATTHEW GORMAN, ESQ.
10
11   SIDLEY AUSTIN, LLP
12   Attorneys for Defendants
13        787 Seventh Avenue
14        New York, New York 10019
15   BY:  JOANNE SELTZER, ESQ.
16
17
18   ALSO PRESENT:
19     BURTON FRIED
20     J.D. MARTINEZ, Videographer
21
22
23
24
25
```

Page 5

```
 1
 2        THE VIDEOGRAPHER:  We are on     02:39:00
 3   the record.  My name is J.D. Martinez of  02:39:00
 4   Veritext New York.  The date today is May 02:39:04
 5   23, 2011.  The time on the video monitor  02:39:05
 6   is 2:39 p.m.  This deposition is being     02:39:09
 7   held at the offices of Thompson Widjor &   02:39:13
 8   Gilly, LLP located at 85 Fifth Avenue, New 02:39:17
 9   York, New York.                            02:39:20
10        The caption of this case is          02:39:20
11   Burton T. Fried versus LVI Services, Inc., 02:39:22
12   et al., filed in the United States         02:39:27
13   District Court, Southern District of New   02:39:29
14   York.  The name of the witness is Gerald   02:39:31
15   Girardi.                                   02:39:33
16        At this time the attorneys will      02:39:34
17   identify themselves and the parties they   02:39:35
18   represent after which our court reporter,  02:39:38
19   Debbie, will swear in the witness.         02:39:41
20        MS. SELTZER:  Joanne Seltzer         02:39:41
21   for Sidley Austin, LLP representing the    02:39:42
22   defendants.                                02:39:45
23        MR. DATOO:  Shaffin Datoo for        02:39:47
24   Thompson Widgor & Gilly representing the   02:39:47
25   plaintiff Burton T. Fried.                 02:39:48
```

2 (Pages 2 to 5)

VERITEXT REPORTING COMPANY

212-267-6868

516-608-2400

c9dfbb84-ebd6-4083-b8a8-7b260e306ed0

Page 6

1              GIRARDI
2    G E R A L D   J.   G I R A R D I,     02:39:50
3    having first been duly sworn by a Notary   02:39:50
4    Public of the State of New York, was     02:39:50
5    examined and testified as follows:       02:39:50
6    EXAMINATION BY MR. DATOO:              02:39:58
7        Q.   Good afternoon, Mr. Girardi.  As   02:39:58
8    I just mentioned, my name is Shaffin     02:40:01
9    Datoo.  To my left is my colleague Matthew   02:40:04
10   Gorman.  We represent Mr. Fried in this   02:40:07
11   matter.                                  02:40:09
12       I am going to ask you a bunch of     02:40:09
13   questions today, and if your attorney does   02:40:12
14   not direct you not to answer, hopefully   02:40:15
15   you can answer all of them today.        02:40:19
16       I am going to start off with        02:40:21
17   some preliminary questions.  Is your     02:40:23
18   ability to tell the truth in any way     02:40:25
19   impaired today?                          02:40:26
20       A.   No.                            02:40:27
21       Q.   Do you understand that the     02:40:27
22   answers you are about to give are under   02:40:28
23   oath?                                    02:40:31
24       A.   Yes.                           02:40:31
25       Q.   And that you are subject to    02:40:31

Page 7

1              GIRARDI
2    penalties of perjury if you give an      02:40:33
3    untruthful answer?                       02:40:36
4        A.   Yes.                           02:40:37
5        Q.   I am going to assume that if you   02:40:38
6    answer a question that you understood it.   02:40:39
7    If you don't understand a question, let me   02:40:40
8    know, and I will ask the question a       02:40:42
9    different way.  Please give verbal answers   02:40:44
10   to my questions.  If you nod your head or   02:40:45
11   shake it, the video will be able to pick   02:40:48
12   it up, but the court reporter won't.      02:40:51
13       A.   Okay.                          02:40:54
14       Q.   If you need a break, let me     02:40:54
15   know.  The only condition I have is that   02:40:56
16   you answer the last question asked.       02:40:58
17       A.   Okay.                          02:40:59
18       Q.   Now, in connection with this    02:41:00
19   lawsuit, did you provide your attorneys   02:41:02
20   with all responsive documents?           02:41:04
21       A.   Yes.                           02:41:05
22       Q.   And where did you look to find   02:41:06
23   these documents?                         02:41:07
24       A.   In Apollo's files electronic and   02:41:08
25   physical.                               02:41:16

Page 8

1              GIRARDI
2        Q.   Do you have any -- do you have a   02:41:16
3    personal e-mail account?                 02:41:18
4        A.   I do.                          02:41:19
5        Q.   Did you look in your personal   02:41:19
6    e-mail account for any documents?        02:41:21
7        A.   There would be no LVI files in   02:41:22
8    my personal e-mail account.  I -- I didn't   02:41:25
9    look in them -- in my personal e-mail     02:41:29
10   account.                                 02:41:31
11       Q.   Did you review any documents you   02:41:31
12   had at home?                             02:41:34
13       A.   No.  I -- LVI documents may have   02:41:35
14   been sent to my personal e-mail account,   02:41:38
15   loan documents, things of that nature,    02:41:42
16   and -- but in terms of this deposition    02:41:44
17   they are all on my work e-mail account    02:41:47
18   because I send it from my Blackberry.     02:41:50
19       Q.   Have you ever been sued before?   02:41:55
20       A.   No.                            02:41:56
21       Q.   Other than this lawsuit, has    02:41:56
22   anyone ever accused you of discrimination?   02:41:57
23       A.   No.                            02:41:59
24       Q.   Have you ever given any sworn    02:42:00
25   testimony before?                        02:42:03

Page 9

1              GIRARDI
2        A.   No.                            02:42:03
3        Q.   Did you do anything to prepare   02:42:05
4    for this deposition?                     02:42:10
5        A.   I met with my attorney.         02:42:11
6        Q.   How many times?                 02:42:13
7        A.   We met once last week.          02:42:14
8        Q.   And for how long?               02:42:18
9        A.   A couple of hours.              02:42:19
10       Q.   And did you review any documents   02:42:20
11   in preparing for this deposition?        02:42:22
12       A.   Yes, we did.                    02:42:23
13       Q.   How many approximately?         02:42:24
14       A.   We had a binder full of         02:42:26
15   documents that are probably 40, 50 tabs in   02:42:29
16   it.  40 tabs of information.             02:42:32
17       Q.   And did you read Mr. Fried's     02:42:35
18   deposition transcript prior to testifying   02:42:37
19   today?                                   02:42:39
20       A.   I did not read his deposition    02:42:39
21   transcript, no.                          02:42:41
22       Q.   Did you read any excerpts or     02:42:42
23   summaries from his deposition transcript?   02:42:44
24       A.   No.                            02:42:47
25       Q.   Mr. Girardi, how old are you?    02:42:47

                                3 (Pages 6 to 9)

Page 10

```
1           GIRARDI
2    A.  Fifty-one.            02:42:49
3    Q.  And what is your date of birth?  02:42:50
4    A.  10/8/59.              02:42:52
5    Q.  And do you know the plaintiff in  02:42:54
6 this lawsuit, Mr. Fried?     02:43:02
7    A.  Yes, I do.            02:43:03
8    Q.  How so?               02:43:04
9    A.  Professionally from our  02:43:05
10 investment in LVI.          02:43:07
11   Q.  When you say our, do you mean  02:43:08
12 Apollo?                     02:43:09
13   A.  Apollo, yes.          02:43:10
14   Q.  And do you know how old Mr.  02:43:11
15 Fried is?                   02:43:13
16   A.  I know from reading his  02:43:13
17 complaint that he is 70.    02:43:15
18   Q.  Okay.  Prior to reading his  02:43:16
19 complaint --                02:43:18
20   A.  I had no idea how old he was.  02:43:18
21   Q.  How old did you think he was?  02:43:20
22   A.  I figured he was older than me.  02:43:23
23   Q.  How much older?       02:43:24
24      MS. SELTZER:  Objection.  You  02:43:26
25 can answer.                 02:43:27
```

Page 11

```
1           GIRARDI
2    A.  I had no idea to be honest with  02:43:27
3 you.                        02:43:30
4    Q.  Okay.  In 2010, November of 2010  02:43:30
5 what company did Mr. Fried work for?  02:43:33
6    A.  He worked for LVI as far as I  02:43:35
7 know.                       02:43:39
8    Q.  LVI Parent or LVI Services?  02:43:39
9    A.  The distinction isn't that  02:43:45
10 important to me frankly.  We were an  02:43:47
11 investor in LVI Services.  I felt he was  02:43:48
12 an employee of LVI Services.  If he was an  02:43:51
13 employee of the Parent, I honestly don't  02:43:55
14 know.                       02:43:57
15   Q.  Do you know what his job title  02:43:57
16 was?                        02:43:58
17   A.  He was the interim CEO up until  02:43:59
18 the restructuring.  Then he was going to  02:44:02
19 be the chairman of the board of the  02:44:06
20 company.                    02:44:07
21   Q.  Okay.  And are you currently  02:44:07
22 employed?                   02:44:11
23   A.  I am.                02:44:11
24   Q.  Full time?            02:44:12
25   A.  Yes, I am.            02:44:13
```

Page 12

```
1           GIRARDI
2    Q.  And where do you work?  02:44:13
3    A.  For Apollo Investment Corp.  02:44:15
4    Q.  And how long have you worked  02:44:17
5 there?                      02:44:18
6    A.  I have been there for just over  02:44:18
7 three years.                02:44:21
8    Q.  And where were you prior to  02:44:21
9 Apollo?                     02:44:23
10   A.  CIBC.                 02:44:23
11   Q.  And do you work in the New York  02:44:26
12 office of Apollo?           02:44:29
13   A.  I work in the New York office,  02:44:30
14 yes.                        02:44:32
15   Q.  And what is your current job  02:44:32
16 title at Apollo?            02:44:34
17   A.  Principal.            02:44:35
18   Q.  And how long have you held that  02:44:41
19 title?                      02:44:42
20   A.  Three years.          02:44:42
21   Q.  And what are your job duties?  02:44:43
22   A.  I work for our mezzanine debt  02:44:45
23 fund.  My primary responsibility is to  02:44:49
24 work on problem credits, workouts, and  02:44:51
25 restructuring.              02:44:53
```

Page 13

```
1           GIRARDI
2    Q.  Now, are you familiar with a  02:44:54
3 company called LVI Parent Corp.?  02:44:55
4    A.  I -- yes.             02:44:57
5    Q.  How so?               02:44:59
6    A.  It's the parent corp. of LVI  02:44:59
7 Services.  Again, the distinction is not  02:45:03
8 that important to me.        02:45:05
9    Q.  It is to me, so I am --  02:45:07
10   A.  Okay.                 02:45:09
11   Q.  -- asking you questions --  02:45:10
12   A.  Sure.                 02:45:11
13   Q.  -- about specific LVI entities.  02:45:12
14      What does LVI Parent do?  02:45:14
15   A.  Nothing that I am aware of.  02:45:16
16   Q.  Is it a holding company?  02:45:19
17   A.  I believe so, but I am not a  02:45:23
18 hundred percent sure.       02:45:24
19   Q.  Who owns LVI Parent?  02:45:25
20   A.  Today I believe our investment  02:45:27
21 is at the LVI Parent level, although I  02:45:30
22 have to go back and refer to documents to  02:45:34
23 make sure, but I -- I couldn't say for  02:45:35
24 sure.                       02:45:37
25   Q.  Are you saying that Apollo is an  02:45:38
```

4  (Pages 10 to 13)

VERITEXT REPORTING COMPANY

212-267-6868                           516-608-2400

c9dfbb84-ebd6-4083-b8a8-7b260e306ed0

Page 18

```
 1          GIRARDI
 2  new lines of business, and things of that  02:49:24
 3  nature primarily.               02:49:28
 4     Q.  How about personnel decisions?  02:49:29
 5     A.  At a certain level based on our  02:49:31
 6  investment agreement, yes, certain  02:49:34
 7  personnel decisions are undertaken by the  02:49:36
 8  board.                          02:49:38
 9     Q.  And what level?            02:49:38
10     A.  I believe it is a handful of the  02:49:39
11  executives.                     02:49:41
12     Q.  Is -- would the chairman be one  02:49:42
13  of those executives?             02:49:44
14     A.  I believe in our investment   02:49:45
15  agreement there is -- the chairman was one  02:49:47
16  of the decisions that was at the board  02:49:51
17  level, yes.                     02:49:53
18     Q.  Okay.  What is LVI Acquisition  02:49:54
19  Corp.?                          02:49:58
20     A.  Again, the distinction isn't  02:49:58
21  that important to me.  It was an  02:50:01
22  intermediate holding company that was  02:50:04
23  formed I believe when the original  02:50:05
24  acquisition from Code was made in 2005.  02:50:08
25     Q.  Does LVI Parent have any    02:50:13
```

Page 19

```
 1          GIRARDI
 2  employees?                      02:50:15
 3     A.  I am not sure.             02:50:15
 4     Q.  Does LVI Parent have any     02:50:18
 5  officers?                       02:50:21
 6     A.  I am not sure.             02:50:21
 7     Q.  Does LVI Parent own any assets?  02:50:24
 8     A.  I don't really know.        02:50:26
 9     Q.  Does LVI Parent have any     02:50:29
10  offices?                        02:50:31
11     A.  I don't believe so.  I don't  02:50:32
12  know.                           02:50:35
13     Q.  Where is LVI Parent         02:50:36
14  headquartered?                  02:50:39
15     A.  LVI is headquartered in New  02:50:40
16  York.  I am not sure if LVI Parent shares  02:50:43
17  the same offices.               02:50:45
18     Q.  Okay.  Does LVI Parent have any  02:50:46
19  subsidiaries?                   02:50:49
20     A.  I assume that they do,       02:50:50
21  but -- LVI Services being one.  I couldn't  02:50:53
22  tell you the others.            02:50:55
23     Q.  Do you know if LVI Services is a  02:50:56
24  wholly-owned subsidiary?         02:51:00
25     A.  I believe it is.           02:51:02
```

Page 20

```
 1          GIRARDI
 2     Q.  Of LVI Parent?             02:51:03
 3     A.  I -- I will assume it is, but I  02:51:04
 4  am not a hundred percent sure.   02:51:08
 5     Q.  Okay.  And what does LVI     02:51:09
 6  Services do?                    02:51:11
 7     A.  Remediation and demolition   02:51:12
 8  services primarily as well as emergency  02:51:15
 9  response business.              02:51:18
10     Q.  And do you -- do you know the  02:51:19
11  relationship between LVI Parent and LVI  02:51:22
12  Services or whichever company is the  02:51:26
13  parent of LVI Services?          02:51:27
14     A.  I am not sure I understand the  02:51:29
15  question.                       02:51:30
16     Q.  Do you know -- is there a    02:51:31
17  relationship between the parent company of  02:51:32
18  LVI Services and LVI Services?   02:51:35
19     A.  I assume there is, yes.      02:51:37
20     Q.  Do you know what that        02:51:39
21  relationship is?                02:51:40
22     A.  There is a parent holding    02:51:41
23  company and an operating company.  02:51:43
24     Q.  Okay.  When were you appointed  02:51:45
25  to the board of directors?       02:51:50
```

Page 21

```
 1          GIRARDI
 2     A.  October 8 when the deal closed.  02:51:51
 3  October 8, 2010 when the transaction  02:51:54
 4  closed when we became an owner.  02:51:56
 5     Q.  Now, prior to your appointment  02:51:58
 6  to the board, were you involved in any way  02:52:01
 7  with LVI Parent or LVI Services?  02:52:02
 8     A.  We were an investor, and so we  02:52:05
 9  were involved as an investor.  Yes.  02:52:07
10     Q.  And can you give me examples of  02:52:09
11  how investors would be involved or how you  02:52:11
12  were involved as an investor?    02:52:14
13     A.  As a mezzanine investor we    02:52:15
14  attended board meetings as observers, so  02:52:18
15  we were allowed to sit in on board  02:52:21
16  meetings and listen to what was discussed.  02:52:23
17  We didn't have a vote.  We were there  02:52:26
18  purely to observe, and, you know, as any  02:52:28
19  investor we would follow up with  02:52:31
20  questions.  We would discuss how the  02:52:33
21  business was doing periodically with the  02:52:38
22  management team, mainly the CFO Paul  02:52:41
23  Cutrone.                        02:52:43
24     Q.  And when did you start sitting  02:52:44
25  in on these board meetings?      02:52:45
```

VERITEXT REPORTING COMPANY

212-267-6868                    516-608-2400

c9dfbb84-ebd6-4083-b8a8-7b260e306ed0

Page 26

```
 1            GIRARDI
 2   that is still -- if that is still the     02:56:00
 3   -- the fact, then, yes, they would have a  02:56:04
 4   Milford and a Westport office.           02:56:07
 5       Q.  And do you know if there are any  02:56:09
 6   employees working out of the Westport    02:56:11
 7   office currently?                        02:56:13
 8       A.  I'm not sure.                    02:56:14
 9       Q.  Now, prior to 2006, do you know  02:56:15
10   what Mr. Fried's job title at LVI Services 02:56:17
11   was?                                     02:56:20
12       A.  Prior to 2006?                   02:56:21
13       Q.  Yes.                             02:56:22
14       A.  In 2005 I believe Burt was the   02:56:23
15   CEO.                                     02:56:29
16       Q.  Okay.  And do you know how long  02:56:30
17   he was CEO for?                          02:56:32
18       A.  No.                              02:56:33
19       Q.  And do you know what his job     02:56:34
20   duties were as CEO?                      02:56:35
21       A.  No.                              02:56:37
22       Q.  Do you know what his work        02:56:38
23   performance was like as CEO?             02:56:39
24       A.  No.                              02:56:41
25       Q.  Now, during the time he was CEO, 02:56:42
```

Page 27

```
 1            GIRARDI
 2   do you know how LVI Services was doing    02:56:48
 3   financially?                             02:56:50
 4       MS. SELTZER:  I object to the        02:56:52
 5   form, but you can answer.                02:56:52
 6       A.  Up until 2005 the company had    02:56:54
 7   been performing well.  That is the time  02:56:58
 8   that -- that was at the time of the Code 02:57:00
 9   Hennessy buyout.  Burt was replaced as CEO 02:57:04
10   in 2006 by Bob McNamara.  In early 2006, 02:57:06
11   up until the time McNamara came on board 02:57:13
12   the company began to underperform, and it 02:57:16
13   has continued to underperform ever since. 02:57:21
14       Q.  To this date?                    02:57:23
15       A.  Yes.                             02:57:23
16       Q.  Now, you testified that Mr.      02:57:24
17   McNamara became CEO in 2006, correct?    02:57:34
18       A.  Sometime in 2006.  Right.        02:57:37
19       Q.  Okay.  Do you know why he became 02:57:39
20   the CEO of LVI Services?                 02:57:42
21       MS. SELTZER:  I object to the        02:57:44
22   form.                                    02:57:45
23       A.  No.                              02:57:46
24       Q.  And do you know when he became   02:57:48
25   CEO?                                     02:57:56
```

Page 28

```
 1            GIRARDI
 2       A.  When?                            02:57:56
 3       Q.  Yes.                             02:57:57
 4       A.  I don't remember the exact date, 02:57:57
 5   no.                                      02:57:59
 6       Q.  Okay.  And do you know how long  02:57:59
 7   Mr. McNamara was CEO of LVI Services?    02:58:01
 8       A.  From sometime in 2006 until      02:58:04
 9   March or April of 2010.                  02:58:07
10       Q.  Okay.  And during the time that  02:58:09
11   Mr. McNamara was CEO, do you know what Mr. 02:58:11
12   Fried's job title was?                   02:58:15
13       A.  I believe he was chairman.       02:58:17
14       Q.  Chairman of the board or         02:58:19
15   chairman at LVI Services?                02:58:23
16       A.  I believe he was the chairman of 02:58:25
17   the board of LVI.  Again, whether it was 02:58:27
18   LVI Services or Parent, that distinction 02:58:29
19   can't -- I can't testify to that.        02:58:32
20       Q.  Was he also an employee of LVI   02:58:34
21   Services?                                02:58:37
22       A.  I'm not sure.                    02:58:37
23       Q.  How often did you interact with  02:58:38
24   Mr. Fried while he was chairman?         02:58:43
25       A.  Infrequently.                    02:58:45
```

Page 29

```
 1            GIRARDI
 2       Q.  How often would that be?         02:58:46
 3       A.  At --                            02:58:49
 4       Q.  How infrequent --                02:58:50
 5       A.  At the board meetings primarily. 02:58:52
 6       Q.  So about four times a year?      02:58:54
 7       A.  Probably.                        02:58:56
 8       Q.  And do you know what Mr. Fried's 02:58:56
 9   job duties were during the time that he  02:58:58
10   was chairman while Mr. McNamara was the  02:58:59
11   CEO?                                     02:59:02
12       A.  No.                              02:59:02
13       Q.  Now, while Mr. Fried was the     02:59:03
14   chairman and Mr. McNamara was the CEO, do 02:59:11
15   you have any knowledge about the quality 02:59:18
16   of his work performance?                 02:59:19
17       A.  As measured by -- in what terms? 02:59:21
18       Q.  Was he doing a good job?         02:59:26
19       A.  The company performed miserably, 02:59:28
20   so I would have to assume that he wasn't 02:59:31
21   doing a good job.                        02:59:34
22       Q.  Why would you say assume that?   02:59:34
23       A.  Because the company performed    02:59:36
24   terribly and we ultimately had to        02:59:38
25   restructure, so I would assume that the  02:59:40
```

8  (Pages 26 to 29)

VERITEXT REPORTING COMPANY

Page 30

```
 1            GIRARDI
 2  entire management team underperformed    02:59:42
 3  including Burt during that time.         02:59:44
 4      Q.  Well, you just testified that    02:59:45
 5  you didn't know what Mr. Fried's job     02:59:47
 6  duties were, didn't you?                 02:59:49
 7      A.  I did.                           02:59:50
 8      Q.  So how do you --                 02:59:52
 9      A.  Well, you asked me about his     02:59:52
10  performance.                            02:59:54
11      Q.  I didn't ask about the company's 02:59:54
12  performance.  I asked about Mr. Fried's  02:59:56
13  performance.                            02:59:58
14        MS. SELTZER:  I object to the      02:59:59
15  form.  Is there a question?              02:59:59
16      Q.  The question -- the question     03:00:01
17  stands.  Do you have any --              03:00:02
18      A.  Read -- please repeat the        03:00:03
19  question.                               03:00:05
20      Q.  Do you have any knowledge of --  03:00:06
21  while Mr. McNamara was the CEO, do you   03:00:07
22  have any personal knowledge of Mr. Fried's 03:00:10
23  work performance as chairman?            03:00:12
24      A.  I would measure work performance 03:00:15
25  based on the performance of the company. 03:00:16
```

Page 31

```
 1            GIRARDI
 2  The company performed miserably during   03:00:18
 3  that period of time.                     03:00:21
 4      Q.  Okay.  And while Mr. McNamara     03:00:22
 5  was CEO, did you have any conversations or 03:00:29
 6  e-mail communications about Mr. Fried's   03:00:31
 7  duties or his role at LVI with anyone?   03:00:34
 8      A.  While Mr. McNamara was --        03:00:38
 9      Q.  Yes.                             03:00:40
10      A.  I don't believe so.  Not to my   03:00:41
11  recollection.                           03:00:43
12      Q.  Now, did there come a time when  03:00:43
13  Mr. McNamara resigned?                   03:00:48
14      A.  Yes.  He resigned in either      03:00:50
15  March or April of 2010.                  03:00:53
16      Q.  Do you know why?                 03:00:54
17      A.  He got another job.              03:00:55
18      Q.  And after Mr. McNamara resigned, 03:00:57
19  who assumed his job duties?              03:01:01
20      A.  Burt Fried.                      03:01:03
21      Q.  Do you know why?                 03:01:05
22      A.  Code Hennessy asked him to       03:01:06
23  assume the job duties.  They were the    03:01:10
24  owner of the business at the time.       03:01:12
25      Q.  Do you know why they asked him?  03:01:13
```

Page 32

```
 1            GIRARDI
 2      A.  Not really.            03:01:15
 3      Q.  And do you know who from Code    03:01:16
 4  Hennessy asked him?           03:01:19
 5      A.  I don't know specifically.       03:01:20
 6      Q.  And what job duties did Mr.      03:01:22
 7  Fried assume?                 03:01:27
 8      A.  I don't know what his specific   03:01:27
 9  job duties were.  He was the interim CEO 03:01:30
10  of the business though.       03:01:32
11      Q.  Do you know if he -- excuse me.  03:01:33
12  Do you know if he kept his job duties as 03:01:35
13  chairman as well?             03:01:37
14      A.  I don't know what his job        03:01:38
15  duties were as chairman, so I couldn't   03:01:40
16  answer that.                  03:01:42
17      Q.  Okay.  Now, while Mr. Fried was  03:01:43
18  the interim CEO, do you have personal    03:01:46
19  knowledge of the quality of his work     03:01:54
20  performance?                  03:01:55
21      A.  As measured how?      03:01:56
22      Q.  As measured by his executing his 03:01:57
23  job duties.                   03:02:00
24      A.  I wasn't -- I don't have a list  03:02:02
25  of his job duties, so I can't really     03:02:04
```

Page 33

```
 1            GIRARDI
 2  answer that.  But again if you are       03:02:07
 3  measured by the performance of the       03:02:09
 4  business, the business continued to      03:02:10
 5  underperform.                 03:02:12
 6      Q.  Okay.  So it didn't get any      03:02:12
 7  better?                       03:02:19
 8      A.  It got worse.         03:02:19
 9      Q.  And did the economy have         03:02:20
10  anything to do with that?     03:02:22
11      A.  The economy certainly had        03:02:23
12  something to do with it, yes. 03:02:26
13      Q.  Okay.  Do you know how LVI's     03:02:28
14  competitors were doing during that same  03:02:30
15  period of time?               03:02:33
16      A.  I don't have a good sense.       03:02:34
17      Q.  Now, while Mr. Fried was the     03:02:40
18  interim CEO, did you have any            03:02:41
19  conversations or e-mail communications   03:02:43
20  with anyone about Mr. Fried's job duties 03:02:45
21  or his role at LVI?           03:02:47
22        MS. SELTZER:  I am sorry.          03:02:51
23  During what period?           03:02:52
24        MR. DATOO:  While Mr. Fried was    03:02:55
25  the interim CEO.              03:02:56
```

9 (Pages 30 to 33)

Page 38

GIRARDI

1   GIRARDI
2   2010.                            03:06:42
3      Q.   And do you know who made the   03:06:46
4   decision to hire Mr. State?         03:06:48
5      A.   It was made by the owners at the  03:06:49
6   time, Code Hennessy.               03:06:51
7      Q.   Did you participate in the     03:06:52
8   decision to hire him?              03:06:53
9      A.   We were asked to interview him  03:06:54
10  as prospective owners, and so we      03:06:57
11  interviewed the candidate, and we told  03:06:59
12  Code that we thought he was a good     03:07:01
13  candidate.                         03:07:03
14     Q.   And when you say "we," are you   03:07:04
15  referring to --                     03:07:06
16     A.   Myself and Rajay Bagaria.      03:07:07
17     Q.   And did you recommend his hire?  03:07:11
18     A.   I don't recall that we         03:07:13
19  recommended or not.  We told them that  03:07:14
20  thought he was a good candidate.      03:07:16
21     Q.   Did you interview any other     03:07:18
22  candidates?                        03:07:20
23     A.   I did not, no.              03:07:20
24     Q.   Do you know if Mr. Bagaria did?  03:07:21
25     A.   I don't believe he did.       03:07:23

Page 39

1   GIRARDI
2      Q.   Do you know when Mr. State     03:07:25
3   actually started working for LVI?     03:07:26
4      A.   I think it was September of 2010  03:07:28
5   although I can't be sure.            03:07:31
6      Q.   Okay.  Now, after Mr. State was  03:07:32
7   hired, did Mr. Fried's job title change?  03:07:34
8      A.   He became chairman of the board.  03:07:37
9      Q.   And was he still an employee of  03:07:41
10  LVI Services?                      03:07:43
11     A.   I don't know what the          03:07:44
12  distinction is, so I can't answer that.  03:07:45
13     Q.   Okay.  Do you know what        03:07:47
14  his -- what his job duties were as     03:07:49
15  chairman of the board?             03:07:51
16     A.   No.                       03:07:51
17     Q.   Now, after Mr. Fried became    03:07:52
18  chairman of the board under Scott State,  03:08:02
19  do you have any personal knowledge as to  03:08:05
20  the quality of Mr. Fried's work       03:08:07
21  performance?                       03:08:09
22     A.   No.                       03:08:10
23     Q.   Okay.  Now, prior to Mr. State's  03:08:10
24  hire, did you ever think about firing Mr.  03:08:15
25  Fried?                             03:08:18

Page 40

1   GIRARDI
2      A.   No.                       03:08:18
3      Q.   Now, after Mr. State was hired,  03:08:20
4   did there come a time when Mr. State began  03:08:28
5   taking away Mr. Fried's job duties?    03:08:31
6      MS. SELTZER:  I object to the     03:08:34
7   form.                             03:08:36
8      A.   I -- yes.  I think -- I don't   03:08:36
9   understand that question.          03:08:40
10     Q.   Did Mr. Fried have any job     03:08:41
11  duties as chairman?                03:08:44
12     A.   I told you I don't -- I don't   03:08:45
13  know what his job duties as chairman were.  03:08:48
14     Q.   Okay.  Do you know if Mr. Fried  03:08:50
15  was performing any work as chairman?   03:08:55
16     A.   I don't really know what he was  03:08:57
17  doing as chairman.                 03:09:00
18     Q.   Okay.  Did you attend a meeting  03:09:01
19  on October 19, 2010 between Mr. State and  03:09:08
20  Mr. Fried?                         03:09:11
21     A.   I don't recall.            03:09:12
22     Q.   Do you know if they met that   03:09:14
23  day?                              03:09:16
24     A.   I don't recall.  I don't know.  03:09:16
25     Q.   Did Mr. Fried ever tell you that  03:09:20

Page 41

1   GIRARDI
2   Mr. State made a comment about his age?  03:09:23
3      A.   Mr. State, yes.            03:09:26
4      Q.   And when did Mr. Fried tell you  03:09:34
5   that?                             03:09:36
6      A.   Mr. Fried didn't tell me that.  03:09:36
7   Mr. State mentioned that Burt took     03:09:38
8   exception to something that he said    03:09:40
9   offhand about his age, yes.          03:09:41
10     Q.   And do you recall --         03:09:43
11     A.   I don't remember whether it was  03:09:44
12  the October 19 meeting or not.       03:09:45
13     Q.   And do you recall when Mr. State  03:09:47
14  told you that?                     03:09:49
15     A.   No.                       03:09:49
16     Q.   And do you know was it before or  03:09:50
17  after the -- the November -- your first  03:09:51
18  board meeting?                     03:09:56
19     A.   It was probably just prior to   03:09:57
20  the November board meeting.         03:09:58
21     Q.   And what did Mr. State tell you?  03:09:59
22     A.   He said that Burt is threatening  03:10:01
23  an age discrimination suit if he doesn't  03:10:04
24  have his job duties restored.  I didn't  03:10:07
25  know what his job duties were.       03:10:10

VERITEXT REPORTING COMPANY

212-267-6868                          516-608-2400

c9dfbb84-ebd6-4083-b8a8-7b260e306ed0

Page 42

```
            GIRARDI
1
2   Subsequently an e-mail was produced with a  03:10:12
3   long list of job duties that Mr. Fried   03:10:14
4   suggested were his duties that he would   03:10:17
5   continue to perform.               03:10:22
6      Q.  Did Mr. State tell you what   03:10:23
7   comment he made about Mr. Fried's age?   03:10:24
8      A.  I don't remember exactly what it 03:10:27
9   was.                      03:10:29
10     Q.  Do you know why Mr. State told   03:10:29
11  you he made a comment about Mr. Fried's   03:10:33
12  age?                       03:10:36
13     A.  Because Burt -- Burt was      03:10:36
14  threatening to make it an issue at the   03:10:38
15  board meeting.  So we should be aware of  03:10:39
16  it.                        03:10:43
17     Q.  But you don't remember what he  03:10:43
18  said?                       03:10:45
19     A.  I --               03:10:47
20     Q.  The comment.             03:10:48
21     A.  I don't remember exactly what he 03:10:49
22  said.                       03:10:50
23     Q.  Do you remember what your     03:10:51
24  reaction was to that comment?        03:10:52
25     A.  I thought it was overstating the 03:10:53
```

Page 43

```
            GIRARDI
1
2   case.                      03:10:55
3      Q.  What was?              03:10:55
4      A.  I thought Burt was out of line  03:10:58
5   and that he was wrong and that Scott meant 03:11:00
6   no malice, and there was nothing to it.  03:11:04
7      Q.  Did you speak to Mr. Fried --  03:11:06
8      A.  I did not.              03:11:07
9      Q.  Okay.               03:11:08
10        -- about that comment?       03:11:13
11     A.  No.                03:11:13
12     Q.  Did you speak to Mr. Fried about 03:11:14
13  the discussion that he had with Mr. State 03:11:16
14  that day in which the comment came out   03:11:17
15  from?                      03:11:19
16     A.  I didn't.             03:11:20
17     Q.  Okay.  Did Mr. Fried ever tell  03:11:21
18  you that Mr. State made a comment about  03:11:31
19  him?                       03:11:34
20     A.  Never.               03:11:34
21     Q.  Did he tell you at your first  03:11:35
22  board meeting that Mr. State made a     03:11:37
23  comment about his age?            03:11:38
24     A.  In the session after the formal 03:11:40
25  board meeting, Mr. Fried made a speech,  03:11:42
```

Page 44

```
            GIRARDI
1
2   and, yes, that was mentioned.        03:11:45
3      Q.  That was during the board     03:11:47
4   meeting?                     03:11:49
5      A.  It was not during a formal board 03:11:49
6   meeting.                     03:11:52
7      Q.  Was he given an opportunity to  03:11:59
8   speak about his situation during the    03:12:01
9   formal board meeting?             03:12:03
10     A.  No.                03:12:04
11     Q.  Was it planned that he would    03:12:04
12  discuss this after the formal board     03:12:05
13  meeting?                     03:12:07
14     A.  I believe it was part of the   03:12:07
15  agenda, yes.                   03:12:09
16     Q.  Mr. Girardi, if you could flip  03:12:10
17  over to the next document in that pile in 03:12:25
18  front of you.  That should be marked    03:12:28
19  Plaintiff's Exhibit 2.  Have you --     03:12:29
20        MS. SELTZER:  Is it Simmons    03:12:38
21  030?                       03:12:41
22        MR. DATOO:  Yes.  I figured it  03:12:42
23  is going to be an issue for you.  I will  03:12:44
24  read in the Bates stamp numbers.       03:12:46
25     Q.  Mr. Girardi, if you could just  03:12:48
```

Page 45

```
            GIRARDI
1
2   look at this document.  Let me know if you 03:12:52
3   have seen it before?             03:12:54
4      A.  Yes, I have.            03:12:55
5      Q.  And when was the first time you 03:12:56
6   saw that document?              03:12:58
7      A.  Probably on the day it was sent 03:12:59
8   on October 28 prior to the board meeting. 03:13:01
9      Q.  Okay.  And if I can turn your  03:13:04
10  attention to the second page of the    03:13:06
11  document.  You've seen this document    03:13:09
12  before?                     03:13:14
13     A.  Yes.                03:13:14
14     Q.  And what is it?           03:13:15
15     A.  It is Burt's list of what he   03:13:16
16  believes his areas of responsibility    03:13:19
17  should be.                   03:13:20
18     Q.  Is it should be or are?       03:13:22
19     A.  I took it to be should be     03:13:24
20  because I didn't know what his areas of  03:13:28
21  responsibility were.             03:13:30
22     Q.  Did you ever speak to Mr. Fried 03:13:30
23  about this list?               03:13:32
24     A.  Never.               03:13:32
25     Q.  And did you ever discuss the   03:13:33
```

12  (Pages 42 to 45)

VERITEXT REPORTING COMPANY

212-267-6868                    516-608-2400

c9dfbb84-ebd6-4083-b8a8-7b260e306ed0

Page 70

GIRARDI

1
2     Q.   Was Mr. State present when Mr.   03:36:54
3  Fried addressed the board?            03:36:57
4     A.   Yes, he was.                  03:36:58
5     Q.   And what did Mr. Fried say to   03:36:59
6  the board?                           03:37:01
7     A.   Burt discussed his long service   03:37:02
8  with LVI.  He was very emotional.  He was   03:37:08
9  rambling.  He was not making a lot of   03:37:13
10 sense.  He was trying to basically justify   03:37:18
11 the job description that he had laid out   03:37:24
12 previously, and we all listened to him.   03:37:26
13    Q.   Did anyone ask any questions?   03:37:29
14    A.   During his talk I think there   03:37:31
15 was some interaction, yes.            03:37:38
16    Q.   Do you know who interacted with   03:37:39
17 him?                                 03:37:40
18    A.   At one point Burt made a comment   03:37:41
19 about going to our sureties and telling   03:37:44
20 them that LVI was -- with him not on board   03:37:48
21 LVI was going to have no risk management.   03:37:59
22 They were going to be in a difficult   03:38:03
23 condition and that he was going to tell   03:38:04
24 them that with what I thought was the   03:38:06
25 hopes of undermining the business, which I   03:38:07

Page 71

GIRARDI

1
2  felt was inappropriate.  I told him that,   03:38:10
3  and he didn't appreciate it.          03:38:12
4     Q.   When did you tell him that?   03:38:14
5     A.   During his speech.            03:38:16
6     Q.   And did anyone else interact   03:38:17
7  with him other than you?             03:38:22
8     A.   I -- I'm sure people did, but I   03:38:23
9  don't remember exactly.              03:38:26
10    Q.   Do you know how long Mr. Fried   03:38:28
11 spoke for?                           03:38:29
12    A.   Twenty, twenty-five minutes.  I   03:38:29
13 can't recall.                        03:38:33
14    Q.   And did Mr. Fried say anything   03:38:34
15 about a comment that Mr. State made about   03:38:35
16 his age during this meeting?         03:38:38
17    A.   I believe he did make mention of   03:38:39
18 it.  He mentioned that he was considering   03:38:42
19 a suit and that he had an appointment with   03:38:44
20 his counsel after the board meeting.   03:38:47
21    Q.   And did -- do you recall what   03:38:49
22 Mr. State said?                      03:38:57
23    A.   Mr. State -- I don't recall   03:38:58
24 exactly what he said, no.            03:38:59
25    Q.   And what happened after Mr.   03:39:01

Page 72

GIRARDI

1
2  Fried finished his address to the board?   03:39:05
3     A.   I believe Burt and Scott left   03:39:06
4  the room, and the board discussed what we   03:39:09
5  had just heard.                      03:39:12
6     Q.   And what was discussed?       03:39:13
7     A.   Our impression of what Burt had   03:39:15
8  to say.                              03:39:19
9     Q.   And what was everyone's -- let's   03:39:20
10 start with you.  What was your impression   03:39:24
11 of what --                           03:39:25
12    A.   Again, I think Burt was out of   03:39:26
13 line.  I think he was incoherent,    03:39:28
14 emotional.  I thought it was inappropriate   03:39:33
15 the way he was addressing us.  I thought   03:39:37
16 he made threats against the business which   03:39:39
17 I thought was entirely inappropriate, and   03:39:41
18 I made that clear to the board that   03:39:43
19 that -- that was my view.            03:39:47
20    Q.   And what did Mr. -- did   03:39:48
21 Mr. Bagaria say anything?            03:39:50
22    A.   I don't remember exactly what he   03:39:51
23 said.                                03:39:52
24    Q.   And what about Mr. Schnabel?   03:39:53
25    A.   John Schnabel I don't recall   03:39:55

Page 73

GIRARDI

1
2  exactly what he said.                03:39:57
3     Q.   And was Mr. State part of this   03:39:58
4  caucus?                              03:40:02
5     A.   I believe he and Burt at that   03:40:03
6  point were out of the room, although I   03:40:05
7  can't remember.                      03:40:06
8     Q.   Do you recall what Mr. Buck   03:40:07
9  said?                                03:40:08
10    A.   No.                           03:40:08
11    Q.   Do you recall what Mr. Fiorucci   03:40:09
12 said?                                03:40:10
13    A.   No.                           03:40:11
14    Q.   How about Mr. Simmons?        03:40:11
15    A.   I don't remember exactly what he   03:40:13
16 said, no.                            03:40:16
17    Q.   And did the board vote on Mr.   03:40:16
18 Fried's employment at this session?   03:40:23
19    A.   No.                           03:40:27
20    Q.   Why not?                      03:40:27
21    A.   We didn't think it was          03:40:29
22 appropriate at the time, and we were going   03:40:30
23 to make another offer to Burt and see if   03:40:32
24 we accommodate him.                  03:40:35
25    Q.   So --                         03:40:37

19  (Pages 70 to 73)

c9dfbb84-ebd6-4083-b8a8-7b260e306ed0

Page 74

GIRARDI

1        GIRARDI
2    A.   We still wanted to have Burt on   03:40:38
3 as chairman.                             03:40:40
4    Q.   Did the board come to some sort  03:40:40
5 of consensus or resolution at the end of 03:40:42
6 this session?                            03:40:45
7    A.   The only consensus that we       03:40:45
8 arrived at is that we asked John Schnabel 03:40:47
9 to -- who had a closer relationship with  03:40:49
10 Burt to talk to Burt and see if he could 03:40:52
11 come to some kind of an arrangement or   03:40:54
12 accomodation with him.                   03:40:56
13   Q.   And did Mr. Schnabel have that   03:40:57
14 conversation with Mr. Fried?             03:41:00
15   A.   I believe he did, yes.           03:41:01
16   Q.   And do you know what they        03:41:03
17 discussed?                              03:41:04
18   A.   Again, it was Burt's job         03:41:05
19 description that he had outlined the     03:41:08
20 responsibilities and whether or not there 03:41:10
21 was some way that we could work with him 03:41:12
22 in coming up with a job description that 03:41:15
23 was satisfactory.                        03:41:17
24   Q.   And do you know when Mr.         03:41:18
25 Schnabel spoke to --                     03:41:21

Page 75

GIRARDI

1        GIRARDI
2    A.   It was a few days after the -- I 03:41:23
3 can't recall exactly, but it was within a 03:41:25
4 couple of weeks of the board meeting.    03:41:27
5    Q.   Now, did you ever investigate    03:41:29
6 Mr. Fried's allegation that he was -- he 03:41:39
7 felt he was discriminated against because 03:41:43
8 of his age by virtue of Mr. State's      03:41:46
9 statement?                              03:41:49
10       MS. SELTZER:   Objection to       03:41:52
11 form.   You can answer.                  03:41:53
12   A.   No.                              03:41:54
13   Q.   Why not?                         03:41:55
14   A.   Because we had the parties in    03:41:56
15 the room, and it was a question of he said 03:41:57
16 she said.                               03:41:59
17   Q.   Did you ask Mr. State if he made 03:42:00
18 that comment?                            03:42:02
19   A.   No.                              03:42:02
20   Q.   Why not?                         03:42:03
21   A.   He is -- he said that it was     03:42:04
22 taken out of context.                    03:42:07
23   Q.   So you did make that --          03:42:08
24   A.   I don't -- I don't recall Scott  03:42:11
25 ever saying he made it.   He            03:42:13

Page 76

GIRARDI

1        GIRARDI
2 would -- whatever Scott said is up for    03:42:15
3 debate at this point.                    03:42:19
4    Q.   Didn't you testify earlier that  03:42:20
5 he told you he made a comment about Mr.   03:42:22
6 Fried's age?                             03:42:24
7    A.   He said that he made a comment   03:42:25
8 that was taken out of context.           03:42:27
9    Q.   So he did make a comment about   03:42:28
10 his age, right?                          03:42:31
11   A.   He made a comment that he said   03:42:32
12 Burt took out of the context.           03:42:34
13   Q.   Okay.  So there is no he said    03:42:36
14 she said about Mr. State making an age   03:42:38
15 based comment, correct?                  03:42:40
16       MS. SELTZER:   Objection to       03:42:42
17 form.                                   03:42:43
18   A.   It wasn't an age-based comment.  03:42:43
19   Q.   What did Mr. State say?          03:42:45
20   A.   I don't know exactly what he     03:42:46
21 said.                                   03:42:48
22   Q.   Okay.  Did he -- do you know if  03:42:48
23 he told -- said to Mr. Fried that Mr.    03:42:50
24 Fried was 70 years old, 71 years old?    03:42:53
25   A.   I don't know exactly what he     03:42:56

Page 77

GIRARDI

1        GIRARDI
2 said.  No.                              03:43:00
3    Q.   Do you know in he said -- if he 03:43:00
4 asked Mr. Fried how long he expected to   03:43:02
5 work?                                   03:43:04
6       MS. SELTZER:   Objection. Asked 03:43:04
7 and answered.                           03:43:05
8    A.   I don't remember exactly what    03:43:06
9 was said, no.                            03:43:09
10   Q.   If you could flip the next       03:43:10
11 document over, it should be Plaintiff's  03:43:26
12 Exhibit 6.  It is Bagaria 113.          03:43:32
13       Could you take a look at this     03:43:37
14 document.  Let me know if you've seen it 03:43:38
15 before.                                 03:43:40
16   A.   I guess so.                      03:43:41
17   Q.   Why do you guess so?             03:43:42
18   A.   I wrote it.                      03:43:48
19   Q.   Okay.  So you've seen it before? 03:43:48
20   A.   I have seen it, yes.             03:43:50
21   Q.   Okay.  Now, according to this    03:43:52
22 document it appears that a conference call 03:43:54
23 between you -- actually let --           03:44:00
24       MR. DATOO:   Strike that.         03:44:03
25   Q.   Why don't you review this        03:44:04

20  (Pages 74 to 77)

Page 82

GIRARDI

1
2     A.   I don't believe so, no.          03:48:19
3     Q.   Do you know if those two spoke   03:48:22
4   that day or on or about that day?      03:48:24
5     A.   I can't remember. I -- November  03:48:26
6   10 is a specific date. I can't recall  03:48:29
7   whether they spoke. I don't believe I was  03:48:31
8   present though to the best of my        03:48:33
9   recollection.                           03:48:35
10    Q.   Now, did there come a time when  03:48:35
11  the board voted to terminate Mr. Fried?  03:48:38
12    A.   We did not have a formal vote to  03:48:40
13  terminate Mr. Fried, no.                03:48:44
14    Q.   Why not?                         03:48:45
15    A.   It never got to the point where  03:48:46
16  we had to vote.                         03:48:50
17    Q.   Why not?                         03:48:51
18    A.   We sent Burt an offer for a      03:48:52
19  consultancy agreement. He rejected it,  03:48:56
20  and he subsequently resigned.           03:48:58
21    Q.   So when you say we, who do you   03:49:00
22  mean by "we"?                           03:49:07
23    A.   The board. The board.            03:49:07
24    Q.   So everyone was in agreement     03:49:09
25  with that offer?                        03:49:11

Page 83

GIRARDI

1
2     A.   Yes.                             03:49:11
3     Q.   Is that memorialized in writing  03:49:12
4   any where?                              03:49:14
5     A.   I don't know.                    03:49:14
6     Q.   Was there one person who was --  03:49:15
7   who acted as a point person to get      03:49:19
8   everyone's letter on that letter?       03:49:22
9     A.   I don't recall, no.              03:49:25
10    Q.   Do you know if you are required  03:49:26
11  to have Apollo, CHS, and Falcon approval  03:49:31
12  if Mr. Fried was to be removed?         03:49:36
13    A.   I believe our investment        03:49:38
14  agreement called for                    03:49:40
15  unanimous -- unanimous approval, yes.   03:49:43
16    Q.   But that is not memorialized     03:49:45
17  anywhere in writing, correct?           03:49:47
18    A.   Our investment is in writing,    03:49:49
19  yes.                                    03:49:50
20    Q.   I am sorry. That you had the     03:49:50
21  sufficient parties' vote?               03:49:52
22    A.   It is not memorialized in        03:49:54
23  writing, no.                            03:49:57
24    Q.   So how do you know everyone was  03:49:58
25  on board?                               03:49:59

Page 84

GIRARDI

1
2     A.   I believe we had a conference    03:50:00
3   call where everybody agreed to send the  03:50:01
4   letter to Burt.                         03:50:03
5     Q.   Do you recall when that          03:50:05
6   conference call was?                    03:50:05
7     A.   I don't remember the date, no.   03:50:06
8     Q.   Do you recall who participated   03:50:08
9   in that conference call?                03:50:10
10    A.   I believe it was the full board.  03:50:12
11    Q.   Would that be reflected in any   03:50:13
12  minutes?                                03:50:15
13    A.   It wasn't a board meeting, no.   03:50:15
14  So I don't believe minutes exist.       03:50:17
15    Q.   Did you take any notes of this   03:50:19
16  conversation?                           03:50:20
17    A.   I don't remember whether I took  03:50:21
18  notes or not, no.                       03:50:23
19    Q.   And was this offer to keep Burt  03:50:24
20  on an ultimatum?                        03:50:31
21    A.   No.                              03:50:33
22    Q.   If he rejected the offer, what   03:50:33
23  were the consequences?                  03:50:36
24         MS. SELTZER:   Objection.        03:50:39
25    A.   I believe -- I don't know what   03:50:40

Page 85

GIRARDI

1
2   the consequences were. No.              03:50:41
3     Q.   Would he -- if you didn't accept  03:50:43
4   this arrangement --                     03:50:46
5     A.   I don't recall exactly what the  03:50:48
6   date was. I believe there was a date by  03:50:49
7   which he had to accept the offer.       03:50:51
8     Q.   And if he didn't?                03:50:53
9     A.   Then, I don't recall exactly     03:50:53
10  what the letter said.                   03:50:56
11    Q.   And did you --                   03:50:57
12         MR. DATOO:   Strike that.        03:51:08
13         MR. DATOO:   We have to switch   03:51:25
14  the tape.                               03:51:26
15         MS. SELTZER:   Okay.            03:51:29
16         MR. DATOO:   Let's go off the    03:51:29
17  record.                                 03:51:31
18         MS. SELTZER:   Sure.            03:51:31
19         THE VIDEOGRAPHER:   We are going  03:51:33
20  off the record. 3:51 p.m., end of tape  03:51:33
21  number 1.                               03:51:37
22         (Recess taken.)                  03:59:34
23         THE VIDEOGRAPHER:   We are       03:59:34
24  returning to the record, 3:59 p.m.      03:59:35
25  beginning of tape number 2.             03:59:38

22 (Pages 82 to 85)

c9dfbb84-ebd6-4083-b8a8-7b260e306ed0

Page 86

GIRARDI

1
2      Q.   Mr. Girardi, if could you flip   03:59:39
3   over to the next document in your pile.   03:59:41
4   It should be Plaintiff's Exhibit 8. It is   03:59:43
5   B. Simmons 44.                            03:59:47
6      A.   Okay.                             03:59:49
7      Q.   Is that identified as            03:59:50
8   Plaintiff's Exhibit 8?                    03:59:54
9      A.   Yes.                             03:59:56
10        MS. SELTZER:  And let the           03:59:57
11   record again show that Mr. Girardi is    03:59:58
12   neither a sender or a receiver of this   04:00:01
13   e-mail, of either.                       04:00:03
14      Q.   Mr. Girardi, if could you flip   04:00:04
15   to the second page. Have you ever seen   04:00:06
16   this document before?                    04:00:11
17      A.   I believe I have, yes.           04:00:12
18      Q.   Okay. And do you recall when    04:00:14
19   you first saw it?                        04:00:15
20      A.   Not exactly, no.                 04:00:17
21      Q.   Did you ever discuss the        04:00:19
22   contents of this letter with anybody?   04:00:22
23      A.   I don't remember a specific     04:00:25
24   discussion about this letter, no.       04:00:27
25      Q.   Do you recall a general         04:00:28

Page 87

GIRARDI

1
2   discussion about this letter?            04:00:32
3      A.   I am sure we had discussions     04:00:33
4   about it. I can't recall anything.       04:00:36
5      Q.   When you say "we," who do you    04:00:38
6   mean?                                    04:00:40
7      A.   Myself and Rajay, probably other 04:00:40
8   members of the board of directors.       04:00:44
9      Q.   Okay. Mr. Girardi, if you could  04:00:45
10   flip over the next document in the pile. 04:01:03
11   It should be Plaintiff's Exhibit 9.      04:01:08
12         MR. DATOO:  Joanne, that is       04:01:19
13   236.                                     04:01:22
14      Q.   Have you seen this document      04:01:23
15   before?                                  04:01:25
16      A.   That is my handwriting, yes.     04:01:25
17      Q.   Okay. In the top left-hand      04:01:27
18   corner it says 11/16. Does that mean you 04:01:39
19   wrote this on November 16?               04:01:42
20      A.   Yes.                            04:01:43
21      Q.   Okay. And can you do me a       04:01:44
22   favor? Can you read everything you wrote 04:01:46
23   into the record?                         04:01:52
24      A.   This is an LVI board of         04:01:52
25   directors call. Fiorucci, Code Hennessy 04:01:55

Page 88

GIRARDI

1
2   Simmons, Simmons and Hogan, Falcon        04:01:59
3   (Schnabel) AIC, Girardi and Reynolds, Buck 04:02:05
4   not present, Scott State. "Schnabel:      04:02:10
5   Burt is open to some role with day-to-day 04:02:16
6   responsibilities. Insists this is due to  04:02:21
7   his age," which I assume -- well I am just 04:02:23
8   reading.                                  04:02:32
9      Q.   I just need you to read.          04:02:32
10      A.   "Burt sent preemption letter.    04:02:32
11   Ignore. Good faith letter offer to Burt  04:02:32
12   Fried. Next step send out letter to Burt. 04:02:36
13   Treatment for Burt e-mail account Westport 04:02:39
14   office, compensation. Treat his daughter  04:02:41
15   as we would any other employee. Maintain  04:02:46
16   status quo until 11:30. General counsel   04:02:49
17   relocate eventually to Milford. Surety    04:02:53
18   demonstrates strategy ability to de-lever 04:02:58
19   and improve coverage ratios performance.  04:03:01
20   Other senior manager off site in Denver   04:03:07
21   week of 11/15."                          04:03:11
22      Q.   Okay. Under the -- I guess at    04:03:12
23   the top half of the document where you   04:03:21
24   write --                                 04:03:23
25         MR. DATOO:  Strike that.          04:03:27

Page 89

GIRARDI

1
2      Q.   So this was a -- were these      04:03:28
3   notes memorializing a conference call that 04:03:30
4   you had with board members?               04:03:33
5      A.   These are my notes of a call     04:03:34
6   with the board members noted on          04:03:36
7   the -- in -- on the page.                04:03:39
8      Q.   In addition to some other        04:03:40
9   nonboard members, correct?               04:03:42
10      A.   Teddy Reynolds is not a board    04:03:43
11   member. Correct.                        04:03:45
12      Q.   And how about Hogan?             04:03:46
13      A.   Hogan is a board member.         04:03:47
14      Q.   Why is Mr. Bagaria's name not   04:03:49
15   listed on here as either present or not  04:03:53
16   present?                                 04:03:55
17      A.   He probably wasn't present. I    04:03:55
18   don't remember though, but I -- I don't  04:03:57
19   think he was present at this call.       04:03:59
20      Q.   Was Mr. Buck present?            04:04:01
21      A.   I listed him as not present, so  04:04:03
22   I assume he wasn't.                      04:04:05
23      Q.   So do you know why you didn't    04:04:06
24   list Mr. Bagaria as not present?         04:04:08
25      A.   I -- I don't remember, no.       04:04:10

23  (Pages 86 to 89)

c9dfbb84-ebd6-4083-b8a8-7b260e306ed0

Page 90

GIRARDI

1         GIRARDI
2     Q.   Okay. And it says here on the   04:04:12
3   top half of the page it says "Burt - sent   04:04:20
4   preemptive letter. Ignore and send good   04:04:26
5   faith letter offer to Burt Fried."   04:04:28
6       What did you mean by "ignore"?   04:04:31
7     A.   Burt had sent us I guess this   04:04:33
8   letter from the previous exhibit.   04:04:35
9     Q.   So Plaintiff's Exhibit 8. Is   04:04:37
10  that what you are referring to?   04:04:40
11    A.   I believe that is what it refers   04:04:41
12  to, yes.   04:04:43
13    Q.   Can you just flip it over and   04:04:43
14  make sure?   04:04:45
15    A.   I -- I am certain that that is   04:04:46
16  what it referred to.   04:04:50
17    Q.   Okay. And why did you -- why   04:04:51
18  did the board ignore the letter?   04:04:58
19    A.   We wanted to keep Burt   04:05:02
20  on -- Burt on as chairman, and so we sent   04:05:04
21  him our offer to enter into a consultancy   04:05:06
22  agreement I believe shortly after this   04:05:10
23  call.   04:05:12
24    Q.   And that was in response to the   04:05:12
25  letter you received -- Plaintiff's Exhibit   04:05:14

Page 91

GIRARDI

1         GIRARDI
2   8?   04:05:18
3     A.   I believe so, yes.   04:05:18
4     Q.   And was there only one letter   04:05:20
5   sent to Burt after you received this   04:05:24
6   letter or were there two letters sent?   04:05:25
7     A.   I don't recall. I know we sent   04:05:27
8   at least one letter with the offer for a   04:05:31
9   consultancy agreement. I don't recall any   04:05:33
10  other letter.   04:05:34
11    Q.   Do you know if it was coupled   04:05:35
12  with a letter that terminated his   04:05:36
13  employment?   04:05:38
14    A.   I don't remember that, no.   04:05:38
15    Q.   Did Mr. Simmons say anything   04:05:39
16  during this call about sending a second   04:05:42
17  letter terminating Mr. Fried's employment?   04:05:44
18    A.   I don't recall during this phone   04:05:47
19  call whether he mentioned that, no.   04:05:50
20    Q.   Okay. Under the heading "next   04:05:52
21  steps," number two, it says "treatment for   04:05:55
22  Burt." What did you mean by that?   04:05:59
23    A.   If Burt was not going to accept   04:06:01
24  our offer we were going to take him off   04:06:04
25  the e-mail system, and that was what that   04:06:09

Page 92

GIRARDI

1         GIRARDI
2   was referring to.   04:06:12
3     Q.   Why would you take him off the   04:06:13
4   e-mail system if he didn't accept your   04:06:14
5   offer?   04:06:17
6     A.   Because he would no longer be an   04:06:17
7   employee of the company I believe based on   04:06:19
8   the terms of that letter.   04:06:20
9     Q.   So you would be terminating --   04:06:22
10    A.   Well, he had --   04:06:24
11  actually -- excuse me. He had already   04:06:26
12  sent us this letter.   04:06:27
13    Q.   Are you referring to Plaintiff's   04:06:32
14  Exhibit 8?   04:06:33
15    A.   Yes.   04:06:34
16    Q.   So why would you terminate him   04:06:34
17  if he didn't accept your offer?   04:06:38
18      MS. SELTZER: Objection.   04:06:41
19    A.   We weren't terminating him.   04:06:42
20    Q.   Why would you take him off the   04:06:43
21  e-mail account?   04:06:46
22    A.   Because -- I don't recall.   04:06:47
23    Q.   All right. You also mentioned   04:06:48
24  west -- you wrote Westport office.   04:06:51
25    A.   Right.   04:06:53

Page 93

GIRARDI

1         GIRARDI
2     Q.   What did you mean by that?   04:06:54
3     A.   There were discussions as we   04:06:55
4   have talked about previously about   04:06:58
5   eventually closing the Westport office.   04:06:58
6     Q.   Why was that listed on here?   04:07:01
7     A.   Because it probably came up on   04:07:03
8   the phone call.   04:07:04
9     Q.   Why would it have come up on   04:07:05
10  that phone call if you were discussing Mr.   04:07:10
11  Fried?   04:07:12
12      MS. SELTZER: Objection.   04:07:13
13    A.   We discussed a number of other   04:07:14
14  things on this call probably in addition   04:07:16
15  to Mr. Fried, including cost savings   04:07:18
16  initiatives that the company was   04:07:22
17  considering at the time.   04:07:23
18    Q.   Okay. You also wrote "treat his   04:07:24
19  daughter as we would treat any other   04:07:26
20  employee."   04:07:28
21    A.   Yes.   04:07:29
22    Q.   "Maintain status quo until   04:07:29
23  11:30." What did you mean by that?   04:07:32
24    A.   I believe in the context of the   04:07:33
25  cost savings initiatives that were   04:07:36

24 (Pages 90 to 93)

c9dfbb84-ebd6-4083-b8a8-7b260e306ed0

Page 94

```
           GIRARDI
 1                                           04:07:37
 2   discussed Scott raised the issue that   04:07:42
 3   Burt's daughter was an employee at      04:07:44
 4   Westport. He was concerned as to how it 04:07:46
 5   would look if she was part of the       04:07:48
 6   reduction in force that was being planned.
 7   Our view as a board was that if she was 04:07:50
 8   worth retaining as an employee, we would 04:07:53
 9   retain her. If she wasn't, we would treat 04:07:56
10   her like any other employee.            04:07:58
11      Q.   And do you know was she -- do   04:08:00
12   you know when she was selected -- was   04:08:04
13   there a list of people --               04:08:06
14      A.   No.                             04:08:07
15      Q.   -- who were going to be laid    04:08:08
16   off?                                    04:08:10
17      A.   No, there wasn't.               04:08:10
18      Q.   So how did people know who was  04:08:11
19   going to be laid off or not?            04:08:13
20      A.   We didn't know who was going to 04:08:15
21   be laid. Scott mentioned that she was an 04:08:17
22   employee, and that given the situation  04:08:19
23   with Burt he was sensitive to it, and the 04:08:21
24   view of the board was that it's a       04:08:24
25   reduction in force. If she is worth     04:08:26
```

Page 95

```
           GIRARDI
 1                                           04:08:28
 2   keeping, you can keep her. If not we    04:08:31
 3   treat her like any other employee which is 04:08:33
 4   what I wrote.                           04:08:33
 5      Q.   At this point in time was it    04:08:35
 6   already decided if the Westport office was 04:08:37
 7   going to be closed or not?              04:08:39
 8      A.   It hadn't been decided. It      04:08:41
 9   was -- it was certainly targeted as an  04:08:43
10   office that was costly and that we would 04:08:45
11   attempt to close.                       04:08:46
12      Q.   Do you know when it was decided 04:08:47
13   that the Westport office was going to   04:08:51
14   close?                                  04:08:51
15      A.   I don't remember exactly.       04:08:52
16   Probably sometime in December, but I don't 04:08:56
17   remember exactly when.                  04:08:57
18      Q.   Okay. Now, it says here        04:09:01
19   "general counsel relocate eventually to 04:09:04
20   Milford." Do you know what that means?  04:09:05
21      A.   I believe Greg DiCarlo worked   04:09:09
22   out of Westport, which I didn't know at 04:09:11
23   the time, and his view was that if the  04:09:14
24   Westport office would eventually close we 04:09:16
25   could move Greg to Milford.
```

Page 96

```
           GIRARDI
 1                                           04:09:18
 2      Q.   Do you know when Mr. DiCarlo    04:09:20
 3   became general counsel of LVI?          04:09:22
 4      A.   No. No, I don't.                04:09:23
 5      Q.   Do you know how long he has been 04:09:24
 6   with LVI?                               04:09:25
 7      A.   No.                             04:09:26
 8      Q.   And you also wrote "surety" I   04:09:32
 9   think "demonstrate strategy. Ability to 04:09:37
10   de-lever" --                            04:09:38
11      A.   Delever.                        04:09:39
12      Q.   Delever is that short for       04:09:42
13   de-leverage?                            04:09:42
14      A.   Yes.                            04:09:43
15      Q.   And can you just -- sorry. Help 04:09:45
16   me out with that?                       04:09:46
17      A.   "Demonstrates strategy, ability 04:09:48
18   to de-lever and improve coverage ratios 04:09:51
19   and performance."                       04:09:52
20      Q.   What did you mean by that?      04:09:54
21      A.   The sureties are an important   04:09:55
22   part of the business. We were concerned 04:09:57
23   given Burt's outburst at the board meeting 04:10:00
24   that he was going to attempt to undermine 04:10:02
25   us with the sureties. So we felt it was
```

Page 97

```
           GIRARDI
 1                                           04:10:06
 2   important that Scott and whoever else was 04:10:08
 3   appropriate on the board go to the      04:10:10
 4   sureties and have a meeting with them and 04:10:12
 5   assure them that we have got a much     04:10:15
 6   stronger balance sheet and that we are  04:10:17
 7   prepared to go forward.                 04:10:19
 8      Q.   So it appears to me that        04:10:21
 9   everything written on this document had to 04:10:23
10   do with Burt Fried?                     04:10:25
11      MS. SELTZER: Objection.             04:10:29
12      A.   Is that a question?            04:10:30
13      Q.   Is that correct?               04:10:32
14      A.   Closing the Westport office, I 04:10:35
15   don't know that that has to with Burt   04:10:37
16   Fried. No.                              04:10:37
17      Q.   So on this call, the only one   04:10:41
18   item you discussed that you claimed was 04:10:45
19   not related to Burt Fried was the Westport 04:10:47
20   office?                                 04:10:48
21      A.   The Denver off site didn't     04:10:51
22   relate to Burt Fried either.            04:10:53
23      Q.   Can you point that --          04:10:54
24      A.   At the bottom of the page.     04:10:57
25      Q.   Other. Okay. Now, that is
```

25 (Pages 94 to 97)

VERITEXT REPORTING COMPANY

212-267-6868                                516-608-2400

c9dfbb84-ebd6-4083-b8a8-7b260e306ed0

Page 127

```
 1            GIRARDI
 2    A.  No.                04:33:25
 3    Q.  Okay.  You just assumed someone  04:33:26
 4  was going to pick up the tab?       04:33:29
 5    A.  Yes.             04:33:31
 6       MS. SELTZER:  Objection.  Is    04:33:32
 7  that a question?           04:33:33
 8       MR. DATOO:  I guess he answered  04:33:33
 9  it.  So --              04:33:34
10       THE WITNESS:  I answered it.    04:33:36
11  Sorry.                04:33:37
12       MS. SELTZER:  That is okay.    04:33:38
13    Q.  Have you ever had any       04:33:39
14  communications with any accountants    04:33:41
15  regarding any contingencies for this case?  04:33:42
16    A.  No.             04:33:45
17    Q.  Okay.             04:33:46
18       MR. DATOO:  Why don't we take a  04:33:49
19  five-minute break, and then we will   04:33:50
20  conclude.              04:33:52
21       MS. SELTZER:  Sure.      04:33:54
22       THE VIDEOGRAPHER:  We're going  04:33:55
23  off the record.  4:33 p.m.       04:33:56
24       (Recess taken.)        04:41:26
25       THE VIDEOGRAPHER:  We're     04:41:26
```

Page 128

```
 1            GIRARDI
 2  returning to the record.  4:41 p.m.    04:41:27
 3    Q.  Mr. Girardi, did you participate  04:41:30
 4  in the negotiation of the terms of the  04:41:32
 5  investor securities agreement?     04:41:34
 6    A.  Yes.             04:41:36
 7       MR. DATOO:  I have no further   04:41:40
 8  questions.             04:41:40
 9       THE VIDEOGRAPHER:  We're going  04:41:42
10  off the record.  The time is 4:41, end of  04:41:43
11  today's questioning.          04:41:46
12       (Time noted:  4:41 p.m.)     04:41:49
13
14
15
16
17
18
19            GERALD GIRARDI
20
21  Subscribed and sworn to before me
22  this     day of      , 2011
23
24
25
```

Page 129

```
 1            GIRARDI
 2    C E R T I F I C A T I O N
 3
 4
 5
 6    I, DEBBIE ZAROMATIDIS, a Shorthand
 7  Reporter and a Notary Public, do hereby
 8  certify that the foregoing witness, GERALD
 9  GIRARDI, was duly sworn on the date
10  indicated, and that the foregoing is a
11  true and accurate transcription of my
12  stenographic notes.
13    I further certify that I am not
14  employed by nor related to any party to
15  this action.
16
17
18
19
20
21
22
23         DEBBIE ZAROMATIDIS
24
25
```

Page 2011

ERRATA SHEET
VERITEXT/NEW YORK REPORTING, LLC

CASE NAME: Fried, Burton T. v. LVI Services, Inc., et al.
DATE OF DEPOSITION: May 23,
WITNESSES' NAME: GERALD GIRARDI

| PAGE | LINE (S) | CHANGE | REASON |
|------|----------|--------|--------|
|      |          |        |        |
|      |          |        |        |
|      |          |        |        |
|      |          |        |        |
|      |          |        |        |
|      |          |        |        |
|      |          |        |        |
|      |          |        |        |
|      |          |        |        |
|      |          |        |        |
|      |          |        |        |
|      |          |        |        |
|      |          |        |        |
|      |          |        |        |
|      |          |        |        |

SUBSCRIBED AND SWORN TO BEFORE ME
THIS ____ DAY OF _____, 20__.

(NOTARY PUBLIC)          MY COMMISSION EXPIRES:

32  (Pages 127 to 2011)

c9dfbb84-ebd6-4083-b8a8-7b260e306ed0

Exhibit 6

1

1

2 UNITED STATES DISTRICT COURT

3 SOUTHERN DISTRICT OF NEW YORK

4 No. 10 Civ. 9308(JSR)

5 ------------------------------------------x

6 BURTON T. FRIED,

7                          Plaintiff,

8         - against -

9 LVI SERVICES, INC., LVI PARENT CORP., CODE

10 HENNESSY SIMMONS, LLC d/b/a CHS PRIVATE

11 EQUITY V LP; APOLLO INVESTMENT CORP.,

12 SCOTT E. STATE, in his official and

13 individual capacities; BRIAN SIMMONS, in

14 his official and individual capacities;

15 RAJAY BAGARIA, in his official and

16 individual capacities; GERALD J. GIRARDI,

17 in his official and individual capacities,

18                          Defendants.

19 ------------------------------------------x

20                      June 2, 2011

                        10:03 a.m.

21

22

23

24

25

2

```
 1
 2
 3
 4        VIDEOTAPE DEPOSITION of GREGORY
 5   DICARLO, taken by the Plaintiff, pursuant
 6   to Notice, held at the offices of Thompson
 7   Wigdor & Gilly, LLP, 85 Fifth Avenue, New
 8   York, New York, before Debbie Zaromatidis,
 9   a Shorthand Reporter and Notary Public of
10   the State of New York.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

4

```
 1
 2        S T I P U L A T I O N S
 3
 4        IT IS HEREBY STIPULATED AND
 5   AGREED by and between the Attorneys for
 6   the respective parties hereto that filing
 7   and sealing be and the same are hereby
 8   waived.
 9        IT IS FURTHER STIPULATED AND
10   AGREED that all objections except as to
11   the form of the question, shall be
12   reserved to the time of the trial.
13        IT IS FURTHER STIPULATED AND
14   AGREED that the within examination may be
15   signed and sworn to before any notary
16   public with the same force and effect as
17   though signed and sworn to before this
18   Court.
19
20
21
22
23
24
25
```

3

```
 1
 2   A P P E A R A N C E S :
 3
 4   THOMPSON WIGDOR & GILLY, LLP
 5   Attorneys for Plaintiff
 6        85 Fifth Avenue
 7        New York, New York 10003
 8   BY:  SHAFFIN A. DATOO, ESQ.
 9
10
11   SIDLEY AUSTIN, LLP
12   Attorneys for Defendants
13        787 Seventh Avenue
14        New York, New York 10019
15   BY:   JOANNE SELTZER, ESQ.
16
17
18   ALSO PRESENT:
19        BURTON FRIED
20        J.D. MARTINEZ, Videographer
21
22
23
24
25
```

5

```
 1
 2        THE VIDEOGRAPHER:  We are on      10:03:36
 3   the record.  My name is J.D. Martinez of   10:03:57
 4   Veritext New York.  The date today is June 10:03:59
 5   2, 2011, and the time is approximately     10:04:02
 6   10:04 a.m. This deposition is being held   10:04:06
 7   at Thompson Wigdor & Gilly LLP located at  10:04:08
 8   85 Fifth Avenue, New York, New York.  The  10:04:12
 9   caption of this case is Burton T. Fried    10:04:15
10   versus LVI Services, Inc., et al., filed   10:04:17
11   in the United States District Court,       10:04:21
12   Southern District of New York.  The name   10:04:22
13   of the witness is Gregory DiCarlo.         10:04:24
14        At this time the attorneys will       10:04:27
15   identify themselves and the parties they   10:04:29
16   represent.  After which our court          10:04:31
17   reporter, Debbie Zaromatidis, will swear   10:04:32
18   in the witness, and we can proceed.        10:04:35
19        MS. SELTZER:  Joanne Seltzer,         10:04:37
20   Sidley Austin on behalf of the defendants. 10:04:39
21        MR. DATOO:  Shaffin Datoo,            10:04:39
22   Thompson Wigdor & Gilly for the plaintiff  10:04:41
23   Burt Fried.                                10:04:43
24
25
```

2 (Pages 2 to 5)

**VERITEXT REPORTING COMPANY**

212-267-6868                                          516-608-2400

**6**

```
1                                    10:04:43
2    GREGORY DICARLO,               10:04:43
3    having first been duly sworn by a Notary  10:04:43
4    Public of the State of New York, was      10:04:43
5    examined and testified as follows:        10:04:51
6    EXAMINATION BY MR. DATOO:                  10:04:51
7        Q.   Good morning, Mr. DiCarlo.        10:04:51
8        A.   Good morning.                     10:04:53
9        Q.   As you know, my name is Shaffin   10:04:54
10   Datoo, and I represent Mr. Fried in this   10:04:55
11   case.  I am going to ask you some          10:04:57
12   questions today, and hopefully you can     10:05:03
13   give me some answers because you're an     10:05:05
14   attorney.  I assume you know what a        10:05:08
15   deposition is, so we don't have to really  10:05:09
16   cover a lot of ground rules.               10:05:12
17       I just want to ask you some            10:05:16
18   quick preliminary questions.               10:05:19
19       A.   Sure.                             10:05:21
20       Q.   Is your ability to tell the       10:05:22
21   truth in any way impaired today?           10:05:23
22       A.   No.                               10:05:25
23       Q.   Okay.  And I'm -- I'm going to    10:05:26
24   assume that IF you answer a question that  10:05:32
25   you understood it.  If you don't           10:05:34
```

**7**

```
1                   DICARLO
2    understand it, please let me know, and     10:05:35
3    I'll ask it a different way.  If you need   10:05:37
4    a break, let me know.  The only condition   10:05:39
5    I have is that you answer the last          10:05:41
6    question asked.                             10:05:42
7        A.   Okay.                              10:05:43
8        Q.   In connection with this lawsuit,   10:05:44
9    did you provide your attorney with all      10:05:46
10   responsive documents?                       10:05:48
11       A.   Yes.                               10:05:49
12       Q.   Okay.  And where did you look to   10:05:51
13   find the documents?                         10:05:53
14       A.   Predominantly with the people     10:05:54
15   that would have those documents including  10:05:59
16   IT.                                         10:06:01
17       Q.   Okay.  Did you check               10:06:02
18   your -- your office for any documents?      10:06:07
19       A.   I had no documents --             10:06:08
20       Q.   Okay.                              10:06:10
21       A.   -- in my stuff.                    10:06:11
22       Q.   Do you have a personal e-mail     10:06:13
23   account?                                    10:06:15
24       A.   Personal?                          10:06:15
25       Q.   Yes.                               10:06:16
```

**8**

```
1                   DICARLO
2        A.   Yes.                               10:06:16
3        Q.   Did you look there for any         10:06:17
4    responsive documents?                       10:06:18
5        A.   No.  I don't use my personal      10:06:19
6    e-mail account for any business-related    10:06:23
7    purposes.                                   10:06:25
8        Q.   Okay.  Do you keep any             10:06:26
9    work-related documents at home?             10:06:29
10       A.   No.                                10:06:31
11       Q.   Have you ever been sued?           10:06:31
12       A.   Yes.                               10:06:34
13       Q.   How many times?                    10:06:34
14       A.   Once.                              10:06:38
15       Q.   And when was that?                 10:06:39
16       A.   That was around 1996.              10:06:40
17       Q.   And --                             10:06:45
18       A.   To the best of my recollection.   10:06:46
19       Q.   Sorry?                             10:06:47
20       A.   To the best of my recollection.   10:06:48
21       Q.   And what was the nature of that   10:06:49
22   lawsuit?                                    10:06:51
23       A.   I was a board member for my       10:06:51
24   condominium association.                    10:06:53
25       Q.   Okay.                              10:06:55
```

**9**

```
1                   DICARLO
2        A.   And the entire board was sued by  10:06:55
3    a disgruntled resident.                     10:06:57
4        Q.   Has anyone ever accused you of     10:07:02
5    discrimination?                             10:07:07
6        A.   No.                                10:07:08
7        Q.   Have you ever given sworn          10:07:08
8    testimony before?                           10:07:13
9        A.   Yes.                               10:07:13
10       Q.   How many times?                    10:07:14
11       A.   I believe twice.                   10:07:15
12       Q.   And when was the first time you   10:07:19
13   gave sworn testimony?                       10:07:23
14       A.   The first time was a deposition   10:07:24
15   about twenty years ago.                     10:07:26
16       Q.   And what was the nature of that   10:07:28
17   case?                                       10:07:30
18       A.   To the best of my knowledge,      10:07:30
19   since I was not a party to it, it had to    10:07:33
20   do with a union employee on a construction 10:07:35
21   project that was laid off and brought a    10:07:39
22   claim because he believed he was laid off  10:07:42
23   due to his union activities.                10:07:46
24       Q.   And when was the second time you  10:07:48
25   gave sworn testimony?                       10:07:54
```

3 (Pages 6 to 9)

**14**

DICARLO

1
2    Q.   Okay.  Do you know for how long?  10:11:14
3    A.   I believe it is -- I'm sure it   10:11:15
4    is in excess of 20 years.  I don't know   10:11:19
5    how much in excess.   10:11:21
6    Q.   And do you recall what his last   10:11:25
7    job title at LVI Services was?   10:11:27
8    A.   I believe it was chairman.   10:11:29
9    Q.   Now, did Mr. Fried also work for   10:11:30
10   LVI Parent?   10:11:32
11   A.   Not to my knowledge.   10:11:33
12   Q.   Okay.  Did he have a -- did he   10:11:34
13   serve on the board of LVI Parent?   10:11:39
14   A.   I believe he did, yes.   10:11:41
15   Q.   And was he chairman of the board   10:11:42
16   of LVI Parent?   10:11:44
17   A.   I believe he was, yes.   10:11:46
18   Q.   Did you attend any board   10:11:48
19   meetings of LVI Parent Corp. since you've   10:11:51
20   been employed?   10:11:54
21   A.   No.   10:11:55
22   Q.   Is there a reason why not?   10:11:55
23   A.   Not to my knowledge.  I've just   10:11:59
24   never been asked.   10:12:02
25   Q.   Okay.  Now, when did you start   10:12:03

**15**

DICARLO

1
2    working at LVI Services?   10:12:09
3    A.   May of 2005.   10:12:10
4    Q.   And what was your job title   10:12:13
5    then?   10:12:18
6    A.   Counsel.   10:12:18
7    Q.   And who did you report to?   10:12:18
8    A.   Burt Fried.   10:12:22
9    Q.   And at that time what was Mr.   10:12:23
10   Fried's job title?   10:12:32
11   A.   At the time I started I believe   10:12:33
12   it was president and CEO.   10:12:34
13   Q.   And what office did you work in   10:12:36
14   when you first started?   10:12:43
15   A.   An office in Westport,   10:12:44
16   Connecticut.   10:12:46
17   Q.   Did you spend all of your time   10:12:51
18   there?   10:12:52
19   A.   Yes.   10:12:53
20   Q.   And what were your job duties as   10:12:53
21   counsel?   10:12:55
22   A.   It was reviewing contracts,   10:12:55
23   providing assistance with litigated   10:12:58
24   matters, drafting various legal documents   10:13:02
25   required by the company.   10:13:11

**16**

DICARLO

1
2    Q.   Were there any other   10:13:16
3    attorneys --   10:13:25
4    MR. DATOO:  Strike that.   10:13:26
5    Q.   Were there any other people that   10:13:27
6    had -- held the position as counsel?   10:13:28
7    A.   No.   10:13:30
8    Q.   Okay.  So were you and Mr. Fried   10:13:31
9    the only attorneys there that you know of?   10:13:34
10   A.   That's correct, yes.   10:13:36
11   MS. SELTZER:  Objection.  At   10:13:37
12   the time, right?  In '05?   10:13:38
13   MR. DATOO:  Yes.   10:13:41
14   Q.   Do you know what Mr. Fried's   10:13:42
15   duties were as CEO, president and CEO when   10:13:43
16   you first started?   10:13:47
17   A.   I understood them to be that he   10:13:48
18   ran the entire company.  He was   10:13:51
19   responsible for every aspect of the   10:13:54
20   company's success and growth.   10:13:56
21   Q.   Okay.  And while Mr. Fried was   10:13:58
22   CEO, did you share any of your job duties   10:14:02
23   with Mr. Fried?   10:14:04
24   MS. SELTZER:  I object to the   10:14:08
25   form, but you can answer.   10:14:09

**17**

DICARLO

1
2    A.   The best way I could describe is   10:14:10
3    that I reported to Burt.  I managed and   10:14:16
4    dealt with the day-to-day routine legal   10:14:20
5    matters, the filing -- I mean the   10:14:25
6    reviewing of contracts, any routine   10:14:28
7    matter, if a branch needed assistance on   10:14:32
8    drafting a release or the lack or having   10:14:36
9    something like that reviewed.  Anything   10:14:38
10   beyond that that required some authority   10:14:42
11   for decision making, I reported to Burt on   10:14:43
12   it, and generally Burt would give me a   10:14:48
13   direction as to how he wanted to handle   10:14:52
14   it, and then I would implement what he   10:14:54
15   wanted done.   10:14:56
16   Q.   Okay.  Did you ever work with   10:14:57
17   Mr. Fried on legal matters other than   10:15:00
18   reporting -- other than seeking his   10:15:04
19   approval for certain things?   10:15:06
20   A.   Yeah.  We worked together on any   10:15:07
21   significant litigated matters certainly.   10:15:11
22   We worked together on any nonroutine   10:15:16
23   contract negotiation, something of -- of a   10:15:20
24   larger significance dollar-wise or   10:15:24
25   something unusual in the project itself   10:15:28

5 (Pages 14 to 17)

VERITEXT REPORTING COMPANY

212-267-6868

516-608-2400

22

```
             DICARLO
 1
 2      A.  My job title?          10:19:26
 3      Q.  Yes.                   10:19:27
 4      A.  It was still counsel.      10:19:27
 5      Q.  And who did you report to when   10:19:28
 6  Mr. McNamara was CEO?          10:19:30
 7      A.  I was never formally told who I  10:19:32
 8  report to, but in practice I reported to  10:19:35
 9  Burt.                         10:19:36
10      Q.  And while Mr. McNamara was CEO,   10:19:43
11  were you still working in the Westport   10:19:46
12  office?                       10:19:47
13      A.  Yes.                   10:19:48
14      Q.  Did you work at the Westport   10:19:48
15  office your entire time at LVI Services?   10:19:50
16      A.  Yes.                   10:19:52
17      Q.  And while Mr. McNamara was CEO,   10:19:53
18  did your job duties change in any way from   10:19:55
19  when Mr. Fried was CEO?        10:19:58
20      A.  No.                    10:20:00
21      Q.  Okay.  Now, while Mr. McNamara   10:20:00
22  was CEO, did the nature of your -- working   10:20:05
23  relationship with Burt remain the same?   10:20:10
24      A.  Yes, it did.           10:20:12
25      Q.  Were you both performing legal   10:20:16
```

23

```
             DICARLO
 1
 2  work?                         10:20:18
 3      A.  Yes.                   10:20:18
 4      Q.  And was Mr. Fried still handling   10:20:19
 5  the same legal work that he did when he   10:20:24
 6  was CEO?                      10:20:30
 7      A.  Yes.                   10:20:31
 8      Q.  And the same with you?     10:20:31
 9      A.  Yes.                   10:20:33
10      Q.  Okay.  And this is all while Mr.   10:20:33
11  McNamara was CEO, correct?     10:20:35
12      A.  Correct.              10:20:38
13      Q.  Okay.  And did you continue to   10:20:38
14  seek Mr. Fried's advice on certain   10:20:40
15  matters?                      10:20:42
16      A.  Yes.                   10:20:42
17      Q.  Okay.  While Mr. McNamara was   10:20:43
18  CEO?                          10:20:45
19      A.  Yes.                   10:20:45
20      Q.  Okay.  And while Mr. McNamara   10:20:46
21  was CEO, did you feel that Mr. Fried was   10:20:48
22  interfering with your ability to do your   10:20:51
23  job in any way?                10:20:53
24      A.  No.                    10:20:54
25      Q.  Did you feel that Mr.     10:20:55
```

24

```
             DICARLO
 1
 2  Fried -- Mr. McNamara was CEO, did   10:20:59
 3  you feel that Mr. Fried was stepping on   10:21:02
 4  your toes?                    10:21:04
 5      A.  No.                    10:21:06
 6      Q.  Now, while Mr. McNamara was CEO,   10:21:06
 7  were you ever confused as to who was   10:21:18
 8  making the final decisions at LVI?   10:21:20
 9      MS. SELTZER:  Objection to the   10:21:22
10  form.                         10:21:23
11      A.  I won't say I was confused by   10:21:23
12  it, but I didn't necessarily know who was   10:21:25
13  making the final decision on each and   10:21:28
14  every matter.                 10:21:30
15      Q.  Okay.  Why is that?       10:21:31
16      A.  I was not privy to any   10:21:33
17  communication or every communication Burt   10:21:35
18  might have had with Mr. McNamara.  So   10:21:37
19  whether or not Burt was making the   10:21:39
20  decision or making that decision only   10:21:41
21  after consulting with Mr. McNamara, I   10:21:42
22  don't know.                   10:21:45
23      Q.  Okay.  Do you know if other   10:21:46
24  employees were confused as to who was   10:21:49
25  making the final decisions at LVI?   10:21:51
```

25

```
             DICARLO
 1
 2      MS. SELTZER:  I object to the   10:21:54
 3  form.  He didn't say he was confused, but   10:21:55
 4  go ahead.                     10:21:57
 5      MR. DATOO:  Okay.           10:21:58
 6      A.  Not that I am aware of.     10:22:00
 7      Q.  And while Mr. McNamara was CEO,   10:22:02
 8  were you ever confused as to who to report   10:22:08
 9  to on certain matters?         10:22:10
10      A.  No.  It was consistently Burt.   10:22:11
11      Q.  Okay.  Do you know if other   10:22:14
12  employees or do you know if any   10:22:20
13  employees -- employee was confused as to   10:22:25
14  who to report to on certain matters --   10:22:26
15      MR. SELTZER:  Objection.      10:22:29
16      Q.  -- while Mr. McNamara was CEO?   10:22:31
17      MS. SELTZER:  Objection.  Asked   10:22:34
18  and answered, but you can answer again.   10:22:35
19      A.  Not that I am aware of.     10:22:36
20      Q.  Now, while Mr. McNamara was CEO,   10:22:37
21  do you have personal -- do you have any   10:22:41
22  personal knowledge of Mr. Fried's work   10:22:43
23  performance?                  10:22:45
24      A.  No, other than my direct   10:22:45
25  dealings with Mr. Fried as I previously   10:22:47
```

7 (Pages 22 to 25)

**26**

DICARLO

```
1              DICARLO
2   mentioned.                  10:22:49
3       Q.   And based on your direct    10:22:49
4   dealings, how would you describe his work  10:22:51
5   performance?                10:22:53
6       A.   It was good.             10:22:53
7       Q.   Now, did there come a time when  10:22:54
8   Mr. Fried became the interim CEO of LVI   10:22:56
9   Services?                   10:23:00
10      A.   I don't know if that was his    10:23:00
11  title, but there was a time after Bob   10:23:05
12  McNamara left that Burt became president  10:23:08
13  or CEO again.               10:23:12
14      Q.   Okay.  Do you know why Mr. Fried  10:23:14
15  became president or CEO again?      10:23:17
16      A.   I do not.              10:23:21
17      Q.   Okay.  Do you know who asked   10:23:22
18  him? Do you know if anyone asked him to be  10:23:26
19  the president or CEO again?        10:23:28
20      A.   I don't know.            10:23:30
21      Q.   Do you know what job duties Mr.   10:23:31
22  Fried performed when he was the president  10:23:35
23  or CEO again?               10:23:37
24      A.   I believe he performed the     10:23:39
25  duties of running the business again in  10:23:42
```

**27**

DICARLO

```
1              DICARLO
2   its entirety.                10:23:45
3       Q.   And did he also keep his prior   10:23:46
4   job duties that he had as chairman?    10:23:50
5       A.   I don't know.            10:23:53
6       Q.   Now, while Mr. Fried was the CEO  10:23:54
7   and president again, were you still    10:24:02
8   counsel?                    10:24:05
9       A.   Yes.                 10:24:06
10      Q.   And did you still continue to    10:24:06
11  report to Mr. Fried?            10:24:10
12      A.   Yes.                 10:24:11
13      Q.   Were your job duties still the   10:24:12
14  same?                      10:24:17
15      A.   Yes.                 10:24:17
16      Q.   And while Mr. Fried was the     10:24:18
17  president and CEO, did your working    10:24:21
18  relationship with him change in any way?  10:24:26
19      A.   No.                  10:24:28
20      Q.   Were you still working on legal   10:24:29
21  matters together during this time period?  10:24:30
22      A.   Yes.                 10:24:32
23      Q.   Were you -- did you continue to   10:24:32
24  seek advice from Mr. Fried on certain   10:24:37
25  matters?                    10:24:39
```

**28**

DICARLO

```
1              DICARLO
2       A.   Yes.                 10:24:39
3       Q.   Now, while Mr. Fried was the CEO  10:24:40
4   and president again of LVI Services, did   10:24:49
5   you feel that he was interfering with your  10:24:51
6   ability to do your job?           10:24:53
7       A.   No.                  10:24:54
8       Q.   During the same period of type,  10:24:55
9   did you feel that he was stepping on your  10:24:58
10  toes?                      10:24:59
11      A.   No.                  10:24:59
12      Q.   Now, while Mr. Fried was the     10:25:00
13  president and CEO again of LVI Services,   10:25:06
14  do you have personal knowledge of his work  10:25:09
15  performance?                10:25:11
16      A.   Only with respect to what I     10:25:12
17  worked with him on.             10:25:17
18      Q.   And based on your dealings with   10:25:18
19  Mr. Fried, how would you describe his work  10:25:19
20  performance?                10:25:22
21      A.   Good.                10:25:23
22      Q.   Now, while Mr. Fried was the     10:25:27
23  president and CEO again of LVI Services,   10:25:29
24  was the company searching for a permanent  10:25:33
25  CEO?                       10:25:36
```

**29**

DICARLO

```
1              DICARLO
2       A.   That was my understanding, yes.  10:25:37
3       Q.   Do you know why?          10:25:38
4       A.   I do not.              10:25:39
5       Q.   Do you know what Mr. Fried     10:25:40
6   planned to do after the company found a   10:25:43
7   permanent CEO?               10:25:44
8       A.   No.                  10:25:46
9       Q.   Do you know if he planned to     10:25:53
10  return to his former role?         10:25:54
11      A.   I don't know.            10:25:56
12      Q.   Now, while Mr. Fried was the     10:25:57
13  president and CEO of LVI Services for a   10:26:05
14  second time, did you have any         10:26:08
15  conversations or e-mail communications    10:26:10
16  with anyone at LVI Services about Mr.    10:26:12
17  Fried's job duties or his role at LVI?    10:26:16
18      MS. SELTZER:  I object to the       10:26:18
19  form, but you can answer.          10:26:19
20      A.   Give me the time frame one more  10:26:20
21  time? I am sorry.              10:26:22
22      Q.   While Mr. Fried was the CEO and   10:26:24
23  president of LVI Services for the second   10:26:27
24  time, did you have any conversations or   10:26:29
25  e-mail communications with anyone about   10:26:32
```

VERITEXT REPORTING COMPANY

212-267-6868                          516-608-2400

**38**

```
1          DICARLO
2  was run through Burt.                    10:35:06
3      Q.  And did you speak to Mr. State    10:35:07
4  prior to your appointment to general      10:35:09
5  counsel about your role at LVI?           10:35:11
6      A.  No.                               10:35:15
7      Q.  When was the first time that you  10:35:32
8  spoke to Mr. State about your role at LVI? 10:35:34
9          MS. SELTZER:  Objection to        10:35:36
10                                           10:35:37
11     A.  I don't recall speaking to Mr.    10:35:37
12 State about my role at LVI.               10:35:39
13     Q.  When -- I believe you testified   10:35:41
14 that Mr. State told you that you were to  10:35:42
15 report to him?                            10:35:44
16     A.  No, he didn't.  I was told by     10:35:52
17 John Leonard that Mr. State said I should 10:35:53
18 report to him.                            10:35:56
19     Q.  Okay.  Did you ever have any      10:35:56
20 conversations with Mr. State about your   10:35:58
21 job duties?                               10:35:59
22         MS. SELTZER:  Objection. Asked    10:36:00
23 and answered.                             10:36:01
24     A.  No.                               10:36:02
25     Q.  To this day?                      10:36:03
```

**39**

```
1          DICARLO
2      A.  To this day.                      10:36:05
3      Q.  Now, while -- after Mr. State     10:36:06
4  was hired and before you were appointed   10:36:17
5  general counsel, did you feel that Mr.    10:36:19
6  Fried was interfering with your ability to 10:36:21
7  do your job?                              10:36:22
8      A.  No, it was business as usual.     10:36:23
9      Q.  Okay.  During that period of      10:36:25
10 time?                                     10:36:31
11     A.  Correct.                          10:36:31
12     Q.  Now, after you became general     10:36:32
13 counsel, did you feel that Mr. Fried was  10:36:33
14 interfering with your ability to do your  10:36:36
15 job?                                      10:36:38
16     A.  I don't feel he was interfering   10:36:38
17 with my ability to do my job. I feel the  10:36:45
18 conflict that had arisen between Burt and 10:36:48
19 Scott State was causing me confusion as to 10:36:51
20 the proper reporting relationships and the 10:36:55
21 level of involvement each of them should  10:36:58
22 have in any particular matter.            10:37:00
23     Q.  Okay.  And would it have been     10:37:01
24 ideal for you if the two of them worked it 10:37:07
25 out?                                      10:37:10
```

**40**

```
1          DICARLO
2          MS. SELTZER:  I object to the     10:37:11
3  form.                                     10:37:12
4      A.  Ideal. I don't know about         10:37:12
5  ideal. I -- subjective term. I could      10:37:14
6  have worked with either of them as they   10:37:21
7  saw fit as long as I had clear direction. 10:37:26
8      Q.  Okay.  But neither Mr. Fried nor  10:37:29
9  Mr. State gave you that direction; is that 10:37:31
10 correct?                                  10:37:33
11     A.  The direction I received was      10:37:38
12 through John Leonard that I was to report 10:37:40
13 directly to Scott State.                  10:37:43
14     Q.  And did Mr. Fried ever tell you   10:37:44
15 to report directly to him during this     10:37:46
16 period of time that you were appointed    10:37:48
17 general counsel?                          10:37:51
18     A.  No, he never indicated that, but 10:37:52
19 he did continue to require my input of my 10:37:54
20 keeping him in the loop on several        10:38:03
21 matters.                                  10:38:05
22     Q.  So was --                         10:38:05
23     A.  A variety of matters.             10:38:06
24     Q.  Was Mr. Fried conducting          10:38:08
25 business as usual --                      10:38:13
```

**41**

```
1          DICARLO
2          MS. SELTZER:  I object to the     10:38:14
3  form.                                     10:38:16
4      Q.  -- with respect to your working   10:38:16
5  relationship?                             10:38:17
6          MS. SELTZER:  I object to the     10:38:18
7  form.                                     10:38:19
8      A.  It -- it was business as usual    10:38:23
9  but maybe a little more involvement than I 10:38:25
10 was used to by Mr. Fried.                 10:38:31
11     Q.  Would it have been the same       10:38:33
12 level of involvement as when Mr. Fried was 10:38:35
13 chairman the first time?                  10:38:39
14     A.  For the most part with at least   10:38:40
15 one exception I could think of, yes.      10:38:43
16     Q.  And what exception is that?       10:38:46
17     A.  The exception was that -- that I  10:38:48
18 found very unusual was shortly after I was 10:38:51
19 appointed general counsel Mr. Fried       10:38:54
20 e-mailed me that he wanted to be copied on 10:38:59
21 all comments I made to contracts.  In     10:39:03
22 other words, I would review a contract.  I 10:39:08
23 would put together a list of comments, and 10:39:10
24 I would e-mail those to the appropriate   10:39:12
25 branch and regional managers.  Burt asked 10:39:14
```

11 (Pages 38 to 41)

VERITEXT REPORTING COMPANY
212-267-6868                     516-608-2400

**50**

DICARLO

1
2  had heard had happened during the portions  10:53:52
3  when he was not present.  10:53:55
4      Q.   Okay.  How long -- do you know  10:53:57
5  how long after the board meeting did Mr.  10:54:01
6  Fried mention to you that Mr. State made a  10:54:02
7  comment about his age?  10:54:04
8      A.   I don't recall if it was shortly  10:54:05
9  thereafter.  I don't remember.  10:54:09
10     Q.   After -- after hearing what Mr.  10:54:11
11  Fried told you, did you investigate?  10:54:15
12     MS. SELTZER:  Can I put in an  10:54:19
13  objection here?  As you know, Mr. DiCarlo  10:54:21
14  is general counsel.  10:54:23
15     MR. DATOO:  Yes.  10:54:25
16     MS. SELTZER:  So if there were  10:54:26
17  any activities that you took on on behalf  10:54:27
18  of the company as general counsel in  10:54:29
19  preparation for litigation, you're not to  10:54:31
20  disclose those.  10:54:33
21     MR. DATOO:  Well, I am just  10:54:37
22  asking if he investigated.  I don't want  10:54:38
23  to know --  10:54:39
24     MS. SELTZER:  Yes, but I mean  10:54:40
25  if that was part and parcel of what he was  10:54:41

**51**

DICARLO

1
2  doing as a general counsel for the  10:54:43
3  company, then he should really not talk  10:54:46
4  about what he did with respect to that  10:54:49
5  investigation.  10:54:51
6      MR. DATOO:  I don't want to  10:54:51
7  know what he did.  I just want to know  10:54:53
8  whether he investigated or not.  10:54:55
9      MS. SELTZER:  Okay.  10:54:57
10     A.   I -- I wouldn't say I  10:55:01
11  investigated it, but I did discuss it with  10:55:04
12  John Leonard and was told that the company  10:55:06
13  is aware of Burt's concern because he had  10:55:12
14  made it clear at the board meeting of his  10:55:15
15  allegation of age discrimination, and I  10:55:17
16  believe counsel was already engaged at  10:55:25
17  that point to handle it.  10:55:27
18     Q.   Now, what did Mr. Leonard tell  10:55:34
19  you about the November -- about what  10:55:36
20  happened at the November 4 meeting to  10:55:38
21  the -- and I am not asking you to disclose  10:55:42
22  any attorney-client communications you had  10:55:46
23  with him.  10:55:48
24     MS. SELTZER:  So you just want  10:55:49
25  the factual things that John told him?  10:55:50

**52**

DICARLO

1
2      MR. DATOO:  Yes.  10:55:53
3      MS. SELTZER:  Right.  Okay.  10:55:54
4      A.   The way it was described to me  10:55:55
5  was that Burt accused Mr. State of making  10:56:01
6  the statement I described earlier about  10:56:08
7  his age and that he accused Mr. State of  10:56:10
8  age discrimination, and that I think the  10:56:15
9  only thing John said was that there was a  10:56:20
10  blow up about it among the board, and I  10:56:22
11  didn't have any more detail about that  10:56:25
12  because I don't believe John was in the  10:56:28
13  room at the time that was discussed.  10:56:29
14     Q.   Did you hear what happened at  10:56:32
15  the board meeting from anybody else?  10:56:34
16     A.   No.  10:56:37
17     A.   Well, I should correct that and  10:56:48
18  say I did have discussions, but I -- I  10:56:51
19  would classify them as attorney-client  10:56:53
20  privileged communications.  10:56:56
21     Q.   And who did you have the  10:56:56
22  discussions with?  10:56:58
23     A.   Scott State.  10:56:59
24     Q.   And when did you have that  10:56:59
25  discussion?  10:57:00

**53**

DICARLO

1
2      A.   I believe it was December 3.  10:57:01
3      Q.   Okay.  Did you hear anything  10:57:06
4  else about what happened at the November 4  10:57:13
5  meeting from anybody?  10:57:16
6      A.   No.  10:57:17
7      Q.   Okay.  Did you speak to Mr.  10:57:19
8  Fried after the November 4 board  10:57:25
9  meeting --  10:57:27
10     MS. SELTZER:  Other than --  10:57:29
11     Q.   -- about what happened?  10:57:30
12     MS. SELTZER:  Other than what  10:57:32
13  he has already testified to?  10:57:33
14     MR. DATOO:  Correct.  10:57:34
15     A.   About what happened at the board  10:57:35
16  meeting?  10:57:37
17     Q.   Yes.  10:57:38
18     A.   No.  10:57:38
19     MR. DATOO:  Okay.  I am  10:57:45
20  probably just going to have to -- can we  10:57:46
21  go off?  10:57:48
22     THE VIDEOGRAPHER:  We're going  10:57:49
23  off the record.  The time is 10:57 a.m.  10:57:49
24     (Recess taken.)  10:59:34
25     THE VIDEOGRAPHER:  We're  10:59:42

14 (Pages 50 to 53)

VERITEXT REPORTING COMPANY

212-267-6868                                    516-608-2400

**62**

DICARLO

1
2     MS. SELTZER:  It has arrived,   11:21:11
3  so --                        11:21:15
4     MR. DATOO:  Okay.  Well, let me   11:21:16
5  just finish up with this.            11:21:19
6     MS. SELTZER:  Okay.         11:21:20
7     Q.  If you look at the second page,   11:21:21
8  Burt says -- Burt writes: "Please copy me   11:21:23
9  on all of your e-mails containing your   11:21:28
10  comments to the contract provisions bonded 11:21:30
11  on -- and on bonded after your review if   11:21:32
12  you have not discussed your comments   11:21:36
13  previously with me and advise me of the   11:21:38
14  replies."                 11:21:40
15     So Mr. Fried wanted you to copy   11:21:42
16  him, correct?              11:21:44
17     A.  Correct.           11:21:46
18     Q.  And that is only if you didn't   11:21:46
19  discuss any of your comments that you made 11:21:51
20  with him previously, correct?      11:21:55
21     A.  Correct.           11:21:56
22     Q.  And he wanted you to advise him  11:21:57
23  of any replies to your comments, correct?  11:22:00
24     A.  Correct.           11:22:02
25     Q.  And would that just be keeping   11:22:03

**63**

DICARLO

1
2  Mr. Fried in the loop?         11:22:09
3     A.  It was highly unusual in our   11:22:10
4  relationship and the method under which we  11:22:15
5  worked prior to this e-mail.  I did not   11:22:20
6  copy Burt on my contract comments, and I   11:22:26
7  had not for five plus years.  I dealt with  11:22:28
8  them myself.  I went to Burt or copied   11:22:33
9  Burt on the select few where we were   11:22:37
10  unable to negotiate or I or management   11:22:40
11  without Burt's input was unable to   11:22:44
12  negotiate an acceptable resolution to a   11:22:47
13  problematic provision, and I when I say   11:22:50
14  acceptable I mean within the parameters   11:22:52
15  that had evolved over the course of my   11:22:55
16  time working with Burt.  I had -- I had an  11:22:59
17  idea or a clear idea of what was      11:23:02
18  acceptable and what we could negotiate up   11:23:05
19  to a point.  If I was unable to get it   11:23:07
20  negotiated to within those parameters, I   11:23:09
21  would go to Burt.  It was a very small   11:23:15
22  percentage of all the contracts I reviewed  11:23:18
23  that I would run by Burt, so this was   11:23:20
24  highly unusual.              11:23:29
25     Q.  Now, because most of this was   11:23:30

**64**

DICARLO

1
2  redacted, you know, I can't really tell   11:23:32
3  what was going on in here, but was Mr.   11:23:34
4  Fried by virtue of this e-mail asking you   11:23:37
5  to report to him or just run things by   11:23:39
6  him?                     11:23:42
7     A.  First of all, this was not   11:23:42
8  anything to do with a casino.  I don't   11:23:49
9  know if you think that is related, but it   11:23:52
10  is not.                  11:23:54
11     Q.  I am not --           11:23:54
12     A.  I just want to make that clear   11:23:56
13  because I wasn't sure if there was a   11:23:58
14  connection there.          11:23:59
15     Q.  No, I was -- earlier on I was   11:24:00
16  asking whether Mr. Fried sent you this   11:24:02
17  e-mail because of an error that was made   11:24:04
18  in connection with a casino -- a   11:24:07
19  demolition project for a casino.      11:24:11
20     A.  The answer is emphatically no.   11:24:12
21     Q.  I am sorry?          11:24:15
22     A.  Emphatically no.        11:24:16
23     Q.  To what question?       11:24:18
24     A.  To the question of whether this  11:24:19
25  e-mail was made in relation to a mistake   11:24:20

**65**

DICARLO

1
2  being made on a contract with respect to a  11:24:23
3  casino.  This neither relates to a casino   11:24:24
4  nor a mistake made in the contract, this   11:24:28
5  e-mail.                  11:24:31
6     Q.  No, I'm not talking about the   11:24:31
7  e-mail chain.  I am talking specifically   11:24:33
8  about what Mr. Fried wrote in this e-mail,  11:24:35
9  whether it was in response to an error or   11:24:38
10  to an oversight made in connection with a   11:24:40
11  contract for the demolition of a casino.   11:24:43
12     A.  And the answer is no.      11:24:45
13     Q.  Okay.             11:24:47
14     A.  No.              11:24:47
15     Q.  Now, as I said -- as I was   11:24:48
16  saying earlier, did Mr. Fried tell you to   11:24:53
17  report to him?            11:24:57
18     A.  He did not.          11:24:57
19     Q.  Okay.  And was Mr. Fried making  11:24:59
20  recommendations as to what provisions   11:25:04
21  should be included in this contract or   11:25:08
22  what should be negotiated?        11:25:12
23     A.  Yes.              11:25:14
24     Q.  And who was making the final   11:25:15
25  decisions on what goes in the contract and  11:25:16

17 (Pages 62 to 65)

74

DICARLO

```
 1            DICARLO
 2    second page of that document, and if you   11:35:21
 3    look to the second full paragraph above    11:35:22
 4    the word Scott.  Do you see that?          11:35:24
 5        A.   Yes.                    11:35:26
 6        Q.   Okay.  If I can draw your       11:35:27
 7    attention to the second sentence in the    11:35:28
 8    second full paragraph, it reads: "Most     11:35:31
 9    troublesome is that he is just stepping    11:35:34
10    all over our new general counsel, Greg     11:35:37
11    DiCarlo, which tends to marginalize Greg   11:35:41
12    at a time when I need him to step up."      11:35:43
13            Now, was Mr. Fried stepping all    11:35:52
14    over you at this point in time?            11:35:54
15        MS. SELTZER:  I object to the          11:35:57
16    form.                          11:35:58
17        A.   I wouldn't use the words         11:35:58
18    stepping all over, no.  I would say it was 11:36:06
19    business as usual, meaning as it had been  11:36:08
20    for the entirety of the time I had been    11:36:15
21    with LVI up to that point.  What was       11:36:18
22    happening, as I said, was there was        11:36:21
23    confusion on my part about reporting       11:36:24
24    relationships and the authority of both    11:36:32
25    Scott and Burt to direct my activities.    11:36:36
```

75

DICARLO

```
 1            DICARLO
 2        Q.   Now, at this point in time, was   11:36:41
 3    there confusion about your reporting       11:36:43
 4    relationship?                     11:36:47
 5        A.   Well, because Scott wrote this    11:36:48
 6    e-mail on October 29, it is clear to me    11:36:55
 7    that I had had at least some conversation  11:37:01
 8    with John Leonard up to this point where I 11:37:02
 9    expressed that confusion over the          11:37:07
10    reporting relationship of being unsure of  11:37:09
11    how I should handle direction from Burt    11:37:11
12    versus Scott.                     11:37:14
13        Q.   And this was prior to the e-mail  11:37:15
14    that Mr. Fried sent you on November 1,     11:37:18
15    correct?                        11:37:20
16        A.   It is indeed.              11:37:21
17        Q.   Okay.  So what resulted in your   11:37:22
18    confusion?                       11:37:24
19        A.   I don't have any memory of what  11:37:27
20    the specific issues were that gave rise to 11:37:30
21    that --                         11:37:34
22        Q.   Okay.                   11:37:34
23        A.   -- in that two or three-day time 11:37:35
24    frame.                          11:37:37
25        Q.   So do you know what Mr. State    11:37:38
```

76

DICARLO

```
 1            DICARLO
 2    was talking about when he said Mr. Fried   11:37:39
 3    was just stepping all over you?            11:37:42
 4        A.   No, not specifically.         11:37:43
 5        Q.   And did you feel marginalized at 11:37:45
 6    this point in time?                   11:37:49
 7        A.   I don't think I felt          11:37:50
 8    marginalized.  Confused.                11:37:53
 9        Q.   Do you know what Mr. State was   11:37:55
10    talking about when he wrote it tends to    11:37:58
11    marginalize you?                   11:38:02
12        A.   I don't.                 11:38:03
13        Q.   Okay.  Did there come a time    11:38:03
14    when Mr. Fried was terminated?             11:38:46
15        A.   I know there was a time when Mr. 11:38:48
16    Fried left.  I am not entirely clear on    11:38:58
17    whether it was a termination or not.       11:39:00
18        Q.   Okay.                   11:39:02
19        A.   Or a voluntary departure.      11:39:03
20        Q.   Did you ever have a conversation 11:39:09
21    with Mr. Fried in which he told you he was 11:39:11
22    separating from the company?             11:39:13
23        A.   He -- he must have said        11:39:15
24    something to me prior to leaving.  I know  11:39:20
25    he just didn't walk out, but I don't have  11:39:22
```

77

DICARLO

```
 1            DICARLO
 2    a specific recollection of a conversation. 11:39:24
 3        Q.   Do you recall speaking with Mr.  11:39:25
 4    Fried at the Westport office while         11:39:27
 5    Ms. Shari Dembin was present?            11:39:32
 6        A.   I don't recall.             11:39:34
 7        Q.   Okay.  Do you know --         11:39:38
 8        MR. DATOO:  Strike that.           11:39:46
 9        Q.   You testified that you don't     11:39:47
10    know if Mr. Fried was terminated or he     11:39:49
11    left voluntarily?                   11:39:52
12        A.   Correct.                 11:39:53
13        Q.   Okay.  Do you know if he was    11:39:54
14    terminated as an employee of LVI?          11:39:57
15        A.   I am not entirely sure.        11:40:00
16        Q.   Okay.                   11:40:05
17        MS. SELTZER:  Go ahead.            11:40:07
18        Q.   Do you know when Mr.           11:40:08
19    Fried -- Mr. Fried's last day at work was? 11:40:23
20        A.   I believe it was November 30.   11:40:26
21        Q.   Okay.                   11:40:29
22        A.   2010.                   11:40:30
23        Q.   And in between the time Mr.     11:40:31
24    Fried sent you the e-mail on November 1    11:40:35
25    and November 30, 2010, did you have a      11:40:39
```

20  (Pages 74 to 77)

VERITEXT REPORTING COMPANY

212-267-6868                                       516-608-2400

82

```
         DICARLO
 1
 2       MS. SELTZER:  Over -- over the    11:44:46
 3   period that Scott State was --        11:44:48
 4       MR. DATOO:  No, over the period   11:44:50
 5   that Mr. DiCarlo was referring to.    11:44:51
 6       MS. SELTZER:  So the entire       11:44:53
 7   period that Mr. Fried was in the Westport  11:44:54
 8   office is what you are saying?        11:44:56
 9       MR. DATOO:  It is --              11:44:58
10       A.  It was -- it was infrequent that  11:44:59
11   he wouldn't be there, although he was out  11:45:01
12   of the office more often during the time  11:45:04
13   he came back on as president and CEO.    11:45:08
14   After McNamara left before Scott came on  11:45:11
15   when Burt took on running the company    11:45:14
16   again, he tended to be out of the office a  11:45:16
17   bit more.  I know he traveled to England  11:45:19
18   at one point relating to business.  He    11:45:21
19   certainly traveled with me on several     11:45:26
20   occasions -- a number of occasions to     11:45:28
21   Mississippi, to New Orleans, to          11:45:31
22   Washington.  We went to a number of places  11:45:35
23   regarding, you know, litigated matters    11:45:37
24   that we traveled on.                     11:45:40
25       Q.  Do you know if Mr. Fried spent   11:45:41
```

83

```
         DICARLO
 1
 2   any time in the the New York City office  11:45:43
 3   of LVI?                                  11:45:45
 4       A.  Once Bob McNamara came on board  11:45:46
 5   I am not aware of Burt spending any time  11:45:51
 6   there.                                   11:45:54
 7       Q.  How about when Mr. Fried         11:45:54
 8   was -- became president and CEO for the  11:46:03
 9   second time?                            11:46:05
10       A.  Not that I am aware.            11:46:05
11       Q.  Do you know if Mr. Fried tried  11:46:07
12   to secure contracts for LVI throughout   11:46:15
13   his -- his time at LVI?                  11:46:20
14       A.  Yes.                            11:46:22
15       Q.  And did he secure a lot of      11:46:23
16   contracts in New York City?             11:46:26
17       A.  Define a lot.                   11:46:27
18       Q.  Did he secure any contracts in  11:46:35
19   New York City?                          11:46:36
20       A.  Yes.                            11:46:37
21       Q.  How many approximately?         11:46:37
22       A.  MSG.  I am not entirely sure of  11:46:38
23   his involvement on 130 Liberty but of Bob  11:46:46
24   McNamara drove that more than Burt in '07,  11:46:53
25   '08.  Those -- those are what I can think  11:46:57
```

84

```
         DICARLO
 1
 2   of at the moment.                       11:47:06
 3       Q.  Okay.  And as part of securing  11:47:07
 4   these -- the MSG contract, would Mr. Fried  11:47:09
 5   have to -- would Mr. Fried travel in to  11:47:12
 6   New York to attempt to secure that      11:47:15
 7   contract?                               11:47:18
 8       A.  I -- I know of it at least -- of  11:47:19
 9   two certainly occasions when he did travel  11:47:22
10   to New York.  One was during the        11:47:24
11   negotiation process for a meeting where  11:47:27
12   they had some concerns about LVI, and Burt  11:47:32
13   went to allay those concerns, and I know  11:47:34
14   he went to Turner's office in New York    11:47:38
15   City to execute the contract in person.  11:47:42
16       Q.  And do you recall when this was?  11:47:45
17       A.  I believe the MSG contract was   11:47:47
18   executed I think it was in June 2010.     11:47:51
19       Q.  And is that contract still being  11:48:02
20   performed?                               11:48:03
21       A.  Yes.                            11:48:04
22       Q.  What is the size of that        11:48:04
23   contract?                               11:48:05
24       A.  Dollar value?                   11:48:06
25       Q.  Yes.                            11:48:06
```

85

```
         DICARLO
 1
 2       A.  Approximately 27 million        11:48:07
 3   dollars.                                11:48:08
 4       Q.  Is that considered a large      11:48:08
 5   contract?                               11:48:10
 6       A.  It is.                          11:48:11
 7       Q.  Is that LVI's largest contract?  11:48:11
 8       MS. SELTZER:  Objection.            11:48:15
 9   During which period of time?            11:48:16
10       A.  During 2010.                    11:48:18
11       A.  It is the largest one I am aware  11:48:19
12   of.                                     11:48:24
13       Q.  Okay.                           11:48:25
14       A.  Yes.                            11:48:26
15       Q.  And do you know if Mr. Fried was  11:48:26
16   involved in securing the 130 Liberty     11:48:29
17   contract?                               11:48:32
18       A.  My understanding is that when we  11:48:32
19   had initially negotiated for that job in  11:48:39
20   the fall of 2005 Burt was primarily      11:48:42
21   involved in 2005 with this negotiation,  11:48:49
22   and I assisted him with that.  LVI could  11:48:53
23   not come to terms at that time, and we    11:48:58
24   walked away from the job.  In 2007 after  11:49:02
25   the fire at 130 Liberty and the          11:49:09
```

22  (Pages 82 to 85)

**86**

```
1            DICARLO
2    termination of the contractor that was    11:49:12
3    hired to do the work, there were          11:49:14
4    negotiations again.                        11:49:17
5        My understanding is that Bob          11:49:18
6    McNamara I would say would have been more  11:49:20
7    involved than Burt in that negotiation if  11:49:29
8    not almost exclusively, and I think        11:49:29
9    he -- he even negotiated that contract and 11:49:35
10   had it drafted up without my involvement   11:49:37
11   at all. I never even saw that contract     11:49:39
12   until after it was executed.               11:49:43
13       Q.  So now in connection with         11:49:44
14   securing contracts, would it be common to  11:49:51
15   travel to the site of where --             11:49:58
16       MR. DATOO:  Strike that.              11:50:00
17       Q.  Is the MSG contract still         11:50:02
18   currently ongoing?                         11:50:06
19       A.  Yes.                               11:50:07
20       Q.  And how many employees are        11:50:08
21   working at MSG?                            11:50:10
22       A.  I have no idea.                    11:50:13
23       Q.  Do you know if it is -- do you    11:50:14
24   have any idea?                             11:50:16
25       A.  None.                             11:50:16
```

**87**

```
1            DICARLO
2        Q.  Okay.  Do you know of any other   11:50:17
3    contracts that Mr. Fried secured for LVI   11:50:24
4    or assisted in securing?                   11:50:27
5        MS. SELTZER:  Throughout his          11:50:30
6    entire period of employment?              11:50:31
7        MR. DATOO:  Yes, through Mr.          11:50:32
8    DiCarlo's entire period of employment.     11:50:35
9        A.  None come to mind, but I -- I     11:50:37
10   have a sense that there were others.       11:50:43
11       Q.  Okay.  In New York City?          11:50:45
12       A.  Not necessarily specific to New   11:50:47
13   York City, but certainly he was active in  11:50:49
14   negotiating work on an ongoing basis       11:50:54
15   throughout the country.                    11:50:58
16       Q.  And when he did that, would he    11:50:59
17   remain at the Westport office or would he  11:51:00
18   travel?                                    11:51:03
19       A.  I suppose it varied depending on  11:51:03
20   the need for him to be personally present  11:51:06
21   somewhere.                                 11:51:09
22       Q.  Do you know if there were any     11:51:09
23   contracts that Mr. Fried attempted to      11:51:12
24   secure but didn't in New York City?        11:51:14
25       A.  Nothing is coming to mind that I  11:51:18
```

**88**

```
1            DICARLO
2    could think of.                            11:51:27
3        Q.  Okay.  And in instances where     11:51:28
4    someone was unsuccessful in securing       11:51:31
5    contracts, would that result in travel?    11:51:34
6        MS. SELTZER:  I object to the         11:51:41
7    form.                                      11:51:42
8        A.  It is possible.  It is possible.  11:51:43
9        Q.  Okay.  Are you familiar with      11:51:44
10   Shari Dembin?                              11:51:46
11       A.  Yes.                               11:51:47
12       Q.  How so?                            11:51:48
13       A.  She is Burt's daughter and was a  11:51:49
14   coworker of mine in the Westport office    11:51:52
15   for the entirety of the time I was there   11:51:55
16   up until mid-January 2011.                 11:51:58
17       Q.  And do you know how long she was  11:52:05
18   employed by LVI?                           11:52:07
19       A.  I believe it was fifteen or       11:52:08
20   sixteen years.                             11:52:09
21       Q.  And did she work at the Westport  11:52:10
22   office the entire time you were there?     11:52:12
23       A.  Yes.                               11:52:14
24       Q.  Do you know if she worked in      11:52:14
25   another office prior to the Westport       11:52:16
```

**89**

```
1            DICARLO
2    office?                                    11:52:18
3        A.  Yes.  She had said she used to    11:52:19
4    work in the New York office prior to the   11:52:22
5    Westport office -- office opening in I     11:52:25
6    believe in 2003.                           11:52:27
7        Q.  Okay.  Is the Westport office     11:52:29
8    currently open?                            11:52:31
9        A.  Yes.                               11:52:32
10       Q.  And how long is it going to       11:52:33
11   remain open for?                           11:52:35
12       A.  The lease expires at the end of   11:52:36
13   August 2011 at which point we will vacate. 11:52:38
14       Q.  And -- and do you know where you  11:52:42
15   are going?                                 11:52:43
16       A.  We don't have a new space these   11:52:44
17   leased as of yet.                          11:52:51
18       Q.  When does the lease              11:52:52
19   expire -- I'm sorry?                       11:52:54
20       A.  No, that is it.                    11:52:55
21       Q.  When does the lease expire for    11:52:56
22   the Westport office?                       11:52:58
23       A.  End of August 2011.               11:52:59
24       Q.  And you mentioned we.  Who else   11:53:01
25   is there?                                  11:53:03
```

23 (Pages 86 to 89)

**VERITEXT REPORTING COMPANY**

212-267-6868                          516-608-2400

**90**

DICARLO

1
2    A.   Associate counsel Tom Cullen and  11:53:04
3    paralegal Jeannie Naggy.                11:53:06
4    Q.   Is there a discussion about you  11:53:08
5    and your team moving to the Milford     11:53:09
6    office?                                 11:53:12
7    A.   There has been some discussion   11:53:12
8    of that, but that is not going to happen.  11:53:13
9    Q.   Why not?                          11:53:16
10   A.   It is not a very conducive       11:53:17
11   environment to the type of work we do.   11:53:24
12   Q.   Okay.  Is there any discussion   11:53:26
13   about renting a suite?                  11:53:28
14   A.   There is discussion about        11:53:31
15   renting a smaller space for the three of  11:53:33
16   us.                                     11:53:35
17   Q.   Okay.                             11:53:35
18   A.   Somewhere in the Connecticut      11:53:36
19   area, yes.                              11:53:37
20   Q.   Do you know what Ms. Dembin's     11:53:38
21   job title was?                          11:53:43
22   A.   I -- I am not sure, no.           11:53:44
23   Q.   Do you know what she did?         11:53:48
24   A.   She processed bond requests,      11:53:49
25   insurance certificate requests.  She had  11:53:57

**91**

DICARLO

1
2    some involvement with travel, and I     11:54:02
3    don't -- I am not sure exactly what her  11:54:06
4    duties were with respect to it, but I know  11:54:08
5    she had some involvement with it, and she  11:54:09
6    handled meeting planning when -- whenever  11:54:15
7    there was a need for a significant      11:54:18
8    meeting, management meetings.           11:54:21
9    Q.   Okay.  Do you know who she        11:54:23
10   reported to?                            11:54:30
11   A.   I understood it to be Burt Fried  11:54:31
12   just based on what I saw, but I've never  11:54:34
13   heard one way or the other who she      11:54:38
14   reported to while Burt was there.       11:54:40
15   Q.   And do you have any personal      11:54:42
16   knowledge about the quality of her work?  11:54:47
17   A.   Not really, no.                   11:54:48
18   Q.   What do you mean by "not          11:54:55
19   really"?                                11:54:57
20   A.   Well, my involvement with her     11:54:57
21   really was just relating to the bond    11:55:02
22   requests.  So a bond request would come  11:55:04
23   in.  She would gather the information out  11:55:06
24   of the package that came to get it to the  11:55:08
25   broker, and then she would route the    11:55:11

**92**

DICARLO

1
2    contract and the whole request as a whole  11:55:14
3    to me, so that I could review the       11:55:16
4    contract.  So, you know, to the extent  11:55:24
5    that she had to deal with that, there was,  11:55:26
6    you know, no issues with it.            11:55:28
7    Q.   Now, did there come a time when  11:55:30
8    Ms. Dembin was terminated?              11:55:32
9    A.   Yes.                              11:55:34
10   Q.   Do you recall when that was?      11:55:34
11   A.   I believe her last day was        11:55:35
12   January 14 of 2011.                     11:55:38
13   Q.   Do you know why she was           11:55:41
14   terminated?                             11:55:42
15   A.   She was terminated as part of a   11:55:43
16   reduction in force with four or five other  11:55:45
17   people people in the Westport office as  11:55:52
18   well as a number of other people        11:55:54
19   throughout the country.                 11:55:57
20   Q.   Now, other than Ms. Dembin, do   11:55:57
21   you know the names of those people that  11:56:01
22   were terminated -- that were part of the  11:56:02
23   reduction in force at the Westport office?  11:56:05
24   A.   At the Westport office?           11:56:07
25   Q.   Yes.                              11:56:09

**93**

DICARLO

1
2    A.   Yes, I do.                        11:56:09
3    Q.   Can you give me their names?      11:56:10
4    A.   Sure.  It was Robin Keller,       11:56:11
5    Kristin Braun, Peggy Craemer, Marcy Juran.  11:56:16
6    I think that is it.                     11:56:35
7    Q.   And do you know what Marcy        11:56:36
8    Juran's job title was?                  11:56:37
9    A.   I don't know her title, but she  11:56:40
10   was marketing.                          11:56:41
11   Q.   And do you know what Ms. Peggy   11:56:42
12   Craemer's job title was?                11:56:48
13   A.   No, but again marketing.          11:56:50
14   Q.   How about Robin Keller?           11:56:52
15   A.   Receptionist and also -- well    11:56:53
16   her title was receptionist.             11:56:57
17   Q.   Did she do any marketing?         11:57:00
18   A.   No, she was Shari Dembin's        11:57:01
19   backup when Shari was not in the office to  11:57:04
20   do, you know, bond requests and insurance  11:57:07
21   requests in Shari's absence.            11:57:09
22   Q.   And Kristin Braun, do you know   11:57:11
23   what her job title was?                 11:57:13
24   A.   She was also marketing.           11:57:15
25   Q.   Okay.  And were there any other  11:57:17

24 (Pages 90 to 93)

**VERITEXT REPORTING COMPANY**