Exhibit 7

1

1

2  UNITED STATES DISTRICT COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  No. 10 Civ. 9308(JSR)

5  -------------------------------------x

6  BURTON T. FRIED,

7                          Plaintiff,

8        - against -

9  LVI SERVICES, INC., LVI PARENT CORP., CODE

10  HENNESSY SIMMONS, LLC d/b/a CHS PRIVATE

11  EQUITY V LP; APOLLO INVESTMENT CORP.,

12  SCOTT E. STATE, in his official and

13  individual capacities; BRIAN SIMMONS, in

14  his official and individual capacities;

15  RAJAY BAGARIA, in his official and

16  individual capacities; GERALD J. GIRARDI,

17  in his official and individual capacities,

18                          Defendants.

19  -------------------------------------x

20                          June 3, 2011

                            9:10   a.m.

21

22

23

24

25

**2**

```
1
2
3
4          VIDEOTAPE DEPOSITION of JOHN
5    LEONARD, taken by the Plaintiff, pursuant
6    to Notice, held at the offices of Thompson
7    Wigdor & Gilly, LLP, 85 Fifth Avenue, New
8    York, New York, before Debbie Zaromatidis,
9    a Shorthand Reporter and Notary Public of
10   the State of New York.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**4**

```
1
2            S T I P U L A T I O N S
3
4        IT IS HEREBY STIPULATED AND
5    AGREED by and between the Attorneys for
6    the respective parties hereto that filing
7    and sealing be and the same are hereby
8    waived.
9        IT IS FURTHER STIPULATED AND
10   AGREED that all objections except as to
11   the form of the question, shall be
12   reserved to the time of the trial.
13       IT IS FURTHER STIPULATED AND
14   AGREED that the within examination may be
15   signed and sworn to before any notary
16   public with the same force and effect as
17   though signed and sworn to before this
18   Court.
19
20
21
22
23
24
25
```

**3**

```
1
2    A P P E A R A N C E S :
3
4    THOMPSON WIGDOR & GILLY, LLP
5    Attorneys for Plaintiff
6       85 Fifth Avenue
7       New York, New York 10003
8    BY:  SHAFFIN A. DATOO, ESQ.
9
10
11   SIDLEY AUSTIN, LLP
12   Attorneys for Defendants
13       787 Seventh Avenue
14       New York, New York 10019
15   BY:   JOANNE SELTZER, ESQ.
16
17
18   ALSO PRESENT:
19       BURTON FRIED
20       J.D. MARTINEZ, Videographer
21
22
23
24
25
```

**5**

```
1
2                        09:10:42
3        THE VIDEOGRAPHER:  Good      09:10:42
4    morning.  My name is J.D. Martinez of   09:10:42
5    Veritext New York.  The date today is June  09:10:42
6    3, 2011, and the time on the video is 9:10  09:10:42
7    01 a.m.  Today's deposition is being held  09:10:42
8    at the office of Thompson Wigdor & Gilly,  09:10:42
9    LLP located at 85 Fifth Avenue, New York,  09:10:42
10   New York.  The caption of the case is   09:10:42
11   Burton T. Fried versus LVI Services, Inc.  09:10:42
12   et al., filed in the United States   09:10:42
13   District Court, Southern District of New  09:10:42
14   York.  The name of the witness is John   09:10:42
15   Leonard.                       09:10:42
16        At this time the attorneys will   09:10:42
17   identify themselves and the parties they  09:10:42
18   represent after which our court reporter,  09:10:42
19   Debbie Zaromatidis, will swear in the   09:10:42
20   witness, and we can proceed.   09:10:42
21        MS. SELTZER:  Joanne Seltzer  09:10:42
22   Sidley Austin for all defendants.   09:10:42
23        MR. DATOO:  Shaffin Datoo   09:10:42
24   Thompson Wigdor & Gilly for the plaintiff
25   Burt Fried.
```

2 (Pages 2 to 5)

**VERITEXT REPORTING COMPANY**

212-267-6868                                        516-608-2400

**6**

LEONARD

1
2  J O H N   L E O N A R D,
3  having first been duly sworn by a Notary
4  Public of the State of New York, was
5  examined and testified as follows:
6  EXAMINATION BY MR. DATOO:                    09:10:42
7      Q.    Good morning, Mr. Leonard.          09:10:42
8      A.    Good morning.                        09:10:42
9      Q.    As you know, my name is Shaffin     09:10:42
10  Datoo, and I represent Mr. Fried in this     09:10:42
11  lawsuit.  I am just going to ask you a       09:10:42
12  whole bunch of questions today, and          09:10:42
13  hopefully you can answer all of them         09:10:42
14  unless your attorney directs you not to      09:10:42
15  answer.  I am just going to start off with   09:10:42
16  a couple of ground rules.                    09:10:42
17          Do you understand that the           09:10:42
18  answers you are about to give are under      09:10:42
19  oath and that you are subject to the         09:10:42
20  penalties of perjury if you give an          09:10:42
21  untruthful answer?                           09:10:42
22      A.    Yes.                                09:10:42
23      Q.    I am going to assume that if you   09:10:42
24  answer a question that you understood it.    09:10:42
25  If you don't understand a question, let me   09:10:42

**7**

LEONARD

1
2  know, and I will ask the question in a       09:10:42
3  different way.  Please give verbal answers   09:10:42
4  to my questions.  Don't nod your head or     09:10:42
5  shake it; otherwise, the court reporter      09:10:42
6  won't be able to take it down, and also      09:10:42
7  please let me finish asking a question       09:10:42
8  before you answer it; otherwise, the court   09:10:42
9  reporter will not be able to take that       09:10:42
10  down.  If you need a break, let me know.     09:10:42
11  The only condition I have is that you        09:10:42
12  answer the last question asked.              09:10:42
13          Is your ability to tell the          09:10:42
14  truth in any way impaired today?             09:10:42
15      A.    No.                                 09:10:42
16      Q.    Okay.  Now, in connection with     09:10:42
17  this lawsuit, did you provide your           09:10:42
18  attorney with all responsive documents?     09:10:42
19      A.    I did not provide documents.       09:10:42
20      Q.    Okay.  Do you have any documents   09:10:42
21  that have anything to do with this           09:10:42
22  lawsuit?                                     09:10:42
23      A.    I have one document.               09:10:42
24      Q.    And which document is that?        09:10:42
25      A.    It is some notes I took down       09:10:42

**8**

LEONARD

1
2  from a phone call I had between myself and   09:10:42
3  Burt.                                        09:10:42
4      Q.    And did you provide those notes    09:10:42
5  to your attorney?                            09:10:42
6      A.    I did not.                          09:10:42
7      Q.    Okay.                               09:10:42
8          MS. SELTZER:  You'll get them        09:10:42
9  when I get them.                             09:10:42
10      Q.    Okay.  Do you intend to provide    09:10:42
11  that to your attorney?                       09:10:42
12      A.    Yes.                               09:10:42
13          MR. DATOO:  Okay.  Joanne, I        09:10:42
14  request production of those notes.          09:10:42
15      Q.    Do you recall when you had that   09:10:42
16  conversation with Mr. Fried that you took   09:10:42
17  notes on?                                   09:10:42
18      A.    I believe it was in early         09:10:42
19  January of 2011.                            09:10:42
20      Q.    Okay.  And do you know what you   09:10:42
21  discussed with Mr. Fried?                   09:10:42
22      A.    We discussed initially my injury  09:10:42
23  that I had had from an accident and then    09:10:42
24  his disappointment in me and supposedly     09:10:42
25  how I had changed regarding my actions      09:10:42

**9**

LEONARD

1
2  with the company.                            09:10:42
3      Q.    Okay.  Why did you take notes      09:10:42
4  about that conversation?                     09:10:42
5      A.    One, because there had been a      09:10:42
6  lawsuit filed against LVI prior to that      09:10:42
7  and, two, just to make sure I had it clear   09:10:42
8  in my head what was discussed in case I      09:10:42
9  was asked about it.                          09:10:42
10      Q.    Okay.  Is it your practice to      09:10:42
11  take notes of conversations you have over   09:10:42
12  the phone?                                   09:10:42
13      A.    Not usually.                       09:10:42
14      Q.    Okay.  What -- what did you say    09:10:42
15  on this phone call?                          09:10:42
16      A.    Not too much.  I listened.         09:10:42
17  Basically Burt said he no longer wanted to   09:10:42
18  have anything to do with me or wanted me    09:10:42
19  to have nothing to do with his family and   09:10:42
20  that he was upset with my actions and the   09:10:42
21  way I had dealt with the situation of the   09:10:49
22  reduction of forces that we had and         09:10:49
23  basically said I turned into a mouse.       09:10:49
24      Q.    How long was this conversation?   09:10:49
25      A.    I would say ten minutes.          09:10:49

3 (Pages 6 to 9)

**VERITEXT REPORTING COMPANY**

212-267-6868                                    516-608-2400

**34**

```
 1              LEONARD
 2    Q.  Okay.  Did Mr. Fried at       09:29:21
 3  this -- at this point in time did Mr.  09:29:24
 4  Fried ever tell that he wanted to retire  09:29:26
 5  or use words to that effect?           09:29:28
 6    A.  He had said he, you know, wanted  09:29:29
 7  to go to the beach many times through our  09:29:33
 8  career, but I don't know in 2006 if he  09:29:38
 9  said that.                           09:29:41
10    Q.  Okay.  When -- when did he say  09:29:45
11  that to you?                         09:29:45
12    A.  Over different periods of our  09:29:46
13  relationship through our career, so I  09:29:50
14  can't give you an exact time.        09:29:52
15    Q.  And what did you understand that  09:29:55
16  to mean?                             09:29:56
17    A.  That at some point he would like  09:29:56
18  to retire and sit on the beach.      09:29:58
19    Q.  Did he tell you when that was?  09:30:01
20    A.  No.                            09:30:03
21    Q.  Do you know who Robert McNamara  09:30:04
22  is?                                  09:30:20
23    A.  Yes.                           09:30:20
24    Q.  Who is he?                     09:30:20
25    A.  He is the former CEO of LVI    09:30:23
```

**35**

```
 1              LEONARD
 2  Services, Inc.                       09:30:26
 3    Q.  And was he -- was he hired to  09:30:26
 4  replace Mr. Fried as CEO?            09:30:28
 5    A.  Yes.                           09:30:30
 6    Q.  And while Mr. McNamara was CEO,  09:30:34
 7  what was Mr. Fried's job title?      09:30:36
 8    A.  Chairman.                      09:30:38
 9    Q.  Do you know -- while Mr.       09:30:39
10  McNamara was CEO, do you know what Mr.  09:30:48
11  Fried's job duties were as chairman?  09:30:52
12    A.  No.                            09:30:54
13    Q.  Do you know what he did as     09:30:54
14  chairman?                            09:30:55
15       MS. SELTZER:  Objection.  Asked  09:30:56
16  and answered.  You can answer it again.  09:30:57
17    A.  Yes.  He did legal work.  He did  09:30:58
18  some oversight of sales at different  09:31:06
19  times.  He did review of contracts of  09:31:10
20  bonds, oversaw some of the marketing  09:31:15
21  efforts coming out of Westport, the office  09:31:22
22  he worked at, travel, general guidance of  09:31:25
23  any issues contractually that I would have  09:31:37
24  or Bob would have.                   09:31:44
25    Q.  Okay.  Now, when you say -- you  09:31:45
```

**36**

```
 1              LEONARD
 2  mentioned that Mr. Fried did some work in  09:31:48
 3  sales.  Does that include securing and  09:31:55
 4  attempting to secure contracts for LVI  09:31:57
 5  Services?                            09:32:00
 6    A.  From time to time.            09:32:00
 7    Q.  Okay.  And what else did you  09:32:02
 8  mean by sales?                       09:32:07
 9    A.  There were periods of time where  09:32:12
10  he oversaw some of the national      09:32:14
11  salespeople.                         09:32:16
12    Q.  And was he working less than  09:32:23
13  five days a week when he was chairman?  09:32:25
14       MS. SELTZER:  Objection.  Under  09:32:27
15  McNamara?                            09:32:28
16       MR. DATOO:  Under McNamara.    09:32:30
17    A.  Not in general.                09:32:33
18    Q.  What do you mean by that?      09:32:34
19    A.  I mean I don't know if he worked  09:32:35
20  five days a week every week when he worked  09:32:37
21  for Bob, but in general he worked a full  09:32:39
22  work week if that is your question.  09:32:41
23    Q.  Okay.  That is.  Thank you.   09:32:43
24       And did Mr. Fried in his role as  09:32:45
25  chairman under McNamara step away from the  09:32:48
```

**37**

```
 1              LEONARD
 2  day-to-day responsibilities?         09:32:51
 3    A.  Yes.                           09:32:59
 4    Q.  And now while Mr. McNamara was  09:32:59
 5  CEO, do you have any personal knowledge of  09:33:02
 6  Mr. Fried's work performance as chairman?  09:33:04
 7    A.  Do I have any -- repeat the    09:33:07
 8  question, please.                    09:33:14
 9    Q.  How -- how was Burt -- was Burt  09:33:15
10  doing a good job as chairman under Mr.  09:33:19
11  McNamara?                            09:33:21
12    A.  Yes.                           09:33:22
13    Q.  Now, while Mr. McNamara was CEO,  09:33:23
14  did Mr. Fried ever tell you that he wanted  09:33:29
15  to retire or use words to that effect?  09:33:31
16    A.  I don't believe so.           09:33:34
17    Q.  Now, did there come a time when  09:33:44
18  Mr. Fried became the interim CEO of LVI  09:33:47
19  Services?                            09:33:51
20    A.  Yes.                           09:33:51
21    Q.  Do you recall when that was?   09:33:53
22    A.  Approximately April of 2010.  09:33:55
23    Q.  Do you know why?              09:34:00
24    A.  Mr. McNamara had resigned the  09:34:04
25  position.                            09:34:08
```

10 (Pages 34 to 37)

**38**

```
 1              LEONARD
 2     Q.   Okay.  And do you know if Mr.      09:34:10
 3  Freed volunteered to become interim CEO or  09:34:11
 4  if he was asked to become interim CEO?      09:34:17
 5     A.   I don't know.              09:34:20
 6     Q.   Okay.  And what job duties did   09:34:26
 7  Mr. Fried assume as interim CEO?            09:34:28
 8     A.   Oversight of the company.      09:34:31
 9     Q.   Okay.  And do you know if he    09:34:34
10  continued to perform or if he continued to  09:34:36
11  do what he did as chairman while he was     09:34:39
12  interim CEO?                     09:34:41
13     A.   Yes.                   09:34:43
14     Q.   Okay.  Now, while Mr. Fried was  09:34:44
15  interim CEO, what was he working on?        09:34:48
16     MS. SELTZER:  I object to the         09:34:52
17  form.                            09:34:53
18     A.   Running the company day to day.   09:34:58
19  I mean you need to be more specific if      09:35:01
20  you --                          09:35:03
21     Q.   What did that involve?         09:35:03
22     A.   It involved working with me in   09:35:15
23  overseeing the overall performance of the   09:35:16
24  company, dealing with any issues with the   09:35:19
25  company, looking at where the company was   09:35:22
```

**39**

```
 1              LEONARD
 2  functionally, all the responsibilities of   09:35:27
 3  overseeing the company.  Too much to list.  09:35:33
 4     Q.   Now, at this point in time when  09:35:43
 5  Mr. Fried was interim CEO, what office was  09:35:44
 6  he working in?                   09:35:48
 7     A.   Westport, Connecticut.        09:35:50
 8     Q.   And do you know if he spent any  09:35:51
 9  time in the New York office during this     09:35:53
10  period of time?                  09:35:54
11     A.   I do not personally know.      09:35:55
12     Q.   Okay.  Was Mr. Fried required to  09:35:57
13  travel as interim CEO?               09:36:00
14     A.   I am sure from time to time he   09:36:13
15  had to travel, but I don't know his         09:36:15
16  travel.                          09:36:17
17     Q.   Okay.  And during the time that  09:36:17
18  Mr. Fried was interim CEO, did LVI have a   09:36:19
19  lot of contracts in New York City?          09:36:22
20     A.   Rephrase the question because   09:36:33
21  I -- I don't understand it.          09:36:34
22     Q.   Was LVI Services doing a lot of  09:36:35
23  work in New York City?               09:36:37
24     A.   No.                   09:36:38
25     Q.   Was LVI -- while Mr. Fried was   09:36:39
```

**40**

```
 1              LEONARD
 2  interim CEO was LVI Services doing any      09:36:46
 3  work -- or LVI doing any work at Madison    09:36:52
 4  Square Garden?                   09:36:56
 5     A.   Yes.                   09:36:56
 6     Q.   And how big was that contract?  09:36:57
 7     A.   28 million.              09:37:01
 8     Q.   Is that considered --        09:37:02
 9     A.   27.5.                  09:37:03
10     Q.   And is that considered a big    09:37:05
11  contract?                        09:37:07
12     A.   Yes.                   09:37:07
13     Q.   And while Mr. Fried was interim  09:37:08
14  CEO, was LVI doing any work at 130          09:37:09
15  Liberty?                         09:37:14
16     A.   Yes.                   09:37:14
17     Q.   And do you know what the value   09:37:16
18  of that contract was?                09:37:18
19     A.   Approximately 30 million.      09:37:19
20     Q.   Is that considered a big        09:37:32
21  contract?                        09:37:33
22     A.   Yes.                   09:37:34
23     Q.   Were those two of the biggest   09:37:34
24  contracts LVI had?                  09:37:38
25     A.   Yes.                   09:37:39
```

**41**

```
 1              LEONARD
 2     Q.   Was LVI doing any other work in  09:37:40
 3  New York City other than the two we just    09:37:45
 4  talked about?                    09:37:47
 5     MS. SELTZER:  Once again during      09:37:48
 6  the interim period?                  09:37:49
 7     MR. DATOO:  During the interim      09:37:52
 8  period.                          09:37:53
 9     A.   Yes, and just for the record you  09:37:53
10  first said LVI services, and I said no     09:37:55
11  because LVI ServiceS was not doing the      09:37:59
12  work.  If you are referring to LVI as a    09:38:01
13  whole, any LVI?                  09:38:03
14     Q.   Yes.                   09:38:05
15     A.   Yes.                   09:38:05
16     Q.   Okay.  So other than the two we  09:38:05
17  just talked about --                09:38:08
18     A.   Were they doing work in New     09:38:12
19  York?                            09:38:14
20     Q.   New York City.             09:38:14
21     A.   Or were we doing work in New    09:38:15
22  York City?                       09:38:19
23     Q.   Yes.                   09:38:19
24     A.   LVI?                   09:38:19
25     Q.   Yes.                   09:38:21
```

11 (Pages 38 to 41)

42

LEONARD

1         LEONARD
2    A.  Yes.         09:38:22
3    Q.  Can you give me the names of   09:38:22
4  other projects that LVI was doing work in  09:38:24
5  New York City?       09:38:27
6    A.  HPD.        09:38:28
7    Q.  What does that stand for?   09:38:29
8    A.  You know what? I -- I don't  09:38:30
9  remember the acronym off the top of my   09:38:33
10  head, but it is downtown.    09:38:35
11    Q.  I am sorry. Where was the   09:38:37
12  location of that?     09:38:39
13    A.  It is on the west side of New  09:38:40
14  York.         09:38:41
15    Q.  Manhattan?     09:38:42
16    A.  Yes, midtown.    09:38:45
17    Q.  And what kind of work was LVI  09:38:45
18  doing there?      09:38:49
19    A.  Abatement and demolition of such  09:38:50
20  structures.      09:38:53
21    Q.  Do you recall what the value of  09:38:53
22  that contract was?    09:38:54
23    A.  There is two contracts, 5   09:38:56
24  million each approximately.   09:39:00
25    Q.  And are those considered large  09:39:01

43

1         LEONARD
2  contracts?       09:39:03
3    A.  Yes.         09:39:04
4    Q.  Any other work that LVI was   09:39:04
5  doing in New York City while Mr. Fried was  09:39:08
6  interim CEO?      09:39:10
7    A.  Yes, but not that I can list off  09:39:11
8  the top of my head.    09:39:15
9    Q.  Just give me as many as you can.  09:39:17
10    A.  When he was interim CEO?   09:39:20
11    Q.  Yes. Well, you know what? Let's  09:39:22
12  broaden the period. Even after the time  09:39:27
13  he was interim CEO just say to -- let's  09:39:29
14  limit it to the time -- let's start at the  09:39:33
15  time Mr. Fried was interim CEO, which  09:39:35
16  would be I believe April 2010 to November  09:39:37
17  2010, the end of November.   09:39:41
18    A.  You know what? I can't list  09:39:47
19  anything off the top of my head. I know  09:39:49
20  there are projects that we were doing, but  09:39:52
21  I can't give you the names of them.   09:39:53
22    Q.  Can you give me an approximate  09:39:55
23  number of the total value of the contracts  09:39:57
24  LVI Services had during that period of  09:40:01
25  time I just mentioned?    09:40:03

44

1         LEONARD
2    A.  The total value --    09:40:05
3    Q.  You know what?    09:40:12
4    A.  Or what was --    09:40:13
5    Q.  Forget that question. I   09:40:14
6  withdraw it.      09:40:16
7      Was LVI doing a    09:40:17
8  substantial -- in your opinion a   09:40:20
9  substantial amount of business in New York  09:40:21
10  City?        09:40:22
11    MS. SELTZER:  I object to the   09:40:23
12  form, but you can answer.   09:40:24
13    A.  Yes.        09:40:25
14    Q.  Was LVI doing the majority of  09:40:26
15  its business in New York City?   09:40:29
16    A.  No.        09:40:31
17    Q.  Okay. What percentage of LVI's  09:40:31
18  business would you say it was doing in New  09:40:35
19  York City during this period of time I  09:40:37
20  mentioned?      09:40:38
21    A.  I would have to see reports and  09:40:42
22  what I call job by jobs.    09:40:44
23    Q.  Can you ballpark it?   09:40:45
24    A.  No.        09:40:47
25    Q.  Okay. Was LVI -- during this  09:40:47

45

1         LEONARD
2  period of time, was LVI doing any work at  09:40:54
3  Yankee Stadium?     09:40:56
4    A.  Yes.         09:40:58
5    Q.  What kind of work was it doing  09:40:58
6  at Yankee Stadium?    09:41:01
7    A.  Abatement and demolition.   09:41:03
8    Q.  And what was the value of that  09:41:05
9  contract?       09:41:06
10    A.  Over 3 million.    09:41:07
11    Q.  Is that considered a large   09:41:14
12  contract?       09:41:16
13    A.  Yes.        09:41:17
14    Q.  Now, did Mr. Fried play a role  09:41:17
15  in securing the MSG contract?   09:41:28
16    A.  Yes.        09:41:31
17    Q.  What role did he play?   09:41:32
18    A.  He met with the procurement   09:41:35
19  manager or head of procurement for Turner,  09:41:42
20  and he also met with the Madison Square  09:41:47
21  Garden project team regarding issues with  09:41:51
22  some perceptual information regarding our  09:41:56
23  company that concerned them and also   09:42:00
24  regarding some pricing when we submitted  09:42:03
25  in terms of our bid.    09:42:08

12 (Pages 42 to 45)

**46**

```
 1            LEONARD
 2    Q.   Would you say he helped LVI in      09:42:10
 3  securing the contract?                     09:42:13
 4    A.   Yes.                                09:42:13
 5    Q.   And with respect to 130 Liberty,    09:42:14
 6  did Mr. Fried play a role in securing that 09:42:18
 7  contract?                                  09:42:21
 8    A.   Not the leading role but he had     09:42:22
 9  a role.                                    09:42:28
10    Q.   And would you say he helped LVI     09:42:28
11  secure that contract?                      09:42:30
12    A.   I can't answer that.                09:42:33
13    Q.   Okay.  Is it because you don't      09:42:38
14  know or --                                 09:42:39
15    A.   Yes, because I don't know.          09:42:40
16    Q.   Okay.  With respect to HPD, did     09:42:42
17  Mr. Fried play a role in securing that     09:42:45
18  contract?                                  09:42:47
19    A.   I don't know.                       09:42:51
20    Q.   Okay.  With respect to Yankee       09:42:52
21  Stadium, did Mr. Fried play a role in      09:42:55
22  securing that contract?                    09:42:59
23    A.   Yes.                                09:43:00
24    Q.   And what role did he play?          09:43:00
25    A.   He and I worked with a company      09:43:03
```

**47**

```
 1            LEONARD
 2  called Demco to secure working with them   09:43:09
 3  as a sub to perform the demolition work.   09:43:16
 4    Q.   And would you say that Mr. Fried    09:43:23
 5  helped LVI secure that contract?           09:43:30
 6    A.   Yes.                                09:43:31
 7    Q.   Now, in connection with these       09:43:32
 8  four contracts we just talked about, did   09:43:40
 9  Mr. Fried travel to New York for any       09:43:41
10  meetings in connection with these          09:43:46
11  contracts?                                 09:43:47
12    A.   At least for MSG.                   09:43:48
13    Q.   Do you know how many times?         09:43:58
14    A.   I know of at least one meeting      09:43:59
15  that he went to.                           09:44:10
16    Q.   Do you know when that was?          09:44:11
17    A.   No.                                 09:44:12
18    Q.   Approximately?                      09:44:12
19    A.   You know, it is somewhere in        09:44:18
20  either the end of 2009 or the beginning of 09:44:25
21  2010.                                      09:44:27
22    Q.   Okay.                               09:44:28
23    A.   Or early 2010.  I don't know as     09:44:28
24  I said exactly.                            09:44:33
25    Q.   Okay.  And do you know if Mr.       09:44:34
```

**48**

```
 1            LEONARD
 2  Fried -- in connection with these four     09:44:36
 3  contracts we just discussed, do you know   09:44:38
 4  if Mr. Fried made any calls from the       09:44:40
 5  Westport office to New York with respect   09:44:43
 6  to these contracts?                        09:44:45
 7    A.   Again, to New York what are you     09:44:49
 8  referring to?                              09:44:52
 9    Q.   To MSG, to HPD, to Yankee           09:44:53
10  Stadium, to 130 Liberty Street?            09:44:59
11        MS. SELTZER:  If you know.           09:45:02
12    A.   I know he made some calls to        09:45:03
13  Turner for MSG.                            09:45:04
14    Q.   Who is Turner?                      09:45:06
15    A.   Turner is the general              09:45:07
16  contractor.                                09:45:08
17    Q.   Is that Turner Construction         09:45:09
18  Company?                                   09:45:11
19    A.   Yes.                                09:45:12
20    Q.   Now, while Mr. Fried was the        09:45:12
21  interim CEO of LVI service, was he         09:45:26
22  searching for a permanent CEO?             09:45:29
23    A.   Yes.                                09:45:34
24    Q.   Do you know why?                    09:45:35
25    A.   Again, I don't believe he wanted    09:45:36
```

**49**

```
 1            LEONARD
 2  to run the day-to-day operations.          09:45:38
 3    Q.   Did he tell you what he wanted      09:45:41
 4  to do once they found -- once LVI Services 09:45:46
 5  found a new CEO?                           09:45:49
 6    A.   Not specifically that I             09:45:50
 7  remember.                                  09:45:56
 8    Q.   Okay.  Did he tell you that he      09:45:56
 9  wanted to step back into his chairman      09:45:59
10  role?                                      09:46:02
11    A.   I believe he did, yes.             09:46:02
12    Q.   Okay.  And did he ever tell you     09:46:07
13  that he planned to die in his chair?       09:46:11
14    A.   Yes.                                09:46:14
15    Q.   And when did he tell you that?      09:46:15
16    A.   Again, I don't know exactly         09:46:20
17  when.  He probably told me that several    09:46:26
18  times.                                     09:46:29
19    Q.   Okay.                               09:46:29
20    A.   But I can't give you an exact       09:46:30
21  date.                                      09:46:31
22    Q.   How about an approximate date?      09:46:32
23    A.   Pick a week probably.               09:46:33
24    Q.   Okay.  That often?                  09:46:41
25    A.   No.  I would say after, you         09:46:43
```

13  (Pages 46 to 49)

VERITEXT REPORTING COMPANY

212-267-6868                                    516-608-2400

## 58

```
                LEONARD
 1
 2      A.   I don't recall.           09:55:22
 3      Q.   Do you recall when Mr. State was  09:55:23
 4   hired?                            09:55:24
 5      A.   I believe September, early  09:55:25
 6   September.                         09:55:32
 7      Q.   Early September?          09:55:32
 8      A.   Or it could have been late  09:55:33
 9   September.                         09:55:34
10      Q.   Okay.                     09:55:35
11      A.   September.                09:55:37
12      Q.   2010?                     09:55:37
13      A.   Yes, sir.                 09:55:39
14      Q.   Mr. Leonard, I am handing you a  09:55:39
15   document that's been previously marked as  09:55:56
16   Plaintiff's Exhibit 10.           09:55:58
17           (Document handed to witness.)  09:56:01
18      A.   You'll have to bear with me.  09:56:09
19      MS. SELTZER:   Let the record  09:56:13
20   show that Mr. Leonard is not a recipient  09:56:14
21   or a sender of these e-mails and as far as  09:56:20
22   I can see none of the e-mails in this.  09:56:23
23      MR. DATOO:  Okay.             09:56:27
24      Q.   If you can take a look at this  09:56:28
25   document.  Let me know if you've seen it  09:56:29
```

## 59

```
                LEONARD
 1
 2   before, please.                   09:56:31
 3           (Pause.)                  09:56:33
 4      A.   I don't believe so.       09:56:44
 5      Q.   Okay.  And can you flip to the  09:56:46
 6   second page of the document.  And you see  09:56:48
 7   the heading other.  Do you see that on the  09:56:52
 8   page?                             09:56:54
 9      A.   Yes.                      09:56:54
10      Q.   If you look at the fourth full  09:56:55
11   paragraph underneath that paragraph, it  09:56:57
12   starts with "in the best case scenario."  09:57:00
13           Do you see that?          09:57:02
14      A.   Yes.                      09:57:03
15      Q.   If I can direct your attention  09:57:03
16   to the second sentence of that paragraph  09:57:04
17   it reads:  "Several members of the senior  09:57:06
18   team have told me that Burt will never  09:57:09
19   retire because he has no other interests  09:57:12
20   and nothing else to do."          09:57:15
21           Do you see that?          09:57:16
22      A.   Yes.                      09:57:17
23      Q.   Did you tell Mr. State that?  09:57:18
24      A.   Not verbatim.             09:57:20
25      Q.   Did you use words to that  09:57:25
```

## 60

```
                LEONARD
 1
 2   effect?                           09:57:26
 3      A.   I used words that I don't  09:57:27
 4   believe Burt will retire.         09:57:31
 5      Q.   And if you can flip to the first  09:57:33
 6   page, right in the middle of it -- this  09:57:38
 7   appears to be an e-mail from Scott State  09:57:45
 8   to Robert Hogan, and it is dated September  09:57:51
 9   19, 2010.                         09:57:53
10      A.   Yes, sir.                 09:57:55
11      Q.   Do you know if this was prior to  09:57:55
12   when Mr. State was hired?         09:57:59
13      A.   I don't know.             09:58:00
14      Q.   Why don't you take a look at the  09:58:03
15   e-mail and let me know.  That might  09:58:05
16   refresh your recollection.        09:58:14
17           (Pause.)                  09:58:15
18      A.   It looks like it was prior to  09:58:22
19   his hiring because he is asking for a  09:58:23
20   modification to the proposal.     09:58:25
21      Q.   Okay.  So it appears you did  09:58:27
22   have a discussion with Mr. State prior to  09:58:29
23   his hire about Mr. Fried, right?  09:58:31
24      MS. SELTZER:   Objection.  He  09:58:33
25   never testified to that.  I mean how are  09:58:34
```

## 61

```
                LEONARD
 1
 2   you drawing that conclusion?      09:58:37
 3      MR. DATOO:  He said that he    09:58:39
 4   does not remember having a conversation  09:58:40
 5   with Mr. State prior to his hire about Mr.  09:58:41
 6   Fried.                            09:58:45
 7      MS. SELTZER:   Right.  But when  09:58:45
 8   did he say that -- I mean he is -- he is  09:58:46
 9   testified that he has had several  09:58:49
10   conversations with Mr. State, right, and  09:58:51
11   he did not -- and and said that he didn't  09:58:54
12   remember whether they were about Mr. Fried  09:58:58
13   or not.                           09:59:00
14      MR. DATOO:  Right.  So now I'm  09:59:01
15   saying so it appears that you did have a  09:59:01
16   conversation with Mr. State.      09:59:05
17      MS. SELTZER:   That -- I am    09:59:06
18   trying to find out where you are drawing  09:59:08
19   that from.                        09:59:09
20      MR. DATOO:  The witness just   09:59:10
21   testified that he had several phone calls,  09:59:11
22   several communications.           09:59:13
23      MS. SELTZER:   I get that, but  09:59:14
24   where from this document are you getting  09:59:16
25   that conversation from?           09:59:18
```

16 (Pages 58 to 61)

**62**

```
1              LEONARD
2      MR. DATOO:  That he said to Mr.      09:59:19
3   State or words to the effect in the second  09:59:21
4   --                                        09:59:23
5      MS. SELTZER:  Yes, but he            09:59:23
6   didn't say when.  In other words, you are  09:59:25
7   assuming that it was before -- that this   09:59:26
8   is what this was referring to.           09:59:28
9   Whereas --                               09:59:30
10     MR. DATOO:  The witness just         09:59:30
11  testified that this was before Mr. State  09:59:31
12  was hired.                               09:59:33
13     MS. SELTZER:  Yes, I get that,       09:59:34
14  but I what I was saying is you are drawing  09:59:36
15  the conclusion that he made those        09:59:38
16  statements to Mr. State prior to Mr. State  09:59:40
17  coming on, and it may not have been the   09:59:41
18  case.                                    09:59:43
19     MR. DATOO:  The e-mail is dated       09:59:43
20  September 19.                             09:59:45
21     MS. SELTZER:  Yes, I know.  So        09:59:46
22  his testimony that he had this           09:59:48
23  conversation about Mr. Fried's doesn't   09:59:50
24  necessarily have anything to do with what  09:59:51
25  is being referenced in this e-mail.      09:59:53
```

**63**

```
1              LEONARD
2      I am not trying to be                09:59:54
3   obstructionist.  I am just telling you  09:59:56
4   what he is testifying is that he had those  09:59:57
5   conversations with Mr. State, but it    09:59:59
6   doesn't necessarily mean that these are  10:00:01
7   the conversations that are referred to in  10:00:02
8   this e-mail.  These could have been other  10:00:04
9   management people that said that to him at  10:00:07
10  this time.                              10:00:09
11     MR. DATOO:  Right, but I just        10:00:09
12  asked him, Mr. Leonard that, and he said  10:00:10
13  he did say that to Mr. State.           10:00:12
14     MS. SELTZER:  Yes, but -- I          10:00:14
15  understand that, but did you ask him when  10:00:15
16  he said that to Mr. State, before he was  10:00:17
17  hired, after he was hired, yesterday?   10:00:19
18     MR. DATOO:  It would clearly be      10:00:22
19  before he was hired because the e-mail is  10:00:23
20  dated September 19.  I don't -- I am not  10:00:25
21  understanding you, Joanne.  I am just not  10:00:28
22  getting it.                             10:00:30
23     MS. SELTZER:  Okay.  You've got      10:00:31
24  a name out here, and it talks about senior  10:00:32
25  management speaking -- saying something  10:00:34
```

**64**

```
1              LEONARD
2   about Burt never retiring.              10:00:36
3      MR. DATOO:  Yes.                     10:00:38
4      MS. SELTZER:  Right, and you         10:00:39
5   asked Mr. Leonard -- unless I am        10:00:40
6   misremembering what you said, and you   10:00:42
7   asked him if he ever had that conversation  10:00:44
8   with State about Burt not retiring.     10:00:50
9   Are --                                  10:00:50
10     MR. DATOO:  Prior to Mr.             10:00:50
11  State's hire.                           10:00:50
12     MS. SELTZER:  Prior to Mr.           10:00:53
13  State's hire?  Did you say prior to Mr.  10:00:54
14  State's hire?                           10:00:57
15     MR. DATOO:  This is all prior.       10:00:59
16     MS. SELTZER:  Then I withdraw        10:01:01
17  the objection and this entire thing.  Go  10:01:02
18  ahead.                                  10:01:04
19  Q.  Prior to Mr. State's hire it        10:01:05
20  appears that you had a conversation with  10:01:08
21  him about Mr. Fried, correct?           10:01:10
22  A.  Correct.                            10:01:12
23  Q.  Okay.  And does this refresh        10:01:13
24  your recollection as to what you discussed  10:01:16
25  with Mr. State prior to his hire about Mr.  10:01:20
```

**65**

```
1              LEONARD
2   Fried?                                  10:01:22
3      A.  It doesn't refresh it, but I do  10:01:22
4   not deny that I could have discussed with  10:01:26
5   Mr. State prior to his hiring that I did  10:01:31
6   not believe that Burt would retire.     10:01:36
7      Q.  Why did the issue of Mr. Fried's  10:01:40
8   retirement come up in a conversation with  10:01:43
9   Mr. State prior to his hire?           10:01:46
10     A.  Again, I don't know exactly, but  10:01:48
11  I assume because I understood that that  10:01:50
12  Scott wanted to do was to run the company,  10:01:55
13  and he may have asked me if I thought Mr.  10:02:01
14  Fried would retire, and if he would have  10:02:03
15  asked me or if he did ask me my answer  10:02:06
16  would have been or was that I did not    10:02:08
17  believe he would retire.                10:02:11
18     Q.  Okay.  Thank you.                10:02:12
19     A.  You're welcome.  Do you want     10:02:16
20  this back?                              10:02:19
21     Q.  You can -- you can keep it.      10:02:20
22  Just keep them in front of you.  I don't  10:02:22
23  want to lose them.                      10:02:24
24     A.  Okay.                            10:02:26
25     Q.  I have a bad habit of losing    10:02:27
```

17 (Pages 62 to 65)

VERITEXT REPORTING COMPANY

212-267-6868                    516-608-2400

**74**

LEONARD

1
2  end it is my issue.  You do your job.        10:12:09
3     Q.   Now, do you know what exactly        10:12:12
4  Mr. Fried was doing that was interfering     10:12:18
5  with Mr. State's ability to act as CEO?      10:12:20
6     A.   I don't know exactly the             10:12:22
7  reasons, but I have my opinion on certain    10:12:36
8  things.                                      10:12:39
9     Q.   Well, give me your opinion.          10:12:40
10    A.   I believe that Scott thought         10:12:42
11 there was a chain of command, and that       10:12:43
12 everybody reported and dealt with him, and   10:12:47
13 that he would deal with anything he wanted   10:12:50
14 to deal with with Burt, and anything else    10:12:53
15 just wasn't what he wanted, and there were   10:12:58
16 issues that Burt dealt with that I don't     10:13:01
17 believe Scott wanted him to deal with.       10:13:07
18    Q.   Now, do you know if Mr. Fried        10:13:10
19 ever attempted to overrule a decision that   10:13:18
20 Mr. State made?                              10:13:21
21    A.   I don't know of any such time.       10:13:24
22    Q.   Do you know if Mr. Fried always      10:13:26
23 deferred to Mr. State?                       10:13:30
24    MS. SELTZER:  I object to the             10:13:32
25 form.                                        10:13:33

**75**

LEONARD

1
2     A.   I believe so.                        10:13:34
3     Q.   Do you know if  State ever told      10:13:36
4  Mr. Fried not to handle a particular         10:13:42
5  assignment?                                  10:13:46
6     A.   I don't know that.                   10:13:47
7     Q.   Okay.  Do you know if Mr. Fried      10:13:50
8  ever refused to give up an assignment or a   10:13:52
9  job duty that Mr. State asked him to give    10:13:57
10 up?                                          10:14:00
11    A.   I don't know that.                   10:14:00
12    Q.   Did Mr. State make very clear to     10:14:01
13 LVI employees what the chain of command      10:14:07
14 was?                                         10:14:09
15    MS. SELTZER:  I object to the             10:14:11
16 form.                                        10:14:12
17    A.   I don't know if he put out any       10:14:13
18 kind of communication.                       10:14:21
19    Q.   Did you know who to report to?       10:14:26
20    A.   Yes.                                 10:14:28
21    Q.   Who?                                 10:14:28
22    A.   Scott State.                         10:14:29
23    Q.   How did you know that?               10:14:30
24    A.   Because I worked for the CEO.        10:14:32
25    Q.   Okay.  Do you know if any of the     10:14:34

**76**

LEONARD

1
2  LVI employees were confused -- let's just    10:14:37
3  start with the management team -- as to      10:14:40
4  who to report to?                            10:14:41
5     A.   I think the only person that may     10:14:45
6  have been confused was Mr. DiCarlo.  The     10:14:48
7  operational management team I don't          10:14:56
8  believe was confused, and I don't know       10:14:58
9  about back office, but I think they knew     10:15:01
10 they reported to Mr. Cutrone, the CFO.       10:15:06
11    Q.   Okay.  Did you have a                10:15:08
12 conversation with Mr. DiCarlo in which you   10:15:10
13 told him that he reports to Scott State?     10:15:13
14    A.   I believe I did.                     10:15:15
15    Q.   Okay.  Did that -- in your mind      10:15:16
16 would that have ended any confusion as to    10:15:22
17 who Mr. DiCarlo reports to?                  10:15:22
18    A.   From my perspective, yes.            10:15:25
19    Q.   Okay.  And do you recall when        10:15:26
20 you had that conversation with him?          10:15:28
21    A.   No, I mean it must have been         10:15:29
22 sometime in October I would guess of 2010.   10:15:32
23    Q.   Early, late?                         10:15:35
24    A.   I don't recall.                      10:15:36
25    Q.   Okay.  Now, after Mr. State          10:15:37

**77**

LEONARD

1
2  started working at LVI Services, was Mr.     10:15:44
3  Fried doing a good job on whatever it is     10:15:49
4  he was working on?                           10:15:50
5     A.   From my perspective, yes.            10:15:52
6     Q.   Okay.  Now, after Mr. State          10:15:56
7  started working at LVI Services, did there   10:15:58
8  come a time when Mr. State began             10:16:01
9  transitioning Mr. Fried's job duties to      10:16:04
10 other employees?                             10:16:06
11    A.   He asked me who could transition     10:16:07
12 into his job duties.  I don't know if they   10:16:18
13 were ever transitioned prior to Burt         10:16:21
14 leaving.                                     10:16:24
15    Q.   Okay.                                10:16:25
16    MS. SELTZER:  Any time you want           10:16:27
17 to take just a five-minute break because     10:16:28
18 we have been going an hour and more.         10:16:30
19    MR. DATOO:  I was just going to           10:16:33
20 offer up a break.                            10:16:34
21    THE VIDEOGRAPHER:  We're going            10:16:36
22 off the record, 10:16 a.m. End of tape       10:16:37
23 number 1.                                    10:16:41
24    (Recess taken.)                           10:24:34
25    THE VIDEOGRAPHER:  We're                  10:24:34

20  (Pages 74 to 77)

**VERITEXT REPORTING COMPANY**

212-267-6868                                              516-608-2400

**114**

```
1              LEONARD
2    administrative assistant?           11:20:38
3       A.   No.                         11:20:39
4       Q.   Did any -- who assumed this 11:20:40
5    responsibility?                     11:20:42
6       A.   Joe Annarumma.              11:20:42
7       Q.   The next point, which I believe 11:20:46
8    is the 11th point, did you -- did Mr. 11:20:54
9    State assume this responsibility?   11:20:58
10      A.   We haven't dealt with it, but I 11:21:01
11   assume he will.                     11:21:06
12      Q.   The next point after that, you 11:21:07
13   listed Mark Canessa.  Did Mr. Canessa 11:21:13
14   assume this responsibility after Mr. Fried 11:21:16
15   separated?                          11:21:18
16      A.   Yes.                        11:21:21
17      Q.   Anyone else?                11:21:25
18      A.   The branches may have.  Some 11:21:26
19   branches oversee their own submissions. 11:21:41
20      Q.   And when you mean by        11:21:43
21   branches --                         11:21:47
22      A.   A branch operating office. 11:21:48
23      Q.   Okay.  And is there a particular 11:21:50
24   individual who would be responsible for 11:21:52
25   this?                               11:21:53
```

**115**

```
1              LEONARD
2       A.   The branch president.       11:21:54
3       Q.   Okay.  And who -- how much  11:21:55
4    branch presidents are there?        11:21:58
5       A.   Approximately 22.           11:22:00
6       Q.   Are you familiar with a document 11:22:03
7    that is referred to as The Bible -- The 11:22:08
8    Bible?                              11:22:16
9       A.   Yes.                        11:22:16
10      Q.   And would The Bible list who are 11:22:17
11   the branch managers?                11:22:19
12      MS. SELTZER:  Objection.         11:22:21
13   I -- he may not even know what you're 11:22:23
14   talking about here.                 11:22:24
15      MR. DATOO:  He just said he is   11:22:26
16   familiar with the document known as The 11:22:27
17   Bible.                              11:22:29
18      MS. SELTZER:  Did he say that    11:22:30
19   he's seen it?                       11:22:31
20      MR. DATOO:  He is familiar with  11:22:32
21   it.                                 11:22:33
22      MS. SELTZER:  Okay, but he may   11:22:34
23   have heard about it, but that doesn't 11:22:36
24   necessarily mean that he's actually seen 11:22:39
25   it.  You may want to clarify it now. 11:22:41
```

**116**

```
1              LEONARD
2       MR. DATOO:  I am just going to    11:22:44
3    ask my next question.               11:22:45
4       Q.   Do you know if The Bible lists 11:22:46
5    who the branch managers are?        11:22:47
6       A.   Yes.                        11:22:50
7       Q.   Okay.  Going on to the next 11:22:50
8    point, the next two actually.  You listed 11:22:52
9    Greg DiCarlo for both.              11:23:02
10      Did Mr. DiCarlo assume the       11:23:04
11   responsibilities -- these responsibilities 11:23:06
12   after Mr. Fried left?               11:23:07
13      A.   Yes.                        11:23:08
14      Q.   Anyone else?                11:23:09
15      A.   I don't believe so.         11:23:10
16      Q.   And the last point, you listed 11:23:20
17   Mark Canessa.  Do you know if Mr. Canessa 11:23:21
18   assumed this responsibility after Mr. 11:23:24
19   Fried left?                         11:23:26
20      A.   Yes.                        11:23:27
21      Q.   Anyone else?                11:23:27
22      A.   I don't believe so.         11:23:28
23      Q.   Okay.  Now, do you know if Mr. 11:23:29
24   Fried was performing all of these duties 11:23:34
25   while he was chairman under Scott State? 11:23:35
```

**117**

```
1              LEONARD
2       A.   For the most part, I believe so, 11:23:37
3    yes.                                11:23:43
4       Q.   Do you know if Mr. State made 11:23:43
5    any comment about Mr. Fried's age?  11:23:57
6       MS. SELTZER:  I object to the    11:23:59
7    form, but you can answer.           11:24:00
8       A.   Secondhand, yes.            11:24:02
9       Q.   Okay.  And how did you find out 11:24:03
10   secondhand?                         11:24:08
11      A.   I believe from Mr. State and Mr. 11:24:09
12   Fried.                              11:24:12
13      Q.   And do you know what the comment 11:24:12
14   was?                                11:24:15
15      A.   Not verbatim.               11:24:16
16      Q.   Do you know -- can you tell me 11:24:22
17   in general?                         11:24:26
18      A.   I believe it was a comment to 11:24:26
19   the effect you're 71.  What are you going 11:24:34
20   to do going forward or what are you going 11:24:39
21   to do for the rest of your life or  11:24:42
22   something to that --                11:24:45
23      Q.   Okay.  And you said you heard 11:24:47
24   this from Mr. Fried and Mr. State?  11:24:49
25      A.   I believe so.               11:24:52
```

30 (Pages 114 to 117)

VERITEXT REPORTING COMPANY

212-267-6868                                516-608-2400

### 146

```
1            LEONARD
2   number 2.                    11:54:53
3       (Recess taken.)          12:04:22
4       THE VIDEOGRAPHER:  We're  12:04:22
5   returning to the record 12:04 a.m. --  12:04:23
6   12:04 p.m., beginning of tape number 3.  12:04:28
7       Q.   Mr. Leonard, are you familiar  12:04:31
8   with Shari Dembin?            12:04:32
9       A.   Yes.                 12:04:33
10      Q.   How so?              12:04:34
11      A.   I have worked with her for many  12:04:35
12  years, and I have known her for longer.  12:04:37
13      Q.   Okay.  And was she employed by  12:04:40
14  LVI Services?                 12:04:42
15      A.   Yes.                 12:04:43
16      Q.   Do you know for how long?  12:04:44
17      A.   Approximately?       12:04:45
18      Q.   Yes.                 12:04:54
19      A.   Ten to fifteen years.  12:04:55
20      Q.   Okay.  And do you know if she is  12:04:57
21  related to Mr. Fried?         12:04:59
22      A.   I do.                12:05:00
23      Q.   And how do you know that?  12:05:01
24      A.   Generally I know that because  12:05:03
25  she had the same last name, and I know her  12:05:09
```

### 147

```
1            LEONARD
2   mother and brother and sister.  12:05:11
3       Q.   Family friends?      12:05:14
4       A.   Yes.                 12:05:15
5       Q.   Okay.  And when did you first  12:05:16
6   find out that Ms. Dembin was related to  12:05:18
7   Mr. Fried?                    12:05:21
8       A.   I don't know when I first found  12:05:22
9   out but many, many years ago.  12:05:28
10      Q.   Okay.  And how is she related to  12:05:30
11  Mr. Fried?                    12:05:33
12      A.   She is his daughter.  12:05:33
13      Q.   And do you know what her job  12:05:35
14  title was, her last job title?  12:05:36
15      MS. SELTZER:  With LVI?   12:05:38
16      MR. DATOO:  With LVI Services.  12:05:41
17      A.   Not specifically.    12:05:42
18      Q.   Generally?           12:05:43
19      A.   Yes, risk management and  12:05:44
20  bonding.                      12:05:48
21      Q.   And do you know what her job  12:05:53
22  duties were?                  12:05:54
23      A.   Generally.           12:05:55
24      Q.   What were they?      12:05:55
25      A.   She oversaw all bonds, bid  12:05:56
```

### 148

```
1            LEONARD
2   bonds, you know, taking in the requests  12:06:02
3   and sending them out and getting them back  12:06:07
4   from the bonding company.  She oversaw the  12:06:09
5   travel in terms of working with Garber.  12:06:16
6   She oversaw all of our company  12:06:19
7   paraphernalia, shirts and things like  12:06:25
8   that.  She did insurance requests,  12:06:30
9   certificates of insurance.  She oversaw  12:06:37
10  any company meeting that we had as an  12:06:40
11  internal company.             12:06:42
12      Q.   And how long was she performing  12:06:44
13  these duties for?             12:06:45
14      A.   Over ten years.      12:06:46
15      Q.   Okay.  And do you know what her  12:06:54
16  work performance was like?    12:06:58
17      A.   Not specifically, but overall,  12:06:59
18  you know, anything I had to do with was  12:07:05
19  always very good.             12:07:07
20      Q.   And do you know who she reported  12:07:09
21  to?                           12:07:10
22      A.   No.                  12:07:10
23      Q.   Would it have been Mr.  12:07:20
24  Annarumma?                    12:07:26
25      MS. SELTZER:  Objection.  12:07:27
```

### 149

```
1            LEONARD
2       A.   On -- on some responsibilities,  12:07:28
3   yes.                          12:07:30
4       Q.   And the others, do you know who  12:07:30
5   she might have reported to?   12:07:32
6       A.   Mr. Fried.           12:07:37
7       Q.   Now, did there come a time when  12:07:39
8   Ms. Dembin was terminated?    12:07:41
9       A.   When you say terminated, let go,  12:07:43
10  yes.                          12:07:51
11      Q.   Separated?           12:07:51
12      A.   Separated.           12:07:52
13      Q.   Left.                12:07:53
14      A.   Separated.           12:07:54
15      Q.   And when was that?    12:07:55
16      A.   I believe January 15, 2011.  12:07:57
17      Q.   Why?                 12:08:01
18      A.   Reduction in force.   12:08:02
19      Q.   Who made the decision to include  12:08:05
20  her in the RIF? By RIF I mean reduction in  12:08:09
21  force.                        12:08:13
22      A.   Understood.  You know, I believe  12:08:14
23  it was a group decision in terms of  12:08:18
24  cutting all overhead we could.  12:08:26
25      Q.   Who was part of that group that  12:08:29
```

38 (Pages 146 to 149)

150

```
1            LEONARD
2  made the decision?                  12:08:30
3      A.   Scott, regional managers,  12:08:31
4  myself, Paul Cutrone.               12:08:39
5      Q.   And when was the decision to  12:08:40
6  include her in the RIF first made?  12:08:46
7      A.   I don't think there was ever an  12:08:49
8  inclusion or noninclusion for Shari  12:08:51
9  specifically.              12:08:57
10     Q.   Well, when was she first   12:08:58
11 identified as someone who should or could  12:09:00
12 be laid off?               12:09:03
13     A.   I would say -- we had -- we had  12:09:08
14 a meeting in Colorado where we presented  12:09:10
15 the budgets, and at that time we saw that  12:09:14
16 we were in trouble in terms of overall  12:09:17
17 spend on the SG and A compared to our  12:09:25
18 revenue goals.  So at that time, somewhere  12:09:30
19 at that time it was discussed on reducing  12:09:33
20 anywhere we could both, you know, on the  12:09:38
21 grant side, which was very thin at the  12:09:44
22 time anyway, or anywhere else.      12:09:47
23     Q.   Now, was it after at that  12:09:49
24 meeting or after where you started  12:09:51
25 discussing specific people to lay off?  12:09:53
```

151

```
1            LEONARD
2      A.   It was after, probably after  12:09:55
3  that meeting.  Yes, maybe it was discussed  12:09:56
4  at that meeting as well.  I don't recall  12:10:01
5  specifically.              12:10:03
6      Q.   Okay.  And why was Ms. Dembin  12:10:04
7  identified as someone who should or could  12:10:08
8  be laid off?               12:10:10
9      A.   Actually, it was reducing the  12:10:11
10 Westport office, so it was everybody at  12:10:19
11 the office besides legal, and she was in  12:10:23
12 that office.               12:10:27
13     Q.   Did you -- why didn't you reduce  12:10:30
14 legal as well?             12:10:35
15     A.   Because it was our belief that  12:10:40
16 we needed legal for contract review and  12:10:42
17 legal matters, and it would not make sense  12:10:45
18 to reduce it and go to outside services  12:10:48
19 that would be way in excess of doing it  12:10:54
20 ourselves.                 12:10:57
21     Q.   Why did you decide to reduce the  12:10:57
22 Westport office or target the Westport  12:10:59
23 office?                    12:11:05
24          MS. SELTZER:  I object to the  12:11:06
25 form.                      12:11:07
```

152

```
1            LEONARD
2      A.   Because the Westport office  12:11:07
3  could be reduced and consolidated in terms  12:11:12
4  of its size in -- in the square footage  12:11:17
5  that was needed for legal, and it was a  12:11:21
6  nonoperating office.        12:11:27
7      Q.   Now, was -- was Ms. Dembin  12:11:28
8  offered the opportunity to work out of  12:11:37
9  another office, so she could have avoided  12:11:38
10 being laid off?            12:11:41
11     A.   I don't believe so.    12:11:42
12     Q.   Why not?               12:11:43
13     A.   Because it was believed that her  12:11:49
14 duties could be done with people that we  12:11:49
15 had in New York.           12:11:51
16     Q.   Who -- who believed that?  12:11:52
17     A.   I think everybody involved.  12:11:58
18     Q.   Now, why wasn't -- was this a  12:12:04
19 new revelation to the group or is  12:12:11
20 this -- the fact that her job duties could  12:12:17
21 be performed by others?     12:12:17
22          MS. SELTZER:  I object to the  12:12:19
23 form.                      12:12:20
24     A.   No, this was a necessity in  12:12:21
25 terms of trying to stay alive for the  12:12:24
```

153

```
1            LEONARD
2  company.                   12:12:31
3      Q.   Well, do you know how much she  12:12:31
4  made a year?               12:12:32
5      A.   Yes.                   12:12:33
6      Q.   How much?               12:12:33
7      A.   85,000.                12:12:34
8      Q.   And do you know -- did LVI have  12:12:41
9  previous layoffs prior to January -- the  12:12:43
10 layoff that occurred in January 2011?  12:12:45
11     A.   I am sure.             12:12:48
12     Q.   Do you know why Ms. Dembin was  12:12:49
13 never identified or was not    12:12:50
14 identified -- sorry.        12:12:54
15          MR. DATOO:  Strike that.  12:12:54
16     Q.   Do you know why Ms. Dembin  12:12:55
17 wasn't laid off in connection with the  12:12:57
18 prior layoffs?             12:12:58
19     A.   The prior layoffs could have  12:12:59
20 been at the branch level.  It could have  12:13:02
21 been on a job level.  You know, the  12:13:04
22 question you asked is so broad.  So  12:13:06
23 it -- it has nothing to do with the Westport  12:13:09
24 office because -- you need to be more  12:13:13
25 specific in terms of previous layoffs.  12:13:17
```

39 (Pages 150 to 153)

**154**

```
1           LEONARD
2      Q.   Well, in connection -- well,    12:13:19
3  let's talk about this layoff.            12:13:21
4      A.   Okay.                           12:13:23
5      Q.   Maybe we will work backwards.   12:13:24
6  How did you -- how did this group identify  12:13:26
7  who to lay off?                          12:13:31
8           MS. SELTZER:  I object to the   12:13:32
9  form.                                    12:13:33
10     A.   It was basically any nonrevenue  12:13:36
11 producing employee that could be let go  12:13:41
12 where we could continue operating.       12:13:50
13     Q.   And did you -- did this group   12:13:54
14 look at every nonrevenue producing       12:13:58
15 employee in the LVI organization?        12:14:02
16     A.   I believe they did.             12:14:06
17     Q.   And how many total people were  12:14:10
18 laid off in January of 2011?             12:14:17
19     A.   I don't know the exact number.  12:14:20
20     Q.   Do you know who was laid off?   12:14:22
21     A.   I don't know exactly.  I need to  12:14:24
22 see the list that we had.                12:14:31
23          MR. DATOO:  51.                 12:14:49
24          (Plaintiff's Exhibit 51 marked  12:14:51
25 for identification.)                     12:14:52
```

**155**

```
1           LEONARD
2          (Document handed to witness.    12:14:53
3      Q.   Mr. Leonard, you have in front  12:14:54
4  of you a document that has been marked as  12:14:56
5  Plaintiff's Exhibit 51.                  12:14:58
6          Can you review the document and  12:15:00
7  let me know if you have seen it before?  12:15:01
8      A.   Yes.                            12:15:03
9      Q.   Okay.  Can you flip to the      12:15:03
10 second page?                             12:15:06
11     A.   Yes.                            12:15:12
12     Q.   Do you know if this lists all   12:15:13
13 the employees that were laid off in      12:15:17
14 connection with the January 2011 RIF?    12:15:19
15     A.   Yes.                            12:15:22
16     Q.   Okay.  Now, who is Lorraine     12:15:22
17 Glenn?                                   12:15:37
18     A.   She is an employee that worked  12:15:37
19 in New York.                             12:15:38
20     Q.   What was her position?          12:15:39
21     A.   I don't know her job title.     12:15:41
22     Q.   Do you know what she did?       12:15:43
23     A.   She did some work in workers    12:15:46
24 comp and risk management, some insurance  12:15:52
25 items working I think for Joe Annarumma.  12:15:57
```

**156**

```
1           LEONARD
2      Q.   Was she considered nonrevenue   12:16:05
3  producing?                               12:16:07
4      A.   Yes.                            12:16:08
5      Q.   And who is Robin Keller?        12:16:08
6      A.   She was a receptionist at the   12:16:11
7  Westport office.                         12:16:16
8      Q.   Nonrevenue producing?           12:16:17
9      A.   Yes.                            12:16:19
10     Q.   We know who Shari Dembin is.    12:16:20
11 Was she nonrevenue producing?            12:16:29
12     A.   Yes.                            12:16:31
13     Q.   How about Peggy Craemer?        12:16:32
14     A.   Yes.                            12:16:34
15     Q.   Nonrevenue producing?           12:16:34
16     A.   Yes.                            12:16:36
17     Q.   Do you know what her job title  12:16:36
18 was?                                     12:16:38
19     A.   No.                             12:16:38
20     Q.   Do you know what office she     12:16:38
21 worked in?                               12:16:41
22     A.   Yes.                            12:16:42
23     Q.   What office?                    12:16:42
24     A.   Westport.                       12:16:43
25     Q.   Do you know what she did?       12:16:43
```

**157**

```
1           LEONARD
2      A.   Yes, marketing prequalification  12:16:45
3  information, submissions.                12:16:51
4      Q.   Okay.  How about Marcy Juran,   12:16:54
5  was she nonrevenue producing?            12:16:58
6      A.   Yes.                            12:17:00
7      Q.   Do you know what she did?       12:17:01
8      A.   Yes.                            12:17:02
9      Q.   What?                           12:17:04
10     A.   Again, assisted in submitting   12:17:05
11 prequals and graphics in marketing.      12:17:11
12     Q.   Okay.  Do you know who Kristin  12:17:14
13 Braun is?                                12:17:20
14     A.   Yes.                            12:17:21
15     Q.   Was she nonrevenue producing?   12:17:21
16     A.   Yes.                            12:17:23
17     Q.   What office did she work in?    12:17:23
18     A.   Westport.                       12:17:25
19     Q.   And do you know what she did?   12:17:26
20     A.   Yes.                            12:17:27
21     Q.   What?                           12:17:28
22     A.   Assisted in marketing and       12:17:29
23 prequals in the Westport office with     12:17:32
24 Peggy and Marcy.                         12:17:36
25     Q.   Do you know who Jerry Fields is?  12:17:37
```

**40  (Pages 154 to 157)**

## 158

```
                LEONARD
1
2      A.   Yes.              12:17:39
3      Q.   And what office did he work in?   12:17:39
4      A.   Texas.            12:17:42
5      Q.   And was he considered nonrevenue   12:17:44
6  producing?              12:17:48
7      A.   As far as I was concerned, yes.   12:17:49
8      Q.   What do you mean by that?     12:17:52
9      A.   He worked in a branch that was   12:17:53
10 an operating branch, but I did not believe   12:17:58
11 he was producing and performing to what   12:18:02
12 was needed.             12:18:05
13     Q.   So was he a performance     12:18:06
14 termination?             12:18:08
15     A.   No, he was we could reduce and   12:18:09
16 live without him.           12:18:19
17     Q.   Was he in a revenue-producing   12:18:20
18 role?                 12:18:22
19     A.   Yes.             12:18:22
20     Q.   Do you feel that he was doing a   12:18:23
21 good job?               12:18:29
22         MS. SELTZER:  Objection.  You   12:18:31
23 can answer.             12:18:32
24     A.   Fair.            12:18:33
25     Q.   And why was he included in the   12:18:35
```

## 159

```
1  layoff?                12:18:37
2      A.   We believed we could produce the   12:18:38
3  same revenue without him.       12:18:41
4      Q.   And who is Matt Dembin? -- do   12:18:43
5  you know who Matt Dembin is?       12:18:50
6      A.   I do.            12:18:51
7      Q.   And what office did he work in?   12:18:51
8      A.   Out of the Westport office.    12:18:53
9      Q.   And was he a nonrevenue     12:18:59
10 producing employee?           12:19:01
11     A.   No.             12:19:01
12     Q.   Okay.  So he worked in a revenue   12:19:07
13 producing role?           12:19:09
14     A.   Yes.             12:19:10
15     Q.   Why was he included in the    12:19:11
16 layoff?                12:19:13
17     A.   Because we believed we could   12:19:14
18 achieve the goals without him.     12:19:16
19     Q.   Was he a performance       12:19:18
20 termination?             12:19:22
21         MS. SELTZER:  I object to the   12:19:23
22 form.                 12:19:24
23     A.   Again, it wasn't for       12:19:24
24 performance.  It was that we believed we   12:19:29
```

## 160

```
                LEONARD
1
2  could do what we were doing at the time   12:19:31
3  without his services.         12:19:35
4      Q.   Okay.  Do you know who Ron    12:19:36
5  Nardone is?             12:19:39
6      A.   Yes.             12:19:40
7      Q.   What office did he work in?    12:19:41
8      A.   Technically out of -- you know,   12:19:43
9  he was a corporate employee, but he worked   12:19:47
10 the majority of time in the Boston office.   12:19:49
11     Q.   And was he a nonrevenue     12:19:52
12 producing employee?           12:19:59
13     A.   No.             12:20:00
14     Q.   He was in a revenue-producing   12:20:00
15 role?                 12:20:02
16     A.   Yes.             12:20:02
17     Q.   And why was he included in the   12:20:03
18 layoff?                12:20:04
19     A.   Same as above.  We did not   12:20:05
20 believe we needed his services to make the   12:20:08
21 revenues and profits that we had      12:20:12
22 projected.             12:20:14
23     Q.   Okay.  And Charles Lafever, do   12:20:15
24 you know who he is?           12:20:21
25     A.   Yes, Lafever.         12:20:21
```

## 161

```
1      Q.   Lafever.           12:20:23
2      A.   Yes.  He was in corporate     12:20:25
3  business development as well.      12:20:26
4      Q.   Was he a nonrevenue producing   12:20:32
5  employee?              12:20:34
6      A.   No, he was a revenue-producing   12:20:34
7  employee.              12:20:36
8      Q.   And what office did he work out   12:20:36
9  of?                  12:20:37
10     A.   I believe the home office.    12:20:38
11     Q.   Do you know where he lived?    12:20:39
12     A.   I believe Pennsylvania, but I am   12:20:41
13 not -- not a hundred percent sure.    12:20:48
14     Q.   And do you know who Mike     12:20:50
15 Debene --              12:20:56
16     A.   Debenedet --         12:20:57
17     Q.   -- Mr. Debenedet is?       12:20:59
18     A.   Yes.             12:21:01
19     Q.   And did he work in a nonrevenue   12:21:01
20 producing role?           12:21:03
21     A.   No.             12:21:04
22     Q.   He worked in a revenue-producing   12:21:12
23 role?                 12:21:14
24     A.   No.  He was project manager, so   12:21:14
```

**41 (Pages 158 to 161)**

VERITEXT REPORTING COMPANY

212-267-6868                         516-608-2400

## 162

```
          LEONARD
 1
 2   he supported, but he did not create      12:21:21
 3   revenue.                    12:21:28
 4       Q.   And what office did he work in?   12:21:29
 5       A.   Connecticut.            12:21:30
 6       Q.   Westport or Milford?        12:21:31
 7       A.   I am sorry. Milford,        12:21:33
 8   Connecticut.                 12:21:35
 9       Q.   And why was he included in the   12:21:35
10   layoff?                   12:21:37
11       A.   We believed we could achieve the  12:21:38
12   budget goals we had in Connecticut without  12:21:39
13   his services.                12:21:42
14       Q.   So now were -- were any other   12:21:42
15   employees other than those that appear on   12:21:56
16   this list considered for layoff?       12:22:00
17       A.   No, all employees.         12:22:06
18       Q.   And do you know why out of the   12:22:06
19   -- out of the 11 employees that were laid   12:22:14
20   off, do you know why six of them came from  12:22:16
21   the Westport office?             12:22:24
22       MS. SELTZER:   I object to the     12:22:26
23   form.                    12:22:27
24       A.   I -- yes, because it was a     12:22:30
25   nonproducing office that we thought we    12:22:33
```

## 163

```
          LEONARD
 1
 2   could consolidate or shrink.         12:22:36
 3       Q.   Who suggested that Ms. Dembin be  12:22:43
 4   included in the -- in the RIF?        12:22:47
 5       MS. SELTZER:   Objection. Asked    12:22:51
 6   and answered.                12:22:53
 7       A.   I don't believe anybody      12:22:54
 8   suggested it.                12:22:55
 9       Q.   So how did her name come up?    12:22:56
10       MS. SELTZER:   Again.         12:22:59
11       A.   Because she was an employee at   12:23:01
12   the Westport office.             12:23:03
13       Q.   Did you look -- did the group   12:23:04
14   look at other branch offices to determine   12:23:06
15   whether they could be closed or reduced?   12:23:10
16       A.   Yes.                12:23:15
17       Q.   And were there any other offices  12:23:16
18   that you determined could be closed or    12:23:17
19   reduced?                   12:23:19
20       A.   No, except for Jerry Fields and  12:23:20
21   Mike Debenedet.               12:23:27
22       Q.   I am sorry. What -- what do you  12:23:28
23   mean by that?                12:23:28
24       A.   They were in branch offices that  12:23:34
25   we thought could deliver the goals without  12:23:36
```

## 164

```
          LEONARD
 1
 2   their services.               12:23:42
 3       Q.   Now, did you ever have any     12:23:43
 4   conversations with Ms. Dembin's       12:23:51
 5   supervisors about including her in the    12:23:55
 6   RIF?                     12:24:00
 7       MS. SELTZER:   I object to the     12:24:01
 8   form.                    12:24:02
 9       A.   When you say any discussions    12:24:06
10   with her supervisors, as to making her    12:24:07
11   part of the RIF?               12:24:11
12       Q.   Yes.               12:24:12
13       A.   I don't believe so.        12:24:13
14       Q.   Then why did you -- why did you  12:24:19
15   include -- how did you know that she     12:24:21
16   wasn't essential or necessary or someone   12:24:24
17   else could do her job duties?        12:24:26
18       MS. SELTZER:   I object to the     12:24:28
19   form.                    12:24:29
20       A.   Because it was stated that they  12:24:29
21   could be done in New York.          12:24:32
22       Q.   Who stated it?           12:24:34
23       A.   Joseph Annarumma.         12:24:35
24       Q.   Okay. And so did you have a    12:24:38
25   discussion with Mr. Annarumma about     12:24:43
```

## 165

```
          LEONARD
 1
 2   Ms. Dembin's job duties?           12:24:45
 3       A.   Not specifically, no.       12:24:47
 4       Q.   How about generally?        12:24:51
 5       A.   I don't know even generally.    12:24:52
 6   I -- I am sure someone had a discussion    12:24:58
 7   that it could be handled in his staff.    12:25:01
 8       Q.   I am sorry. I don't know what   12:25:05
 9   you mean. Can you -- can you explain it   12:25:08
10   to me?                    12:25:10
11       A.   I -- you know, I don't recall   12:25:10
12   if I had a conversation with him, but    12:25:12
13   I -- I am assume that someone had a     12:25:15
14   conversation that it could be dealt with   12:25:17
15   by his staff in New York.          12:25:19
16       Q.   You mean her job duties could be  12:25:20
17   assumed by his staff in New York?      12:25:26
18       A.   Correct.              12:25:27
19       Q.   Okay. And do you know who is    12:25:28
20   performing Ms. Dembin's job duties      12:25:30
21   currently?                  12:25:32
22       A.   Not specifically.         12:25:33
23       Q.   How about generally?        12:25:35
24       A.   I believe Kathy Majors and Jovan  12:25:37
25   Vaughn handle those along with Jeannie    12:25:44
```

**VERITEXT REPORTING COMPANY**

212-267-6868                                        516-608-2400

**166**

```
1            LEONARD
2   Nagy.                        12:25:53
3      Q.   Is Ms. Nagy in New York?     12:25:54
4      A.   No.  She is a paralegal in   12:25:56
5   Connecticut.                 12:25:58
6      Q.   In Westport, Connecticut?    12:25:59
7      A.   Yes, sir.            12:26:01
8      Q.   Is the office still open?    12:26:01
9      A.   Right now, yes.      12:26:03
10     Q.   When is it going to close?   12:26:09
11     A.   When the lease is up in the  12:26:10
12  office or if it is subleased prior.  12:26:12
13     Q.   And do you know where the legal  12:26:14
14  team is going to move to?    12:26:15
15     A.   No.                  12:26:16
16     Q.   Were there any employees who  12:26:17
17  were considered for layoff that were not  12:26:39
18  laid off?                   12:26:43
19     MS. SELTZER:  Objection.  Asked  12:26:44
20  and answered.                12:26:46
21     A.   Not to my knowledge.   12:26:46
22     Q.   So everyone on the list were  12:26:50
23  always on the list --        12:26:57
24     MS. SELTZER:  Objection.   12:26:58
25     Q.   -- of people to be laid off?  12:26:59
```

**167**

```
1            LEONARD
2      MS. SELTZER:  I object to form.  12:27:01
3      A.   I mean when you say always on  12:27:03
4   the list --                 12:27:05
5      Q.   Well did any --       12:27:09
6      A.   -- this was the list.  12:27:10
7      Q.   I am sorry.  If you turn to the  12:27:11
8   document you have in front of you.  12:27:16
9      A.   Yes.                 12:27:17
10     Q.   Were any of other people --  12:27:18
11  other than the people that appear on this  12:27:20
12  list, were there any other names or were  12:27:22
13  there any other people who were selected  12:27:26
14  for layoff but were not laid off or  12:27:29
15  identified for layoff but were not laid  12:27:33
16  off?                        12:27:36
17     MS. SELTZER:  I object to the  12:27:36
18  form, but you can answer if you understand  12:27:37
19  it.                         12:27:40
20     A.   I don't believe so.   12:27:40
21     MR. DATOO:  Why don't we take a  12:27:56
22  break for a few minutes.     12:27:58
23     THE VIDEOGRAPHER:  We're going  12:27:59
24  off the record.  The time is 12:28 p.m..  12:28:00
25     (Recess taken.)          12:30:25
```

**168**

```
1            LEONARD
2      THE VIDEOGRAPHER:  We're     12:30:25
3   returning to the record, 12:30 p.m.  12:30:26
4      Q.   If I can -- Mr. Leonard, if I  12:30:37
5   could direct your attention to Exhibit 51  12:30:40
6   again.                      12:30:43
7      MS. SELTZER:  The last one.  12:30:48
8      A.   This one?            12:30:49
9      Q.   Yes, the first page.  It appears  12:30:50
10  to be an e-mail from to all regional  12:30:54
11  managers, and I think Mr. -- the COO, CFO.  12:30:59
12  I assume that includes Mr. Cutrone and  12:31:05
13  yourself.                   12:31:08
14     A.   (Witness nodding).    12:31:10
15     Q.   Now, you e-mailed a list of  12:31:13
16  proposed employee reductions, correct?  12:31:15
17     A.   Yes.                 12:31:18
18     Q.   And which group of people came  12:31:19
19  up with this list?           12:31:24
20     A.   Basically the group that the  12:31:25
21  e-mail was sent to.          12:31:33
22     Q.   So that included Mr. State, Mr.  12:31:34
23  Cutrone, yourself, and the regional  12:31:37
24  managers?                   12:31:39
25     A.   Yes.                 12:31:40
```

**169**

```
1            LEONARD
2      Q.   Okay.                12:31:40
3      A.   But it included people that  12:31:44
4   worked for them as well.     12:31:46
5      Q.   What do you mean?     12:31:49
6      A.   Whoever, you know, was the  12:31:50
7   oversight, they were supposed to go down  12:31:55
8   and see if there was anybody that could be  12:31:58
9   in the list, which I sent again and made  12:32:01
10  sure that we looked at everywhere we can.  12:32:05
11  So, you know, Cutrone his people, took  12:32:07
12  care of his people.  Regional managers  12:32:13
13  took care of their areas.  Everyone took  12:32:15
14  care of theirs areas and scrubbed to see  12:32:20
15  what the -- what people we could propose  12:32:20
16  to reduce overhead.          12:32:24
17     Q.   Okay.  And did anyone add any  12:32:26
18  employees to the list?       12:32:36
19     A.   After this list?      12:32:37
20     Q.   Yes.                 12:32:39
21     A.   No.                  12:32:40
22     Q.   Okay.                12:32:41
23     A.   At that time.        12:32:46
24     Q.   What do you mean?     12:32:46
25     A.   I can't say that there hasn't  12:32:49
```

43 (Pages 166 to 169)

**170**

```
 1           LEONARD
 2   been any layoffs since January 15.      12:32:52
 3       Q.   Okay.                          12:32:54
 4       A.   There may as well -- there may 12:32:55
 5   have been some since then.              12:32:57
 6       Q.   Have there been?               12:32:59
 7       A.   Yes.  There has been some.     12:33:00
 8       Q.   Do you know when that layoff   12:33:19
 9   occurred?                              12:33:20
10       A.   No.  I just know off the top of 12:33:21
11   my head we have had -- we have reduced  12:33:25
12   more in a couple of places, and we have 12:33:28
13   let a couple of people go.              12:33:30
14       Q.   Was it a -- was it a RIF or were 12:33:32
15   they performance terminations?          12:33:36
16       A.   No, for the most part          12:33:37
17   performance and/or RIF.  There may have 12:33:41
18   been one or two RIFs where we just decided 12:33:46
19   we could go forward without of them.    12:33:48
20       Q.   One or two RIFs or just one or  12:33:51
21   two employees that had been --          12:33:53
22       A.   One or two employees.          12:33:54
23       Q.   Okay.  Do you know what office 12:33:56
24   those employees came from?              12:33:57
25       A.   One was in I believe the Florida 12:33:58
```

**171**

```
 1           LEONARD
 2   corp. -- the Florida office.            12:34:08
 3       Q.   Do you know what -- what he or  12:34:12
 4   she did?                               12:34:14
 5       A.   One was a health and safety    12:34:14
 6   officer.                               12:34:17
 7       Q.   Okay.                          12:34:17
 8       A.   And I am trying to think if     12:34:19
 9   there are any others that --            12:34:21
10       A.   We also did some in Connecticut 12:34:26
11   as well, four or five employees there or 12:34:30
12   two or three employees there.           12:34:33
13       Q.   In Milford?                     12:34:34
14       A.   Yes.                            12:34:35
15       Q.   Do you know what positions they 12:34:36
16   occupied?                              12:34:37
17       A.   Project management and -- and  12:34:38
18   administrative.                        12:34:43
19       Q.   Now, were there any prior       12:34:44
20   versions of the list that you attached to 12:34:51
21   your e-mail?                           12:34:55
22       A.   I don't believe so.            12:34:56
23       Q.   Okay.  Are there any e-mails    12:34:58
24   that -- that discuss names of particular 12:35:01
25   people or positions?                    12:35:10
```

**172**

```
 1           LEONARD
 2       A.   I don't believe so.            12:35:12
 3       Q.   Okay.  So how long before you  12:35:13
 4   sent this e-mail did you have a list of  12:35:21
 5   names of people that were proposed to be 12:35:25
 6   laid off?                              12:35:28
 7       MS. SELTZER:  You mean the list     12:35:29
 8   that is attached?                      12:35:32
 9       MR. DATOO:  Right.                  12:35:33
10       Knowing myself, ten minutes, but    12:35:33
11   I am not sure.                         12:35:35
12       Q.   Okay.  Do you know who developed 12:35:36
13   this list?                             12:35:37
14       A.   The group that I just discussed, 12:35:38
15   the regional management, CFO, COO.     12:35:43
16       Q.   Do you know -- did you receive  12:35:47
17   this list by e-mail?                    12:35:49
18       A.   No, I think I created this list. 12:35:50
19       Q.   Okay.  And what did you -- did  12:35:52
20   you create this list based off of       12:35:54
21   anything?                              12:35:56
22       A.   Based off the discussions with 12:35:56
23   the group.                             12:35:59
24       Q.   And did you create this list    12:35:59
25   immediately after you had a discussion  12:36:02
```

**173**

```
 1           LEONARD
 2   with this group?                        12:36:05
 3       MS. SELTZER:  Objection.  Asked     12:36:06
 4   and answered.                          12:36:07
 5       A.   No, because this was discussed  12:36:08
 6   and talked about and put together over a 12:36:12
 7   period of time, you know, a couple of   12:36:17
 8   weeks at least.                        12:36:20
 9       Q.   Okay.  And that was after the   12:36:20
10   regional managers meeting you had?      12:36:24
11       A.   Yes.                            12:36:26
12       Q.   Okay.  Now, the employees that  12:36:27
13   were laid off in connection with the    12:36:38
14   January 2011 RIF, have -- have any of    12:36:39
15   them -- have you hired any people        12:36:45
16   subsequent to assume their job duties?   12:36:48
17       A.   No.                            12:36:52
18       Q.   Okay.  I asked you very early on 12:36:52
19   in the deposition about the total number 12:36:56
20   of employees within the entire LVI       12:36:58
21   organization.                          12:37:02
22       Do you recall that?                 12:37:02
23       A.   Yes.                            12:37:03
24       Q.   And I don't remember the answer, 12:37:03
25   so I am just going to ask you it again.  12:37:07
```

44 (Pages 170 to 173)

VERITEXT REPORTING COMPANY

212-267-6868                                    516-608-2400

174

```
            LEONARD
1
2    How many did you say there are?        12:37:09
3         MS. SELTZER:  I object to the     12:37:15
4    form.  In the -- I think there were    12:37:16
5    two -- two answers there.  One was the 12:37:18
6    LVI --                                 12:37:20
7    Q.    Okay.  Well, let's -- actually I 12:37:21
8    do have the answer.  I believe you -- you  12:37:23
9    testified earlier that LVI Services    12:37:25
10   employs approximately 50 people; is that  12:37:27
11   correct?                               12:37:29
12   A.    Yes, maybe less though now.      12:37:30
13   Q.    Okay.  And within the entire LVI 12:37:33
14   organization, I believe you testified that  12:37:35
15   LVI employs approximately 400 to 500   12:37:38
16   people; is that correct?               12:37:42
17   A.    Yes.                             12:37:43
18   Q.    Okay.  Now, is that -- did you   12:37:44
19   only take into account the salaried    12:37:48
20   employees?                             12:37:51
21   A.    Yes.                             12:37:52
22   Q.    How many nonsalaried employees   12:37:53
23   work for LVI Services?                 12:37:58
24   A.    For LVI Services?               12:38:00
25   Q.    Yes.                             12:38:04
```

175

```
            LEONARD
1
2    A.    Minimal.                         12:38:08
3    Q.    Sorry?                           12:38:11
4    A.    Very minimal.                    12:38:11
5    Q.    Okay.  And how about for the     12:38:13
6    entire LVI organization?              12:38:14
7    A.    It depends on the day, 2 to     12:38:16
8    3,000.                                 12:38:18
9    Q.    Okay.                            12:38:19
10        MR. DATOO:  Okay.  Thank you      12:38:24
11   very much.  I have no further questions.  12:38:26
12        THE VIDEOGRAPHER:  We're going    12:38:27
13   off the record.  12:38 p.m.  End of    12:38:28
14   today's questioning.                   12:38:31
15        (Time noted: 12:38 p.m.)          12:38:37
16
17
18
19
20           JOHN LEONARD
21
22   Subscribed and sworn to before me
23   this       day of        , 2011
24
25                  .
```

176

```
              LEONARD
1
2        C E R T I F I C A T I O N
3
4
5
6        I, DEBBIE ZAROMATIDIS, a Shorthand
7    Reporter and a Notary Public, do hereby
8    certify that the foregoing witness, JOHN
9    LEONARD, was duly sworn on the date
10   indicated, and that the foregoing is a
11   true and accurate transcription of my
12   stenographic notes.
13       I further certify that I am not
14   employed by nor related to any party to
15   this action.
16
17
18
19
20
21
22
23            DEBBIE ZAROMATIDIS
24
25
```

177

```
              LEONARD
1
2         E X H I B I T S
3
4    PLAINTIFF'S
5    EXHIBIT      DESCRIPTION          PAGE
6    31A    E-mail with attachment      91
7    49     E-mail                     130
8    50     E-mail                     132
9    51     Document                   154
10   52     E-mail                     100
11   53     E-mail                     101
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

45 (Pages 174 to 177)

VERITEXT REPORTING COMPANY

212-267-6868                                    516-608-2400

# Exhibit 8

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

No. 10 Civ. 9308(JSR)

------------------------------------------x

BURTON T. FRIED,

                         Plaintiff,

       - against -

LVI SERVICES, INC., LVI PARENT CORP., CODE

HENNESSY SIMMONS, LLC d/b/a CHS PRIVATE

EQUITY V LP; APOLLO INVESTMENT CORP.,

SCOTT E. STATE, in his official and

individual capacities; BRIAN SIMMONS, in

his official and individual capacities;

RAJAY BAGARIA, in his official and

individual capacities; GERALD J. GIRARDI,

in his official and individual capacities,

                         Defendants.

------------------------------------------x

                         June  1, 2011

                         2:03  p.m.

**2**

1
2
3
4      VIDEOTAPE DEPOSITION of JOHN
5  SCHNABEL, taken by the Plaintiff, pursuant
6  to Notice, held at the offices of Thompson
7  Wigdor & Gilly, LLP, 85 Fifth Avenue, New
8  York, New York, before Debbie Zaromatidis,
9  a Shorthand Reporter and Notary Public of
10 the State of New York.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**4**

1                    SCHNABEL
2          S T I P U L A T I O N S
3
4       IT IS HEREBY STIPULATED AND
5  AGREED by and between the Attorneys for
6  the respective parties hereto that filing
7  and sealing be and the same are hereby
8  waived.
9       IT IS FURTHER STIPULATED AND
10 AGREED that all objections except as to
11 the form of the question, shall be
12 reserved to the time of the trial.
13      IT IS FURTHER STIPULATED AND
14 AGREED that the within examination may be
15 signed and sworn to before any notary
16 public with the same force and effect as
17 though signed and sworn to before this
18 Court.
19
20
21
22
23
24
25

**3**

1
2  A P P E A R A N C E S :
3
4  THOMPSON WIGDOR & GILLY, LLP
5  Attorneys for Plaintiff
6        85 Fifth Avenue
7        New York, New York 10003
8  BY:   SHAFFIN A. DATOO, ESQ.
9
10
11 SIDLEY AUSTIN, LLP
12 Attorneys for Defendants
13        787 Seventh Avenue
14        New York, New York 10019
15 BY:   JOANNE SELTZER, ESQ.
16
17
18 ALSO PRESENT:
19      BURTON FRIED
20      J.D. MARTINEZ, Videographer
21
22
23
24
25

**5**

1                    SCHNABEL
2       THE VIDEOGRAPHER:  We are on      02:03:51
3  the record.  My name is J.D. Martinez of   02:04:27
4  Veritext New York.  The date today is June  02:04:30
5  1, 2011, and the time is approximately     02:04:32
6  2:04 p.m.  This deposition is being held    02:04:35
7  in the office of Thompson Wigdor & Gilly    02:04:38
8  LLP located at 85 Fifth Avenue, New York,   02:04:41
9  New York.  The caption of this case is      02:04:44
10 Burton T. Fried versus LVI Services, Inc.   02:04:46
11 et al. filed in the United States District  02:04:49
12 Court, Southern District of New York.  The  02:04:52
13 name of the witness is John Schanbel.       02:04:55
14      At this time the attorneys will      02:04:58
15 identify themselves and the parties they    02:04:59
16 represent after which our court reporter    02:05:02
17 Debbie Zaromatidis will swear in the        02:05:03
18 witness, and we can proceed.                02:05:05
19      MS. SELTZER:  Joanne Seltzer at     02:05:07
20 Sidley Austin, LLP on behalf of all         02:05:10
21 defendants in this matter.                  02:05:11
22      MR. DATOO:   Shaffin Datoo,         02:05:13
23 Thompson Wigdor & Gilly on behalf of the    02:05:15
24 plaintiff Burt Fried.                       02:05:25
25

2 (Pages 2 to 5)

**VERITEXT REPORTING COMPANY**

212-267-6868                                    516-608-2400

**22**

```
           SCHNABEL
1
2      MS. SELTZER:  I object to the    02:20:59
3   form.  You can answer.              02:21:00
4      A.  There would be obviously formal  02:21:01
5   board meetings, but there would be monthly  02:21:06
6   written updates from the company on   02:21:10
7   performance, and there would be impromptu  02:21:13
8   phone calls, not scheduled phone calls but  02:21:18
9   impromptu ones with Burt or later Scott  02:21:20
10  State and probably more with Paul Cutrone  02:21:25
11  than anyone else between me or my -- my  02:21:28
12  staff.                             02:21:34
13     Q.  Do you still have any of these  02:21:35
14  monthly written updates that you just  02:21:36
15  referred to?                       02:21:39
16     A.  Yes, it would be the normal  02:21:39
17  monthly reporting package from the CFO.  02:21:41
18     Q.  Okay.  And what was contained in  02:21:44
19  those updates?                     02:21:46
20     A.  Mostly operating results,    02:21:47
21  financial statements, the normal financial  02:21:53
22  statements as well as key operating  02:21:56
23  metrics.                           02:21:59
24     MR. DATOO:  Joanne, I'll put it  02:22:03
25  in writing, but I just want to put it on  02:22:04
```

**24**

```
           SCHNABEL
1
2   accessible, and that is how we dealt with  02:23:03
3   it, so it was a little bit informal.  02:23:06
4      Q.  And how often would you have  02:23:08
5   these informal communications with   02:23:09
6   management?                        02:23:11
7      A.  I would say on an average basis  02:23:11
8   twice a month, two or three times a month.  02:23:15
9      Q.  Okay.  Now, how many employees  02:23:17
10  does LVI Services have?            02:23:23
11     A.  Salaried or total?          02:23:25
12     Q.  In total.                   02:23:31
13     A.  I really don't know the answer  02:23:32
14  to that.                           02:23:37
15     Q.  Hundreds, thousands?        02:23:39
16     A.  I would say low thousands.   02:23:41
17     Q.  Low thousands.  And was this  02:23:43
18  true --                            02:23:52
19     A.  And it is a guess by the way.  02:23:53
20  It is a guess.                     02:23:54
21     Q.  Okay.  And was that number   02:23:55
22  around the same in 2010, all of 2010?  02:23:57
23     A.  Well, I think we -- there    02:24:00
24  is -- it is a project oriented business.  02:24:04
25  So it depended upon the project flow at  02:24:06
```

**23**

```
           SCHNABEL
1
2   the record.  I would like production of  02:22:07
3   these monthly written updates for 2009 and  02:22:08
4   2010.                              02:22:11
5      MS. SELTZER:  I think we        02:22:12
6   produced to you everything that we had  02:22:13
7   marked board members, but I will -- I will  02:22:16
8   check.                             02:22:17
9      MR. DATOO:  Okay.              02:22:19
10     Q.  So other than attending board  02:22:21
11  meetings and receiving these monthly  02:22:23
12  written updates and I think --     02:22:28
13     A.  I am sorry.  And there is    02:22:29
14  also -- along with that would be on a  02:22:31
15  monthly basis the CFO would write some  02:22:33
16  sort of a synopsis of those results.  02:22:35
17     MR. DATOO:  Okay.  Joanne, I   02:22:38
18  would like to include that in my request.  02:22:39
19     MS. SELTZER:  Put it in         02:22:41
20  writing.  I'll take it under advisement.  02:22:43
21     Q.  And did you mention that you  02:22:51
22  were involved in some phone calls as well?  02:22:52
23     A.  Yes.  If we had any questions,  02:22:55
24  we would usually just pick up the phone  02:22:58
25  and call.  Management was always -- always  02:23:01
```

**25**

```
           SCHNABEL
1
2   the time, and so they were not all  02:24:08
3   full-time employees I would say.  So --  02:24:12
4   and 2010 wasn't a banner year.  So I  02:24:14
5   suspect that we actually had less employee  02:24:17
6   hours in 2010 than we did in previous --  02:24:19
7   the previous year.  That is a guess.  02:24:22
8      Q.  Can you ballpark how many   02:24:25
9   employees you had in 2010?         02:24:27
10     A.  No, I could not.            02:24:28
11     Q.  Would it be in the hundreds or  02:24:30
12  in the --                          02:24:31
13     A.  It would be the same answer.  It  02:24:32
14  is a complete guess on my part so   02:24:34
15  thousands.  If I said that before as a  02:24:36
16  guess I would stick with that.     02:24:38
17     Q.  Okay.  Does LVI Services have  02:24:39
18  any offices?                       02:24:45
19     MS. SELTZER:  Offices?          02:24:47
20     MR. DATOO:  Offices.           02:24:48
21     A.  Yes.                        02:24:49
22     Q.  How many ballpark?          02:24:50
23     A.  Ballpark 20.               02:24:53
24     Q.  Okay.  Do you know who Robert  02:24:54
25  McNamara is?                       02:24:59
```

                                    7 (Pages 22 to 25)

26

```
 1              SCHNABEL
 2      A.   Yes.                      02:25:01
 3      Q.   Who is he?                02:25:01
 4      A.   The former CEO of LVI.    02:25:02
 5      Q.   And did Falcon have an    02:25:05
 6   investment in LVI when Mr. McNamara was   02:25:10
 7   CEO?                             02:25:14
 8      A.   I -- I do not believe so, and   02:25:15
 9   this is a little bit of -- trying to   02:25:18
10   remember what happened in 2005. We were   02:25:20
11   endeavoring to have Burt trans -- transfer   02:25:22
12   over to a chairman role and bring in a   02:25:28
13   CEO. We were actively looking for a CEO   02:25:30
14   in the time period before the sale of the   02:25:35
15   company, and I believe Bob McNamara was   02:25:37
16   hired only after the sale.        02:25:40
17      Q.   Okay. Do you know why Mr. Fried   02:25:41
18   was going to transition to a chairman   02:25:45
19   role?                            02:25:47
20      A.   That was his wish.        02:25:48
21      Q.   Okay. And as chairman do you   02:25:49
22   know what his job duties were?    02:25:55
23           MS. SELTZER:  I am sorry. Just   02:26:00
24   objection. Under Robert McNamara?   02:26:01
25           MR. DATOO:  Yes.          02:26:04
```

27

```
 1              SCHNABEL
 2      A.   Under Robert McNamara. I do not   02:26:04
 3   know specifically what they were, but in   02:26:10
 4   talking to Burt I realized that he had   02:26:12
 5   quite in depth knowledge of the business.   02:26:19
 6   So that he was not -- he was a caretaker,   02:26:21
 7   chairman, very active. What his   02:26:26
 8   day-to-day duties were wasn't clear, but   02:26:28
 9   you could talk to him about the -- the   02:26:30
10   most strategic matter, and he would have   02:26:33
11   an understanding of it and could give an   02:26:35
12   opinion about it.                 02:26:37
13      Q.   So you don't know exactly what   02:26:38
14   he did, but you do know he knew the   02:26:40
15   business well?                    02:26:42
16      A.   Yes.                      02:26:42
17      Q.   Okay. Do you know what his work   02:26:43
18   performance was like as chairman?   02:26:45
19      A.   Under Bob McNamara?       02:26:48
20      Q.   Yes.                      02:26:51
21      A.   I don't -- I don't really know.   02:26:52
22   From after we sold the business until we   02:26:54
23   reentered the business there really is a   02:26:58
24   kind of a dark period there where I don't   02:27:01
25   really have -- have any interaction with   02:27:03
```

28

```
 1              SCHNABEL
 2   Burt, but as we made our investment -- we   02:27:06
 3   made our toehold investment, we started   02:27:10
 4   speaking to Burt. It was clear that, you   02:27:14
 5   know, he was fully engaged, and he was a   02:27:17
 6   respected member and was somebody   02:27:20
 7   who -- you would want to talk to if you   02:27:22
 8   were going to make an investment in this   02:27:25
 9   company.                         02:27:26
10      Q.   When did you I guess sell your   02:27:26
11   investment in LVI?                02:27:29
12      A.   In 2005 along with Blue Point,   02:27:31
13   who controlled the investment at that   02:27:33
14   time.                            02:27:35
15      Q.   And when did you I guess make   02:27:35
16   another investment?               02:27:39
17      A.   In 2009. So we had fully   02:27:41
18   divested our private investment in 2005   02:27:44
19   with Blue Point. In 2000 -- early 2009   02:27:47
20   through a series of transactions we   02:27:51
21   accumulated senior debt, LVI senior debt.   02:27:53
22      Q.   All right. Now, did there come   02:27:57
23   a time when Mr. Fried became the interim   02:28:10
24   CEO --                           02:28:12
25      A.   Yes.                      02:28:13
```

29

```
 1              SCHNABEL
 2      Q.   -- of LVI. Do you know when   02:28:13
 3   that was?                        02:28:15
 4      A.   I want to say that it is March   02:28:15
 5   of 2010.                         02:28:30
 6      Q.   Okay. Do you know why he became   02:28:37
 7   the interim CEO?                  02:28:39
 8      A.   Well, yes. Bob McNamara left   02:28:41
 9   for another position. We were   02:28:44
10   in -- without a CEO. We would start a   02:28:49
11   search immediately, but we all realized   02:28:54
12   that Burt had been CEO, very capable and   02:28:56
13   continued to do that in the interim   02:28:59
14   period, and as long as he was willing to   02:29:01
15   do that that would be the best outcome.   02:29:02
16      Q.   Do you know if he asked to be   02:29:05
17   interim CEO or he was asked to be interim   02:29:07
18   CEO?                             02:29:12
19      A.   I am -- I am sure we asked him.   02:29:13
20   I mean I think it is one of those things   02:29:15
21   where we kind of look at ourselves -- we   02:29:17
22   are looking in the room here and who is   02:29:21
23   the guy that has operated this company and   02:29:22
24   has done well. Not a bunch of financial   02:29:25
25   guys. So I -- I would assume we made the   02:29:27
```

8 (Pages 26 to 29)

**30**

```
 1            SCHNABEL              02:29:30
 2   first move, but I think Burt, who had a   02:29:30
 3   rather substantial investment in the     02:29:32
 4   company, also would have thought probably 02:29:34
 5   he was the right person for the job.      02:29:36
 6       Q.   What do you mean by Burt having  02:29:38
 7   a substantial investment in the company?  02:29:40
 8       A.   Well, he still had an -- money   02:29:42
 9   -- monies due him.  In what form at that  02:29:46
10   point in time in 2010 -- I mean there were 02:29:49
11   still some management payment that still   02:29:52
12   was owed him.  So just by virtue of the    02:29:57
13   fact that he had the largest stake it was  02:30:01
14   substantial.                              02:30:05
15       Q.   Was he the only one owed         02:30:05
16   money --                                  02:30:08
17       A.   On the management team, no.  No. 02:30:08
18   I would say a top dozen managers at least. 02:30:11
19       Q.   And why were they owed money?    02:30:14
20       A.   That was due to the transaction, 02:30:16
21   the recapitalization of the company.  They 02:30:18
22   received a payment on the                 02:30:21
23   recapitalization.  How it was structured   02:30:24
24   any more I don't -- don't recall, but      02:30:27
25   essentially these were structured as a     02:30:29
```

**31**

```
 1            SCHNABEL
 2   payment up front and then over time to    02:30:33
 3   keep management incentivized while the    02:30:35
 4   company made a turn around.               02:30:40
 5       Q.   And did the company eventually   02:30:41
 6   pay Mr. Fried and the management team any  02:30:49
 7   money that was owed?                      02:30:51
 8       A.   I think the next payment         02:30:53
 9   that -- after the recapitalization, the   02:30:55
10   next payment I don't believe has been made 02:30:58
11   yet, so it is still due and forthcoming.   02:31:00
12       Q.   And is that payment contingent   02:31:03
13   on certain variables or targets or goals?  02:31:05
14       A.   Those payments are -- are        02:31:11
15   different than the -- I don't believe -- I 02:31:13
16   don't remember any more that there         02:31:17
17   is -- you have to understand there is also 02:31:19
18   a management option pool that does have a  02:31:20
19   time vesting component and a performance   02:31:25
20   component in it.  So whether those -- how  02:31:28
21   those payments are structured any more I   02:31:31
22   don't want to venture a guess.  I am just  02:31:32
23   not comfortable at it, and I don't         02:31:35
24   remember.                                 02:31:36
25       Q.   And prior to the                 02:31:37
```

**32**

```
 1            SCHNABEL
 2   recapitalization, did the company pay Mr.  02:31:38
 3   Fried in -- and the other management       02:31:43
 4   employees any money that they may have     02:31:47
 5   been entitled to?                         02:31:48
 6       A.   Well, obviously salary and       02:31:50
 7   bonus, sure.  I assume so.  I -- the last  02:31:52
 8   time I was really involved with the        02:31:54
 9   compensation was upon the sale of the      02:31:56
10   company in 2005, in which case the         02:31:58
11   management team received a substantial     02:32:02
12   amount of options.                        02:32:07
13       Q.   Did that at any point jeopardize 02:32:08
14   the recapitalization?                     02:32:15
15       MS. SELTZER:   I object to the        02:32:17
16   form.  You can answer.                    02:32:18
17       A.   It was part of the negotiation.  02:32:19
18   I -- the way I would -- I would view it is 02:32:20
19   that management wanted to have some sort   02:32:23
20   of form of for lack of a better word stay  02:32:27
21   bonus of some sort.  This was the form     02:32:30
22   that it took.  That is at least how I -- I 02:32:31
23   look at it.  That was negotiated.  That    02:32:35
24   wasn't something that was just given, but, 02:32:37
25   you know, the -- there was quite a bit of  02:32:41
```

**33**

```
 1            SCHNABEL
 2   conversation about valuation of securities 02:32:45
 3   that we exchanged for common stock.  So    02:32:47
 4   every constituent at the table had         02:32:50
 5   something to negotiate, and so I guess if  02:32:53
 6   you weren't willing to be flexible I guess 02:32:55
 7   anything could have put that transaction   02:32:58
 8   in jeopardy, but it was one of the         02:33:00
 9   more important things on the table.        02:33:02
10       Q.   And despite that Falcon -- did   02:33:04
11   Falcon continue --                        02:33:06
12       A.   Yes.                             02:33:07
13       Q.   -- with the investment in LVI?   02:33:07
14       A.   Yes.  Well, not only continue.   02:33:09
15   I think it is better -- we actually took   02:33:19
16   some of other senior notes and exchanged   02:33:21
17   them for common.                          02:33:23
18       Q.   What does that mean?             02:33:24
19       A.   The recapitalization basically   02:33:25
20   was -- took -- took the firm's balance     02:33:28
21   sheet and essentially shrunk it by paying  02:33:30
22   down or converting senior debt, so there   02:33:33
23   was less senior debt post transaction than 02:33:35
24   there was previously.  Some of that was    02:33:37
25   done through a cash investment.  Some of   02:33:40
```

9 (Pages 30 to 33)

VERITEXT REPORTING COMPANY

212-267-6868                                      516-608-2400

**34**

SCHNABEL

1
2  that was done through a conversion.        02:33:42
3  Falcon did not make a new cash investment  02:33:44
4  to the company but took -- willingly took  02:33:47
5  some of its senior debt and converted it   02:33:51
6  into common.                               02:33:54
7      Q.  Is there any way if you could      02:33:54
8  tell me if it is good -- if that is a good 02:33:56
9  thing or a bad thing?                      02:33:58
10     A.  If -- if LVI does really well,      02:33:59
11 it is a superb thing.                      02:34:02
12     Q.  Okay.                              02:34:04
13     A.  And if the company doesn't do      02:34:05
14 well, it is an incredibly stupid thing.    02:34:06
15     Q.  And how has it turned out so       02:34:09
16 far?                                       02:34:11
17     A.  So far it is too -- it is too      02:34:11
18 early to tell actually.  I think the       02:34:13
19 company is rebounding, and we still are    02:34:16
20 very happy with our investment thus far.   02:34:21
21     Q.  Okay.  Now, while Mr. Fried was    02:34:21
22 interim CEO, what -- what job duties was   02:34:28
23 he performing?  Do you know?               02:34:32
24     A.  He was performing all the duties   02:34:34
25 that he had done in -- in the past I -- I  02:34:39

**35**

SCHNABEL

1
2  assume.  Again, I wasn't there from day to 02:34:43
3  day, so I couldn't really check what was   02:34:46
4  on his desk, but he was involved with all  02:34:48
5  the major bidding.  He was involved with   02:34:51
6  all employee issues, major customer        02:34:54
7  issues.  So I would assume that he had his 02:35:00
8  fingers in every pie as he usually did in  02:35:03
9  the past.                                  02:35:06
10     Q.  So would it be fair to say that    02:35:07
11 he assumed -- he was doing -- he was       02:35:09
12 performing the job duties that he held as  02:35:13
13 chairman in addition to those that he      02:35:15
14 assumed as CEO?                            02:35:19
15     A.  I don't know the answer to that.   02:35:21
16 All I can say is that he -- Burt can -- if  02:35:24
17 Burt chooses to be the CEO, he could be a  02:35:30
18 CEO today as far as I am concerned, so he  02:35:33
19 did that role.  Now, whether he took some  02:35:38
20 of his former responsibilities and gave    02:35:41
21 that out or he continued to do them, that  02:35:43
22 I don't know.                              02:35:46
23     Q.  Okay.  And while Mr. Fried was     02:35:46
24 the interim -- interim CEO, do you have    02:35:51
25 any personal knowledge of his work         02:35:54

**36**

SCHNABEL

1
2  performance?                               02:35:56
3      A.  We spoke a lot on the phone.  It   02:35:57
4  was a very difficult business environment. 02:36:05
5  It continues to be challenging, but I      02:36:10
6  perceived no difference in his -- his      02:36:15
7  performance than ever before, and I always 02:36:17
8  had the highest respect for him and        02:36:20
9  continue -- and continue.  So I know -- I  02:36:22
10 think he performed the same.               02:36:25
11     Q.  And while Mr. Fried was the        02:36:26
12 interim CEO, did you have any              02:36:28
13 conversations or e-mail communications     02:36:31
14 with anybody at LVI or any board members   02:36:33
15 about Mr. Fried's job duties or his future 02:36:39
16 at LVI?                                     02:36:41
17     A.  Well, only -- the only time that   02:36:48
18 we spoke about his job duties was after    02:36:50
19 Scott State had been hired as a CEO.       02:36:52
20     Q.  Okay.  So you -- you didn't have   02:36:55
21 any conversations --                       02:36:57
22     A.  Before that, no.                   02:36:59
23     Q.  Okay.                              02:37:00
24     A.  And frankly, I mean I -- I have    02:37:00
25 to say just our opinion as -- as investors 02:37:02

**37**

SCHNABEL

1
2  in the company was quite independent.  We  02:37:11
3  did not depend upon anybody else's opinion 02:37:14
4  of Burt.  We had our own opinion about     02:37:17
5  Burt, you know --                          02:37:20
6      Q.  And what -- what was your          02:37:22
7  opinion about Burt?                        02:37:24
8      A.  No -- the highest regard.  The     02:37:25
9  fact that he was there gave us much        02:37:28
10 comfort.                                    02:37:30
11     Q.  Are you less comfortable now       02:37:30
12 that he is not there?                      02:37:32
13     A.  I would much rather him be         02:37:33
14 there.                                     02:37:35
15     Q.  Okay.  Now, did there come a       02:37:35
16 time when Scott State was hired as         02:37:51
17 president and CEO of LVI Services?         02:37:53
18     A.  I mean he was hired -- yes.        02:37:55
19     Q.  And do you know when that was?     02:38:05
20     A.  Sometime in 2010.  I probably      02:38:09
21 should know this.  I -- I am guessing the  02:38:15
22 summer.                                     02:38:18
23     Q.  Don't worry.  You're not the       02:38:18
24 only one that doesn't know his exact date  02:38:20
25 of hire.                                    02:38:22

10 (Pages 34 to 37)

VERITEXT REPORTING COMPANY

212-267-6868                                516-608-2400

**42**

SCHNABEL

1
2 anything exceptional in that time period 02:42:48
3 that was I would have thought anything 02:42:50
4 bizarre was happening or different was 02:42:53
5 happening.  I assumed it was business as 02:42:55
6 usual. 02:42:57
7     Q.   Okay.  Now, where does -- where 02:42:57
8 do you keep your office at Falcon? 02:43:03
9     A.   We have a -- an address at 450 02:43:05
10 Park Avenue, which is where I work, but we 02:43:09
11 also have a Boston office which is the 02:43:12
12 home office. 02:43:13
13     Q.   And you work in the New York 02:43:14
14 office? 02:43:15
15     A.   I do. 02:43:16
16     Q.   Okay.  Do you live in New York? 02:43:16
17     A.   I live in Long Island. 02:43:18
18     Q.   Okay.  Now, after Mr. State 02:43:19
19 started working at LVI Services, did there 02:43:24
20 come a time when Mr. State began 02:43:27
21 transitioning Mr. Fried's job duties to 02:43:29
22 others? 02:43:31
23         MS. SELTZER:  I object to the 02:43:33
24 form, but you can answer. 02:43:34
25     A.   I only became aware that some 02:43:35

**43**

SCHNABEL

1
2 things were now no longer in his purview 02:43:49
3 at the very end of Mr. Burt's tenure 02:43:52
4 there -- Mr. Fried's tenure there.  So 02:43:58
5 before that I was not aware of any 02:44:01
6 transferring of duties, but obviously I 02:44:03
7 became aware that he was accustomed to 02:44:07
8 being involved with certain things and now 02:44:10
9 all of a sudden was not either invited to 02:44:11
10 be or -- or was told not to be a part of 02:44:15
11 something. 02:44:17
12     Q.   Do you know what those items 02:44:18
13 were? 02:44:19
14     A.   There were some strategic 02:44:19
15 alliances, one overseas in particular I 02:44:26
16 think in England, which I recall 02:44:30
17 specifically.  Other than that, there may 02:44:38
18 have been others, but I just don't recall 02:44:41
19 to be honest. 02:44:43
20     Q.   With respect to this overseas 02:44:44
21 strategic alliance, do you know whose 02:44:46
22 purview that fell within? 02:44:50
23         MS. SELTZER:  I object to the 02:44:52
24 form. 02:44:53
25     A.   Who now -- you mean -- 02:44:53

**44**

SCHNABEL

1
2     Q.   I believe you -- you testified 02:44:56
3 that Mr. -- towards the end Mr. Fried was 02:44:58
4 no longer responsible for this strategic 02:45:02
5 alliance overseas; is that correct? 02:45:06
6     A.   Yes. 02:45:07
7     Q.   Do you know who became 02:45:08
8 responsible for that? 02:45:09
9     A.   I think Mr. State wanted to take 02:45:10
10 that responsibility directly. 02:45:14
11     Q.   Okay. 02:45:16
12     A.   At least that is what Mr. Fried 02:45:17
13 told me. 02:45:19
14     Q.   And do you know if Mr. State 02:45:20
15 made a comment about Mr. Fried's age? 02:45:30
16     A.   Other than in the board meeting, 02:45:33
17 kind of the last board meeting that Mr. 02:45:41
18 Fried was at, other than that, no. 02:45:44
19     Q.   Did you ever have a telephone 02:45:45
20 conversation with Mr. Fried prior to the 02:45:46
21 board meeting in which he told you that 02:45:49
22 Mr. State made a comment about his age? 02:45:51
23         MS. SELTZER:  I object to the 02:45:55
24 form, but you can answer. 02:45:56
25     A.   I don't recall having a specific 02:46:00

**45**

SCHNABEL

1
2 conversation about it.  However, I don't 02:46:03
3 believe that at that meeting I was 02:46:06
4 surprised that -- that Mr. Fried felt that 02:46:08
5 way.  So we must have had a conversation. 02:46:13
6 I mean I -- that is the only way I 02:46:16
7 could -- I could have been advised. 02:46:18
8     Q.   Do you recall when you had that 02:46:20
9 conversation with Mr. Fried? 02:46:21
10     A.   No, I -- I mean I don't remember 02:46:23
11 -- I don't specifically remember the 02:46:27
12 conversation.  So it is hard to say when, 02:46:28
13 but my guess is that it would have been 02:46:30
14 within the week or two before the meeting. 02:46:33
15     Q.   And do you recall what was 02:46:35
16 discussed? 02:46:37
17     A.   No, other than certain of his 02:46:38
18 legacy responsibilities were taken from 02:46:45
19 him and that there seemed to be a real 02:46:49
20 problem between them, which is kind of odd 02:46:57
21 given the fact that Mr. Fried had actually 02:47:05
22 brought Mr. Scott State to the table.  So 02:47:12
23 it is -- it was a very bizarre story 02:47:14
24 actually. 02:47:17
25     Q.   You -- you mentioned that Mr. 02:47:18

12  (Pages 42 to 45)

VERITEXT REPORTING COMPANY

**46**

```
1           SCHNABEL
2  Fried told you that he had some of his    02:47:20
3  legacy responsibilities removed from him;  02:47:21
4  is that correct?                02:47:24
5     A.  Yes.              02:47:25
6     Q.  Did he tell you what those    02:47:26
7  legacy responsibilities were?        02:47:28
8     A.  I think that -- other than    02:47:30
9  the -- the strategic alliance overseas,  02:47:40
10 the only other thing that specifically   02:47:43
11 comes to mind is the contract that was   02:47:44
12 negotiated for Madison Square Garden that 02:47:49
13 he normally would have reviewed a contract 02:47:53
14 of that magnitude and had not.       02:47:58
15    Q.  Do you know who that was      02:48:09
16 assigned to?             02:48:10
17    A.  I would assume the general    02:48:11
18 counsel and I would assume the CEO would  02:48:15
19 have looked that as well.        02:48:17
20    Q.  Now, you also testified that   02:48:18
21 there appeared to be a real problem    02:48:22
22 between Mr. Fried and Mr. State, correct?  02:48:24
23        MS. SELTZER:  I object to the  02:48:27
24 characterization.            02:48:28
25    A.  There was a clear miss -- there 02:48:29
```

**47**

```
1           SCHNABEL
2  was clearly a miscommunication between the 02:48:34
3  two of them.             02:48:36
4     Q.  And --            02:48:37
5     A.  And so -- and that developed   02:48:39
6  quickly.               02:48:41
7     Q.  And why do you -- why do you say 02:48:41
8  that?                02:48:48
9        MS. SELTZER:  Objection.  Which 02:48:48
10 part?                02:48:49
11    Q.  The first part, the       02:48:50
12 miscommunication.            02:48:51
13    A.  Why there was a         02:48:52
14 miscommunication?            02:48:53
15    Q.  Yes.              02:48:54
16    A.  I am not really sure.  That is  02:48:54
17 kind of one of the great mysteries of this 02:48:56
18 whole thing.  Burt has never been     02:49:00
19 uncommunicative with me, so I don't know  02:49:02
20 Scott as well to be honest.  So -- but I  02:49:04
21 would assume that we brought him      02:49:09
22 into -- into the company as CEO.  There   02:49:13
23 was a legacy job that Burt had always    02:49:19
24 occupied.  I assumed it was something that 02:49:21
25 they had talked about, and that it was   02:49:23
```

**48**

```
1           SCHNABEL
2  understood.  That was obviously incorrect. 02:49:26
3     Q.  Understood as to what Mr.     02:49:30
4  Fried's role was going to be?       02:49:33
5     A.  Yes.              02:49:34
6     Q.  Did Mr. Fried ever tell you if  02:49:34
7  Mr. State made -- asked -- did Mr. Fried  02:49:41
8  ever tell you if Mr. State asked him how  02:49:48
9  long he expected to continue to work at   02:49:50
10 LVI?                 02:49:52
11    A.  I am sorry?          02:49:53
12    Q.  Did Mr. Fried ever tell you --  02:49:55
13    A.  Did Mr. Fried -- yes, he did   02:49:57
14 tell me that.              02:50:04
15    Q.  Do you recall when that was?   02:50:04
16    A.  Sometime before the board    02:50:06
17 meeting, a week or two.         02:50:07
18    Q.  Do you know if it was part of   02:50:08
19 the same conversation you may have had?   02:50:11
20    A.  Probably.            02:50:12
21    Q.  And do you recall it -- exactly 02:50:13
22 what he said other than what you just    02:50:16
23 testified to?              02:50:19
24    A.  Other than that he wasn't     02:50:20
25 unhappy -- he was unhappy about that.    02:50:23
```

**49**

```
1           SCHNABEL
2     Q.  Did he tell you why?       02:50:25
3     A.  No, I think -- I think the    02:50:27
4  statement stood for itself.  I mean there  02:50:35
5  was no more explanation.         02:50:37
6     Q.  What do you mean -- how did you 02:50:39
7  interpret that statement?        02:50:41
8     A.  Well, it was among many other   02:50:43
9  statements.  Right.  So he was -- he    02:50:46
10 was -- he had a very unpleasant      02:50:48
11 conversation with Scott.  He did mention   02:50:52
12 that.  He had also talked about, you know, 02:50:53
13 Burt had actually put down on the schedule 02:51:00
14 what he had done and what he thought he   02:51:02
15 could go along forward that would be    02:51:04
16 supportive, and he characterized to me how 02:51:06
17 that was not something that Scott would   02:51:13
18 contemplate.             02:51:15
19    Q.  How did you feel about that?   02:51:16
20    A.  I didn't feel good about that.  02:51:26
21    Q.  Why not?            02:51:27
22    A.  Well, I think almost anybody at 02:51:28
23 least with a clear mind would rather have  02:51:31
24 Burt Fried be a part of the board than not 02:51:33
25 be a part of it.  So I was happy that    02:51:36
```

13  (Pages 46 to 49)

**62**

SCHNABEL

1
2    Q.    Okay.                          03:07:13
3    A.    In addition to receiving I       03:07:15
4    wanted to make sure that I knew from him.   03:07:17
5    Q.    And did you speak to Mr. Fried    03:07:19
6    after you saw this list?                03:07:24
7    A.    I did.  I am sure I did.         03:07:26
8    Q.    And what did -- do you recall    03:07:31
9    when you spoke to Mr. Fried?            03:07:34
10   A.    I don't, but obviously it would   03:07:35
11   be in that week before the board meeting.   03:07:37
12   I assume that I would have tried to see   03:07:40
13   where he was coming from in all of these   03:07:44
14   things.  That is why I was sure that      03:07:46
15   he -- that all of these responsibilities   03:07:51
16   would be subject to the ultimate authority   03:07:53
17   of the CEO.                            03:07:55
18   Q.    And in that conversation did he   03:07:56
19   agree?                                 03:08:00
20   A.    Well, that is what he told me.   03:08:01
21   Q.    Okay.                          03:08:03
22   A.    That is what he told me.         03:08:04
23   Q.    I am sorry?                    03:08:05
24   A.    That is what he told me.         03:08:06
25   Q.    Was anything -- was anything    03:08:07

**63**

SCHNABEL

1
2    else discussed?                        03:08:09
3    A.    Other than, you know, expressing   03:08:10
4    frustration as to why this is such a big   03:08:16
5    issue, I don't think so.               03:08:18
6    Q.    Who was expressing the          03:08:20
7    frustration, you or Mr. Fried?          03:08:21
8    A.    Mostly Mr. Fried, but I too was   03:08:23
9    somewhat befuddled.                    03:08:26
10   Q.    And why?  Why were you befuddled?   03:08:29
11   A.    Well, I -- again I looked at      03:08:35
12   this with hope saying, look, I think there   03:08:37
13   is some sort of a role that we could      03:08:39
14   produce here and perhaps maybe soften some   03:08:41
15   things, take some things off the list,    03:08:43
16   recast them if it was, you know, truly    03:08:46
17   something that was that sensitive.  That   03:08:49
18   is why.                                03:08:53
19   Q.    And did Mr. Fried agree with     03:08:54
20   your approach?                         03:08:57
21        MS. SELTZER:  I object to the     03:08:59
22   form.                                  03:09:00
23   A.    I don't know.  I don't know      03:09:01
24   what -- if he would ultimately have       03:09:05
25   relented on anything.                  03:09:08

**64**

SCHNABEL

1
2    Q.    Now, prior to the November 4     03:09:09
3    board meeting, other than what you just   03:09:26
4    testified to did you have any other       03:09:27
5    conversations with anybody within LVI or   03:09:28
6    on the board about Mr. Fried's job duties   03:09:31
7    or his future at LVI?                  03:09:33
8    A.    If I -- if I -- certainly not     03:09:35
9    with an employee of LVI.  Did I talk to   03:09:44
10   any of the board members?  I really do not   03:09:50
11   think so.                              03:09:54
12   Q.    How about Mr. Leonard?          03:09:55
13        MS. SELTZER:  Objection.  You    03:09:58
14   mean as -- as a an executive of LVI?     03:10:00
15        MR. DATOO:  Yes.                03:10:04
16        MS. SELTZER:  I think it has     03:10:05
17   been asked and answered.               03:10:06
18        MR. DATOO:  Yes.                03:10:07
19   A.    No, I did not speak with him     03:10:08
20   prior to the board meeting.            03:10:10
21   Q.    Getting back to -- going back to   03:10:11
22   the conversation you had with Mr. Fried   03:10:18
23   regarding his job duties, did you document   03:10:22
24   your conversation with Mr. Fried?        03:10:24
25   A.    I do not think so, no.           03:10:26

**65**

SCHNABEL

1
2    Q.    Okay.  And was anyone -- was     03:10:29
3    this a telephone call?                 03:10:32
4    A.    Yes.                           03:10:33
5    Q.    And was anyone else on the line?   03:10:34
6    A.    No.                            03:10:38
7    Q.    Okay.  How often did you see Mr.   03:10:39
8    Fried?                                 03:10:42
9        MS. SELTZER:  Objection.          03:10:45
10   Q.    While Mr. State was the CEO?    03:10:46
11   A.    Does seeing include phone calls?   03:10:49
12   A.    No, just actually seeing him.    03:10:53
13   A.    Face to face.  Not very often.   03:10:55
14   It would have been mostly phone calls and   03:11:01
15   outside of board meetings two or three    03:11:06
16   times perhaps.                         03:11:09
17   Q.    And was that in New York or --    03:11:10
18   A.    Yes.                           03:11:13
19   Q.    -- somewhere else?              03:11:13
20   A.    It would have been in New York,   03:11:14
21   but it would have only been in their      03:11:16
22   offices.  I never went to his office.    03:11:18
23   Q.    And this was during the time Mr.   03:11:20
24   State was CEO?                         03:11:21
25   A.    Yes.                           03:11:22

17  (Pages 62 to 65)

**VERITEXT REPORTING COMPANY**

**66**

SCHNABEL

1
2  Q.  Okay.  And how about while Mr.   03:11:23
3  Fried was the interim CEO, how many times   03:11:28
4  did you see him face to face?   03:11:32
5  A.  Besides board meetings not often   03:11:33
6  at all face to face.  I mean it would have   03:11:43
7  been impromptu.  There would have been no   03:11:45
8  reason to.  We could communicate through   03:11:48
9  e-mail and phone efficiently.  So I -- the   03:11:50
10  only time that we would come together and   03:11:54
11  talk -- he is a board member of another   03:12:01
12  portfolio company of ours, so we would   03:12:04
13  meet in our offices for that, and we would   03:12:09
14  chat a little bit, but that would happen   03:12:11
15  rarely.  Twice maybe.   03:12:14
16  Q.  With respect to this other   03:12:16
17  company or with respect to LVI business?   03:12:17
18  A.  Well, he would be on the other   03:12:19
19  company's business in our offices, and I   03:12:20
20  would speak to him ad hoc, you know, just   03:12:23
21  because he was there.   03:12:26
22  Q.  About LVI business?   03:12:28
23  A.  Yes.  We would talk   03:12:29
24  about -- yeah.   03:12:32
25  Q.  And with respect to phone calls   03:12:33

**67**

SCHNABEL

1
2  while Mr. State was CEO, how many times   03:12:37
3  would you communicate by phone about LVI   03:12:42
4  business?   03:12:48
5  A.  Before this matter or including   03:12:49
6  this matter?   03:12:55
7  Q.  Well, while -- including this   03:12:56
8  matter.   03:12:58
9  A.  Including this matter.   03:12:59
10  Q.  This matter meaning the job   03:13:00
11  duties?   03:13:02
12  A.  The job duties?   03:13:03
13  Q.  Okay.   03:13:04
14  A.  All of it.  We probably spoke on   03:13:05
15  the phone I am guessing about maybe ten   03:13:08
16  times.   03:13:13
17  Q.  While Mr. State was CEO?   03:13:14
18  A.  Yes.   03:13:16
19  Q.  All about LVI business?   03:13:16
20  A.  All about LVI business.   03:13:18
21  Q.  And only one time about his job   03:13:19
22  duties and his future?   03:13:22
23  A.  No.  I would think we had a   03:13:23
24  couple of phone calls about that.  I   03:13:25
25  mean -- when -- when Scott State took over   03:13:27

**68**

SCHNABEL

1
2  there was less reason for me to talk to   03:13:30
3  him directly about LVI until this -- this   03:13:32
4  time.   03:13:36
5  Q.  Okay.   03:13:36
6  A.  But we probably still spoke   03:13:36
7  anyway.  I mean we were -- he -- Mr. Fried   03:13:39
8  actually spoke at our annual conference   03:13:42
9  that year as -- as a representative of the   03:13:45
10  board.  So I talked to him a couple of   03:13:48
11  times about that, and then I am sure we   03:13:50
12  two or three times we had maybe one super   03:13:56
13  in depth conversation but other   03:13:59
14  than -- but I am sure we talked more than   03:14:00
15  just once about this issue.   03:14:02
16  Q.  And how about while he   03:14:04
17  was -- while Mr. Fried was interim CEO?   03:14:06
18  How often did you speak to him on the   03:14:09
19  phone about LVI business?   03:14:11
20  A.  If there was not a board meeting   03:14:13
21  and there wasn't anything out of the norm,   03:14:17
22  probably once a month, but occasionally we   03:14:22
23  would look at an add on or an acquisition   03:14:25
24  possibility or he would -- he would   03:14:30
25  voluntarily call to update on a major   03:14:35

**69**

SCHNABEL

1
2  piece of business.  So, you know, twice a   03:14:38
3  month I guess would be the average while   03:14:44
4  he was interim CEO.   03:14:45
5  Q.  Now, did you attend the board   03:14:47
6  meeting on November 4?   03:14:54
7  A.  Yes.   03:14:56
8  Q.  And how long did that meeting   03:14:56
9  last for?   03:15:00
10  A.  I would say four or five hours.   03:15:01
11  Q.  And were Mr. Fried's job duties   03:15:13
12  or his future at LVI discussed at this   03:15:17
13  board meeting?   03:15:20
14  A.  Only with respect to was there   03:15:20
15  some way to resolve the chairman role.   03:15:29
16  Q.  And at what point in the board   03:15:40
17  meeting was this issue discussed?   03:15:45
18  A.  At the end.   03:15:46
19  Q.  And how long was it discussed   03:15:50
20  for?   03:15:52
21  A.  There were several iterations   03:15:53
22  where Burt spoke to the board only so   03:16:01
23  management I think was asked to leave the   03:16:03
24  room if -- if I am remembering this   03:16:07
25  correctly, and so he spoke I would say   03:16:09

18  (Pages 66 to 69)

**70**

SCHNABEL

1
2  about not quite an hour, but I mean it was  03:16:14
3  more than 20, 30 minutes, and that is with  03:16:20
4  some response back and forth from the rest  03:16:24
5  of the board members.  Then he left along  03:16:26
6  with Scott, and then as a board we spoke  03:16:28
7  for a while as well.  I am not -- now,  03:16:31
8  again, I am guessing how long that would  03:16:35
9  have been, but I -- it had to be at least  03:16:37
10  an hour.  03:16:42
11  Q.  And what did Mr. Fried say at  03:16:43
12  this meeting?  03:16:47
13  A.  Well, he felt that we had come  03:16:47
14  to an impasse or that he had come to an  03:16:53
15  impasse with Scott, and he felt that  03:16:55
16  that -- that this didn't make any sense  03:17:05
17  whatsoever.  He felt that he could not  03:17:12
18  continue with his -- he would not just  03:17:12
19  work at the pleasure of the CEO, that he  03:17:15
20  wanted to have some defined  03:17:19
21  responsibilities, and he felt he was not  03:17:23
22  accorded the respect he is due as a  03:17:29
23  long-term servant of the company, and he  03:17:32
24  also made it clear that he did not  03:17:40
25  want -- that if he was no longer going to  03:17:43

**71**

SCHNABEL

1
2  have these specific duties that he no  03:17:45
3  longer wanted any outside parties who may  03:17:47
4  depend upon him to think that he did have  03:17:52
5  something to do with them.  So, in other  03:17:56
6  words, if the surety, and he used that as  03:17:57
7  an example, took comfort in the fact that  03:18:01
8  Burt was there looking -- overlooking the  03:18:04
9  underwriting of any particular contract he  03:18:09
10  wanted us to affirmative -- the board to  03:18:14
11  affirmatively or the company to  03:18:18
12  affirmatively tell the sureties that he no  03:18:20
13  longer was involved.  03:18:24
14  Q.  Do you think that was a fair  03:18:25
15  request?  03:18:27
16  A.  I think it was -- I don't know  03:18:27
17  to be honest with you.  I think it is  03:18:37
18  completely within him as a person that I  03:18:38
19  have known for fifteen, sixteen years.  03:18:43
20  Burt is someone who integrity means a lot  03:18:46
21  to.  So he would not want anyone to borrow  03:18:50
22  his -- you know, his reputation.  So that  03:18:57
23  I think is -- is fair.  I think that we  03:19:03
24  didn't want to just kind of blow up our  03:19:09
25  relationship with the surety.  So I think  03:19:13

**72**

SCHNABEL

1
2  he put us a little bit on the spot.  So I  03:19:15
3  think fair is a -- fair is a kind of a  03:19:19
4  difficult word, but I understand where he  03:19:25
5  was coming from.  It was completely in  03:19:26
6  character, and I had sympathy for it.  03:19:28
7  Q.  Did you view Mr. Fried as making  03:19:31
8  a threat?  03:19:39
9  A.  I think others might have.  03:19:40
10  I -- I certainly personally did not.  I  03:19:42
11  did -- knowing Burt I understood where he  03:19:46
12  was coming from.  03:19:48
13  Q.  How would you describe Mr.  03:19:49
14  Fried's demeanor at this meeting while he  03:19:51
15  was speaking?  03:19:53
16  A.  He -- he delivered his  03:19:54
17  thoughts -- you know, he wasn't -- he  03:20:04
18  wasn't overly emotional.  He certainly was  03:20:09
19  together.  He was calm.  I think as there  03:20:12
20  was a little bit of back and forth I think  03:20:15
21  he did become more agitated, but I -- I  03:20:19
22  think everybody else did, too.  It was  03:20:22
23  certainly uncomfortable.  03:20:30
24  Q.  Why was that?  03:20:32
25  A.  Well, he was clearly unhappy.  03:20:32

**73**

SCHNABEL

1
2  Burt is not someone to -- he communicates  03:20:35
3  very well, and so I think in that  03:20:39
4  circumstance anybody would have been  03:20:42
5  uncomfortable, and I mean ultimately he  03:20:43
6  does tell the board that he believes that  03:20:47
7  this is age related.  I mean that was the  03:20:49
8  last statement or -- that he wanted to  03:20:53
9  leave this with.  03:20:57
10  Q.  Did he say why he felt this was  03:20:58
11  age related?  03:21:00
12  A.  He had mentioned that -- a  03:21:01
13  previous conversation he had with Scott,  03:21:04
14  and that was -- that was it.  03:21:09
15  Q.  Is it the same comment that he  03:21:10
16  told you that Mr. State made?  03:21:12
17  A.  Yes.  03:21:13
18  Q.  Okay.  And after Mr. Fried  03:21:14
19  spoke -- sorry.  Was Mr. State present  03:21:19
20  while Mr. Fried -- was Mr. State present  03:21:21
21  while Mr. Fried spoke?  03:21:24
22  A.  Yes.  03:21:25
23  Q.  And did Mr. -- sorry.  03:21:26
24  MR. DATOO:  Strike that.  03:21:31
25  Q.  While Mr. Fried was speaking,  03:21:32

**19  (Pages 70 to 73)**

VERITEXT REPORTING COMPANY

212-267-6868                                        516-608-2400

138

SCHNABEL

1
2    Q.   Other than the first page, can    04:43:15
3    you tell me if you have seen this document    04:43:17
4    before?    04:43:18
5    A.   I don't think I have.    04:43:19
6    Q.   Is that the first time you've    04:43:40
7    seen this document?    04:43:42
8    A.   I think it is.    04:43:43
9    Q.   Did anyone ever -- do you know    04:43:49
10   what this document is?    04:43:53
11   A.   Yes.    04:43:54
12   Q.   What is it?    04:43:54
13   A.   It is a communication to the    04:43:56
14   company that Mr. Fried has been -- maybe    04:44:03
15   he has been wrongfully terminated at this    04:44:09
16   point.  I don't know but -- or that he has    04:44:12
17   been harmed.    04:44:14
18   Q.   Do you recall having a    04:44:15
19   discussion regarding this letter?    04:44:16
20   A.   Yes.    04:44:17
21   Q.   Do you know when you had that    04:44:17
22   discussion?    04:44:19
23   A.   I am sure there was a board    04:44:19
24   meeting convened, a telephonic board    04:44:24
25   meeting convened shortly after this    04:44:28

139

SCHNABEL

1
2    letter, sort of 16th, 17th.  I don't know.    04:44:30
3    Q.   Do you remember who was present    04:44:33
4    on -- during that telephonic meeting?    04:44:35
5    A.   I -- I assume the entire board    04:44:37
6    was there.  I can't -- I don't remember    04:44:41
7    anyone not being there.    04:44:43
8    Q.   Do you know if Mr. Jeffrey Smith    04:44:44
9    was on the line?    04:44:45
10   A.   I don't recall, but I would not    04:44:47
11   be surprised that he would be.    04:44:55
12   Q.   And what would --    04:44:57
13       MS. SELTZER:   Okay.  This is    04:44:58
14   where we have to draw a line.  If Jeffrey    04:45:00
15   Smith was on that telephone call, and I    04:45:02
16   don't know whether he was or he wasn't, he    04:45:04
17   was acting as counsel for the board, and I    04:45:06
18   am not going to let Mr. Schnabel testify    04:45:09
19   as to the contents of that conversation.    04:45:12
20       MR. DATOO:   First of all, we    04:45:14
21   don't know that.  Second of all, he served    04:45:15
22   as a secretary taking the minutes.    04:45:17
23       MS. SELTZER:   No, he was also    04:45:19
24   serving as counsel for the board.    04:45:20
25       MR. DATOO:   Let me just go    04:45:22

140

SCHNABEL

1
2    through it.  I am not going to ask him --    04:45:23
3       MS. SELTZER:   Okay.    04:45:25
4       MR. DATOO:   Well, I don't even    04:45:26
5    know what I am going to ask him yet.    04:45:27
6    Q.   What would be the purpose of Mr.    04:45:30
7    Smith being on the phone?    04:45:32
8    A.   Well, he was company counsel.    04:45:33
9    He was on every board meeting and --    04:45:35
10   Q.   Was --    04:45:37
11   A.   -- he would be viewed as    04:45:38
12   corporate -- you know, corporate counsel    04:45:40
13   for this -- for this particular purpose.    04:45:42
14   Q.   Was he also the secretary to the    04:45:45
15   board?    04:45:46
16   A.   Yes, he was.    04:45:46
17   Q.   And was he also responsible for    04:45:48
18   taking minutes?    04:45:49
19   A.   Yes, he was.    04:45:50
20   Q.   And would this have been an    04:45:51
21   instance where minutes would be taken?    04:45:56
22       MS. SELTZER:   Objection to the    04:46:02
23   form.    04:46:03
24   A.   Yes, I mean can you re -- can    04:46:03
25   you tell me -- ask me in a different way?    04:46:12

141

SCHNABEL

1
2    Q.   Sure.  Well, let me just ask a    04:46:14
3    series of questions.  Mr. Smith was    04:46:20
4    secretary of the board, correct?    04:46:22
5    A.   Yes.    04:46:23
6    Q.   And it was part of his job as    04:46:23
7    secretary to take minutes of board    04:46:27
8    meetings?    04:46:30
9    A.   Yes.    04:46:31
10   Q.   And was this a board meeting?    04:46:31
11   A.   I don't recall if there was a    04:46:33
12   formal call of a meeting -- call of a    04:46:35
13   meeting, but certainly everybody on the    04:46:37
14   board was on the phone call.    04:46:39
15   Q.   And in those instances are    04:46:41
16   minutes taken?    04:46:46
17   A.   If it is a formal board call,    04:46:50
18   yes, I would assume there would be.    04:46:53
19   Q.   Okay.  And if minutes don't    04:46:56
20   exist, is that -- so should minutes have    04:46:58
21   existed of that meeting?    04:47:02
22   A.   I didn't really view that    04:47:03
23   as -- as a board meeting.  I didn't have    04:47:07
24   this letter.  I think people were reacting    04:47:12
25   to the letter.  I think they were looking    04:47:14

36  (Pages 138 to 141)

VERITEXT REPORTING COMPANY

212-267-6868                                        516-608-2400

## 142

```
                SCHNABEL
1
2   for counsel, and they wanted everyone to    04:47:16
3   hear the counsel together, and I would       04:47:19
4   assume that we were talking to Jeffrey.      04:47:27
5   We are not -- we are certainly not talking   04:47:30
6   to Greg DiCarlo. There is no other           04:47:33
7   counsel on the line. This is a legal         04:47:34
8   matter, so I mean I -- to be honest with     04:47:36
9   you I don't think I would have -- I would    04:47:41
10  have defined it quite that closely, but I    04:47:42
11  didn't -- I knew that we were asking him     04:47:47
12  him his opinion.                             04:47:51
13      Q.   Do you know if he was on the        04:47:52
14  line for sure?                               04:47:53
15      A.   For sure. For sure no. But I        04:47:54
16  would assume he would have been.             04:48:02
17      Q.   Would he have been on the line      04:48:04
18  the whole time?                              04:48:06
19      A.   Yes. I mean if this was not a       04:48:07
20  board meeting, and we were talking about     04:48:11
21  this and he was a part of it, we wouldn't    04:48:13
22  have recused him. We just would have been    04:48:15
23  talking to him.                              04:48:18
24      Q.   Did you take any notes of this      04:48:19
25  meeting?                                     04:48:21
```

## 143

```
                SCHNABEL
1
2       A.   There was nothing to take notes    04:48:22
3   of. No.                                      04:48:23
4       Q.   Do you recall when this meeting     04:48:24
5   took place, telephonic meeting?              04:48:26
6       A.   I assume sometime after this,       04:48:30
7   but closely after this date. I mean I       04:48:32
8   don't know what day of the week is the       04:48:34
9   15th. I mean --                              04:48:36
10      MS. SELTZER:  The 16th is a              04:48:38
11  Tuesday. So --                               04:48:40
12      A.   Tuesday so a day or two later.      04:48:42
13      Q.   Okay. And was anything decided      04:48:45
14  at the end of this meeting?                  04:48:58
15      MS. SELTZER:  Objection.                 04:48:59
16      MR. DATOO:  I am no asking               04:49:00
17  about any communication with counsel.        04:49:01
18      MS. SELTZER:  No, he is not              04:49:03
19  going to talk about anything that was        04:49:04
20  discussed and decided at that particular     04:49:05
21  meeting with counsel. You are not to         04:49:07
22  answer that question.                        04:49:09
23      MR. DATOO:  I am not asking him          04:49:10
24  about any communications he had with         04:49:11
25  counsel. I just want to know what they       04:49:12
```

## 144

```
                SCHNABEL
1
2   decided.                                     04:49:15
3       MS. SELTZER:  Whatever the               04:49:15
4   decision was arrived at was arrived at       04:49:16
5   with counsel's consent or with counsel's     04:49:18
6   counsel, so I am not going to let him        04:49:22
7   answer that you can take that to the         04:49:24
8   judge. He is not going to talk about it.     04:49:27
9       MR. DATOO:  Okay.                        04:49:31
10      Q.   What did you do after this          04:49:32
11  meeting?                                     04:49:34
12      A.   I probably spoke to my partners.    04:49:34
13      Q.   About what?                         04:49:40
14      A.   The fact that -- that Burt was      04:49:42
15  going to pursue legal recourse.              04:49:47
16      Q.   Okay. Did you speak to anybody      04:49:50
17  -- when you say partners, who do you mean    04:49:52
18  by partners?                                 04:49:55
19      A.   Partners at Falcon.                 04:49:56
20      Q.   Did you speak to anybody else       04:49:58
21  after the phone call, any other board        04:49:59
22  members after the phone call?                04:50:02
23      A.   No. I mean they probably showed     04:50:04
24  me an e-mail where you'll probably show me   04:50:10
25  an e-mail where I said I do -- -- I do not   04:50:13
```

## 145

```
                SCHNABEL
1
2   recall doing that because I was not happy    04:50:19
3   with this outcome.                           04:50:20
4       Q.   Now, at this point in time prior    04:50:22
5   to having this telephonic board meeting,     04:50:23
6   was Mr. Simmons' letter proposal finalized   04:50:26
7   at that point?                               04:50:31
8       A.   Can you say that again?             04:50:34
9       Q.   Sure. The letter you referred       04:50:35
10  to that Mr. Simmons was putting together,    04:50:37
11  which would contain the proposal to Mr.      04:50:39
12  Fried, was it finalized at the time you      04:50:41
13  had this telephonic --                       04:50:44
14      A.   I am sure. I am sure that this      04:50:46
15  is a reaction to it. Sure. I would -- I      04:50:48
16  would think that it was delivered.           04:50:50
17      Q.   You think the letter in front of    04:50:52
18  you, which is Plaintiff's Exhibit 8, was     04:50:54
19  in reaction to the proposal?                 04:50:57
20      A.   I would assume so, yes. I mean      04:51:00
21  I guess I am wrong, but I -- I would         04:51:04
22  assume so.                                   04:51:06
23      Q.   Handing you a document that has     04:51:16
24  been previously marked as Plaintiff's        04:51:21
25  Exhibit 11, can you take a look at the       04:51:23
```

37  (Pages 142 to 145)

**146**

SCHNABEL

1
2 document and let me know if you've seen it   04:51:25
3 before?   04:51:28
4    A.   I have not seen this before.   04:51:35
5 All right. So you got -- you did this   04:51:36
6 beforehand.   04:51:40
7    Q.   Is -- is this the terms of the   04:51:40
8 proposal or the -- or Mr. Simmons' letter   04:51:44
9 that you were referring to earlier?   04:51:49
10    A.   The numbers look right.   04:51:51
11    Q.   So do you -- do you still   04:52:08
12 believe that the letter, Plaintiff's   04:52:10
13 Exhibit --   04:52:12
14    A.   No, the dates are the day after.   04:52:12
15    Q.   Okay.   04:52:14
16       MS. SELTZER:   Can we go off the   04:52:16
17 record just one second?   04:52:17
18       MR. DATOO:   Sure.   04:52:19
19       THE VIDEOGRAPHER:   We're going   04:52:20
20 off the record. The time is 4:52.   04:52:20
21       (Discussion held off the   04:52:20
22 record.)   04:53:16
23       THE VIDEOGRAPHER:   We are   04:53:16
24 returning to the record at 4:53 p.m.   04:53:22
25    Q.   Now, if you -- if you look at   04:53:24

**147**

SCHNABEL

1
2 Plaintiff's Exhibit 8, did you see this   04:53:28
3 letter?   04:53:35
4    A.   Sorry.  What is 8?   04:53:37
5    Q.   Plaintiff's 8.  It should say at   04:53:39
6 the bottom.   04:53:42
7    A.   This is 11.   04:53:43
8    Q.   I am sorry.   04:53:44
9       MS. SELTZER:   This is 11.   04:53:45
10    Q.   I am sorry. Plaintiff's 11?   04:53:46
11    A.   Yes.   04:53:48
12    Q.   Did you see this letter before   04:53:48
13 it was delivered to Mr. Fried?   04:53:51
14    A.   No.   04:53:54
15    Q.   Okay. But I believe you   04:53:55
16 testified earlier that this was consistent   04:53:58
17 with --   04:54:01
18       MS. SELTZER:   Objection.   04:54:04
19 That -- that is not what he said.   04:54:05
20       MR. DATOO:   Well, you didn't   04:54:08
21 let me finish question first of all.   04:54:09
22       MS. SELTZER:   Well, he was   04:54:11
23 about to answer, so I wanted to jump in   04:54:12
24 before -- before he did.   04:54:15
25    Q.   Is this letter consistent -- do   04:54:16

**148**

SCHNABEL

1
2 the terms of this letter -- are the terms   04:54:18
3 of this letter consistent with the   04:54:20
4 proposal you were talking about?   04:54:24
5    A.   The -- the proposal that I knew   04:54:25
6 about was a longer proposal. It was   04:54:28
7 several pages in length. I see that the   04:54:40
8 week before it looks like what happens is   04:54:43
9 I am now -- I am assuming that this was   04:54:52
10 delivered to the company. The board meets   04:54:54
11 that night, and there is a sense that we   04:54:56
12 need to send something to say, hey, Burt   04:54:58
13 there is something on the table for you to   04:55:00
14 consider.   04:55:02
15    Q.   Okay.   04:55:02
16    A.   But that we used an abbreviated   04:55:04
17 letter of this sort, I did not know about   04:55:07
18 it or I certainly don't recall.   04:55:10
19       THE VIDEOGRAPHER:   Going off   04:55:22
20 the record, 4:55 p.m. End of tape number   04:55:23
21 2.   04:55:29
22       (Recess taken.)   05:04:03
23       THE VIDEOGRAPHER:   We are   05:04:03
24 returning to the record. 5:04 p.m.,   05:04:04
25 beginning of tape number 3.   05:04:08

**149**

SCHNABEL

1
2       (Document handed to witness.)   05:04:10
3    Q.   Mr. Schnabel, I have handed you   05:04:10
4 a document that has previously been marked   05:04:12
5 as Plaintiff's Exhibit number 12.   05:04:15
6    A.   Okay.   05:04:17
7    Q.   Look at the document and let me   05:04:18
8 know if you've seen it before.   05:04:20
9    A.   Not with this letterhead, but,   05:04:22
10 yes, I have scene this before.   05:04:24
11    Q.   So the -- and do the contents of   05:04:26
12 this document --   05:04:29
13    A.   So this was the cover letter to   05:04:29
14 this (indicating).   05:04:32
15    Q.   When you say --   05:04:33
16    A.   11 was a cover letter of 12.   05:04:34
17       MS. SELTZER:   They were both   05:04:37
18 attached to the same e-mail. So the   05:04:45
19 answer would be yes to that, and they are   05:04:47
20 Bates stamped consecutively. So --   05:04:50
21       MR. DATOO:   Yes, I just --   05:04:52
22    A.   Okay.   05:04:53
23    Q.   Okay. So is this I guess the   05:04:54
24 proposal that you've seen before, the   05:04:58
25 longer form you were referring to earlier?   05:05:00

38  (Pages 146 to 149)

VERITEXT REPORTING COMPANY

212-267-6868                    516-608-2400

158

```
1                SCHNABEL
2   because Scott will not stay.        05:21:57
3      Q.   And you chose Scott?        05:22:00
4      A.   I think practically I chose  05:22:05
5   Scott.  Not because I didn't want Burt but  05:22:09
6   because we didn't have a CEO.  If Scott  05:22:12
7   would have left, that would have been  05:22:15
8   practically very difficult for us.    05:22:18
9      Q.   Why is that?               05:22:19
10     A.   Well, we just went through a CEO  05:22:20
11  search and found nobody other than Scott,  05:22:24
12  who was referred to us by Burt, realized  05:22:26
13  that we would have to go back to the well.  05:22:30
14  We were in a company that was not doing  05:22:32
15  very well in that particular quarter and  05:22:34
16  saw some more difficulties ahead.     05:22:38
17        (Continued on next page.)     05:22:38
18
19
20
21
22
23
24
25
```

159

```
1                SCHNABEL
2      A.   If -- if I had lobbied that Burt  05:22:43
3   had to stay or I would vote against any  05:22:48
4   proposal, it definitely would have been  05:22:52
5   viewed by Scott as a no confidence vote  05:22:58
6   from me.                           05:23:00
7        MR. DATOO:  Okay.  Thank you   05:23:03
8   very much.  No further questions.     05:23:11
9        THE VIDEOGRAPHER:  We're going  05:23:14
10  off the record, 5:23 p.m. End of today's  05:23:14
11  questioning.                        05:23:17
12        (Time noted:  5:23 p.m.)      05:23:20
13
14
15
16
17
18
19              JOHN SCHANBEL
20
21  Subscribed and sworn to before me
22  this    day of      , 2011
23
24
25
```

160

```
1                SCHNABEL
2         C E R T I F I C A T I O N
3
4
5
6       I, DEBBIE ZAROMATIDIS, a Shorthand
7   Reporter and a Notary Public, do hereby
8   certify that the foregoing witness, JOHN
9   SCHANBEL, was duly sworn on the date
10  indicated, and that the foregoing is a
11  true and accurate transcription of my
12  stenographic notes.
13       I further certify that I am not
14  employed by nor related to any party to
15  this action.
16
17
18
19
20
21
22
23           DEBBIE ZAROMATIDIS
24
25
```

161

```
1                SCHNABEL
2         E X H I B I T S
3
4   PLAINTIFF'S
5   EXHIBIT    DESCRIPTION          PAGE
6   38     E-mail            50
7   40     E-mail            95
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

41  (Pages 158 to 161)

VERITEXT REPORTING COMPANY

212-267-6868                                516-608-2400

Exhibit 9

| | |
|---|---|
| **From:** | State, Scott <state, scott@lvi.com> |
| **Sent:** | Friday, November 5, 2010 3:53 PM |
| **To:** | David S. Hicks <David.S.Hicks@us.mwhglobal.com> |
| **Subject:** | RE: How did your LVI board meeting go? |

Generally as expected and full endorsement by the Board of my Agenda.  In a battle with founder about his need to retire but Board gets it and is working to exit him with some respect.  All in all, on course I described to you.

**From:** David S. Hicks [David.S.Hicks@us.mwhglobal.com]
**Sent:** Friday, November 05, 2010 2:11 PM
**To:** State, Scott
**Subject:** How did your LVI board meeting go?

Scott –

At your convenience, please let me know if the board meeting went the way you expected.

Thanks,

Dave

CONFIDENTIAL

LVI 003203

# Exhibit 10

# HUMAN RESOURCES

## "THE BIBLE"

### PERSONAL & CONFIDENTIAL

August, 2010

BF_0241

NEW YORK (30)
LV SERVICES INC.
80 BROAD STREET, 37TH FLOOR
NEW YORK, NY 10004

| EMPLOYEE NAME | EMP # | TITLE | SALARY | DATE OF HIRE | DATE OF RE-HIRE | DATE OF BIRTH | SEX | SS# | AUTO ALLOW. | MEDICAL $/F | DENTAL $/F | 401K(N) | 401K(2%) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Alvarado, Christine A | | Director of IT | | | | | M | | $0.00 | Waived | Waived | Decline | Decline |
| Astacio, Joseph M | | Treasurer & Secretary | | | | | M | | $0.00 | Waived | Waived | | Decline |
| Balaraj, Mark P | | Staff Accountant | | | | | M | | $0.00 | S | S | 6 | Decline |
| Bajaj, Catherine | | Junior Accountant | | | | | F | | $0.00 | | | 4 | Decline |
| Basu, Kausik | | Cash Management Assistant | REDACTED | | | | M | REDACTED | $0.00 | | | | Decline |
| Bodla, Bercedes | | Accounts Payable Clerk | | | | | F | | $0.00 | | | | Decline |
| Bravo, Kristen J | | Marketing Assistant/Proposal Coordinator | | | | | F | | $0.00 | Waived | Waived | 16 | Decline |
| Cassin, Paul | | Marketing Coordinator | | | | | M | | $0.00 | | | | Decline |
| Craner, Peggy J | | Manager of Accounting & Financial Reporting | | | | | F | | $0.00 | | | 4 | Decline |
| Colton, Paul | | Marketing Coordinator | | | | | M | | $0.00 | | | | Decline |
| Cuiczma, Paul | | Associate General Counsel | | | | | M | | $0.00 | | | | Decline |
| DiCarlo, Gregory J | | VP/Chief Financial Officer | | | | | M | | $0.00 | | | | Decline |
| Diaolo, Gregory | | Director/Building Administrator | | | | | M | | $0.00 | | | 3 | Decline |
| Finol, Barton | | Associate Counsel | | | | | M | | $0.00 | Waived | Waived | | Decline |
| Finol, Barton | | Chairman | | | | | M | | $0.00 | Waived | Waived | | Decline |
| Gill, Rayne | | HR Administrative Assistant | | | | | F | | $0.00 | Waived | Waived | 6 | Decline |
| Hamidi, Kabhah S | | Payroll Clerk | | | | | F | | $0.00 | | | 8 | Decline |
| Hamidi, Yuvane | | System Engineer | | | | | M | | $0.00 | | | | Decline |
| Isenhour, Joshua S | | Junior Accountant | | | | | M | | $0.00 | F | F | | Decline |
| Juma, Nancy L | | Marketing Coordinator | | | | | F | | $0.00 | S | S | | Decline |
| Kaplar, Robin W | | Marketing Coordinator | | | | | M | | $0.00 | | | | Decline |
| Leicter, Robert W | | Receptionist/Administrative Assistant | REDACTED | | | | M | REDACTED | $0.00 | S | S | | Decline |
| Leicter, Robert W | | Senior Network Engineer | | | | | M | | $0.00 | | | | Decline |
| Leonard, Ann | | Network Administrator | | | | | F | | $0.00 | Waived | Waived | | Decline |
| Leonard, Ann | | Group Administrator | | | | | F | | $0.00 | Waived | Waived | 3 | Decline |
| Maldonado, Natalie M | | Jr. Project Accountant | | | | | F | | $0.00 | F | F | | Decline |
| Mastropierro, Michael A | | Cash Management Assistant | | | | | M | | $0.00 | | | | Decline |
| McCormick, Lorraine | | HR Administrative Assistant | | | | | F | | $0.00 | S | S | | Decline |
| McCoy, Thomas | | W/C Claims Manager | | | | | M | | $0.00 | F | F | | Decline |
| Medina, Aileen | | Accounts Payable Clerk | | | | | F | | $0.00 | | | | Decline |
| Nagy, Anne B | | Paralegal | | | | | F | | $0.00 | Waived | Waived | | Decline |
| Olivera, Lydia M | | Payroll Supervisor | | | | | F | | $0.00 | | | | Decline |
| Prescott III, Wayne | | Sales Tax Administrator | | | | | M | | $0.00 | | | | Decline |
| Pietsch, J | | Group Controller | | | | | M | | $0.00 | | | 4 | Decline |
| Rapuzzi, Jr. Frank X | | Group Controller | | | | | M | | $0.00 | | | 4 | Decline |
| Rapuzzi, Jr. Frank X | | Assistant Payroll Supervisor | | | | | M | | $0.00 | F | F | | Decline |
| Rodrigues, Elizabeth | | Tax Manager | | | | | F | | $0.00 | | | 5 | Decline |
| Roahrig, Larry | | Administrative Assistant | | | | | M | | $0.00 | Waived | Waived | 2 | Decline |
| Santiago, Vivian | | Accounts Payable Assistant | | | | | F | | $0.00 | | | | Decline |
| Silver, Greg | | Accounts Payable Supervisor | | | | | M | | $0.00 | F | F | 5 | Decline |
| Sochnam, Kamal | | VP Payroll/System Manager | | | | | M | | $0.00 | Waived | Waived | | Decline |
| Wells-Pietrafitta, Dana | | Payroll Manager | | | | | F | | $0.00 | S | S | 6 | Decline |
| Wilson, Malcolm K | | Licensing Coordinator | | | | | M | | $0.00 | | | | Decline |
| Wright, Jovaughn M | | Administrative Assistant | | | | | M | | $0.00 | | | | Decline |

TOTAL:                                                                                   TOTAL:

NEW YORK (0011)
LVI SERVICES INC.
80 BROAD STREET, 5TH FLOOR
NEW YORK, NY 10004

| EMPLOYEE NAME | EMP # | TITLE | SALARY | DATE OF HIRE | DATE OF REHIRE | DATE OF BIRTH | SEX | SSN | AUTO ALLOW | MEDICAL S/F | DENTAL S/F | 401(K)% | 401(K)2% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Abito, Frank | 3000169 | VP/Regional Manager | | 04/01/91 | | 08/27/59 | F | | $700.00 | | | Decline | Decline |
| Anderson, Terence W | 3000322 | Regional Manager | | 06/21/10 | | 10/27/68 | F | | $0.00 | S | | 2 | Decline |
| Bogdanski, Gustavo | 3000324 | Regional Manager Plumbing | | 12/17/07 | | 10/22/64 | F | | $0.00 | S | | Decline | Decline |
| Cabanas, Mark | 3000305 | Sr. Vice President of Sales | | 12/28/07 | | 07/09/62 | F | | $1,250.00 | S | | 3 | Decline |
| Denduluri, Matthew J. | 3000000 | National Business Development Manager | REDACTED | 07/26/06 | | 03/28/71 | M | REDACTED | $500.00 | Decline | Decline | 4 | Decline |
| Gilhooly, Thomas M V | 3000006 | VP/Business Development Sector Manager | | 07/22/98 | 09/08/02 | 11/19/62 | M | | $700.00 | Decline | Decline | 5 | Decline |
| LaFever II, Charles R | 3000041 | National Account Manager | | 08/26/09 | | 10/16/64 | M | | $0.00 | | | Decline | Decline |
| Leonard, John | 3000167 | Chief Operating Officer | | 03/15/87 | | 05/07/86 | M | | $700.00 | Decline | Decline | Decline | Decline |
| Meskaco, Brian K | 3000004 | National Account Manager | | 07/26/99 | | 05/07/56 | M | | $150.00 | S | | 5 | Decline |
| Mooney, James | 3000160 | Vice President | | 11/11/87 | | 06/24/61 | M | | $700.00 | S | S | 4 | Decline |
| Nardone, Ronald | 3000162 | Vice President | | 05/01/89 | | 04/29/59 | M | | $700.00 | F | | Decline | Decline |
| Pearson, David | 3000019 | Regional Business Development Manager | | 12/07/98 | | 03/29/59 | M | | $150.00 | S | | Decline | Decline |
| Ryan, John D | 3000186 | Regional Manager/Estimator | | 06/13/88 | | 01/28/56 | M | | $150.00 | F | | 4 | Decline |
| Ryan, John D | 3000199 | Senior Project Manager/Estimator | | 01/16/06 | 12/05/07 | 06/28/60 | M | | $750.00 | F | | 4 | Decline |
| Southern, Todd | 3000211 | National Business Development Manager | | 07/01/04 | | 06/07/58 | M | | $600.00 | Waived | Waived | 15 | Decline |
| Thibodeaux, Gary | 3000212 | Regional Health & Safety | | 08/01/00 | | 01/18/62 | F | | $750.00 | S | | 4 | Decline |
| Thibodeaux, Gary | 3000212 | Regional Health & Safety Officer | | 09/03/00 | | 03/23/60 | F | | $600.00 | F | | 4 | Decline |
| Verochlo, Stevin L | 3000207 | Regional Health & Safety Officer | | 05/21/07 | | 11/11/57 | S | | $500.00 | S | | 4 | Decline |
| Warner, James L | 3000193 | Special Project Manager | | 01/15/06 | | 09/21/48 | M | | $600.00 | | | Decline | Decline |

TOTAL:                                                                 TOTAL: $19,876.00

BF_0244