# Exhibit 11

1

1

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    No. 10 Civ. 9308(JSR)

5    ------------------------------------------x

6    BURTON T. FRIED,

7                            Plaintiff,

8              – against –

9    LVI SERVICES, INC., LVI PARENT CORP., CODE

10   HENNESSY SIMMONS, LLC d/b/a CHS PRIVATE

11   EQUITY V LP; APOLLO INVESTMENT CORP.,

12   SCOTT E. STATE, in his official and

13   individual capacities; BRIAN SIMMONS, in

14   his official and individual capacities;

15   RAJAY BAGARIA, in his official and

16   individual capacities; GERALD J. GIRARDI,

17   in his official and individual capacities,

18                         Defendants.

19   ------------------------------------------x

20                            May 26, 2011

                              10:03 a.m.

21

22

23

24

25

**2**

```
 1
 2
 3
 4          VIDEOTAPE DEPOSITION of SCOTT
 5   STATE, taken by the Plaintiff, pursuant to
 6   Notice, held at the offices of Thompson
 7   Wigdor & Gilly, LLP, 85 Fifth Avenue, New
 8   York, New York, before Debbie Zaromatidis,
 9   a Shorthand Reporter and Notary Public of
10   the State of New York.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**3**

```
 1
 2   A P P E A R A N C E S :
 3
 4   THOMPSON WIGDOR & GILLY, LLP
 5   Attorneys for Plaintiff
 6        85 Fifth Avenue
 7        New York, New York 10003
 8   BY:  SHAFFIN A. DATOO, ESQ.
 9        MATTHEW GORMAN, ESQ.
10
11   SIDLEY AUSTIN, LLP
12   Attorneys for Defendants
13        787 Seventh Avenue
14        New York, New York 10019
15   BY:  JOANNE SELTZER, ESQ.
16
17
18   ALSO PRESENT:
19        BURTON FRIED
20        J.D. MARTINEZ, Videographer
21
22
23
24
25
```

**4**

```
 1
 2            S T I P U L A T I O N S
 3
 4        IT IS HEREBY STIPULATED AND
 5   AGREED by and between the Attorneys for
 6   the respective parties hereto that filing
 7   and sealing be and the same are hereby
 8   waived.
 9        IT IS FURTHER STIPULATED AND
10   AGREED that all objections except as to
11   the form of the question, shall be
12   reserved to the time of the trial.
13        IT IS FURTHER STIPULATED AND
14   AGREED that the within examination may be
15   signed and sworn to before any notary
16   public with the same force and effect as
17   though signed and sworn to before this
18   Court.
19
20
21
22
23
24
25
```

**5**

```
 1
 2        THE VIDEOGRAPHER:  Good          10:09:27
 3   morning.  My name is J.D. Martinez of    10:09:27
 4   Veritext New York.  The date today is May  10:09:29
 5   26, 2011, and the time is approximately   10:09:31
 6   10:09 a.m.  This deposition is being held  10:09:34
 7   in the office of Thompson Wigdor & Gilly  10:09:38
 8   LLP located at 85 Fifth Avenue, New York,  10:09:41
 9   New York.  The caption of this case is    10:09:45
10   Burton T. Fried versus LVI Services, Inc.,  10:09:47
11   et al. filed in the United States District  10:09:51
12   Court, Southern District of New York.  The  10:09:53
13   name of the witness is Scott State, and at  10:09:56
14   this time the attorneys will identify     10:09:58
15   themselves and the parties they represent  10:09:59
16   after which our court reporter, Debbie     10:10:01
17   Zaromatidis, will swear in the witness,    10:10:05
18   and we can proceed.                        10:10:05
19        MS. SELTZER:  Joanne Seltzer         10:10:08
20   with Sidley Austin for all of the          10:10:09
21   defendants.                                10:10:11
22        MR. DATOO:  Shaffin Datoo with        10:10:12
23   Thompson Wigdor & Gilly representing the   10:10:14
24   plaintiff Burton Fried.                    10:10:16
25
```

2  (Pages 2 to 5)

**VERITEXT REPORTING COMPANY**

212-267-6868                                      516-608-2400

**6**

1
2    S C O T T   S T A T E,                10:10:17
3    having first been duly sworn by a Notary   10:10:17
4    Public of the State of New York, was       10:10:17
5    examined and testified as follows:         10:10:17
6    EXAMINATION BY MR. DATOO:                   10:10:25
7        Q.   Good morning, Mr. State.          10:10:25
8        A.   Who is this gentleman?            10:10:26
9        Q.   I am just about to introduce him  10:10:28
10   to you. As you know, my name is Shaffin    10:10:30
11   Datoo. To my left is my colleague Matthew  10:10:32
12   Gorman. To his left, as you know, is Mr.   10:10:35
13   Burt Fried.                                10:10:38
14       A.   Right.                            10:10:38
15       Q.   Is your ability to tell the       10:10:39
16   truth in any way impaired today?           10:10:41
17       A.   No.                               10:10:43
18       Q.   Do you understand that the        10:10:43
19   answers you are about to give are under    10:10:45
20   oath and that you are subject to penalties 10:10:47
21   of perjury if you give an untruthful       10:10:50
22   answer?                                    10:10:52
23       A.   Yes.                              10:10:52
24       Q.   I am going to assume that if you  10:10:53
25   answer a question that you understood it.  10:10:55

**7**

1                    STATE
2    If you don't understand a question, let me 10:10:57
3    know, and I will ask the question in a     10:10:59
4    different way.                             10:11:00
5        A.   Okay.                             10:11:01
6        Q.   Please give verbal answers to my  10:11:02
7    questions. Don't nod your head or shake    10:11:04
8    it. Otherwise, the court reporter won't    10:11:06
9    be able to take it down, and please let me 10:11:08
10   finish asking my question before you start 10:11:11
11   answering it Or the court reporter won't   10:11:13
12   be able to take it down.                   10:11:15
13       A.   Okay.                             10:11:16
14       Q.   If you need a break, let me       10:11:17
15   know. The only condition I have is that    10:11:19
16   you answer the last question asked.        10:11:20
17       A.   Okay.                             10:11:22
18       Q.   In connection with this lawsuit,  10:11:23
19   did you provide your attorney with all     10:11:25
20   responsive documents?                      10:11:27
21       A.   Yes.                              10:11:27
22       Q.   And where did you look to find    10:11:28
23   these documents?                           10:11:30
24       A.   Computers, hard files, office.    10:11:31
25       Q.   Do you have a personal e-mail     10:11:35

**8**

1                    STATE
2    account?                                   10:11:37
3        A.   Yes.                              10:11:37
4        Q.   And did you review any e-mails    10:11:38
5    in your personal e-mail account?           10:11:40
6        A.   Yes.                              10:11:42
7        Q.   And did you provide any           10:11:42
8    responsive e-mails in your personal e-mail 10:11:44
9    account to your attorney?                  10:11:47
10       A.   Yes.                              10:11:47
11       Q.   And do you keep any work-related  10:11:49
12   documents at home?                         10:11:50
13       A.   Very few but, yes, some.          10:11:51
14       Q.   And did you look through those    10:11:53
15   documents to see if there are any          10:11:54
16   responsive documents?                      10:11:55
17       A.   Yes.                              10:11:56
18       Q.   And did you provide those to      10:11:56
19   your attorneys if there were any?          10:11:57
20       A.   Yes.                              10:11:58
21       Q.   Have you ever been sued before?   10:11:59
22       A.   Yes.                              10:12:02
23       Q.   How many times?                   10:12:03
24       A.   Once.                             10:12:04
25       Q.   And what was --                   10:12:05

**9**

1                    STATE
2        A.   I'm sorry. Twice.                 10:12:08
3        Q.   And when was the first one?       10:12:10
4        A.   About 2003.                       10:12:15
5        Q.   And what was the nature of that   10:12:17
6    lawsuit?                                   10:12:18
7        A.   It was as a director of a         10:12:18
8    foreign subsidiary of a company that I     10:12:21
9    used to run, and it was in Australia, and  10:12:23
10   under Australian law directors could be    10:12:27
11   sued personally for issues associated with 10:12:31
12   companies.                                 10:12:35
13       Q.   Okay. And what was -- what were   10:12:36
14   the allegations in the lawsuit?            10:12:38
15       A.   The company had taken a loan      10:12:40
16   from another party, and the loan had not   10:12:43
17   been properly repaid. The third party      10:12:47
18   sued the company I believe and all the     10:12:52
19   directors.                                 10:12:54
20       Q.   And how did that lawsuit end?     10:12:55
21       A.   That lawsuit went on for eight    10:12:58
22   or nine years. It was resolved last        10:13:02
23   February. It settled out of court between  10:13:04
24   the company and the other party. I -- I    10:13:08
25   had nothing really to do with the          10:13:12

3 (Pages 6 to 9)

**VERITEXT REPORTING COMPANY**

212-267-6868                                              516-608-2400

**90**

1          STATE
2    interim CEO?                        11:39:14
3        A.   I would assume shortly after Mr.   11:39:15
4    McNamara left.                      11:39:17
5        Q.   Do you know why Mr. McNamara    11:39:19
6    left?                              11:39:21
7        A.   I do not.                    11:39:21
8        Q.   And do you know why Mr. Fried   11:39:22
9    became interim CEO?                  11:39:25
10       A.   I think it is because Mr.      11:39:27
11   McNamara left.                      11:39:28
12       Q.   And do you know if someone asked  11:39:30
13   him to become interim CEO?           11:39:31
14       A.   I do not.                    11:39:34
15       Q.   Do you know how he became the  11:39:35
16   interim CEO?                        11:39:39
17       A.   No.                         11:39:40
18           MS. SELTZER:   Objection to the  11:39:42
19   form.                              11:39:43
20       Q.   Okay.  Do you know what job    11:39:44
21   duties Mr. Fried assumed when he became  11:39:47
22   interim CEO?                        11:39:50
23       A.   No.                         11:39:51
24       Q.   Do you know if he kept his prior  11:39:55
25   job duties while he was interim CEO?   11:39:57

**91**

1          STATE
2        A.   I do not.                    11:40:01
3        Q.   While Mr. Fried was interim CEO,  11:40:02
4    do you have any personal knowledge of his  11:40:06
5    work performance?                    11:40:07
6        A.   I do not.                    11:40:08
7        Q.   And did there come a time when  11:40:09
8    you were hired as CEO?               11:40:20
9        A.   Pardon me?                   11:40:21
10       Q.   Did there come a time when you  11:40:22
11   were hired as CEO?                   11:40:24
12       A.   Yes.                         11:40:25
13       Q.   And -- we have to do this to    11:40:25
14   make the record clear.               11:40:27
15       A.   Okay.                        11:40:28
16       Q.   When was that?               11:40:29
17       A.   Approximately September 28.  You  11:40:29
18   know, if you can confirm the date, we can  11:40:35
19   establish the 28th.  I think -- I think  11:40:37
20   that is the date.  I am not a hundred  11:40:39
21   percent sure.                       11:40:41
22       Q.   Okay.                        11:40:41
23           (Document handed to witness.)   11:40:57
24       Q.   Mr. State, you have in front of  11:40:58
25   you a document that has been previously  11:41:00

**92**

1          STATE
2    marked as Plaintiff's Exhibit 17.    11:41:02
3        A.   Yes.                         11:41:04
4        Q.   Can you review the document and  11:41:04
5    let me know if you have ever seen it   11:41:05
6    before?                            11:41:07
7        A.   I -- I know that I've seen the  11:41:08
8    text.  I don't know that I've seen this  11:41:10
9    exact piece of paper before.          11:41:13
10       Q.   Okay.  Did you approve          11:41:14
11   this -- the text of this document before  11:41:20
12   it was issued?                      11:41:21
13       A.   I -- I don't -- I don't know   11:41:22
14   that I would say I approved it.  I      11:41:23
15   am -- I'm not a hundred percent sure.  I  11:41:27
16   believe this was issued before I was an  11:41:29
17   employee of the company, so on that basis  11:41:31
18   I'm not sure I could technically approve  11:41:34
19   it.                                11:41:36
20       Q.   I am handing you a document that  11:41:37
21   we --                              11:41:53
22           (Plaintiff's Exhibit 22 marked   11:41:53
23   for identification.)                11:41:56
24           (Document handed to witness.)   11:41:56
25       Q.   Mr. State, you have in front of  11:41:56

**93**

1          STATE
2    you a document that has been marked     11:41:58
3    Plaintiff's Exhibit 22.              11:41:59
4        A.   Okay.                        11:42:01
5        Q.   Can you please --             11:42:01
6        A.   Yes, I remember this.          11:42:02
7        Q.   Okay.                        11:42:04
8        A.   Okay.  So I approved the        11:42:10
9    contents of this release.  I wouldn't say  11:42:12
10   I approved the release because I couldn't.  11:42:14
11   I wasn't a member of the company, but I  11:42:16
12   gave some information, which I believe the  11:42:18
13   age went in there.  I don't know that    11:42:22
14   the -- where this came from in here.    11:42:27
15       Q.   Do you know why the release    11:42:29
16   refers to your age?                  11:42:32
17       A.   No idea.                      11:42:33
18       Q.   Do you know why the release    11:42:35
19   doesn't refer to Mr. Fried's age?      11:42:36
20       A.   No.  Do you have an earlier     11:42:38
21   draft of this by chance?             11:42:45
22       Q.   I don't think so.              11:42:48
23       A.   This says that there was --     11:42:51
24   there was an attached file in this e-mail.  11:42:53
25   I am just curious -- you asked why age was  11:42:56

24  (Pages  90  to  93)

VERITEXT REPORTING COMPANY

212-267-6868                                    516-608-2400

## 114

STATE

1
2    MS. SELTZER:  I object to form.  12:02:34
3    A.   I believe at some point I        12:02:35
4  concluded that -- that he was never going  12:02:36
5  to retire.  And can we back up just a      12:02:38
6  little bit?                    12:02:41
7    Q.   Sure.                12:02:41
8    A.   At the time I took the job, I    12:02:42
9  was not aware that Mr. Fried was even an   12:02:45
10  employee of the company in his role as    12:02:47
11  chairman.  I had understood in his role as 12:02:49
12  CEO or interim CEO he was an employee, but 12:02:52
13  I didn't even know that in his chairman    12:02:55
14  role under McNamara he had been an        12:03:00
15  employee.  It -- and through no one's      12:03:02
16  fault I just was not aware of that.        12:03:07
17    Q.   Okay.  And you -- you mentioned  12:03:09
18  that you had a discussion with Brian       12:03:11
19  Simmons regarding Mr. Fried's -- regarding 12:03:14
20  Mr. Fried.                    12:03:24
21    A.   Yes.                 12:03:25
22    Q.   And do you recall when that      12:03:25
23  discussion was?                12:03:27
24    A.   I believe that discussion       12:03:27
25  occurred shortly before the conversation I 12:03:33

## 115

STATE

1
2  had with Mr. Fried about his duties.       12:03:36
3  Somewhere in that call it one-week time    12:03:39
4  frame.                       12:03:43
5    Q.   And do you know why Mr. Simmons   12:03:44
6  had the impression that Mr. Fried wanted   12:03:45
7  to retire?                    12:03:47
8    A.   It was my understanding they had  12:03:48
9  had a conversation to that effect.         12:03:53
10    Q.   Did Mr. Simmons tell you that?    12:03:56
11    A.   I -- I believe so.  I am not a   12:03:58
12  hundred percent positive, but I believe    12:04:04
13  those were his words.             12:04:06
14    Q.   And do you -- did you document    12:04:07
15  that conversation with Mr. Simmons?       12:04:09
16    A.   No.                  12:04:11
17    Q.   Is it your practice to document  12:04:12
18  conversations you have with other people?  12:04:15
19    A.   Very seldom.             12:04:17
20    Q.   Okay.                12:04:18
21    (Document handed to witness.)       12:04:18
22    Q.   Mr. State, I am handing you a    12:04:47
23  document that has been previously marked   12:04:49
24  as Plaintiff's Exhibit 10.  Please take a  12:04:51
25  look at the document and let me know if    12:04:53

## 116

STATE

1
2  you've seen it before.            12:04:55
3    (Document handed to witness.)       12:05:03
4    A.   I -- I recognize the -- I       12:05:03
5  haven't seen -- I don't believe I've seen  12:05:06
6  this document because it is -- it looks    12:05:08
7  like it is from Hogan to Simmons, but the  12:05:10
8  substance of the document from myself to   12:05:13
9  Hogan, yes.                   12:05:15
10    Q.   Now, let me direct your         12:05:16
11  attention to the second page.          12:05:23
12    A.   Okay.                 12:05:26
13    Q.   The fourth paragraph.  Do you    12:05:26
14  see the first sentence?  It reads:  "In the 12:05:33
15  best case scenario Burt will decide to     12:05:36
16  retire at some date certain from LVI upon  12:05:38
17  a new CEO being named and offer to support 12:05:41
18  the business under a consulting agreement  12:05:44
19  in any way the new CEO sees fit."          12:05:46
20    Do you see that?              12:05:50
21    A.   Yes.                 12:05:50
22    Q.   And when you wrote this e-mail,   12:05:51
23  it was before you were hired by LVI,       12:05:53
24  correct?                     12:05:58
25    A.   I believe -- what is the date on 12:05:58

## 117

STATE

1
2  it?  It was written on September 19.       12:06:01
3    Q.   Was that before you got an offer 12:06:07
4  for employment?                12:06:10
5    A.   I don't think so.  No, it       12:06:11
6  couldn't have been because this e-mail     12:06:14
7  from me is specifically about the offer of 12:06:16
8  employment.  Notice on -- it is called     12:06:19
9  regarding offer was the title of the      12:06:24
10  e-mail.                      12:06:26
11    Q.   Is this before you accepted the  12:06:26
12  offer?                       12:06:28
13    A.   I believe so.            12:06:29
14    Q.   Okay.  Now, what did you mean by 12:06:30
15  that first sentence in paragraph 4 on page 12:06:35
16  2?                         12:06:39
17    A.   I -- I believe, you know, what I 12:06:39
18  was thinking about at the time is that     12:06:44
19  rather than have uncertainty about when    12:06:47
20  Burt was going to retire we would         12:06:49
21  basically come to some conclusion right up 12:06:52
22  front about the date, you know, having     12:06:54
23  believed that that was his intention.  It  12:06:59
24  didn't make sense to me to leave that      12:06:59
25  loose end out there where everyone would   12:07:02

30 (Pages 114 to 117)

**118**

STATE

1
2   wonder when that was going to happen.      12:07:05
3      Q.   What did you mean by the best      12:07:08
4   case scenario?                  12:07:10
5      A.   As -- you know, as an alternate   12:07:12
6   to not -- not saying okay here is my plan.   12:07:15
7   I just felt like it was good for everybody   12:07:18
8   to be above board and say here is what we   12:07:21
9   are going to do.  The alternate case is it   12:07:24
10  would be mysterious to everybody, and no   12:07:27
11  one would know what was going to happen.   12:07:30
12     Q.   Did you expect him to retire?   12:07:33
13     A.   I thought he wanted to.         12:07:36
14     Q.   But you never asked him         12:07:37
15  directly?                     12:07:39
16     MS. SELTZER:  Objection.            12:07:39
17     A.   I don't know.  I mean I -- I   12:07:40
18  just -- there were so many signs that I   12:07:42
19  perceived anyway from him that that was   12:07:45
20  his intention.  I'm not sure that I ever   12:07:47
21  said so you want to retire.  I -- I don't   12:07:49
22  recall doing that.               12:07:52
23     Q.   What signs did you -- did he   12:07:53
24  give you?                     12:07:54
25     A.   The discussion --           12:07:55

**119**

STATE

1
2      MS. SELTZER:  Objection.            12:07:56
3      A.   -- that I have -- I've laid out   12:07:57
4   for you.  The -- you know, the -- the   12:07:59
5   statement that he is 71, and he doesn't   12:08:04
6   want to do this any more, which, you know,   12:08:04
7   later in the meeting I had with him he   12:08:06
8   corrected me and said he was 70 and         12:08:07
9   laughed about it, the statement about I   12:08:09
10  should be going through -- out through the   12:08:11
11  back door instead of in through the front   12:08:14
12  door.  There were, you know, enough of   12:08:16
13  these things that it -- it just appeared   12:08:18
14  to me that was the intention.  So it   12:08:20
15  wouldn't have struck me to say tell me   12:08:23
16  exactly, you know, you want to retire.  I   12:08:27
17  wasn't -- it never even crossed my mind.   12:08:29
18     Q.   Did you ever talk to him and ask   12:08:32
19  him when do you expect to retire?         12:08:33
20     A.   No, I -- this -- this e-mail   12:08:35
21  right here clearly says, you know, we   12:08:37
22  would have -- under the best case scenario   12:08:39
23  we would -- we could come to that   12:08:41
24  conclusion.  Now, remember, at this point   12:08:43
25  in time I didn't even know Burt was an   12:08:45

**120**

STATE

1
2   employee of the company.  So retirement to   12:08:48
3   me, you know, meant he was essentially   12:08:52
4   going to step away from the business, as I   12:08:55
5   had been told was his intention all along,   12:08:57
6   and as chairman of the board it wasn't   12:09:01
7   really in my purview to be making those   12:09:04
8   kinds of decisions.  He didn't work for   12:09:08
9   me.  I didn't know he was an employee of   12:09:10
10  the company, and as an employee of the   12:09:12
11  company I still to this day don't know who   12:09:13
12  he would have worked for.  It became very   12:09:17
13  confusing when I discovered he was an   12:09:20
14  employee.                     12:09:22
15     Q.   Now, was there any problem with   12:09:23
16  Mr. Fried not retiring?             12:09:26
17     A.   I -- I am sorry.  I don't follow   12:09:27
18  what -- what do you mean by problem?   12:09:31
19     Q.   You -- you mentioned -- you   12:09:34
20  testified earlier that there was a lot of   12:09:36
21  uncertainty regarding if Mr. Fried was   12:09:37
22  going to retire.  Why was that such a big   12:09:40
23  deal?                       12:09:43
24     A.   I think it was a distraction to   12:09:43
25  a lot of people to not know who is in   12:09:46

**121**

STATE

1
2   charge and who is doing what and, you   12:09:49
3   know, as I said when I -- when I         12:09:52
4   discovered that Mr. Fried was an employee   12:09:54
5   it sealed -- there seemed to be a great   12:09:56
6   deal of ambiguity as to what that meant   12:09:58
7   because every other employee of the   12:10:01
8   company worked for me, and he didn't.   12:10:03
9      Q.   He didn't report to you?         12:10:06
10     A.   No.                     12:10:07
11     Q.   How do you know that?          12:10:09
12     A.   I have an org chart that -- I   12:10:10
13  don't think he reported to McNamara.  I   12:10:14
14  don't know who he reported to.          12:10:16
15     Q.   What did it say on the org   12:10:17
16  chart?                      12:10:22
17     A.   He is not on there.           12:10:22
18     Q.   Did you ever ask him who he   12:10:30
19  reports today?                 12:10:32
20     A.   No, I -- I don't recall ever   12:10:32
21  asking him.                   12:10:34
22     Q.   Did you ever ask anybody who he   12:10:35
23  reported to?                  12:10:38
24     A.   I think when I found out he was   12:10:39
25  an employee I asked one of the investors.   12:10:40

31 (Pages 118 to 121)

**130**

STATE

```
1           STATE
2       Q.  Okay.  So there are people that    12:16:54
3   have the job duties that Mr. Fried said he  12:16:57
4   had at LVI that report to other people at   12:17:00
5   LVI, correct?                               12:17:04
6       A.  I believe that is correct.         12:17:05
7       Q.  Okay.  Now, in that paragraph,     12:17:08
8   staying with the fourth paragraph in        12:17:29
9   the -- in the third sentence you            12:17:31
10  write -- actually in the second sentence    12:17:33
11  it reads:  "Several members of the senior   12:17:34
12  team have told me that Burt will never      12:17:36
13  retire because he has no other interests    12:17:38
14  and nothing else to do."                    12:17:40
15          Who are you referring to from       12:17:42
16  the senior team?                            12:17:44
17      A.  I believe John Leonard had told     12:17:45
18  me that, and -- you know, I'm not sure      12:17:49
19  that I -- I think what John had told me     12:17:57
20  was that -- he had told me that, and he     12:18:00
21  said everybody believes this or something   12:18:02
22  to that effect.  I didn't like go poll the  12:18:04
23  group and say what do you think.  That      12:18:07
24  was, you know, not what I was interested    12:18:09
25  in.                                         12:18:11
```

**131**

```
1           STATE
2       Q.  So when you wrote senior team,     12:18:11
3   you are referring solely to John Leonard?   12:18:13
4       A.  I was referring to John Leonard    12:18:16
5   and -- other members of the senior group    12:18:17
6   that had been in the company a long time.   12:18:21
7       Q.  So prior to you accepting an       12:18:25
8   offer for employment from LVI, you were     12:18:28
9   told by people that Burt would never        12:18:30
10  retire?                                     12:18:40
11      A.  That they thought that.  I          12:18:40
12  didn't believe that.  I didn't believe      12:18:41
13  that the employees at the company had       12:18:42
14  specific knowledge as to what Burt's        12:18:43
15  intentions were.  This is why -- this is    12:18:46
16  why I had a conversation with Burt three    12:18:48
17  days later because I had gotten certain     12:18:50
18  information from Simmons that said this is   12:18:52
19  the intentions, and, you know, I was        12:18:55
20  getting conflicting data.  I was            12:18:59
21  collecting data trying to figure out for    12:19:02
22  myself what was going on.                   12:19:04
23      Q.  But yet you never asked Mr.         12:19:05
24  Fried if he intended to retire?             12:19:08
25      A.  I just didn't -- I -- I don't       12:19:09
```

**132**

```
1           STATE
2   know if I did or not.  That is -- that is   12:19:11
3   my testimony.  I told you I didn't          12:19:13
4   specifically recall saying it in those      12:19:16
5   words, but I -- I got this what I believed  12:19:17
6   was an assurance on the phone the day I     12:19:22
7   accepted the job that, you know, my -- my   12:19:24
8   interpretation was that that was what he    12:19:30
9   wanted to do.                               12:19:35
10      Q.  Did Mr. Fried ever tell you he      12:19:35
11  wanted to retire?                           12:19:37
12      A.  I think he did.  Not in those       12:19:38
13  specific words, but I think what was said   12:19:40
14  to me was concluded by me to mean that.     12:19:42
15      Q.  Who is John Leonard?                12:19:46
16      A.  John Leonard is -- excuse me --     12:19:49
17  the COO of the company.                     12:19:52
18      Q.  And how long has he worked for      12:19:53
19  the company?                                12:19:55
20      A.  I believe over 20 years.            12:19:56
21      Q.  Do you know if he and Mr. Fried     12:19:58
22  worked together?                            12:20:00
23      A.  I believe they worked together     12:20:01
24  for many years.                             12:20:03
25      Q.  And so you don't think Mr.          12:20:03
```

**133**

```
1           STATE
2   Leonard would know Burt's intentions about  12:20:05
3   his retirement?                             12:20:07
4       A.  No.                                 12:20:08
5       Q.  And you think you would have a      12:20:09
6   better indication of that based on three    12:20:13
7   phone conversations?                        12:20:14
8           MS. SELTZER:  Objection to the      12:20:15
9   form.                                       12:20:17
10      A.  I believe I would have the          12:20:17
11  ability to make my own conclusion based on  12:20:18
12  collecting information from different        12:20:21
13  people, and based on information from        12:20:23
14  someone that owns the company telling me     12:20:27
15  it is Burt's desire to retire it is a        12:20:30
16  logical conclusion I could draw.             12:20:33
17      Q.  Okay.  Why did you write in the     12:20:35
18  second -- third sentence "That is not a      12:20:40
19  healthy situation for Burt or LVI."?         12:20:42
20      A.  The healthy situation for LVI       12:20:45
21  relates back to the second paragraph,        12:20:51
22  second sentence, and that is the concern I   12:20:54
23  had with a singular focus and confusion      12:20:58
24  with the team about who is in charge.  I     12:21:02
25  felt like a significant problem in the       12:21:04
```

34 (Pages 130 to 133)

**182**

```
1              STATE
2      A.  He was a business development    02:27:36
3  employee working primarily with hotels and  02:27:38
4  hospitality.                    02:27:41
5      Q.  Nationwide?                02:27:43
6      A.  Yes, pretty much.          02:27:44
7      Q.  Was he based out of a certain  02:27:45
8  branch?                        02:27:48
9      A.  He -- he worked primarily in the  02:27:48
10  northeast, New York, New Jersey, Westport.  02:27:51
11      Q.  Now, were you -- when you refer  02:27:54
12  to reviews in the first sentence, was that  02:28:05
13  performance reviews?            02:28:07
14      A.  Yes.                    02:28:08
15      Q.  And why were you taking Burt's  02:28:09
16  place on the reviews for these people?    02:28:13
17      A.  Because he and I agreed that I  02:28:15
18  would.                        02:28:17
19      Q.  Okay.                  02:28:17
20      A.  Not in this e-mail, but there is  02:28:20
21  other e-mail I am absolutely certain    02:28:22
22  somewhere that says that.  I mean I can  02:28:25
23  almost visualize the words.  Do you want  02:28:31
24  me to transition these to you?  It is    02:28:34
25  probably in this e-mail called        02:28:36
```

**183**

```
1              STATE
2  transitory matters or something like    02:28:38
3  that.                          02:28:39
4      Q.  So he asked you?            02:28:40
5      A.  Yes.                    02:28:41
6      Q.  And is this something a CEO    02:28:41
7  does, is review the performance of      02:28:43
8  employees?                      02:28:45
9      A.  Yes.                    02:28:45
10      Q.  Okay.  Of all employees or just  02:28:46
11  certain level employees?          02:28:48
12      A.  It -- these are employees that I  02:28:49
13  wouldn't typically have seen as a CEO    02:28:52
14  doing, but the process had been started at  02:28:56
15  the CEO level, and so I continued it at  02:28:59
16  the CEO level.                  02:29:01
17      Q.  Because in the past the CEO    02:29:02
18  would do employee reviews?          02:29:05
19      A.  No.  There was an employee    02:29:06
20  review done on these two individuals for  02:29:07
21  poor performance, and the follow-up review  02:29:10
22  was transitioned to me after I came into  02:29:12
23  the company.                    02:29:14
24      Q.  Okay.  And when Mr. Fried asked  02:29:16
25  you if you wanted -- whether he should  02:29:24
```

**184**

```
1              STATE
2  transitions this to you, was it the    02:29:29
3  responsibility of reviews in general or  02:29:30
4  just reviews for these two individuals?  02:29:32
5      A.  Reviews for these two        02:29:34
6  individuals.                    02:29:35
7      Q.  So do you know if Mr. Fried was  02:29:35
8  reviewing other employees?          02:29:37
9      A.  I do not.                02:29:38
10      Q.  Okay.                  02:29:40
11      (Plaintiff's Exhibit 27 marked  02:30:20
12  for identification.)              02:30:20
13      (Document handed to witness.)    02:30:20
14      Q.  Mr. State, you have in front of  02:30:22
15  you a document that has been marked    02:30:23
16  Plaintiff's Exhibit 27.          02:30:25
17      Can you review the document and  02:30:32
18  let me know if you have seen it before?  02:30:33
19      A.  I am familiar with the content.  02:30:36
20  I don't know if I have seen this specific  02:30:37
21  document or not.                02:30:39
22      Q.  Do you have any reason to doubt  02:30:39
23  that you didn't receive any of these    02:30:41
24  e-mails?                        02:30:45
25      A.  No.                    02:30:45
```

**185**

```
1              STATE
2      Q.  Okay.  Or send any of these    02:30:46
3  e-mails?                        02:30:56
4      A.  No.                    02:30:57
5      Q.  Did you ask Burt to look for new  02:30:57
6  office space for the New York office?    02:31:04
7      A.  No.                    02:31:06
8      Q.  Did you ask anybody to look for  02:31:07
9  new office space for the New York office?  02:31:09
10      A.  I asked Joseph Annarumma to take  02:31:10
11  that task up.                  02:31:13
12      Q.  Did you meet with Burt on    02:31:14
13  October 19?                    02:31:21
14      A.  Yes.                    02:31:22
15      Q.  And did the topic of new office  02:31:22
16  space for the New York office even come  02:31:28
17  up?                            02:31:30
18      A.  I -- I believe it did come up.  02:31:31
19      Q.  And what was -- why did it come  02:31:33
20  up?                            02:31:36
21      A.  Because the lease is expiring in  02:31:36
22  the current location and we were looking  02:31:39
23  for -- we needed to look for either a    02:31:41
24  place to go or to renegotiate the lease in  02:31:43
25  the space we were in.            02:31:46
```

47 (Pages 182 to 185)

VERITEXT REPORTING COMPANY

212-267-6868                                516-608-2400

**362**

```
1           STATE
2   thing.                          05:52:46
3       Q.   In the next sentence you wrote,   05:52:46
4   "In a battle with founder about his need   05:52:48
5   to retire, but board gets it and is   05:52:50
6   working to exit him with some respect."   05:52:52
7       A.   Right.                  05:52:55
8       Q.   When you use the word "founder",   05:52:56
9   are you referring to Mr. Fried?   05:52:58
10      A.   Yes.                    05:53:00
11      Q.   What did you mean by in a battle   05:53:00
12  with founder about his need to retire,   05:53:02
13  but --                          05:53:06
14      A.   That the board was in a battle   05:53:07
15  with -- with Mr. Fried.         05:53:08
16      Q.   And what did you mean by the   05:53:12
17  words "his need to retire"?      05:53:13
18      A.   I -- I think what I am referring   05:53:15
19  to there is that there was a census that   05:53:17
20  Burt had made, and this was Brian's words   05:53:20
21  I guess, that Burt had made an indication   05:53:23
22  in '05, '06 that he intended to retire.   05:53:26
23  The board actually thought he was a part   05:53:30
24  time -- had part-time involvement in the   05:53:33
25  company ,and then it came to light in this   05:53:35
```

**363**

```
1           STATE
2   board meeting that Burt indicated he was   05:53:38
3   working -- he had always worked full time.   05:53:41
4   I think there was a lot of surprise at the   05:53:44
5   board meeting at the involvement   05:53:46
6   that -- that Burt indicated he had had   05:53:48
7   with the company, and so there was a lot   05:53:50
8   -- I mean the discussion at the board   05:53:52
9   meeting was specifically about Burt stated   05:53:54
10  -- according to Brian Burt stated interest   05:53:58
11  or intent to retire, and, you know, we   05:54:00
12  were in a battle about that.    05:54:04
13      Q.   So at that meeting,       05:54:05
14  did -- November 4 meeting --    05:54:10
15      A.   That is -- yes, the board   05:54:11
16  meeting.                        05:54:13
17      Q.   Did you -- were you still under   05:54:13
18  the impression that Mr. Fried wanted to   05:54:15
19  retire?                         05:54:16
20      A.   Was I under the impression? I am   05:54:17
21  not sure what I concluded. The meeting   05:54:24
22  was so bizarre. It -- I concluded that it   05:54:26
23  seemed to be Burt's interest to have a   05:54:30
24  fight. I didn't really understand what   05:54:33
25  his objective was at that point. I don't   05:54:36
```

**364**

```
1           STATE
2   know what his objective is today. I think   05:54:39
3   he may have been happy to retire if he got   05:54:42
4   the right package going out. I just don't   05:54:44
5   know. I --                      05:54:47
6       Q.   This --                  05:54:47
7       A.   It is just speculative. I don't   05:54:48
8   have any idea.                  05:54:51
9       Q.   But at this point you still   05:54:52
10  didn't ask or did you ask Mr. Fried if he   05:54:54
11  wanted to retire at this point?   05:54:57
12      A.   Nobody was asking Mr. Fried   05:54:59
13  anything at this point.         05:55:01
14      Q.   Okay. Why were you discussing   05:55:02
15  LVI matters with Mr. Hicks?     05:55:09
16      A.   Because Mr. Hicks was a   05:55:10
17  prospective new hire for the company, and   05:55:13
18  I didn't want to get into the business   05:55:16
19  of -- of getting him involved in the   05:55:18
20  company. He knew that -- that there was a   05:55:19
21  lot of unrest in the company. He wanted   05:55:21
22  to make sure that if he was going to leave   05:55:23
23  his job and come to LVI, he -- he would   05:55:25
24  work during -- he is a former employee of   05:55:29
25  mine from a past relationship -- that I   05:55:31
```

**365**

```
1           STATE
2   was going to be there.          05:55:33
3       Q.   How did he know that there was   05:55:34
4   unrest in the company?          05:55:35
5       A.   I had had a conversation with   05:55:36
6   him. He is a friend. He is a personal   05:55:38
7   friend.                         05:55:40
8       Q.   And what I -- maybe I didn't   05:55:40
9   follow you, but when you wrote "his need   05:55:45
10  to retire" -- "in a battle with founder   05:55:51
11  about his need to retire," were   05:55:57
12  you the -- when you said battle I believe   05:56:01
13  you testified that you referred to the   05:56:03
14  board?                          05:56:06
15      A.   That is the board.        05:56:06
16      Q.   Does that include you?    05:56:07
17      A.   Yes and no. I think it really   05:56:08
18  includes the outside investors of the   05:56:10
19  company. It is -- this all got down to   05:56:12
20  what they wanted to do, whether there was   05:56:15
21  a relationship that we both stayed or one   05:56:19
22  or the other of us wasn't going to be   05:56:22
23  there.                          05:56:24
24      Q.   So it was either --        05:56:24
25          MR. DATOO: Strike that.   05:56:28
```

92 (Pages 362 to 365)

VERITEXT REPORTING COMPANY

212-267-6868                                    516-608-2400

## 418

```
 1          STATE
 2      MR. DATOO:  Okay.  Can we just    06:44:40
 3  take a quick break?  I want to see if    06:44:41
 4  there is anything left.              06:44:43
 5      THE VIDEOGRAPHER:  We're going    06:44:44
 6  off the record.  6:44 p.m.             06:44:45
 7      (Recess taken.)                 06:44:49
 8      THE VIDEOGRAPHER:  We're        06:48:51
 9  returning to the record.  6:48 p.m.      06:48:51
10      Q.   Mr. State, who put or placed    06:48:54
11  Ms. Dembin on the list for those to be    06:48:58
12  laid off?                          06:49:02
13      A.   I am not certain.  It probably    06:49:03
14  was Joseph or John, but I am not certain.   06:49:12
15      Q.   John Leonard?              06:49:14
16      A.   Yes.                     06:49:15
17      (Continued on next page.)       06:49:15
18
19
20
21
22
23
24
25
```

## 419

```
 1          STATE
 2      MR. DATOO:  Okay.  Thank you    06:49:16
 3  very much.  I have no further questions.   06:49:19
 4      THE VIDEOGRAPHER:  We're going    06:49:20
 5  off the record.  6:49 p.m.  End of today's   06:49:21
 6  questioning.                       06:49:27
 7      (Time noted:  6:49 p.m.)          06:49:28
 8
 9
10
11
12
13
14          SCOTT STATE
15
16  Subscribed and sworn to before me
17  this     day of         , 2011
18
19                   .
20
21
22
23
24
25
```

## 420

```
 1
 2          C E R T I F I C A T I O N
 3
 4
 5
 6      I, DEBBIE ZAROMATIDIS, a Shorthand
 7  Reporter and a Notary Public, do hereby
 8  certify that the foregoing witness, SCOTT
 9  STATE, was duly sworn on the date
10  indicated, and that the foregoing is a
11  true and accurate transcription of my
12  stenographic notes.
13      I further certify that I am not
14  employed by nor related to any party to
15  this action.
16
17
18
19
20
21
22
23          DEBBIE ZAROMATIDIS
24
25
```

## 421

```
 1
 2          E X H I B I T S
 3
 4  PLAINTIFF'S
 5  EXHIBIT        DESCRIPTION            PAGE
 6  22      Press release              92
 7  23      Offer letter              152
 8  24      E-mail                    171
 9  25      E-mail                    175
10  26      E-mail                    180
11  27      E-mail                    184
12  28      E-mail                    203
13  29      E-mail                    210
14  30      List of job duties          215
15  31      List of job duties          227
16  32      E-mail                    266
17  33      E-mail                    293
18  34      Agenda                    302
19  35      E-mail                    316
20  36      E-mail                    360
21  37      E-mail                    390
22  38      (Exhibit skipped)
23  39      Draft press release         145
24
25
```

105  (Pages 418 to 421)

# Exhibit 12

ORIGINAL                                    1

1

2   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
3
    - - - - - - - - - - - - - - - - - - -x
4
    BURTON T. FRIED,
5
                        Plaintiff,
6
              -against-
7                   10 Civ. 9308 (JSR)(JCF)

8   LVI SERVICES, INC.; LVI PARENT CORP.;
    CODE HENNESSY SIMMONS LLC d/b/a CHS
9   PRIVATE EQUITY V LP; APOLLO
    INVESTMENT CORP.; SCOTT E. STATE, in
10  his official and individual capacities;
    BRIAN SIMMONS, in his official and
11  individual capacities; RAJAY BAGARIA,
    in his official and individual
12  capacities; GERALD J. GIRARDI, in his
    official and individual capacities,
13
                        Defendants.
14
    - - - - - - - - - - - - - - - - - - -x
15
                        May 20, 2011
16                      9:56 a.m.

17                      Videotaped deposition of

18  BURTON T. FRIED, taken by attorneys for

19  Defendants, pursuant to notice, held at the

20  offices of Sidley Austin LLP, 787 Seventh

21  Avenue, New York, New York, before Nicole

22  Cannistraci, a Shorthand Reporter and Notary

23  Public within and for the State of New York.

24      Pages 293 - 297 were marked "Highly Confidential"

25  and separately bound.

**ELISA DREIER**
**REPORTING CORP.**

950 Third Avenue          Telephone: 212-557-5558
New York, New York 10022  Fax: 212-557-0050
Email:production@courtreportingedrc.com

2

```
 1
 2   A p p e a r a n c e s :
 3
 4        THOMPSON WIGDOR & GILLY LLP
          Attorneys for Plaintiff
 5             85 Fifth Avenue
               New York, New York 10003
 6
          BY:   DOUGLAS H. WIGDOR, ESQ.
 7
 8
          SIDLEY AUSTIN LLP
 9        Attorneys for Defendants LVI Services,
            Inc., LVI Parent Corp., Scott E.
10          State, Brian Simmons, Rajay Bagaria
            and Gerald J. Girardi
11             787 Seventh Avenue
               New York, New York 10019
12
          BY:   JOANNE SELTZER, ESQ.
13              MICHAEL D. MANN, ESQ.
14
15   Also Present:
16        ILITCH PETERS - Videographer
17        GREGORY G. DiCARLO, ESQ.
          LVI Services
18
19
20
21
22
23
24
25
```

3

```
 1
 2              S T I P U L A T I O N S
 3              IT IS HEREBY STIPULATED AND
 4     AGREED, by and between the attorneys for the
 5     respective parties hereto, that the sealing
 6     and filing of the within deposition be
 7     waived; that such deposition may be signed
 8     and sworn to before any officer authorized
 9     to administer an oath with the same force
10     and effect as if signed and sworn to before
11     a Justice of this Court.
12
13
14              IT IS FURTHER STIPULATED AND
15     AGREED that all objections, except as to
16     form, are reserved to the time of trial.
17
18
19              IT IS FURTHER STIPULATED AND
20     AGREED that the within examination and any
21     corrections thereto may be signed before any
22     Notary Public with the same force and effect
23     as if signed and sworn to before this Court.
24
25
```

4

```
 1              Burton T. Fried
 2          THE VIDEOGRAPHER:  This is tape
 3     number one of the videotaped deposition
 4     of Mr. Burton T. Fried in the matter of
 5     Burton T. Fried, plaintiff, against LVI
 6     Services, Incorporated, et al.,
 7     defendants, in the United States
 8     District Court, Southern District of
 9     New York, case number 10 Civ 9308
10     (JSR)(JCF).
11          This deposition is being held at
12     Sidley Austin, 787 Seventh Avenue, on
13     May 20th, 2011 at approximately
14     9:56 a.m.
15          My name is Ilitch Peters from the
16     firm of Elisa Dreier Reporting Services
17     and I'm the legal video specialist.  The
18     court reporter is Nicole Cannistraci, in
19     association with Elisa Dreier Reporting
20     Services located at 950 Third Avenue,
21     New York, New York.
22          For the record, will counsel
23     please introduce themselves.
24          MR. WIGDOR:  For the plaintiff,
25     Doug Wigdor, Thompson Wigdor & Gilly.
```

5

```
 1                 Burton T. Fried
 2            MS. SELTZER:  And Joanne Seltzer
 3       from Sidley Austin, representing LVI
 4       Services, Inc., LVI Parent Corp., Scott
 5       State, Brian Simmons, Rajay Bagaria and
 6       Gerald Girardi.
 7            MR. MANN:  Michael Mann from
 8       Sidley Austin, representing same
 9       defendants.
10            MS. SELTZER:  And we have here
11       also Greg DiCarlo, who is the general
12       counsel for LVI Services, Inc.
13            THE VIDEOGRAPHER:  Now will the
14       court reporter please swear in the
15       witness.
16  B U R T O N    T.   F R I E D, having been first
17  duly sworn by Nicole Cannistraci, a Notary
18  Public of the State of New York, was examined
19  and testified as follows:
20  EXAMINATION
21  BY MS. SELTZER:
22            Q.   Good morning, Mr. Fried.
23            A.   Good morning.
24            Q.   Have you ever been deposed before?
25            A.   Yes.
```

45

1                    Burton T. Fried

2  Mr. Simmons saying, "We have to move on" or "we

3  have to plan for the future" was his support of

4  the ageist statement that Scott State made; is

5  that correct?

6          A.    Yes.

7          Q.    Couldn't it be that Mr. Simmons

8  was actually saying that he was supporting

9  Mr. State's actions in moving some of your

10 responsibilities to management as opposed to the

11 statement?

12                 MR. WIGDOR:   Objection.

13                 Go ahead.

14         A.    He was supporting the ageist

15 remark and the actions he was taking because of

16 the ageist remark by saying, "We have to plan

17 for the future."  Planning for the future,

18 because of the ageist remark, is inalterably

19 connected and merged.

20                 In my statement to him, it wasn't

21 two separate conversations.  It was one complete

22 dialogue in which he supported by saying, "We

23 have to plan for the future."  He didn't say, "I

24 don't consider you too old but we have to assign

25 duties for other reasons."  His simple comment

63

```
 1                    Burton T. Fried
 2   complaint?
 3                    MR. WIGDOR:   Objection.
 4        A.    Yes.
 5        Q.    Any other reason why you didn't
 6   name Mr. Schnabel in your complaint?
 7                    MR. WIGDOR:   Objection.  Calls for
 8            privileged communications.
 9        Q.    Other than what you've discussed
10   with your counsel, is there any other reason why
11   you didn't name Mr. Schnabel?
12        A.    I only named people who I knew
13   supported it, my termination, because of age.
14   And I did not name the board members who did not
15   evidence support of that during the course of
16   the meeting on -- or in telephone conversations.
17        Q.    Did Mr. Simmons ever tell you that
18   the decision was unanimous?
19        A.    No.
20        Q.    Did anyone ever tell you that?
21        A.    No.
22        Q.    What year did you join LVI,
23   Mr. Fried?
24        A.    July 1986.
25        Q.    And what was your title at that
```

64

1                    Burton T. Fried

2    time?

3            A.      General counsel.   And I have --

4    maybe I've been called president, but I didn't

5    perform as such.

6            Q.      Okay.   So your first position with

7    LVI was as general counsel?

8            A.      Yes.

9            Q.      And what was your position

10   subsequent to that title?

11           A.      A few years later I became

12   president and CEO.

13           Q.      So that would have been around

14   1988, '89?

15           A.      Yes.   '89, I believe.

16           Q.      And -- go ahead.

17           A.      Yeah, correct.

18           Q.      And how long did you hold that

19   position?

20           A.      I held that position for 17 years.

21           Q.      When did you start working out of

22   the Westport office?

23           A.      September of 2003.

24           Q.      And what was the reason for your

25   moving to the Westport office?

1                    Burton T. Fried

2          A.    I could be more effective in the

3   management of the company through less travel

4   and more effective in the development of and

5   oversight, really, of the New York corporate

6   office and the development of the business in

7   New York and making plans for the fact that at

8   my request we were about to be engaged in the

9   recruitment of the CEO, new CEO, at which point

10  I would become chairman.

11         Q.    Why did you think that being in

12  Connecticut would make you more effective with

13  respect to oversight of what was happening in

14  New York?

15         A.    I no longer had to travel three

16  hours a day, and I showed up for work usually

17  around seven o'clock in the morning, and rather

18  than traveling and first arriving at the office

19  sometime later.

20         Q.    Do you live in Westport?

21         A.    Yes.

22         Q.    Was a consideration for your

23  moving to a Westport office convenience to you

24  with respect to your commute to work?

25         A.    Yes.

66

```
 1                   Burton T. Fried
 2         Q.     Did you have an office in
 3    New York?
 4         A.     Yes.
 5         Q.     Where was that located?
 6         A.     Eighty Broad Street.
 7         Q.     And with respect to a normal week,
 8    how many days did you work in New York as
 9    opposed to the days that you worked in Westport,
10    Connecticut?
11                 MR. WIGDOR:  You're talking about
12              physically or what he was doing?
13                 MS. SELTZER:  No, physically.
14         A.     I worked in the New York office
15    maybe two, three days a week and Connecticut
16    two, three days a week.  It depended upon
17    business matters as to where I worked, but I
18    also, in addition -- even if I wasn't physically
19    in the New York office, I was having meetings in
20    New York City on securing work and other legal
21    matters and business matters.  So I wasn't
22    limiting it -- if I worked in Connecticut three
23    days, it wouldn't necessarily mean I was only
24    two days in New York.  I could have been there
25    longer than that.
```

1                    Burton T. Fried

2          Q.      So it's your testimony that you

3    split your week fairly evenly between New York

4    and Westport?

5          A.      Yeah, and that was also a concern

6    of Code Hennessy later on, that I -- that I make

7    sure that I'm, you know, in Connecticut --

8    rather, in New York.  They were concerned about

9    the corporate staff and my presence.

10         Q.      In Connecticut or in New York?

11         A.      In New York, later.

12         Q.      This splitting of the week between

13   Connecticut and New York, was that pretty much

14   for the entire period of time after you moved to

15   the Westport office?

16         A.      In what period of time are you

17   talking about?

18         Q.      That's fair enough.

19                 After Scott State took the job as

20   CEO/president of the company, did you also split

21   your weeks in between the New York and

22   Connecticut offices?

23         A.      No.  I visited the New York office

24   but it wasn't on a prescribed -- where necessary

25   I came into the New York office for meetings.

75

1                    Burton T. Fried

2          Q.      Was that your decision to

3   transition into a chairman role or was it the

4   decision of CHS or any entity involved in the

5   purchase of the company?

6          A.      It was my decision.

7          Q.      Why did you decide that you wanted

8   transitioning to an active chairman role?

9          A.      We had achieved revenues

10  approaching 300 million.  I felt that the

11  company had the capability of continuing its

12  profitable growth and achieving revenues with

13  profits of a billion.

14                  At that point in time we were

15  dominating -- the dominant force in the nation

16  in the performance of our services.  We had a

17  brand name.  We had 25-plus offices.  We were

18  probably the largest of our kind in the planet.

19  And I believed the company needed the management

20  skill sets to take us to a billion and I didn't

21  know that I had that capability.  And I then

22  recommended to Blue Point that we conduct a

23  search.  And they asked me to retain a

24  recruiter.  They supported the effort to retain

25  a recruiter.

                    Burton T. Fried

1
2        Q.    Can I stop you one second?  We'll
3    talk about the recruitment from this point.
4    Right now let's just focus back a second to your
5    decision, if it was your decision, to take the
6    role of chairman.
7              And I think you just testified
8    that you did that because you believed that the
9    skill sets needed to take the company to the
10   next step in terms of profitability were maybe
11   skill sets that you didn't have.  Am I --
12       A.    Yes.  I felt there had to be a
13   manager out there that could contribute the
14   skill sets to take us, you know, to triple our
15   earnings and to manage the company effectively.
16       Q.    It also says here, "This
17   transition was planned and announced prior to
18   initiating the sales process."
19             Was your moving into a position of
20   chairman from the position of CEO a condition of
21   CHS's hire -- purchase of LVI?
22       A.    A condition?
23       Q.    Yes.
24       A.    No.  We -- we began the
25   recruitment process before I ever knew the name

77

```
 1                    Burton T. Fried
 2  Code Hennessy, and retained the recruiter even
 3  before I heard the name Code Hennessey, and
 4  suspended this recruitment process even before I
 5  ever heard the name Code Hennessey, because we
 6  now decided to move forward with a possible sale
 7  of the company and I felt that it would be
 8  useless to identify a candidate and select one
 9  when we couldn't introduce the new owner for
10  whom he would work.  So we suspended that
11  process.
12          Q.    So at the time that Code Hennessey
13  bought LVI, they knew that you had intended to
14  step from the position of CEO to the position of
15  chairman and to hire a CEO to take your place in
16  that position; is that correct?
17          A.    There was no intention.  They knew
18  I would.  And that was the plan before and they
19  bought the company with that understanding.
20          Q.    Was there ever a chairman before
21  you in that position?
22          A.    No.  I was the most senior officer
23  for the period of time from 19 -- certainly
24  performing the function from 1989 through this
25  date, which was 2005.
```

78

1                    Burton T. Fried

2        Q.      What was your understanding of the

3   term "active chairman role"?

4        A.      I would participate in executive

5   decisions.

6        Q.      What types of executive decisions

7   did you believe were a proper prominence for an

8   active chairman of the board?

9        A.      Well, it wasn't what I thought.

10  It was what the board thought and senior

11  management supported, that role.  That was

12  initially just defined for the purposes of a

13  document of strategic growth, which is

14  acquisitions, organic growth or acquisitions.

15  But my forte and contribution historically had

16  been in the legal area and risk assessment and

17  in the negotiation of major contracts and in

18  claims -- the development of claims and

19  negotiation and approval of claims.  Now I'm

20  talking about claims in the multimillion dollars

21  claims, project claims.

22              And so without defining it on

23  November 16th, when the letter agreement was

24  signed as to my role, I sort of morphed into

25  that role in support of the actions of the CEO,

```
 1                    Burton T. Fried
 2   with his consent and clearly with the
 3   understanding and consent of the board of both
 4   LVI Services and LVI Acquisition, the then
 5   parent of LVI Services.
 6                    And was requested by the board,
 7   which included Mr. Simmons, Mr. Hogan,
 8   Mr. Hennessy from CHS, to actively pursue a
 9   variety of matters on behalf of the company,
10   including collection of approximately
11   $10 million of receivables that were owed as a
12   result of Hurricane Katrina.
13         Q.    We'll get to the responsibilities
14   under Mr. McNamara in a second.  I just want to
15   focus back to your understanding of the role of
16   active chairman at the time that this company
17   was sold to CHS.
18         A.    Okay.
19         Q.    And you mentioned a second ago
20   that you believed -- was it your understanding
21   that the strategic initiatives that you were
22   going to be asked to do were determined by the
23   board of directors and the CEO that would be
24   taking your position?
25         A.    I don't think the board of
```

80

```
 1                    Burton T. Fried
 2   directors ever got involved in the operations of
 3   the business.  They were there simply to listen
 4   quarterly, if that frequent, to results of
 5   operations and the plans for the future and to
 6   make recommendations to management of what steps
 7   to take and who to use and how to get there.
 8            Q.    So who would you believe would
 9   have been responsible for determining the types
10   of growth initiatives that you would be focused
11   on as chairman of LVI?
12            A.    That would be the CEO, and that
13   would be with the support of the board.
14            Q.    Did you view the chairman role as
15   an opportunity to remove yourself from the
16   day-to-day management of the firm?
17            A.    Yes.
18            Q.    Why did you want to remove
19   yourself from the day-to-day management?
20            A.    Simply because the CEO role, by
21   its title, as chief executive officer, should
22   have the day-to-day and final decision in the
23   operations of the business.  And the chairman
24   should be a person who supports the actions of
25   the CEO and in any way that the CEO seeks that
```

81

                    Burton T. Fried

1

2    advice and counsel.

3         Q.    Did you play a role in recruiting

4    the new CEO, the very first CEO after you --

5    after the sale or during the sale of CHS -- of

6    LVI to CHS?

7         A.    We commenced -- we started up

8    again the recruitment process under the original

9    retainer agreement that we had signed with

10   Heidrick & Struggles, and only this time it was

11   like Blue Point.  Mr. Simmons, on behalf of Code

12   Hennessy, asked that I select the candidate,

13   find the candidate, select the candidate and

14   present the candidate for the approval of Code

15   Hennessey.

16        Q.    So am I to understand that you

17   were in charge of the recruiting process for the

18   CEO position?

19        A.    I was the sole person who -- who

20   was engaged to -- with that task and worked with

21   Hunter --

22        Q.    Was Mr. McNamara the only person

23   that presented as a CEO candidate?

24        A.    No.  There were others, but for --

25   for consideration and review, but it was

108

1                         Burton T. Fried

2           A.      Failure of Code Hennessy to live

3    up to their obligations to him and the company

4    insofar as growth acquisitions, and he decided

5    to leave.

6           Q.      So did he believe there weren't

7    enough growth acquisitions?

8           A.      He felt that -- I believe, I can't

9    read the man's mind, but I believe, and he

10   evidenced -- he expressed that acquisitions --

11   opportunities that he presented to the board

12   were not embraced, and recommendations -- other

13   recommendations he was making to the equity

14   owner with respect to the financial structure of

15   the company were not acted on, and later proved

16   that his advice should have been taken.

17          Q.      When Mr. McNamara resigned, you

18   stepped in as interim president and CEO; is that

19   correct?

20          A.      I was requested by Brian Simmons

21   of the board.

22          Q.      So Mr. Simmons asked you to step

23   in; is that correct?

24          A.      Personally.

25          Q.      Is that something you wanted to

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

109

1                    Burton T. Fried

2     do?

3          A.    I've served LVI and I -- they had

4     a need, and it wasn't a position that I wanted,

5     but was by necessity.  There was no one else

6     that could handle the position, especially in

7     the trying times of restructuring and the

8     economy.

9          Q.    When you were working as chairman,

10    were you working full-time?

11         A.    Yes.

12         Q.    Was there ever an agreement that

13    you would be working part-time while you were

14    working as chairman?

15         A.    No.  After Mr. McNamara took over,

16    he discussed with me a reduction in my

17    compensation in connection with now that I was

18    no longer CEO but chairman.  And I agreed to a

19    reduction of 20 percent, down to 600,000,

20    provided that the amount of time that I had to

21    devote was no more than 20 percent less than a

22    full week, which was four days.

23         Q.    I don't mean to interrupt you, but

24    is it your testimony then that you did go to a

25    more part-time schedule, less than a full-time

1                    Burton T. Fried

2    schedule?

3           A.     For one week.

4           Q.     For one week?

5           A.     And then I went back to a

6    full-time schedule at the same compensation that

7    I agreed to, which was the reduced amount.

8           Q.     Why did you go back to full-time?

9           A.     My services were necessary.

10          Q.     Did Mr. McNamara ask you to go

11   back full-time?

12          A.     No.

13          Q.     Did the board?

14          A.     No.   The demands of the business

15   required it, and as everyone in the company

16   knew, including people at the Westport office, I

17   worked from 7 in the morning straight until 5 or

18   5:30, sometimes 6.

19          Q.     When Mr. McNamara resigned, did

20   you ever think about taking over the role of CEO

21   again?

22          A.     No.

23          Q.     Why?

24          A.     I felt the company had the need to

25   have somebody in there that could grow the

1                    Burton T. Fried
2    ever heard of before.
3              Q.    In fact, you knew Mr. State, is
4    that correct, prior to this search?
5              A.    I had known Mr. State and he was
6    sort of introduced to be considered for the
7    position by one or more managers of LVI.
8              Q.    When did you meet Mr. State?
9              A.    I met him in around '99 or 2000.
10             Q.    And what was the circumstances
11   around which you met Mr. State?
12             A.    We were in bankruptcy court for a
13   competitor of LVI.
14             Q.    What was your understanding of
15   Mr. State's reputation at the time that you met
16   him and subsequent to that?
17             A.    I didn't really know Mr. State
18   prior to my first meeting with him.
19             Q.    Did you recommend to Mr. State
20   that he should apply for the position of CEO at
21   LVI?
22             A.    I suggested that after being
23   requested to do that by other managers.
24             Q.    What other managers?
25             A.    I don't -- I believe it was

118

1                    Burton T. Fried

2    Mr. Leonard and Mr. Messisco.

3          Q.     Did you agree with their

4    assessment that he would be a good candidate for

5    the position?

6          A.     I knew that he would not be the

7    candidate that -- like Mr. Hopkins.  He didn't

8    have the management expertise or knowledge of a

9    Mr. Hopkins or a Mr. McNamara.  But what he did

10   have was the capability, based upon his

11   representation, that he could bring substantial

12   business to the company in the power sector,

13   specifically Energy Solutions, which he claimed

14   to have a strong relationship with.  And I felt

15   that what we needed at the time was to get

16   somebody in that could add 50 or $100 million in

17   business to the company and provided he would

18   not change the culture.  And I had him, as well

19   as the other candidates at that time,

20   interviewed by the COO, the CFO and the regional

21   managers so that they could give me their

22   opinion, because there was no one leading

23   candidate among the three in my mind.  And they

24   selected Mr. State.

25         Q.     What do you mean by changing the

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

121

1                      Burton T. Fried

2     Falcon and Apollo and then the senior managers

3     of the company.

4          Q.     Did you have some reservations

5     with respect to Mr. State's management

6     experience?

7          A.     He wasn't in the profile that I

8     was hoping to secure, but clearly it appeared

9     that he had certainly the same or similar

10    experience or as much experience as the other

11    two candidates.  So I had no objection and in

12    fact supported his hiring upon the

13    recommendation of the senior managers.

14         Q.     So would you say that Mr. State

15    was your and the management's choice for the

16    position?

17         A.     He was as a result of my adopting

18    the recommendation of the senior managers.  He

19    wasn't the choice of Mr. Simmons but then he

20    became his choice.

21         Q.     Did you have any conversations

22    with Mr. Simmons or any other CHS person about

23    the possibility of Scott State being hired?

24         A.     It was simply we were proposing --

25    I proposed him as the choice of management and

132

1                    Burton T. Fried

2    decision-maker.

3            Q.    And you respond back to

4    Mr. Simmons that before Mr. McNamara accepted

5    the LVI CEO position, his only question of you

6    was how long you would continue at LVI.  And you

7    responded a day, up to a year, subject to your

8    pleasure.

9                    What did you mean by that comment?

10           A.    As long as he wants.

11           Q.    So you would stay either a day or

12   up to a year?

13           A.    I would stay.  Always my intention

14   was to stay for an extended duration, but I

15   wanted to give him the comfort that he was the

16   final decision-maker and I would stay as long as

17   he wanted, and therefore his reply was until I

18   leave.

19           Q.    Had Mr. McNamara decided to

20   terminate you the day after he became the CEO,

21   would that have been in accordance with your

22   understanding of your promises to him?

23           A.    Provided -- yes, provided it was

24   not the subject of age discrimination.

25           Q.    You then write -- you write that

176

```
 1                  Burton T. Fried
 2        Q.    Anything in sum and substance that
 3   was like that?
 4        A.    Absolutely no.
 5              In fact, Mr. State thought I was
 6   71 and when he made a statement to me on the
 7   19th, his remark was after I said, "Why are you
 8   taking away all of my responsibilities," he said
 9   to me, "Burt, you're 71 years of age, how long
10   do you expect to work?"  And my response to him
11   was, "Scott, I'm only 70 years of age."
12              We never had that -- that
13   conversation, and had we had the conversation,
14   he wouldn't say I was 71.
15              MS. SELTZER:  Could you mark this,
16         please, as Exhibit 14.
17              (Discussion items marked Fried
18         Exhibit 14 for identification.)
19        Q.    Did you meet with Mr. State on
20   October 19th?
21        A.    I did.
22        Q.    Did you meet with him in New York?
23        A.    Yes.
24        Q.    Was it in the offices of LVI?
25        A.    Yes.
```

182

1                    Burton T. Fried

2          A.    That's what I said.  I was giving

3   you my answer.

4          Q.    Okay.

5          A.    I said, "You want to go to the

6   next item."

7          Q.    Okay.  I thought you were talking

8   to me.  Go ahead.

9          A.    To State?

10         Q.    Yeah.

11         A.    And he said -- looked at the list

12  and he said.  "I'm going to be reassigning all

13  your responsibilities to other managers and I'm

14  going to do that in the next 60 to 90 days, and

15  when that's completed, I can let you know if

16  there is anything else for you to do."

17               I didn't immediately respond

18  because I was in a state of shock.  And my only

19  response was, "Scott, why would you do that?"

20               His response was, "Burt, you're 71

21  years of age, how long do you expect to work.

22  And what if you get hit by a truck" -- a bus,

23  rather -- "what if you get hit by a bus, and we

24  have to plan for the future."

25               My response to that, since this

183

1                    Burton T. Fried

2  was the first time that there was any indication

3  that -- of what his -- what he was going to do

4  with my responsibilities -- so I said, "Scott,

5  number one, I'm 70 years of age, not 71.  Number

6  two, the things that I perform for the company

7  is not -- there is no one here that performs

8  that, there is no duplicity, and based upon my

9  experience, I think I am performing it in a

10 manner in which I think can best serve the

11 interests of LVI Services.  I don't plan to be

12 hit by a bus; I'm in good health and I expect to

13 work for a long period of time.  I am healthy,

14 and by the way, there aren't many buses in

15 Westport, Connecticut."

16              And his response was, "Well,

17 that's the way I'm going to proceed."

18              I was in shock.  I -- frankly, I

19 had no warning, no indication, and I said to

20 him, "Well, is there anything you want me to

21 do?"  And he said, "Not that I can think of."

22 And I said, "Well, I'm in the midst of working

23 with Studley, who I retained to find corporate

24 office space, the lease expires next August, do

25 you want me to handle that?"  He said, "Oh,

194

1                    Burton T. Fried

2    nobody has, to this date, but you.

3           Q.    Tell me again one more time the

4    sentence he said to you.  I just want to make

5    sure we have it 100 percent clear on the record.

6           A.    After he told me that he's

7    reassigning all the responsibilities, my

8    responsibilities to others, and within 60 to 90

9    days he'll determine what, if anything else, I

10   have to do, there is for me to do, and related

11   the conversation about "We have to plan for the

12   future and what if you get hit by a bus," I

13   asked him, "Why are you doing this?"  His answer

14   was, "Burt, you're 71 years of age, how much

15   longer do you expect to work?"

16          Q.    That was the sum of the statement?

17          A.    Quote-unquote.

18          Q.    Okay.  Let's talk a little bit

19   about those telephone conversations you say that

20   you had subsequent to this meeting.  You say the

21   first one, I believe, was with Mr. Simmons?

22          A.    No.  The first one was calling

23   counsel for advice.

24          Q.    Okay.  Barring that one, what was

25   the first one that we can talk about?

1                    Burton T. Fried

2          A.    Mr. Bagaria.

3          Q.    So the first person you thought to

4   call was Mr. Bagaria?

5          A.    Yes.

6          Q.    Okay.  And how long was the

7   telephone conversation?

8          A.    I don't remember, 10-15 minutes.

9          Q.    And did you speak with him about

10  the background of what the conversation was

11  between you and Mr. State, the areas of

12  responsibility?

13         A.    I didn't detail the

14  responsibilities but I described the nature of

15  the meeting.

16         Q.    And did you describe to him

17  Scott's intent to transfer those

18  responsibilities to other people?

19         A.    Yes.

20         Q.    Did you explain to him the comment

21  that you've just told me?

22         A.    Yes.

23         Q.    And what was Mr. Bagaria's

24  reaction?

25         A.    "Scott State is the CEO and I

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

196

                    Burton T. Fried

1

2   support whatever he does."

3          Q.    Did you tell Mr. Bagaria that you

4   believed that statement was in violation of age

5   discrimination statutes?

6          A.    I said there was something illegal

7   about that insofar as using age as a reason for

8   the assignment.

9          Q.    What did Mr. Bagaria say to that?

10         A.    He said, "I continue to support

11  Scott State in whatever he does."

12         Q.    Did you say anything else to

13  Mr. Bagaria?

14         A.    Not that I recall.

15         Q.    And the second conversation was

16  with whom?

17         A.    With Brian Simmons.

18         Q.    And how much after the

19  conversation with Mr. Bagaria did you speak to

20  Mr. Simmons?

21         A.    It might have been a day or two.

22         Q.    And what did you tell

23  Mr. Bagaria -- I mean Mr. Simmons, sorry.

24         A.    I related the same conversation

25  that I had related to Mr. Bagaria.

197

```
 1                    Burton T. Fried
 2          Q.    Word for word?
 3          A.    Absolutely.
 4          Q.    So you told him about the
 5   responsibilities, you told him about Mr. State's
 6   response to those, about the statement that
 7   Mr. State made?
 8          A.    Yes.
 9          Q.    And that you felt that this was in
10   some way discriminatory on the basis of age?
11          A.    Yes.
12          Q.    And what was Mr. Simmons' response
13   to you?
14          A.    At first he said -- he sounded as
15   if he was surprised and he'll somehow figure out
16   a solution to this, but then he said, "You know,
17   Scott State is the CEO and we have to support
18   whatever he wants to do."
19          Q.    Did you say anything to him back
20   when he said that?
21          A.    No.  He said to me that he would
22   speak to other directors and get back to me.
23          Q.    Did you ask him to forward your
24   list of chairman responsibilities to the rest of
25   the board?
```

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

198

                         Burton T. Fried

1

2          A.    Yes.

3          Q.    Did you ask him to address this

4    issue at the board of directors meeting on

5    November 4th?

6          A.    No.  I said to him I would forward

7    him the list.  He asked is it okay to send it to

8    the other directors.  I said absolutely.

9          Q.    Anything else that you remember

10   about the conversation with Mr. Simmons?

11         A.    No.

12         Q.    Was there anybody, by the way, in

13   the room with you when you were making these

14   telephone conversations that we're going to talk

15   about?

16         A.    Intentionally not.

17         Q.    Anybody within earshot?

18         A.    Could be, but I mean, I wasn't in

19   a soundproof room but I didn't have anyone there

20   as a witness as to what I was telling to anyone,

21   because at the moment there was no final

22   decision in this matter and, you know, stuff

23   like this goes out like wild fire and causes

24   distraction and unrest, and there was no reason

25   for that.

199

1                    Burton T. Fried

2           Q.    And was this in your office in

3    Westport?

4           A.    Yes.

5           Q.    Were all these calls on the same

6    day?

7           A.    No.

8           Q.    Anything else that you remember

9    about the communication with Simmons?

10          A.    Not necessarily.  I mean, he could

11   have been calling me back.  I mean, you know, it

12   wasn't as if I called him -- in fact, it was a

13   case that I called him and he wasn't there and

14   he did call me back.  So, you know, not

15   necessarily the call I made to him and he picked

16   up the phone, but that was essentially what

17   occurred.

18                And then it was a few days later

19   that I got a call or John Schnabel sent me an

20   e-mail and asked me to call him.  I don't recall

21   which way it went.

22          Q.    Did Mr. Schnabel ask you to call

23   him or did you ask Mr. Schnabel to call you, do

24   you remember?

25          A.    I spoke to him.  He wasn't there

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

200

1                      Burton T. Fried

2    the first time that I reached out to him and

3    left a message.

4            Q.    What do you remember about your

5    conversation with Mr. Schnabel?

6            A.    It was identical.

7            Q.    Same exact thing?

8            A.    Same exact thing.

9            Q.    What was Mr. Schnabel's reaction?

10           A.    Shock.

11           Q.    Tell me, how do you express shock

12   over the telephone?

13           A.    He expressed that's unbelievable.

14   In so many words, these people are a bunch of

15   idiots.  I don't know if he used the word

16   "idiots," but something similar.

17                 "The whole purpose of making this

18   investment, a critical element in my making this

19   investment, was your continuity in the

20   management of the business and your presence.

21   I'm going to straighten this out.  I oppose this

22   and I'll get back to you."

23           Q.    And then you may have testified to

24   this already, but refresh my recollection, did

25   he get back to you?

270

1                  Burton T. Fried

2          would.

3                  So go.

4          Q.    Mr. Simmons had mentioned the

5   concept of a consultancy agreement on

6   November 2nd, as you said, right?

7          A.    In an e-mail.

8          Q.    So the letter that was sent by

9   Mr. Wigdor on the 15th, your testimony isn't

10  that they -- that letter was in retaliation

11  because Mr. Simmons had already spoken about

12  those terms back on November 1st -- 2nd, right?

13                 MR. WIGDOR:  Objection.

14                 You can answer.

15         A.    He suggested that that was what

16  the board wanted to do, but he did not do it

17  until the day after a complaint by my attorney

18  of age discrimination was delivered.

19         Q.    You resigned from the board of

20  directors on November 30th, 2010; is that

21  correct?

22         A.    Yes.

23         Q.    Why did you resign?

24         A.    That was the last day of my

25  employment with LVI Services.  And my election

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

271

Burton T. Fried

1    to the other boards and responsibilities on

2    other boards of both LVI Services, LVI Parent

3    and -- and other subsidiary boards was only

4    because of my employment at LVI Services.  So I

5    sought to extinguish that legal connection.

6              Q.    Could you have stayed on the board

7    of LVI Parent and not been an employee of LVI

8    Services?

9              A.    It's possible, I guess.

10             Q.    Did you want to do that?

11             A.    I chose not to have responsibility

12   being on that board when my employment was

13   terminated.

14             Q.    What parts of the LVI business

15   were housed in the Westport office?

16             A.    Very important aspects of the

17   business.

18             Q.    Okay.  Tell me what they were.

19             A.    My services were performed there.

20   Services of Greg DiCarlo, which provided legal

21   services to all offices throughout the nation

22   and corporate.  His other counsel, who also

23   provided legal services in support of

24   Mr. DiCarlo, paralegal who supported their

274

1                    Burton T. Fried

2          Q.     I think we were talking about the

3     closing of the Westport office, and forgive me

4     if I asked you this before but when did you

5     first learn that the Westport office was going

6     to be closed?

7          A.     I believe it was in a

8     communication from Brian Simmons to me which

9     alluded to the fact they planned to close the

10    Westport office.

11         Q.     You said that communication was

12    somewhere in November?

13         A.     I believe it was the letter they

14    sent me two days before the board meeting, or

15    the e-mail.

16         Q.     Do you know why the Westport

17    office was closed?

18         A.     No.

19         Q.     Did anybody tell you why the

20    Westport office was closed?

21         A.     No.

22         Q.     Do you know who decided that the

23    Westport office should be closed?

24         A.     No.

25         Q.     Do you know when that decision was

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

275

```
 1                    Burton T. Fried
 2  taken?
 3          A.    No.
 4          Q.    Is it your belief that the office
 5  was closed because you complained about
 6  discrimination?
 7          A.    I believe that it was a factor
 8  in -- in closing the office and dismissing my
 9  daughter and using the closing of the Westport
10  office as an excuse for the retaliation against
11  her because of the acts of my complaints of age
12  discrimination.
13          Q.    Was your daughter -- your daughter
14  was selected for the reduction of force; is that
15  correct?
16              MR. WIGDOR:   Objection.
17          Q.    Your daughter was selected for
18  termination?
19          A.    I don't know what that means
20  except that I know that her employment was
21  terminated on January 6th.
22          Q.    Was she the only employee
23  selected?
24          A.    There were four other employees
25  that were terminated.
```

336

```
 1                    Burton T. Fried
 2                    CERTIFICATE
 3   STATE OF NEW YORK      )
 4                          )    Ss.
 5   COUNTY OF QUEENS       )
 6            I, NICOLE CANNISTRACI, a Shorthand
 7   Reporter and Notary Public within and for the
 8   State of New York, do hereby certify:
 9            That I reported the proceedings in the
10   within entitled matter, and that the within
11   transcript is a true record of such proceedings.
12            I further certify that I am not
13   related to any of the parties to this action by
14   blood or marriage, and that I am in no way
15   interested in the outcome of this matter.
16            IN WITNESS WHEREOF, I have hereunto
17   set my hand this 20th day of May, 2011.
18                    Nicole Cannistraci
19                    NICOLE CANNISTRACI
20
21
22
23
24
25
```

# Exhibit 13

**LVI SERVICES, INC.**
**80 Broad Street**
**New York, NY 10004**

Date: November *16*, 2005

Mr. Burton T. Fried
149 Roseville Road
Westport, CT 06880

*Re:  Terms of Employment with LVI Services, Inc. and LVI Acquisition Corporation*

Dear Burt:

This letter memorializes our discussions as to the material terms of your employment arrangement with LVI Services, Inc. (the "Company") and LVI Acquisition Corporation ("Buyer") following the acquisition (the "Acquisition") of LVI Parent Corp. by Buyer:

| | |
|---|---|
| Job Title/Responsibilities: | You will continue to serve as President and Chief Executive Officer of the Company and Buyer until a replacement President and Chief Executive Officer is hired to oversee and conduct the day to day business of the Company and Buyer.  You will be expected to perform such services as are customary for such positions, including such duties and responsibilities as are assigned from time to time by the board of directors (the "Board") of the Company and Buyer.  After a new President and Chief Executive Offer is hired, you will serve as the Chairman of the Company and Buyer with primary responsibility for strategic growth. |
| Compensation: | You will receive a base salary of $750,000 per year, which may be altered to a mutually agreed level following the hiring of a new President and Chief Executive Officer.  Your base salary shall be payable in regular installments in accordance with the Company's general payroll practices and shall be subject to customary withholdings. |
| | You will be entitled to receive an annual bonus as determined by the Board in its sole discretion based upon the Company's achievement of budgetary and other objectives set by the Board. |
| Benefits: | You will be entitled to the same benefits as all other senior executives and that you currently enjoy.   The Company will, subject to insurability and commercially reasonable cost, maintain (i) a long-term disability insurance policy for you with payout terms comparable to those in the disability policy currently maintained by the Company for you and (ii) a $1,000,000 life insurance policy for you for which you may designate the beneficiary.  You understand and acknowledge that the Company will not maintain the $5,000,000 key-man life insurance policy that was in place prior to the Acquisition. |
| | You will be entitled to 20 days paid vacation annually, in addition to public holidays upon which the Company is officially closed for business. |
| | The Company shall provide you with an automobile comparable to the Mercedes |

BF_01

S500 currently leased for you by the Company and reimburse you for expenses related to such automobile including insurance, tolls, parking, maintenance, repairs and gas.

**Reimbursement of Expenses:** The Company will reimburse you for all reasonable expenses incurred by you in the course of performing your duties, which are consistent with the Company's policies in effect from time to time with respect to travel, entertainment and other business expenses, subject to the Company's requirements with respect to reporting and documentation of such expenses.

**Repurchase of Equity** As will be provided in your Executive Securities Agreement, in the event of your death, at the election of your legal representative, Buyer will repurchase for cash the common and preferred stock of Buyer you acquire at the time of the Acquisition at fair market value subject to any restrictions in the Company's credit agreements.

**Office** You will work in the Company's New York city office two days a week and three days a week in an office maintained by the Company in Westport, Connecticut.

After your transition from President and Chief Executive Officer to Chairman, you will work five days a week in Westport, Connecticut. The Company will maintain the current office in Westport, Connecticut or an office with similar facilities at substantially the same rent reasonably acceptable to you in Westport, Connecticut.

We look forward to your continued relationship with the Company. If these terms and conditions are acceptable to you, please sign below to confirm and return this letter to us at your earliest convenience.

Very truly yours,

LVI SERVICES, INC.

BY: _Steven R. Brown_
Name: _Steven R. Brown_
Title: _Vice President_

ACCEPTED AND AGREED
THIS ___ DAY OF NOVEMBER 2005:

_____
Burton T. Fried

CHI1 4385188.4

BF_02

S500 currently leased for you by the Company and reimburse you for expenses related to such automobile including insurance, tolls, parking, maintenance, repairs and gas.

**Reimbursement of Expenses:** The Company will reimburse you for all reasonable expenses incurred by you in the course of performing your duties, which are consistent with the Company's policies in effect from time to time with respect to travel, entertainment and other business expenses, subject to the Company's requirements with respect to reporting and documentation of such expenses.

**Repurchase of Equity** As will be provided in your Executive Securities Agreement, in the event of your death, at the election of your legal representative, Buyer will repurchase for cash the common and preferred stock of Buyer you acquire at the time of the Acquisition at fair market value subject to any restrictions in the Company's credit agreements.

**Office** You will work in the Company's New York city office two days a week and three days a week in an office maintained by the Company in Westport, Connecticut.

After your transition from President and Chief Executive Officer to Chairman, you will work five days a week in Westport, Connecticut. The Company will maintain the current office in Westport, Connecticut or an office with similar facilities at substantially the same rent reasonably acceptable to you in Westport, Connecticut.

We look forward to your continued relationship with the Company. If these terms and conditions are acceptable to you, please sign below to confirm and return this letter to us at your earliest convenience.

Very truly yours,

LVI SERVICES, INC.

BY: _____
Name: _____
Title: _____

ACCEPTED AND AGREED
THIS 11 DAY OF NOVEMBER 2005,

Burton T. Fried

CHI\ 4385182.4

BF_03

# Exhibit 14



**Contact:**

Amy McGahan
Dix & Eaton
216-241-3027
amcgahan@dix-eaton.com

Burton T. Fried
LVI Services
212-951-3661
bfried@lviservices.com

**FOR IMMEDIATE RELEASE**

## LVI SERVICES NAMES ROBERT A. McNAMARA AS PRESIDENT AND CEO

*Executive to lead LVI through continued growth into new markets and geographies;
Burton T. Fried to play active role as Chairman to support company's expansion*

**NEW YORK – July 13, 2006 –** LVI Services Inc., the nation's largest remediation and facility services firm with more than 30 offices across the country, announced today that Robert A. McNamara has joined the company as President and Chief Executive Officer. Burton T. Fried, 66, who has held these positions since 1989, has become Chairman and will continue to play an active role in supporting the company's growth in its current markets, the acquisition of complementary businesses and its expansion into new geographic areas.

"Bob has outstanding business acumen and experience in operating billion-dollar-plus businesses, as well as a track record of successful leadership involving projects of tremendous magnitude," Fried said. "His client focus and team orientation will help stimulate the continued profitable growth of LVI. I look forward to working closely with him to take LVI to the next level."

McNamara, 52, held senior positions with Fluor Corporation for the past decade, including responsibility for major businesses serving the industrial and chemical markets. Fluor, a *Fortune* 500 company with annual revenues of $13.2 billion in 2005, provides services on a global basis in the fields of engineering, procurement, construction, operations, maintenance and project management.

Brian P. Simmons, a Partner with the private equity firm Code Hennessy Simmons LLC, which has a major investment in LVI, said, "Bob McNamara brings distinct perspectives, management strengths and significant experience that will complement those of Burt Fried, who has been the driving force behind LVI's rapid growth. Burt has positioned LVI well for future growth through internal expansion and key acquisitions. They will make an outstanding team for the future."

CONFIDENTIAL

LVI 003294

McNamara most recently served Fluor as a Senior Group President responsible for Fluor China and for overseeing strategic planning and global project execution systems for all business lines.  In previous positions as a Group President, he was responsible for various engineering, procurement and construction groups with annual revenues up to $2.6 billion.  The groups' worldwide market focus included chemicals, manufacturing, mining, highways, roads, bridges, tunnels, rail, microelectronics, pharmaceutical, biologics, consumer products, automotive and metals.

Earlier in his career, McNamara spent 18 years with Marshall Contractors Inc., including serving as its President and Chief Operating Officer.  The privately held construction management business grew from $3 million in annual revenues in 1977 to more than $700 million in 1996, when it was acquired by Fluor.

McNamara, a board member of Asyst Technology (Nasdaq: ASYT), earned a bachelor's degree in economics from Brown University, Providence, R.I.


### About LVI Services

LVI Services Inc. is the United States' leading provider of a wide array of integrated facility services, including environmental remediation, demolition and related services for commercial, industrial, multi-family residential and governmental facilities. LVI focuses on projects involving asbestos, lead paint, mold, infection control, hazardous materials, emergency and disaster services, and demolition. Founded in 1986, LVI has more than 30 offices across the United States, is licensed in every state, and is experienced in responding to natural and manmade disasters around the world. The company's annual revenues exceed $380 million. For more information, visit www.lviservices.com.

# # #

CONFIDENTIAL

LVI 003295

# Exhibit 15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x

BURTON T. FRIED,

      Plaintiff,

   v.

LVI SERVICES, INC.; LVI PARENT CORP.; CODE
HENNESSY SIMMONS LLC d/b/a CHS PRIVATE
EQUITY V LP; APOLLO INVESTMENT CORP.;
SCOTT E. STATE, in his official and individual
capacities; BRIAN SIMMONS, in his official and
individual capacities; RAJAY BAGARIA, in his
official and individual capacities; GERALD J.
GIRARDI, in his official and individual capacities,

      Defendants.

-------------------------------------------------------------- x

10-CV-9308 (JSR)(JCF)

**DECLARATION OF
BURTON T. FRIED**

I, Burton T. Fried, pursuant to 28 U.S.C. §1746, declare and state as follows:

  1.  I am the Plaintiff in the above-captioned action.  I am the former General Counsel, President and Chief Executive Officer, and Chairman of Defendant LVI Services, Inc. ("LVI").  I was admitted to practice law in the State of New York in 1964.  I have personal knowledge of the facts set forth herein and submit this declaration in opposition to Defendants' motion for summary judgment.

  2.  I began working for LVI in 1986 and worked for the company until I was fired in November 2010.  From approximately 1989 through November 2010, I was the President and CEO and/or Chairman of LVI.

  3.  While Robert McNamara was President and CEO of LVI from approximately July 2006 through approximately April/May 2010, I was Chairman of LVI.  During this time, I worked on behalf of LVI and its subsidiaries in New York City and to the best of my recollection, my work included, but was not limited to, the following:

1

(a)     A meeting in New York City with counsel to the City of New York to secure approval by the City of New York to a Vendex Listing sought by an LVI subsidiary. As a result of my efforts, the subsidiary secured a Vendex Listing and was able to bid on the Hudson Yards project in New York City, and was subsequently awarded the project.

(b)     A meeting in New York City with Defendant Scott State to discuss entering into an agreement in which an LVI subsidiary would serve as the subcontractor on two large projects which Mr. State's client sought to bid involving the U.S. Department of Energy. As a result of my efforts at this meeting, the subsidiary entered into the agreement and two projects were bid by Mr. State's client with the subsidiary as the subcontractor.

(c)     A meeting in New York City with Mr. McNamara and a company called DEMCO to discuss the role of an LVI subsidiary as a subcontractor of DEMCO in connection with a project involving the remediation and demolition of Yankee Stadium. The subsidiary became a subcontractor to DEMCO for the remediation and demolition of Yankee Stadium.

(d)     A meeting in New York City with Mr. McNamara to discuss outstanding monies owed to an LVI subsidiary from DEMCO involving the remediation at Yankee Stadium. During that meeting, a payment schedule with DEMCO was negotiated for payment of arrears due and the terms for the performance of demolition at the site were agreed upon.

(e)     A meeting in New York City with an attorney from Arent Fox LLP to discuss potential ERISA violations allegedly caused by the work performed by LVI's outside administrator.

(f)     A meeting in New York City with an attorney from the office of the Inspector General of the New York City School Construction Authority to approve the pre-qualification of an LVI subsidiary to bid on projects involving New York City schools. As a result of my efforts, the pre-qualification was ultimately approved and the subsidiary was able to bid on these projects.

(g)     Multiple meetings in New York City with representatives from the New York County District Attorney's Office and the U.S. Attorney for the Southern District of New York to assist them in the investigation of the events surrounding the bidding which led to a contract with another contractor for the performance of work at 130 Liberty Street, and the deaths of two fireman during the course of that work. An LVI subsidiary had bid that work, was awarded the contract, but withdrew from the project. After the deaths of the two firemen, the subsidiary was awarded a contract to complete the work.

2

(h)    A meeting in New York City with the CEO of Charys Holding Company, Inc. to negotiate a payment schedule for approximately $12 million owed to LVI subsidiaries.  As a result, a payment schedule was agreed upon at the meeting.

(i)    A meeting in New York City with Asset Recovery Group, Inc. to negotiate a $5 million remediation contract for a project involving a Pratt & Whitney facility.

(j)    A meeting in New York City to interview a candidate for a Regional Manager position within the LVI organization.

(k)    A meeting in New York City to interview a candidate for a senior management position within the LVI organization.

(l)    A meeting in New York City with New Mountain Capital, LLC, a private equity fund, to discuss its interest in purchasing LVI to accomplish a recapitalization and loan restructuring.

(m)    A meeting in New York City with Apollo Investment Corporation to discuss issues in connection with the restructuring of LVI.

4.      During the same time frame, I also, on almost a daily basis, called and/or emailed personnel at LVI's New York City office about LVI-related projects in New York City and/or about issues involving the operations of LVI at its New York City office including, but not limited to, accounts receivable, personnel and legal matters.

5.      During the same time frame, I also worked on matters for several LVI-related projects in New York City.  For example, I reviewed the contracts for projects involving Yankee Stadium, 130 Liberty Street, and was involved in the resolution of a jurisdictional dispute initiated by the Iron Workers union at the 130 Liberty Street project.

6.      After Mr. McNamara resigned as President and CEO in May 2010, I assumed his former role and became interim President and CEO of LVI.  From approximately May 2010 through approximately September 2010, I continued to work on behalf of LVI and its subsidiaries in New York City and to the best of my recollection, my work included, but was not limited to, the following:

3

(a)     A meeting in New York City with Turner Construction Company ("Turner"), Madison Square Garden officials and their consultants in connection with a project involving the renovation of Madison Square Garden ("MSG Project") to discuss scope of work and contract issues.

(b)     A meeting in New York City with Turner, MSG Project officials and their consultants to discuss pricing of the MSG Project.

(c)     A meeting in New York City in connection with the MSG Project with Turner, MSG Project officials and their consultants to answer questions regarding the historical integrity and current business practices of LVI and its subsidiaries.

(d)     A meeting in New York City with Turner in connection with the MSG Project to sign the contract for the project.  As a result of my efforts, LVI and/or its subsidiaries employ up to approximately 700 workers in connection with the MSG Project.

(e)     A meeting in New York City with attorneys from Sidley Austin LLP, and other parties with their attorney, regarding a dispute about the obligation of LVI to pay the balance of a purchase price for a company that an LVI subsidiary purchased.

(f)     A meeting in New York City with Russell Reynolds Associates to discuss the search for a President and CEO for LVI.

(g)     A meeting in New York City with American International Group to discuss with its insurance and surety executives the status of the recapitalization and loan restructuring, and current financial results of LVI.

(h)     Multiple meetings in New York City with Avisco, Inc. to negotiate a strategic alliance between LVI and Avisco, Inc. in order to secure projects.

(i)     A meeting in New York City with Helix Enterprises to negotiate a strategic alliance between LVI and Helix Enterprises in order to secure projects.

(j)     A meeting in New York City with a consultant to discuss how LVI could secure projects in Haiti.

(k)     A meeting in New York City with a New York based building owner to secure a multi-million dollar project for an LVI subsidiary.  The subsidiary was subsequently awarded the project.

(l)     Multiple meetings in New York City to interview candidates for the LVI President and CEO position.

(m)     A meeting in New York City with an owner of an environmental management firm to discuss potential business opportunities for LVI.

4

(n)     A meeting in New York City with representatives of DEME to discuss a potential strategic alliance in order to secure projects.

(o)     A meeting in New York City with candidates for New York City based management positions within the LVI organization.

7.      During the same time frame, I also, on almost a daily basis, continued to call and/or email personnel at LVI's New York City office about LVI-related projects in New York City and/or about issues involving the operations of LVI at its New York City office including, but not limited to, accounts receivable, personnel and legal matters.  Moreover, I worked with Studley, a commercial real estate broker in New York City, by telephone and email in efforts to secure new office space for the New York City office of LVI.  In addition, I had weekly conference calls with the on-site management of the 130 Liberty Street project to discuss project-related issues.

8.      While Chairman, and interim President and CEO, I also met with representatives of Arch Surety in New York City on an annual basis.

9.      Other than me, no other member of senior management was fired by LVI.

10.     I was paid by the New York City office from its New York City controlled bank account.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 20, 2011

BURTON T. FRIED

5

Exhibit 16



**Fw: BT Fried Compensation**
Burton Fried   to: Kamal Sookram                         05/13/2010 06:45 AM

| History: | This message has been replied to. |
| --- | --- |

Kamal:                                              *(# 3000026)*

Please increase my annual compensation to rate of $750,000 per year commencing May 15th. Print copy
of this e-mail with below approval for your records.          *$ 600K → $ 750K*

Burt                                              *Eff- 04/16/10*

Burton T. Fried
Chairman/CEO
LVI Services Inc.
877 Post Road East
Suite # 4
Westport, CT 06880
Phone: (203) 222-0584
Fax: (203) 222-2227
bfried@lviservices.com

----- Forwarded by Burton Fried/New York/Lviservices on 05/13/2010 06:43 AM -----

| From: | "Simmons, Brian P." <BSimmons@chsonline.com> |
| --- | --- |
| To: | <BFried@lviservices.com> |
| Cc: | "Hogan, Robert" <Rhogan@chsonline.com>, "George, Marcus J." <MGeorge@chsonline.com>, "Lester, Laura" <LLester@chsonline.com>, "Hennessy, Daniel J." <djhennessy@chsonline.com>, "Smith, Jeffrey N." <jnsmith@sidley.com> |
| Date: | 05/12/2010 05:05 PM |
| Subject: | RE: Comp |

Confirmed.  You are earning every penny of it.

**From:** BFried@lviservices.com [mailto:BFried@lviservices.com]
**Sent:** Wednesday, May 12, 2010 4:05 PM
**To:** Simmons, Brian P.
**Cc:** Hogan, Robert; George, Marcus J.; Lester, Laura; Hennessy, Daniel J.; Smith, Jeffrey N.
**Subject:** Re: Comp

Thanks, Brian.  Compensation would return to $750,000
---------------------------
Burton T. Fried
Chairman/CEO
LVI Services Inc.
877 Post Road East
Suite # 4
Westport, CT 06880
Phone: (203) 222-0584
Fax: (203) 222-2227
bfried@lviservices.com

BF_04

# Exhibit 17

**ATTORNEY CLIENT PRIVILEGE**
**AIC MEMORANDUM**

To:         Interested Parties
From:       Rajay Bagaria, Jerry Girardi, Teddy Reynolds
Cc:         Emil Buchman, Joseph Glatt
Date:       June 11, 2010
Re:         **LVI Services, Inc.**
            **Proposed Restructuring Overview**

---

## I – Situation Overview

In November 2005, AIC invested $43.0 million of senior subordinated notes and $2.5 million of equity to support the buyout of LVI Services, Inc. ("LVI" or the "Company") by Code Hennessy & Simmons ("CHS" or the "Sponsor"). LVI is a leading provider of building facility services including asbestos abatement, lead abatement, mold remediation, emergency disaster response, interior and structural demolition and other specialty contracting services to a broad range of commercial, industrial and institutional clients located throughout the United States. The Company operates through 25 regional branch locations nationwide with more than 3,000 employees, a large portion of which are hourly workers. While LVI experienced challenges almost immediately following our initial investment (discussed in more detail below), the Company was still able to generate $34-$35 million of EBITDA in both 2007 and 2008. However, the current economic downturn and its impact on the Company's core commercial end markets has materially impacted 2009 and YTD 2010 financial results. For the LTM period ended April 30, 2010, LVI generated revenue and EBITDA of $237.6 million and $18.7 million (7.9% margin), respectively.

Despite financial underperformance, the qualities that initially attracted us to invest in LVI are still largely intact. Over a two decade period, the Company has proven its ability to profitably grow both organically and through acquisitions. Furthermore, the Company's safety record is amongst the best in the industry, enabling it to obtain work on many high profile projects including the Pentagon, 9/11 clean-up, NASA Kennedy Space Center, 130 Liberty Street (Deutsche Bank building in lower Manhattan) and, a more recent award, Madison Square Garden. In its Emergency Response business segment, LVI is able to mobilize quickly and provide meaningful man-hours which it bills at attractive margins. For example, when hurricanes Katrina and Rita struck the Gulf in 2005, LVI nearly doubled its workforce to capitalize on the clean-up opportunity, which created over $70 million of incremental EBITDA over a two year time period. This business line contributes insignificant earnings in the LTM period, but provides a valuable option on the upside. We believe LVI also possesses high quality managers, which is particularly important in contract estimation. Regional branch management largely remains intact from the initial investment. With the addition of Bob McNamara as CEO, the Company increased its focus on improving its safety record which allowed LVI to diversify away from commercial construction / remediation projects and penetrate the energy, environmental and industrial industries. For all these reasons, we continue to believe the Company has reason to exist and that earnings will improve with economic growth.

Despite being a clear industry leader with a demonstrated track record, LVI has been a challenging investment for CHS since the initial LBO. When LVI was purchased in late 2005, the Company was benefitting from a massive amount of Katrina/Rita hurricane related clean-up work. By the end of 2005, LVI was billing $1 million of clean-up related revenue a day in Louisiana and Texas (at 30-35% margins), enabling it to produce $66 million of EBITDA that year. Based on the widespread destruction in the region, management projected clean-up related work to take months if not years to complete and forecasted 2006 and 2007 EBITDA of $104 million and $76 million, respectively. For a variety of

1

**Confidential**

AIC 00000113

reasons, most notably anticipated FEMA clean-up related funds not being released and Louisiana political bureaucracy, this projected revenue and earnings growth never materialized for LVI.

The Company's capital structure and covenants from the initial 2005 LBO were predicated on a meaningful level of near term debt paydown from the projected hurricane clean up work. When this level of work did not materialize, the Company breached covenants in late 2006 and was forced to amend its debt agreements to provide for higher interest rates in exchange for covenant headroom. Since this time, the Company has performed relatively well and won high profile projects including the remediation and demolition of the Deutsche Bank building which allowed LVI to maintain earnings in 2008 despite the dramatic drop off in its core commercial end markets. However, beginning in 2009 the economic downturn has begun to more materially impact earnings and has not been able to be offset by other similarly large projects. As such, in late 2009 the Company commenced discussions with its lenders and other key constituent groups around a more comprehensive balance sheet restructuring.

Based on current LTM EBITDA of $18.7 million, which we view as near "trough" levels, the Company is levered 6.4x through $119 million of funded net senior debt, with our subordinated notes financing through 9.1x. Given the number of constituents that must be dealt with, the LVI restructuring is complex and further complicated by our inability to use bankruptcy as a resolution mechanism. One of our challenges has been dealing with a roughly $40 million working capital claim (amount under dispute) owed to the prior owners of the business (including current management) related to the receivables delivered on the closing date of the initial LBO for hurricane clean up work. As LVI began to underperform in 2006 and sought covenant relief, the Company's lenders restricted any further payments on this claim[1]. Additionally, there is an $8.5 million seller note issued to the prior owners of an existing subsidiary of LVI, the Mazzochis, related to the acquisition of the Mazzochi demolition business by LVI in 2007. This claim has a guarantee from the LVI operating company and as such, even though it is expressly subordinated to AIC's claim, makes an out-of-court restructuring even more difficult.

After months of intense discussions, and the untimely resignation of CEO Bob McNamara, it appears we are close to a broad restructuring solution which we highlight in greater detail in this memo. In summary, this restructuring involves a debt-to-equity conversion of AIC's existing $52 million subordinated debt position, a $25 million injection of new money ($15 million from CHS; $10 million from AIC) and the conversion of $15 million of senior debt to common equity from a large senior lender (Falcon Investments) who purchased the debt at distressed levels over the past year. The combination of these actions, along with other payments and amendments as outlined in this memo, provide for a restructured entity levered to 4.6x (through the senior debt) and creates the Company at 6.8x - 7.2x (depending on how we settle certain claims). The ownership structure of this restructured entity will be 37.5% CHS, 37.5% AIC and 25.0% Falcon (prior to dilution from management options).

In summary, we believe the new money investment is attractive in its own right and critical to obtaining any recovery on our mezzanine. The amount of ownership provided to AIC creates an opportunity to make $50-$60 million of proceeds in 3-4 years (assuming EBITDA reverts to $35-$40 million). Should EBITDA only rebound to $25 million, a level we would view as a reasonably conservative case, our recovery would still be $30 million, which is attractive compared to the alternatives.

---

[1] The initial working capital claim was for ~ $50 million. LVI paid $25 million of this claim up until the time it was restricted from paying any more by its lenders. With interest, the remaining $25 million portion of the claim has accreted to ~ $40 million.

2

Confidential

AIC 00000114

## II – Restructuring Overview

### Sources and Uses

The table below details the sources and uses for the proposed LVI restructuring. The restructuring for LVI importantly contemplates: $25 million of new cash equity ($15 million from CHS; $10 million from Apollo), $15 million of senior debt (to equity) conversion by Falcon, $52 million of subordinated debt conversion by Apollo, and the use of $17 million of balance sheet cash to repay the revolver and various other expenses. The new equity will be used to repay senior debt through a dutch tender. The charts below show the senior debt retired at par, however we expect to take out loans in the 85-90 context (the term loan is currently quoted in the low 70s though there has been little trading activity).

*($ in millions)*

| Sources | Amount | Uses | Amount |
|---|---|---|---|
| New Equity (net of 5% Equity Fee) | $25.0 | Paydown Revolver | $9.5 |
| Balance Sheet Cash | 17.0 | Reduction of Senior Term Loan - Cash Paydown | 25.0 |
| Conversion of Falcon Senior Debt Claim | 15.0 | Reduction of Senior Term Loan - Falcon Conversion | 15.0 |
| | | Payments to Key Management (W/Cap Claim Related) | 4.0 |
| | | Senior Debt Amendment Fee | 0.9 |
| | | Fees & Expenses (Legal, Financial Advisor, Etc.) | 2.6 |
| **Total Sources** | **$57.0** | **Total Uses** | **$57.0** |

### Existing and Pro Forma Capitalization

LVI's restructured balance sheet will have total debt reduced by approximately $100 million, thereby providing a permanent solution to its capital structure problems. Cash-pay debt will be reduced to 4.6x, which implies a relatively healthy interest coverage ratio of 2.0x. While we show the full amount of the Mazzochi claim – to be conservative – we expect this claim to be eliminated for some lesser amount for reasons discussed later in this memo. Pro forma liquidity stands at $19 million, which combined with FCF is enough to support working capital as the business rebounds.

*($ in millions)*

| | Estimated at Closing | | | | Pro Forma for Restructuring | | |
|---|---|---|---|---|---|---|---|
| | At Closing | x LTM EBITDA (net) | x LTM EBITDA - CapEx (net) | Pro Forma Adjustments | Pro Forma | x LTM EBITDA (net) | x LTM EBITDA - CapEx (net) |
| Cash | $18.0 | | | ($17.0) | $1.0 | | |
| Revolver | $9.5 | | | ($9.5) | $0.0 | | |
| Term Loan | 113.9 | | | (40.0) | 75.9 | | |
| Equipment Loans / Cap. Leases | 11.5 | | | | 11.5 | | |
| Total Senior Debt | $134.9 | | 6.4x | 7.7x | | $87.4 | 4.6x | 5.6x |
| Apollo Sub. Debt | 51.6 | | 9.1x | 11.1x | (51.6) | 0.0 | | |
| Mazzochi Seller Note | 8.5 | | | | 8.5 | | |
| Total Debt | $191.0 | | 9.6x | 11.6x | | $95.9 | 5.1x | 6.2x |
| Accrued Working Capital Claim due to Sellers | $8.0 | | | | 8.0 | | |
| Aggregate Contributed Equity to Date | 86.0 | | | (38.0) | 0.0 | | |
| | | | | (86.0) | | | |
| New Contributed Equity | 0.0 | | | 40.0 | 40.0 | | |
| **Total Capitalization** | **$321.0** | | **16.2x** | **19.7x** | | **$135.9** | **7.2x** | **8.8x** |

| | |
|---|---|
| LTM 4/30/10 EBITDA | $18.7 |
| LTM 4/30/10 CapEx | 3.3 |
| Estimated PF Interest Expense | 9.3 |

| Pro Forma Coverage Stats | | Pro Forma Available Liquidity | |
|---|---|---|---|
| EBITDA / Interest | 2.0x | Cash | $1.0 |
| EBITDA - CapEx / Interest | 1.7x | R/C Availability | 18.0 |
| | | **Total PF Liquidity** | **$19.0** |

3

Confidential

AIC 00000115

## Ownership

The following chart outlines the ownership split of LVI post-restructuring. Ownership is based on a recapitalized value of 6.8x - 7.2x depending on the final amount of the Mazzochi claim. At present, our notes finance from 6.4x to 9.1x (net leverage). Our view has been that we are the fulcrum but multiples are stretched particularly when factoring in the $7.5 million of payments required to compensate management for prior claims, the Mazzochi claim of up to $8.5 million, which while contractually junior is structurally senior and therefore cannot be flushed out-of-court, and other restructuring costs. Consistent with this thinking – and our desire not to provide the entire $25 million of new money required – we obtain modest value for our mezzanine conversion but our recovery is primarily driven by the new money investment. Given that we have had to take a significant haircut in order to facilitate an out-of-court consensual restructuring, we required that Falcon also convert its existing senior debt into equity at a 33% discount, which they argued strongly against. To illustrate the difference - while CHS's $15 million equity investment provides 37.5% ownership, Falcon's $15 million conversion only provides 25% ownership. This is what AIC achieves through its $10 million investment. We believe the ownership percentages below are fair and provide AIC a chance for a full recovery, which is discussed later in this memo.

| Owner | Amount | Common Consideration | Common Value | Pre-Mgmt Options | Post-Mgmt Options |
|---|---|---|---|---|---|
| AIC Mezz | 51.6 | 10% | 5.0 | 12.5% | 11.3% |
| AIC New Money | 10.0 | 100% | 10.0 | 25.0% | 22.5% |
| AIC TOTAL | 61.6 | | 15.0 | 37.5% | 33.8% |
| CHS New Common | 15.0 | 100% | 15.0 | 37.5% | 33.8% |
| Falcon | 13.0 | 67% | 10.0 | 25.0% | 22.5% |
| Mgmt Options | | | | 0.0% | 10.0% |
| Total | | | 40.0 | 100.0% | 100.0% |

## Board Composition

LVI's Board will consists of: Burt Fried, Chairman / former CEO, 2 seats for each Apollo and CHS, 1 seat for Falcon and 2 independent seats, which will be nominated by majority shareholders. We expect the independent seats to remain held by the existing directors who are Richard Ferrucci (owns an insurance brokerage firm, secured the Arch bonding relationship) and Robert Buck (Chairman/CEO of Beacon Roofing, a former CHS portfolio company). The shareholders agreement is fairly straightforward and provides for certain veto rights (which each owner maintains) and almost all major decisions to be made by majority vote.

| Owner | Board Seats |
|---|---|
| Apollo | 2 |
| CHS | 2 |
| Falcon | 1 |
| Independents | 2 |
| CEO | 1 |
| Burt Fried | 1 |
| | 9 |

4

AIC 00000116

### III – Key Constituents

Excluding Apollo and CHS, four primary constituent are critical to achieving the contemplated restructuring. These are:

1. Falcon Investments, who owns $37 million (or 23%) of the first lien
2. Management, who importantly are owed $8 million from the disputed "working capital" claim
3. Nick Mazzochi, who has an $8.5 million note (at an opco, but subordinated to AIC's mezzanine)
4. The senior lenders – we need 100% to vote in favor given maturity extension

Below is a more detailed discussion of where we stand with each key constituent.

### 1. Falcon Investments

Falcon Investments was formed as a private equity fund in 2000 by Sandeep Alva and William Kennedy who worked previously together in the mezzanine group of John Hancock Life Insurance Company. Falcon is currently investing its third fund, has $1 billion of assets under management, is based in New York and targets $10-$75 million sub debt and equity investments. Throughout the LVI process, Falcon has been very difficult to deal with and oftentimes unreasonable. Rafael Fogel is the partner responsible for the investment. Prior to joining Falcon, "Rafe" was a high yield manager at SunAmerica Investments.

Falcon is highly familiar with LVI, having held a minority position in the Company under the previous ownership (Blue Point). Through secondary purchases, Falcon today holds $37 million of the first lien which constitutes 32% of the term loan (but its vote is only 23% when including the revolver). Reaching a deal with Falcon was therefore a first step and took extensive discussions over months. The deal with Falcon, which has it converting $15 million, will leave them owning 19% of the senior facility post restructuring. This assumes Falcon does not tender any of its position in the dutch auction.

While most aspects of our deal with Falcon have been negotiated, we are concerned that Falcon may seek to revisit its economics if a deal with the senior lenders materially changes or the settlement with Mazzochi takes a turn for the worse. At present, this does not seem like it will be the case.

### 2. Management / Working Capital Claim

The acquisition consideration for LVI contained a deferred payment, which would be made upon cash receipt of certain accounts receivable. The Company made $25 million of the estimated $50 million of payments in connection with this working capital adjustment, but as the business underperformed (and creditors prohibited further cash distributions), LVI reached an agreement with the previous owners to defer payment indefinitely. That amount has since accrued to almost $40 million and sits at LVI Acquisition Corp, a holding company.

We've included a schedule of the amounts owed to different constituents under the working capital adjustment on the next page. Blue Point (seller of LVI to CHS) is the largest holder with $22.8 million exposure. To date, we have not had any discussions about this claim with Blue Point. Though structurally and contractually junior to the new equity, this claim is disclosed in LVI's audited financials and therefore attracts attention with sureties. To clean it up, we would be prepared to offer a small amount of out-of-the-money warrants struck at a value after which CHS and Apollo achieve a full recovery. The claim with management is more difficult as it extends throughout the organization and encompasses all key employees including branch managers. Management, and in particular Burt Fried, has expressed a strong desire to be able to obtain this value over time.

5

AIC 00000117

We cannot provide compensation to one party of a claim and not the others. However, we do not want to risk jeopardizing employee morale or risk defections over this issue. As such, we plan to make a $4 million payment to the management at closing in connection with achieving a successful restructuring. Management will be able to obtain an additional $4 million (paid equally over 2 years) if it can grow EBITDA to certain agreed upon targets – these earn-outs would be permitted "restricted payments" under the credit agreement. We believe we are close to a deal with management however tax considerations still need to be vetted.

| Summary | |
|---|---|
| Blue Point | $ 22,834,193.71 |
| DuPont/Wilton/Sürchting | 2,779,230.65 |
| Falcon | 4,410,517.92 |
| Ed Pleasants | 217,504.97 |
| Mgmt Employees – current | 8,869,313.24 |
| Mgmt Employees - former (*) | 883,857.54 |
| | $ 39,994,618.03 |

## 3. Mazzochi Claim

In 2007, LVI acquired Mazzochi Wrecking, Inc. a NJ based provider of structural demolition services (fifth largest in the U.S.). The acquisition consideration consisted of approximately $12 million of cash, $5.4 million of assumed debt and $10 million in deferred consideration in the form of a note that sits at LVI Mazzochi Wrecking, a subsidiary of LVI Services, the borrower. The obligation is at an operating company and therefore is structurally senior to the term loans and mezzanine. It is also guaranteed by LVI Services and therefore derives credit support from all the other operating companies. However, the note is expressly subordinated to debt at LVI Services and therefore would be treated as a junior claim in bankruptcy. The note amount is approximately $8.5 million.

Prior to its sale to LVI, Mazzochi was engaged in an FBI undercover investigation aimed at rooting out a corrupt Newark city official. Effectively the official was awarding business to Mazzochi in exchange for Mazzochi subcontracting with firms that would provide the official with compensation. We've been told that Mazzochi came under FBI investigation after having conspired with the official (a criminal offense). In exchange for leniency, Mazzochi agreed to cooperate. However in the process of setting up the official, he won several jobs that effectively inflated earnings. No disclosure was made of this during the sale process, which is a clear breach of certain representations and warranties in the purchase agreement. The investigation was made public only recently and LVI is seeking to cancel the remaining note.

Mazzochi believes he is entitled to the full amount of the claim. Even if he ultimately agrees to the breach, there is a question of how to quantify the damages. We have some thoughts but in short believe this could take some time to resolve, particularly if Mazzochi chooses to litigate versus settle. The Company has a strong position and will attack all consideration paid to Mazzochi. The next step however is for LVI and Mazzochi's lawyers to see if they can make any progress on a settlement. Given how long this will likely take to resolve, we plan to close with the $8.5 million liability remaining on the balance sheet.

## 4. The Senior Lenders

There are effectively two groups of senior lenders – one with revolver commitments and the other with funded term loan exposure. There is little crossover holdings which has been problematic because each group has a different motivation. The revolver lenders currently have $25.5 million outstanding in the form of funded loans and letters of credit under a $45 million committed facility. This group recognizes the need to continue extending revolver availability, but their goal is to reduce exposure to the maximum

Confidential

AIC 00000118

extent possible. Complicating matters, Dymas/Cerberus is the second largest holder under the revolver with $17.5 million. Dymas has been outspoken about their intent to limit future exposure and can hold-up the deal. Other revolver lenders including M&T and CIBC appear more commercially minded. Despite these dynamics, we are actually very close to agreement.

The term loan is held by 13 institutions with Falcon holding the largest amount at 23% and Highland the second largest holder at 10%. Confirmed through our own checkings, outside of these two groups, all investors in the first lien seem highly motivated to complete a restructuring as quickly as possible and the deal we have proposed is attractive to them. The following chart contains a summary of key terms. At this point, we have had several rounds of comments with the first lien, and while a handful of points remain outstanding (capex covenant, additional covenant in the future, minor economic adjustments), we believe we can arrive at a deal materially similar to what is outlined below. To note, the primary risk to a deal with the first lien is that a 100% vote is required given the maturity extension. This gives smaller holders significant hold-up value. Bankruptcy is not a good option to flush these accounts, as we believe it will impede LVI's ability to obtain bonding and compete for new business. We provide an option for these accounts to sell their loan through the dutch tender and would use this pressure to drive consensus.

One other item to note, we are contemplating LVI paying a $400,000 per year management fee. Apollo's share of this would be $150,000.

| Term | Current Credit Agreement | Company Proposal (6/7) |
|---|---|---|
| Revolving Credit Commitment | • $45MM | • $38MM as of the Closing Date; with a reduction to $35MM anytime LTM does not exceed $17MM |
| Maturity | • Revolver: November 16, 2010<br>• Term Loan: November 16, 2011 | • Revolver: September 30, 2013<br>• Term Loan: March 31, 2014 |
| Amortization | • Quarterly amortization of $350K through 12/31/10; balloon payments for subsequent quarters | • Quarterly amortization payments of $150K beginning on March 30, 2011 |
| Term Loan Call Protection | • N/A | • Year 1 - 102; Year 2 - 101 (if paydown is made with proceeds from a debt or equity issuance) |
| Covenants | • Min FCCR (currently at 1.15x); total leverage (currently at 5.00x w/step-down to 4.90x at 9/30/2010); CapEx not to exceed $7.5MM | • Min FCCR of 1.00x thru 12/31/2011, 1.15x thereafter; CapEx set at the greater of 120% of projections and $7.5MM |
| Pricing | • Based on a leverage grid, currently at P + 4.00% (not including default interest) | • LIBOR + 7.50% if Total Leverage > 3.25x<br>• LIBOR + 4.75% if Total Leverage ≤ 3.25x<br>• 1.75% LIBOR Floor |
| Sponsor Guaranty | • No longer in effect | • Subject to the conversion of not less than $15 million of Term Loans to equity on the Closing Date, among other things, no guaranty of the Sponsor of Revolving Loans and Letter of Credit Usage shall be required. |
| Management Fees | • Up to $1MM per year, payable in cash | • Up to $400k per year. payable in cash (so long as FCCR ≥ 1.00x, otherwise shall accrue) |
| Excess Cash Flow Sweep | • 75% of excess cash flow | • 75% of excess cash flow |
| Other | • N/A | • Payment of an amendment fee to lenders of 0.75% on the pro forma facility<br>• Payment to certain members of the management team of $4MM at closing, with the opportunity to earn two additional payments of $2MM each<br>• Ability to conduct a reverse Dutch auction for a period of no longer than fifteen (15) days after close<br>• Conversion of $15MM of term loans into equity<br>• Equity contribution of at least $25MM<br>• Potential consideration given to holders of the Working Capital Adjustment in the form of warrants for common equity |

7

Confidential

AIC 00000119

## IV – Company and Financial Overview

LVI is the nation's largest environmental remediation, demolition and facility services provider and the only national provider of turnkey remediation and demolition services in the U.S.  LVI serves facility owners and construction firms in large and growing end markets including energy, power and industrial, infrastructure, government and institutional – along with its core retail and commercial markets.  The Company leverages its national footprint comprised of 25 regional offices to deliver asbestos abatement, soft and structural demolition, mold remediation, decontamination and decommissioning, fireproofing and on-demand emergency response services to customers across the country.  In 2009, LVI completed work on over 4,000 projects with an average contract size of $66,000.

Along with its bonding capacity (discussed in more detail later in this memo), a key differentiator for LVI is its world-class safety record – which sets it apart from its peers and provides the Company with the opportunity to access a broader range of industrial and other non-commercial customers, including government (federal, state and municipal), leading power utility providers and major oil and gas companies.  During 2009, LVI experienced a recordable incident rate of 1.2 cases per 100 full time workers compared to the industry average of 5.1 cases.  Furthermore, LVI had a lost time injury rate of 0.2 cases per 100 full time workers as compared to the industry average of 2.7 cases.  These safety metrics have been improving over the past several years – driven by a heightened safety focus implemented under prior CEO Bob McNamara.  Within the construction services sector, safety metrics are critical to maintain particularly as it relates to workers comp insurance, bonding and public projects.




LVI groups its service offerings into 3 business segments: Remediation, Demolition, and Emergency Response.  Each of these three segments are discussed in greater detail in the following pages.

Remediation Segment (45% of 2010E Revenue)
LVI's remediation segment primarily consists of jobs related to the remediation of asbestos, lead and mold as well as specialized services including fireproofing and infection control.  LVI has an extensive history of successful abatement projects, with almost 18,000 asbestos abatement projects completed since 2000 and over 50 million recorded man hours related to asbestos and mold removal in the past 20 years.  The Company is capable of performing remediation tasks in either non- or partially-occupied buildings and caters to a wide variety of clients, including government buildings, schools, hospitals, hotels, industrial facilities and more.  LVI has a proven track record with exceptionally low incident rates and employs the most up-to-date abatement solutions with quality standards exceeding national and industry standards.  According to *Engineering News-Record*, LVI is the largest asbestos abatement contractor in the U.S. at almost four times the size of its closest competitor.

8

AIC 00000120

As illustrated below, LVI's Remediation segment has been severely negatively impacted by the recent economic downturn, with total segment revenue for 2010 projected at $125-$130 million (roughly equal to 2002 total remediation revenue and down from a peak of $245 million in 2008). It should be noted that the true downturn over the past two years and the impact on the Remediation segment has been somewhat masked by the large 130 Liberty Street abatement project (Deutsche Bank building in lower Manhattan), which contributed $54 million of remediation revenue in 2008 and $37 million in 2009. Excluding this one project, "adjusted" revenue for the Remediation segment declined by 15% and 28% in 2008 and 2009, respectively, and is projected to decline by another 8% in 2010. In management's forecast as illustrated in the following pages, total Remediation segment revenue is projected to return to 2003-2005 levels by 2012-2014 due to expected improvement in the core commercial environment.

**Remediation Segment**

| ($ in millions) | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | INITIAL BANK PLAN 2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **REVENUE** | | | | | | | | | | | |
| ACM | $112.6 | $97.0 | $110.8 | $122.7 | $126.3 | $138.4 | $159.8 | $182.2 | $201.1 | $145.4 | $91.1 |
| Lead | 6.1 | 7.4 | 5.2 | 4.2 | 4.2 | 6.3 | 10.0 | 11.5 | 8.4 | 4.3 | 6.6 |
| Mold/Hazmat | 0.3 | 4.5 | 8.8 | 18.1 | 23.8 | 20.2 | 19.4 | 13.7 | 12.1 | 8.3 | 12.8 |
| FP | 4.6 | 5.0 | 6.4 | 6.5 | 9.7 | 12.1 | 13.3 | 16.5 | 23.0 | 16.1 | 15.1 |
| Total Remediation | $123.6 | $113.9 | $131.2 | $151.5 | $164.0 | $177.0 | $202.5 | $223.9 | $244.6 | $174.1 | $125.6 |
| % Growth | — | -7.8% | 15.2% | 15.5% | 8.3% | 7.9% | 14.4% | 10.6% | 9.2% | -28.8% | -27.9% |
| **DIRECT GROSS PROFIT** | | | | | | | | | | | |
| ACM | $30.5 | $26.1 | $28.4 | $32.0 | $29.4 | $30.8 | $41.3 | $43.6 | $45.6 | $32.2 | $23.1 |
| % Margin | 27.1% | 26.9% | 25.6% | 26.1% | 23.3% | 22.3% | 25.8% | 23.9% | 22.7% | 22.1% | 25.4% |
| Lead | 1.8 | 1.6 | 1.3 | 1.3 | 1.3 | 1.9 | 3.0 | 3.4 | 2.7 | 1.3 | 1.7 |
| % Margin | 29.5% | 21.6% | 25.0% | 31.0% | 31.0% | 30.2% | 30.0% | 29.6% | 32.1% | 30.2% | 25.8% |
| Mold/Hazmat | 0.1 | 1.6 | 3.3 | 7.2 | (1.3) | 8.1 | 6.3 | 4.1 | 4.0 | 2.9 | 3.6 |
| % Margin | 33.3% | 35.6% | 37.5% | 39.6% | -5.5% | 40.1% | 32.5% | 29.9% | 33.1% | 34.9% | 28.1% |
| FP | 1.3 | 1.3 | 1.5 | 1.4 | 2.3 | 2.9 | 3.1 | 3.8 | 6.0 | 3.4 | 4.1 |
| % Margin | 28.3% | 26.0% | 23.4% | 21.5% | 23.7% | 24.0% | 23.3% | 23.0% | 26.1% | 21.1% | 27.2% |
| Total Remediation | $33.7 | $30.6 | $34.5 | $41.9 | $31.7 | $43.7 | $53.7 | $54.9 | $58.3 | $39.8 | $32.5 |
| % Margin | 27.3% | 26.9% | 26.3% | 27.6% | 19.3% | 24.7% | 26.5% | 24.5% | 23.8% | 22.9% | 25.9% |

**Remediation Segment (Excluding 130 Liberty St. Project)**

| ($ in millions) | 2007 | 2008 | 2009 | INITIAL BANK PLAN 2010 |
|---|---|---|---|---|
| Total Remediation Revenue | $223.9 | $244.6 | $174.1 | $125.6 |
| Less: 130 Liberty ACM Revenue | 0.0 | (54.3) | (37.4) | 0.0 |
| "Adjusted" Remediation Revenue | $223.9 | $190.3 | $136.7 | $125.6 |
| % Growth | | -15.0% | -28.2% | -8.1% |

9

AIC 00000121

Demolition Segment (47% of 2010E Revenue)

Through its Demolition segment, LVI executes both structural and non-structural demolition projects, ranging from selective interior / exterior demolition to large-scale building implosions. In addition, LVI's total turnkey demolition services provide a key competitive advantage as the Company can also perform any required remediation services in advance of demolition (as they did for the 130 Liberty Street Deutsche Bank project and are doing for the Madison Square Garden project). The Company has performed major demolition projects for industrial manufacturing and chemical plants, power plants, retail and commercial facilities, resorts and movie sets and prides itself on its reputation for world class performance, safety and efficiency.

LVI has been expanding its Demolition focus over the past 5+ years as it sought to add a key complimentary product offering to its core abatement and remediation services. The Company accomplished this primarily through acquisitions, including the 2007 acquisition of Mazzochi Wrecking, the premier provider of surgical demolition services in the New York / New Jersey metro area. As such, over the past 10 years LVI has grown its annual demolition related revenue from $15-$20 million to over $100 million.

**Demolition Segment**

| ($ in millions) | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | INITIAL BANK PLAN 2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **REVENUE** | | | | | | | | | | | |
| Demolition | $27.3 | $26.4 | $14.9 | $19.0 | $44.6 | $81.4 | $99.9 | $129.5 | $108.5 | $76.4 | $131.5 |
| % Growth | -- | -3.3% | -43.6% | 27.5% | 134.7% | 82.5% | 22.7% | 29.6% | -16.2% | -29.5% | 72.0% |
| **DIRECT GROSS PROFIT** | | | | | | | | | | | |
| Demolition | 3.1 | 3.5 | 2.9 | 3.3 | 9.1 | 14.7 | 21.2 | 26.7 | 24.1 | 18.9 | 31.1 |
| % Margin | 11.4% | 13.3% | 19.5% | 17.4% | 20.4% | 18.1% | 21.2% | 20.6% | 22.3% | 24.7% | 23.7% |

A primary driver of recent and projected demolition revenue growth relates to LVI's increased focus on and successful penetration of industrial, oil & gas and power utility projects. A major area of upside for the Company relates to these areas – primarily the projected deconstruction and decommission of older coal-fired power plants in the U.S., an initiative well documented and driven by EPA and other air emission regulations being implemented by the current Obama administration. Related to this, LVI recently signed a five year strategic alliance contract with NRG Energy, one of the nation's largest power generators. Under this agreement, LVI will serve as NRG's preferred provider of environmental services and demolition work at its power-generating facilities nationwide. In the very near term, LVI expects to receive a release of a $10.4 million project for NRG's El Segundo, CA plant related to this initiative, and other facility awards are expected to follow in the near to intermediate term. The total revenue opportunity related to NRG alone is projected by management to be $40-$60 million. Besides NRG, LVI has also been in discussions with other large utility companies for similar such work and management believes they are well positioned to secure projects from utilities such as Progress Energy, Duke Energy and AEP. Management estimates that each power plant job is a $5-$20 million revenue opportunity.

10

AIC 00000122

**Emergency Response Segment (8% of 2010E Revenue)**
The Company's Emergency Response segment now operates under the NorthStar brand. NorthStar offers professional emergency response and recovery services to customers facing damage and disruption left in the wake of any size disaster. NorthStar leverages LVI's national network of 25 regional offices and more than 3,000 employees to rapidly dispatch teams ready to assist customers in restoring their business safely, cost effectively and on schedule. The self-performing and cross-trained labor force has decades of unmatched experience with all types of industries and challenges and works with the best equipment and technology.

With over 900 million square feet contracted under MSAs, NorthStar is a preferred provider to approximately 50 large customers with holders of significant real estate portfolios, such as retailers and hospitality companies (e.g. Target, Holiday Inn). In addition to the day-to-day non-emergency work (leaks, water damage due to faulty sprinklers, etc.), the MSAs create significant upside opportunity for NorthStar in the event of hurricanes or other significant catastrophes and has allowed LVI to compete with large disaster recovery firms across the nation. For example, the Company generated over $150 million of aggregate clean-up related revenue related to 2004-2005 hurricanes, and more recently is expected to earn $5-$15 million of revenue from the recent flooding in Nashville and Rhode Island. LVI currently has people working in the Gulf on the BP oil spill, and believes this could be material to near-term earnings.

**Emergency Response Segment**

| ($ in millions) | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | INITIAL BANK PLAN 2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **REVENUE** | | | | | | | | | | | |
| Emergency Response | 0.3 | 11.4 | 2.1 | 1.0 | 54.9 | 121.2 | 22.8 | 8.1 | 23.6 | 14.8 | 22.8 |
| *% Growth* | *--* | *3700.0%* | *-81.6%* | *-52.4%* | *5390.0%* | *120.8%* | *-81.2%* | *-64.5%* | *191.4%* | *-37.1%* | *53.6%* |
| **DIRECT GROSS PROFIT** | | | | | | | | | | | |
| Emergency Response | 0.1 | 3.7 | 0.9 | 0.0 | 27.7 | 55.0 | 8.3 | 3.2 | 7.7 | 5.4 | 7.2 |
| *% Margin* | *33.3%* | *32.5%* | *42.9%* | *4.0%* | *50.5%* | *45.4%* | *36.4%* | *39.5%* | *32.6%* | *36.4%* | *31.6%* |

In Management's forecast, Emergency Response is projected to contribute $15-$20 million of annual revenue – primarily driven by non-emergency, recurring clean up work under its nationwide MSAs. A major disaster such as a hurricane (or the BP oil cleanup) represents upside to management's projections, but not something we are underwriting for purposes of evaluating the proposed new money investment in LVI. To note, LVI currently has 35 workers involved with the oil spill clean-up and many more on standby. In general it charges $24 per worker/hour and achieves a 30% contribution margin. The clean-up will eventually involve substantial amounts of additional labor. We estimate that if LVI can ultimately have 500 workers involved with the clean up, clean-up work will provide $13 million of revenue (over six months) and $4 million of profit. This provides some idea of the potential upside.

11

AIC 00000123

### V – Bonding Discussion

LVI must post bonds for all public projects, which represents about 25% of LVI's total business (private projects rarely require bonds). The following chart shows the amounts of bonds issued over the past four years and the amount outstanding as of 3/31/2010. As shown, the average bond is $700,000 and the related work is generally completed within a few months – as such, this is generally low risk business for sureties. LVI does however obtain bonds for larger projects (e.g., the work at 130 Liberty required a $14 million bond).

| YEAR ISSUED | TOTAL BONDS ISSUED | OUTSTANDING BONDS AS OF 3/31/2010 | # OF BONDS ISSUED | AVG. VALUE OF BONDS ISSUED |
|---|---|---|---|---|
| 2010 | $ 4,649,573 | $ 2,236,721 | 17 | 273,504 |
| 2009 | 44,488,145 | 17,777,838 | 85 | 523,390 |
| 2008 | 96,255,598 | 22,931,326 | 84 | 1,145,900 |
| 2007 | 86,123,075 | 4,544,179 | 122 | 705,927 |
| 2006 | 69,254,390 | 35,577 | 122 | 567,659 |
| TOTALS | $ 300,770,780 | $ 47,525,640 | 430 | $ 699,467 |

A bond is issued by a surety to effectively protect taxpayer dollars. To use an example, when LVI is awarded a project for $10 million, Arch (LVI's primary bonding provider) provides the municipality with a $10 million "performance and payment" bond in their favor. This ensures that if anything were to happen to LVI, the surety would step-in to complete the work. While this rarely occurs, the surety in this situation would hire other contractors to finish the job. Knowing that LVI has built in a 20% margin, the surety has some room to find contractors that might be more expensive. The way bonding exposure is tracked then (shown in the chart above) is based on the remaining value of the contract (as progress is made, bonding exposure is reduced).

LVI today uses primarily Arch Capital (ticker: ACGL) and AIG (Chartis) for surety bonds. Though there is no written contract to this effect, which in practicality would not have much meaning as each bond are not drawn like a revolver but based on the merits of each project, Arch has generally allocated $200 million of exposure to LVI. While LVI never needs this much in bonding, the size is an important differentiator in the market (show of strength). Arch has been working with LVI for 7-8 years; the relationship was sourced and still managed by Richard Ferrucci, who sits on LVI's board (and owns and insurance brokerage company). AIG has been working with LVI for 20 years; because their commitment to the surety business has wavered, LVI prefers to do more business with Arch.

Surety economics are seemingly low – Arch makes approximately 1% on outstanding bonds –this is because the risk and capital requirements are low. A surety has never lost money with LVI in its operating history. What sureties like to see from companies like LVI are a consistent track record in completing projects profitability, ideally the work is related to shorter-term projects and the contractor must have balance sheet strength. Arch wants comfort that LVI can withstand losses from an occasional unprofitable contract or the economic downturn. When LVI was acquired by CHS, Arch had concern over the amount of leverage and asked that LVI post a $10 million letter of credit in its favor. That LC still is in place today (we would hope to have this credit support removed following the close of this transaction, which would free up revolver capacity). Part of the impetus to get a deal done soon is that Arch has not yet received LVI's audit (we can't deliver with a clean opinion) and accordingly has expressed concern about the situation. They are aware of the financial restructuring taking place and are acting patiently. It's not in their interest to do anything that would precipitate a downturn, but if this situation persists Arch's underwriting will likely change to narrow exposure and over time we will likely lose them.

12

AIC 00000124

We have reviewed public information on Arch and believe they are in solid financial shape, well capitalized and committed to the surety business. Notably, Arch recently hired a senior person from Liberty Mutual to head the surety business and in press releases described this as a growth business. LVI is arranging for us to speak to Arch directly next week. Given the importance of bonding and dependency on Arch, upon closing we intend source additional providers as quickly as possible. Because LVI deals with hazardous materials, obtaining bonding is not as straightforward as it might be for a general contractor. However management has begun discussions with Safeco (owned by Liberty Mutual) and believes it can obtain a line once the financial restructuring has taken place.

## VI – CEO Search

In March 2010, in the midst of restructuring, Bob McNamara resigned to take become CEO of the Americas for Bovis Lend Lease. This is a big position and hopefully he will be helpful to LVI in this capacity. Fortunately, Burt Fried, Chairman and former CEO, was able to step-in as interim CEO and provide time for an orderly transition. CHS has taken the lead on the CEO search and, along with Burt Fried, has narrowed the list to four potential candidates through Heidrick & Struggles. We will meet with these candidates in the coming weeks. Our feeling though is that we will be able to recruit a talented CEO once the restructuring is completed. At present though, we are fortunate to have Burt Fried as interim CEO who has done a good job stabilizing the situation.

| Name/Title/Company | Prior Experience/Education | Compensation |
|---|---|---|
| Adrian W. Jackman<br>*Executive Vice President – International Operations*<br>EMCOR Group, Inc. | 1980 – MA– Cambridge University<br><br>1977 – BA – Cambridge University | Base: $300K<br>Bonus: 100% |
| Daniel K. Mazany<br>*SVP Principal in Charge Healthcare Group*<br>Bovis Land Lease | 1987 – MBA – University of New Haven | Base: $325K<br>Bonus: 50% |
| John L. Hopkins<br>*Group Executive, Fluor Environmental & Nuclear Operating Company* | 1980 – BBA –University of Texas | Base: $550K<br>Bonus: 100% |
| Jim Bollweg<br>*President CBI Services,Inc.* | 1974 – BS – Western Michigan University | Base: $400K<br>Bonus: 40% |

13

AIC 00000125

## VII – Consolidated Historical Financial Summary and Management Projections

The chart below summarizes LVI's 2007-2009 historical financial performance as well as management's 5-year forecast. Remediation segment revenue is projected to improve (and return to 2003-2005 levels) due to economic improvement and a return to normalcy in commercial end markets. Demolition related revenue is projected to increase given the Company's recent penetration and focus on industrial, oil & gas and utility end markets and related decommissioning / deconstruction work. As of April 2010, the Company has a $105 million backlog – a significant majority of which relates to demolition work and including $27 million for the recently awarded abatement / demolition project for Madison Square Garden. Backlog trends have been improving and management feels confident that the Company has stabilized. To note, we have engaged a market consulting firm (FMI) to interview customers and competitors and provide a better sense of where we are in the cycle. We expect to have this report in the coming days.

The projected FCF below assumes $3.75 million of earnout/other payments in each of 2011 and 2012 relating to payouts to management (relating to their pre-restructuring working capital claims - $2 million assumed paid in 2011 and $2 million assumed paid in 2012) and Mazzocchi-related payments (model assumes $1.75 million each in both 2011 and 2012). For conservatism, we show credit stats assuming the $8.5 million Mazzocchi seller note remains on LVI's balance sheet as debt.

SUMMARY HISTORICAL AND PROJECTED FINANCIALS

| ($ in millions) | 2007A | 2008A | 2009A | 2010E | 2011E | 2012E | 2013E | 2014E |
|---|---|---|---|---|---|---|---|---|
| **Revenue Build** | | | | | | | | |
| Remediation | $223.8 | $244.6 | $174.1 | $127.5 | $139.8 | $148.8 | $171.2 | $186.8 |
| Demolition | 129.5 | 108.5 | 76.4 | 126.6 | 144.7 | 159.1 | 175.0 | 192.5 |
| Emergency Response | 8.2 | 23.6 | 14.8 | 14.1 | 15.6 | 17.1 | 18.8 | 20.7 |
| **Total Revenue** | **$361.5** | **$376.7** | **$265.3** | **$268.2** | **$300.1** | **$325.0** | **$365.0** | **$400.0** |
| *% Growth* | *10.9%* | *4.2%* | *-29.6%* | *1.1%* | *11.9%* | *8.3%* | *12.3%* | *9.6%* |
| | | | | | | | | |
| Gross Profit (incl. D&A) | 71.7 | 75.4 | 54.5 | 59.8 | 66.0 | 71.5 | 80.3 | 88.0 |
| *% Margin* | *19.8%* | *20.0%* | *20.5%* | *22.3%* | *22.0%* | *22.0%* | *22.0%* | *22.0%* |
| | | | | | | | | |
| SG&A | 51.6 | 50.6 | 44.4 | 44.6 | 45.9 | 48.4 | 52.0 | 55.4 |
| *% of Total Revenue* | *14.3%* | *13.4%* | *16.7%* | *16.6%* | *15.3%* | *14.9%* | *14.4%* | *13.9%* |
| | | | | | | | | |
| **Adj. EBITDA** | **$34.3** | **$35.1** | **$20.4** | **$24.0** | **$26.1** | **$28.5** | **$33.8** | **$38.1** |
| *% Margin* | *9.5%* | *9.3%* | *7.7%* | *8.9%* | *8.7%* | *8.8%* | *9.3%* | *9.5%* |
| | | | | | | | | |
| CapEx | 4.4 | 4.2 | 4.1 | 4.1 | 3.8 | 5.8 | 4.6 | 5.0 |
| *% of Total Revenue* | | | | | | | | |
| | | | | | | | | |
| Note - Total Backlog | $138.5 | $120.1 | $89.3 | | | | | |

PROJECTED FCF AND CREDIT STATS (PF FOR RESTRUCTURING)

| | 6 mos. 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|
| **Free Cash Flow** | | | | | |
| EBITDA | $15.5 | $26.1 | $28.5 | $33.8 | $38.1 |
| Earnout / Other Payments | 0.0 | (3.8) | (3.8) | 0.0 | 0.0 |
| Maintenance CapEx | (2.9) | (3.8) | (4.1) | (4.6) | (5.0) |
| Operating Lease Buyout | 0.0 | 0.0 | (1.8) | 0.0 | 0.0 |
| Taxes | (2.9) | (4.8) | (6.7) | (8.8) | (10.8) |
| Change in Working Capital | (0.3) | (1.3) | (3.7) | (5.4) | (5.2) |
| **Subtotal - FCF** | **$9.5** | **$12.6** | **$8.6** | **$15.0** | **$17.1** |
| Management Fee | (0.2) | (0.4) | (0.4) | (0.4) | (0.4) |
| Cap. Lease Payments | (1.4) | (2.7) | (2.8) | (2.6) | (1.6) |
| Cash Interest | (4.6) | (7.4) | (6.6) | (6.4) | (6.2) |
| **FCF for Debt Repayment** | **$3.3** | **$2.1** | **($1.2)** | **$5.7** | **$9.0** |
| | | | | | |
| Net Senior Debt | $81.3 | $76.5 | $74.9 | $66.7 | $56.2 |
| Net Senior Debt / EBITDA | 3.4x | 2.9x | 2.6x | 2.0x | 1.5x |
| | | | | | |
| Net Total Debt | $89.8 | $85.0 | $83.4 | $75.2 | $64.7 |
| Net Total Debt / EBITDA | 3.7x | 3.3x | 2.9x | 2.2x | 1.7x |

14

AIC 00000126

**Quarterly Analysis and 2010 "Likely Case" Projection**

Management believes that they have good momentum heading into H2 2010 -- including a $105 million backlog as of April 30th which should drive near term earnings – and is reluctant to revise downward the 2010 EBITDA estimate of $24 million (although they acknowledge this will be difficult to achieve). This H2 forecast projects Q3 and Q4 revenue of $80 million and $75 million, respectively. Given our discussions with management of the assumptions contained in these quarterly forecasts, we believe a $10 million revenue reduction in each of these two remaining quarters is warranted for a more "base case" estimate – particularly given the underperformance vs. plan thus far in 2010 (our adjustment is effectively a run-rate of the underperformance). At approximately 20% gross margin and SG&A relatively fixed at $11 million a quarter, this $20 million cumulative revenue reduction through year end equates to a $4 million reduction to 2010 EBITDA. At $20 million of earnings, total leverage at year end (including the Mazzochi note) is estimated at 4.5x vs. management's plan of 3.7x and down from 5.1x estimated at closing. If we are successful in eliminating the Mazzochi note, total leverage would be approximately 4x.

It's important to note that LVI experiences some seasonality (primarily due to weather) with H2 stronger than H1. The business therefore faces relatively favorable comps in the back half of the year. We would be disappointed if we did not see EBITDA growth from June levels.

**Quarterly EBITDA Analysis**

|  | Q1 | Q2 | Q3 | Q4 | Total |
|---|---|---|---|---|---|
| 2008A | 4.3 | 9.5 | 11.1 | 10.2 | $35.1 |
| 2009A | .5.5 | 6.0 | 4.1 | 4.8 | $20.4 |
| 2010E | 3.7 | 4.8 | 8.2 | 7.4 | $24.0 |
| | | | | | |
| Mgmt Case 2010 LTM EBITDA | $18.6 | $17.4 | $21.5 | $24.0 | |
| Projected Leverage at Year End | | | | 3.7x | |
| | | | | | |
| AIC Base Case Assumptions | | | | | |
| Revenue "Risk" to 2010 Quarterly Periods | | $0.0 | $10.0 | $10.0 | |
| EBITDA Impact (1) | | 0.0 | 2.0 | 2.0 | |
| | | | | | |
| AIC Base Case 2010 LTM EBITDA | $18.6 | $17.4 | $19.5 | $20.0 | |
| Projected Leverage at Year End | | | | 4.5x | |

(1) Assumes 20% Gross Margin business; SG&A assumed relatively fixed (as per management guidance).

15.

**Confidential**

AIC 00000127

## VIII – Recovery Analysis

For purposes of projecting returns / recoveries to the various constituents, we have assumed an exit in 3 years (June 2013). The tables below illustrate returns assuming 3 different LTM EBITDA assumptions at exit ($25 million, $30 million, and $35 million) and furthermore assume an exit multiple of 6.5-7.0x. As a reminder, LVI generated EBITDA of $34-$35 million in both 2007 and 2008, and upside certainly exists for EBITDA meaningfully greater than $35 million in 3 years. However, for underwriting purposes we have focused on the three cases illustrated below. Additionally, for conservatism we again assume that the Mazzochi seller note remains an $8.5 million debt obligation of LVI.

To bookend reasonable outcomes – we believe an exit EBITDA of $25 million represents a conservative case and $35 million of EBITDA represents a reasonable growth case. At a 6.5x exit multiple on $25 million of EBITDA, the new money generates a 1.9x MOIC and a 3-year IRR of 23.6%. Given the equity stake received from our mezzanine conversion, total proceeds to AIC would be $28 million under this scenario. In a $35 million and 7x exit, the new money generates an MOIC of 3.7x and a 3-year IRR of 55.2%. Total proceeds to AIC in this scenario is $56 million.

To note, for purposes of the Falcon IRR shown below we assume their contribution is valued at $15 million (face amount of senior term loan being converted). In reality, their cost basis for their term loan investment is closer to 50 cents on the dollar and their internal IRRs would be much greater (and a reason they were ultimately willing to convert at a higher valuation than the new money investment proposed by CHS and AIC).

Assumed 3-year Exit with LTM EBITDA of $25 million

| Exit Multiple of 6.5x | | Exit Multiple of 7.0x | |
|---|---|---|---|
| | AIC $25mm Case | | AIC $25mm Case |
| | 6.5x | | 7.0x |
| *($ in millions)* | 3-Year Exit | *($ in millions)* | 3-Year Exit |
| **Apollo** | | **Apollo** | |
| Mezz Conversion Equity | $9.4 | Mezz Conversion Equity | $10.9 |
| New Money Equity | 18.9 | New Money Equity | 21.7 |
| Subtotal | $28.3 | Subtotal | $32.6 |
| **CHS** | | **CHS** | |
| New Money Equity | 28.3 | New Money Equity | 32.6 |
| Subtotal | $28.3 | Subtotal | $32.6 |
| MOIC on New Money | 1.9x | MOIC on New Money | 2.2x |
| 3-Year IRR on New Money | 23.6% | 3-Year IRR on New Money | 29.4% |
| **Falcon** | | **Falcon** | |
| Common Equity from Conversion | 18.9 | Common Equity from Conversion | 21.7 |
| Subtotal | $18.9 | Subtotal | $21.7 |
| Falcon 3-Year IRR | 8.0% | Falcon 3-Year IRR | 13.1% |
| Mgmt Options | $4.0 | Mgmt Options | $5.2 |

Confidential

AIC 00000128

Assumed 3-year Exit with LTM EBITDA of $30 million

| Exit Multiple of 6.5x | | Exit Multiple of 7.0x | |
|---|---|---|---|
| | AIC $30mm Case | | AIC $30mm Case |
| | 6.5x | | 7.0x |
| ($ in millions) | 3-Year Exit | ($ in millions) | 3-Year Exit |
| **Apollo** | | **Apollo** | |
| Mezz Conversion Equity | $13.1 | Mezz Conversion Equity | $14.8 |
| New Money Equity | 26.2 | New Money Equity | 29.6 |
| Subtotal | $39.3 | Subtotal | $44.4 |
| **CHS** | | **CHS** | |
| New Money Equity | 39.3 | New Money Equity | 44.4 |
| Subtotal | $39.3 | Subtotal | $44.4 |
| MOIC on New Money | 2.6x | MOIC on New Money | 3.0x |
| 3-Year IRR on New Money | 37.8% | 3-Year IRR on New Money | 43.8% |
| **Falcon** | | **Falcon** | |
| Common Equity from Conversion | 26.2 | Common Equity from Conversion | 29.6 |
| Subtotal | $26.2 | Subtotal | $29.6 |
| Falcon 3-Year IRR | 29.4% | Falcon 3-Year IRR | 25.4% |
| Mgmt Options | $7.2 | Mgmt Options | $8.7 |

Assumed 3-year Exit with LTM EBITDA of $35 million

| Exit Multiple of 6.5x | | Exit Multiple of 7.0x | |
|---|---|---|---|
| | AIC $35mm Case | | AIC $35mm Case |
| | 6.5x | | 7.0x |
| ($ in millions) | 3-Year Exit | ($ in millions) | 3-Year Exit |
| **Apollo** | | **Apollo** | |
| Mezz Conversion Equity | $16.8 | Mezz Conversion Equity | $18.7 |
| New Money Equity | 33.5 | New Money Equity | 37.5 |
| Subtotal | $50.3 | Subtotal | $56.2 |
| **CHS** | | **CHS** | |
| New Money Equity | 50.3 | New Money Equity | 56.2 |
| Subtotal | $50.3 | Subtotal | $56.2 |
| MOIC on New Money | 3.4x | MOIC on New Money | 3.7x |
| 3-Year IRR on New Money | 49.6% | 3-Year IRR on New Money | 55.2% |
| **Falcon** | | **Falcon** | |
| Common Equity from Conversion | 33.5 | Common Equity from Conversion | 37.5 |
| Subtotal | $33.5 | Subtotal | $37.5 |
| Falcon 3-Year IRR | 30.7% | Falcon 3-Year IRR | 35.6% |
| Mgmt Options | $10.5 | Mgmt Options | $12.2 |

## IX– Summary Remarks

This is a challenging situation given the number of constituents involved, pressure we are experiencing with Arch (given LVI's inability to deliver a clean audit) and lack of visibility on the cycle. If we can't reach a capital structure solution in the near-term the business will likely come under significant pressure. We are hopeful that the FMI report, which we expect to receive in the coming days, will confirm what we are seeing and hearing from management – that the business has flat-lined, its industry positioning remains strong and the market outlook is improved.

17

Confidential

AIC 00000129

The restructuring we've taken a lead in developing requires unanimous support and therefore almost by definition cannot be ideal for any group. Ultimately, we believe a $10 million investment is warranted because it's in connection with implementing a permanent solution and provides AIC with a good shot at recouping a meaningful amount, if not all, of our total investment. The valuation we are investing at is reasonable, the debt load manageable and the new money economics are potentially 3-4x.

LVI has a long operating history and through this downturn we are effectively at revenue levels experienced 10 years ago. But today, LVI is a more diverse and professional business than it was then and has major opportunities in the energy market that it previously could not pursue (lacked relationships/expertise). As such, we expect it to recover to higher levels in the coming years. As this occurs, we will likely have opportunities to refinance the debt at less expensive rates. Improved performance will also enable an exit, which we believe might occur with a large strategic seeking a U.S. footprint or a niche remediation company with a solid reputation and track record. It could also occur with a private equity group, which could grow LVI both organically and through acquisitions – effectively the strategy LVI has been pursuing for two decades. The market is still highly fragmented and will consolidate over time.

This memo was intended to provide an overview of the situation and new money investment.   We will keep the team posted on the restructuring process, performance and key findings from the FMI report. Please call any of us with questions.

18

Confidential

AIC 00000130

# Exhibit 18

**From:**      Scott State <scott.state@gmail.com>
**Sent:**      Tuesday, September 14, 2010 4:09 PM
**To:**        Hogan, Robert <Rhogan@chsonline.com>
**Cc:**        Simmons, Brian P. <BSimmons@chsonline.com>
**Subject:**   Re: Burt/LVI Board

I think we can assume that Burt is essentially another Falcon vote on the Board. Long term, very close relationship there from what I have gathered.

The whole surety question is an interesting one. The LVI surety (Arch) is one of the smaller players in the market and not real active. Have done alot of surety work dealing with claims and litigation for third parties and not seen them in the game too much. They recently changed out their management and the new leader (David Finkelstein) came over from Liberty Mutual. I believe Burt has had a call with him to introduce himself. We will have to get on this quickly since Liberty is not really a player at all in the construction surety market and Finkelstein will be looking at what business he wants to keep. If Arch were to pull away I do feel confident we could put a new line in place with a number of other parties I have worked with.

On Tue, Sep 14, 2010 at 2:39 PM, Hogan, Robert <Rhogan@chsonline.com> wrote:
> You are correct. I missed that in my earlier email. This was added by Falcon late in the
> negotiation process. They were concerned that the lack of a CEO and the future departure of Burt
> would be damaging to the business--in particular its relationship with the sureties. In addition,
> Falcon did not want the Chairmanship in the hands of one of the three key shareholders. Burt
> made sense as a "neutral" Chairman.
>
> As long as the three key shareholders own at least 50% of what they owned immediately post-
> restructuring, we would need the unanimous vote of the three shareholders to replace Burt as
> Chairman.
>
> In the end, you will run the business and report to the entire Board, not solely the Chairman.
>
> ─────────────────────────────────────
> Robert Hogan
> Principal
> Code Hennessy & Simmons LLC
> 10 S. Wacker Drive, Suite 3175
> Chicago, IL 60606
> (p) 312-876-2679
> (f) 312-876-3854
>
>
> ...................................................................................................................................
> **From:** Scott State [mailto:scott.state@gmail.com]
> **Sent:** Tuesday, September 14, 2010 3:16 PM
> **To:** Hogan, Robert
> **Cc:** Simmons, Brian P.
>
> **Subject:** Re: Burt/LVI Board
>
> That is in 4.1 (a) (ii) I believe. In the Covenants section 5.1 (a) (v), I think it requires unanimous consent of
> the investors to remove him as Chairman of the Board. Am I missing something?

CONFIDENTIAL

On Tue, Sep 14, 2010 at 2:05 PM, Hogan, Robert <Rhogan@chsonline.com> wrote:

The current Investor Securities Agreement stipulates that Burt will be on the board so long as he is underlined employed by the Company.  If he is no longer employed by the Company, he may remain on the Board or someone else may be elected to take his place with the vote of two of the three major shareholders.

Robert Hogan
Principal
Code Hennessy & Simmons LLC
10 S. Wacker Drive, Suite 3175
Chicago, IL  60606
(p) 312-876-2679
(f)  312-876-3854

CONFIDENTIAL

# Exhibit 19

| | |
|---|---|
| **From:** | Scott State <scott.state@gmail.com> |
| **Sent:** | Sunday, September 19, 2010 8:48 PM |
| **To:** | Hogan, Robert <Rhogan@chsonline.com> |
| **Subject:** | Re: Offer |

Rob

I offer the following proposal for modified terms to the offer of employment:

**Salary / Bonus**

The salary of $400K is fine, bonus should be set with a 120% of plan threshold to achieve 100% bonus. I would like a simple set of objectives for 2010 tied to a "signing" bonus payable at year-end.

**Safety Incentive**

Concept is fine. Targets for 2011 need to be based on improvement from current performance. After 2011 the targets can be as stated in the original offer.

**Equity / Options**

I am not comfortable making an investment in the business at this point. In our discussion on Tuesday you had indicated that August performance appeared to be such that TTM EBITDA would bounce back towards $18MM. On Friday it seems that may have been revised down to a roughly $300K improvement in August 2010 vs. 2009 EBITDA. The August 2009 performance was about $840K so a $300K improvement on that would still be very low. I think the business continues to be under pressure and determination of FMV is difficult.

I would like to have a meaningful share of the upside created in the business. For me, that amounts to roughly 5% of the gain in value. We went over a concept that would provide a transaction bonus on sale that would reflect a drop in option strike price from the current value which is based on implied equity value. I think the approach is simple and meets my desire to have the ability to get my starting equity value to be reflective of what may be FMV at this point. I would like to make this simple and fair to all parties and would prefer to have just a typical option award mechanism as opposed to the multiple option / equity purchase provisions in the current offer.

**Other**

I believe that all other provisions of the offer are acceptable.

In addition to coming to terms on the financial parameters I would like to also get fully satisfied that the operational objectives of the business can be optimized. My view of LVI is that the business needs to be brought back to life and then some serious repositioning must take place. The old markets and ways of doing business will not put the Company where it needs to be a few years from now. We will need to make changes to the operating culture, find new markets, and develop a franchise that has attractive prospects if we are to exit this with a good outcome.

To be successful and move beyond what "has been" to what "can be" starts with leadership and a single vision. I have expressed my concern about having that singular focus and avoiding confusion within the team about who is in charge. I need to get to a meeting of the minds with Burt before making the leap on this opportunity. Burt has told me he plans to continue part-time with LVI pursuing opportunities in Dubai on over-water oil platform remediation. He is also actively pursuing hiring a CIO for the Company. These are two plans I would

LVIP 001802

not anticipate pursuing upon joining the team as being unrealistic and unnecessary respectively.  I would like Burt's commitment not to challenge those decisions if they are made as this would likely result in an immediate division in the management team.

In the best-case scenario Burt will decide to retire at some date certain from LVI upon a new CEO being named and offer to support the business under a consulting agreement in any way the new CEO sees fit.  Several members of the senior team have told me that Burt will never retire because he has no other interests and nothing else to do.  That is not a healthy situation for Burt or LVI.  If Burt wants to keep his oar in the water due to the additional $4MM owed under the working capital adjustment from the prior deal then it will complicate matters.

I am optimistic that this is a business that can be positioned for long-term success.  I am also willing to do the heavy lifting to achieve that goal.  However, I prefer to enter into this commitment with a clear vision of goals and leadership.  Upon agreement on the business terms of the offer I would like to have a meeting with Burt to establish our working relationship and then move to a conclusion.

I look forward to our upcoming discussion.

Best Regards,

Scott


On Fri, Sep 17, 2010 at 3:36 PM, Hogan, Robert <Rhogan@chsonline.com> wrote:
> Haven't gotten final August numbers, but they expect to beat last year's EBITDA by at least $300k.

Robert Hogan
Principal
Code Hennessy & Simmons LLC
10 S. Wacker Drive, Suite 3175
Chicago, IL  60606
(p) 312-876-2679
(f) 312-876-3854


**From:** Scott State [mailto:scott.state@gmail.com]
**Sent:** Friday, September 17, 2010 4:33 PM
**To:** Hogan, Robert
**Subject:** Re: Offer

Rob

Will get something off this weekend.

Have you received the August #'s yet?

Scott

On Fri, Sep 17, 2010 at 1:35 PM, Hogan, Robert <Rhogan@chsonline.com> wrote:
> Scott,
>
> I received your message.  I am confident we can come to an agreement on a compensation

CONFIDENTIAL

LVIP 001803

package for you that works for everyone and has you excited about leading LVI.

With that in mind, I think it will work best if you provide a specific counterproposal on the key topics.

We want to reach agreement with you as soon as possible.  If we have the proposal from you this weekend, we can get on the phone with you this weekend or early Monday and hammer out a solution.

We look forward to hearing from you.

Have a good weekend.

Rob

_____

Robert Hogan
Principal
Code Hennessy & Simmons LLC
10 S. Wacker Drive, Suite 3175
Chicago, IL  60606
(p) 312-876-2679
(f)  312-876-3854

CONFIDENTIAL

# Exhibit 20



**Contact:**
Burton T. Fried              Amy McGahan
LVI Services                 Dix & Eaton
203-222-0584                 216-241-3027
bfried@lviservices.com       amcgahan@dix-eaton.com

**FOR IMMEDIATE RELEASE**

### LVI SERVICES NAMES SCOTT E. STATE AS PRESIDENT AND CEO

*Experienced executive with environmental background to drive*
*continued growth in new markets and geographies*

NEW YORK – September 27, 2010 – LVI Services Inc., the nation's largest remediation and facility services firm with more than 25 offices across the country, announced today that Scott E. State, P.E., has joined the company as President and Chief Executive Officer, effective immediately. Burton T. Fried, who was serving as interim CEO since earlier this year, will return to his primary role as Chairman and will continue to play an active role in supporting the company's expansion into new services areas and geographies.

"Scott State has extensive experience in leading and growing environmental- and construction-oriented companies," Fried said. "As a professional engineer, Scott has outstanding technical skills as well as an executive management background with large, complex organizations. His experience in development and financial advisory projects for the military, nuclear and private industry will enable Scott to make a significant contribution to the profitable growth of LVI."

Brian P. Simmons, a Partner with the private equity firm Code Hennessy & Simmons LLC, which has a major investment in LVI, said, "Scott State is a valuable addition to the LVI executive team. His combination of technical skills and executive experience will provide an immediate and lasting impact on LVI's client service, growth and financial strength. Burt, Scott and the overall management team are well positioned to take this company to the next level of performance."

As a consultant since 2002, State, 47, has led several development and financial advisory projects with clients seeking to buy or sell major assets or to re-capitalize their businesses. Engagements have included a $120 million remediation of a 9,000-acre former military facility, technical program management consulting, and executive level support focused on cleaning up

CONFIDENTIAL

former nuclear weapons and nuclear power plant sites. He has successfully completed projects in the U.S., Europe, Asia and Australia.

"The opportunity to serve LVI as its new CEO is an assignment that I am very excited about," State said. "My relationship with LVI goes back more than a decade and I have had a close working relationship with Burt Fried. I look forward to continued success in the traditional markets the Company has pursued and expansion in both new service areas and geographies."

State served as Chairman and CEO of MACTEC, Inc., a leader in engineering, environmental and construction services worldwide with 80 locations, from 1996 to 2002, directing and leading annual revenue growth from $45 million to more than $500 million. During his tenure, State executed a leveraged buyout of MACTEC from the company's ESOP, completed a second re-capitalization as the firm expanded, and successfully integrated nine acquisitions.

State holds bachelor's and master's degrees in Nuclear Engineering and a master's degree in Engineering Management, and is a licensed Nuclear Engineer. He formerly held an NRC Reactor Operators license, DOE "Q" clearance, and DoD Top Secret clearance.

State, a native of Iowa, is operating out of LVI's Denver and New York offices.

**About LVI Services**
LVI Services Inc. is the United States' leading provider of a wide array of integrated facility services, including environmental remediation, demolition, fireproofing and related services for commercial, industrial, multi-family residential and governmental facilities. LVI focuses on projects involving asbestos, lead paint, mold, infection control, hazardous materials, fireproofing, emergency and disaster services, and demolition. Founded in 1986, LVI has more than 25 offices across the United States, is licensed in every state, and is experienced in responding to natural and manmade disasters around the world. The company's annual revenues exceed $250 million. For more information, visit www.lviservices.com.